**THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CONSOLIDATED INDUSTRIES, LLC** | ) | |
| **d/b/a WEATHER KING PORTABLE** | ) | |
| **BUILDINGS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 1:22-cv-01230-STA-jay** |
| **v.** | ) | |
| | ) | |
| **JESSE A. MAUPIN,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Before a single deposition has been taken in this case, Defendants have moved for summary judgment with respect to Plaintiff "Weather King's" misappropriation of trade secrets claims. Defendants take the extraordinary position that *not a single* item of information developed and utilized by Weather King to operate its business rises to the level of a protected trade secret as a matter of law. Because Weather King has presented ample evidence demonstrating a genuine dispute of material fact, Defendants' motion should be denied.

## BACKGROUND

Led by Defendant Jesse Maupin, the nine individual Defendants, while still employed by Weather King, conspired to form Defendant American Barn Co. and steal away Weather King's portable buildings operations in the Western United States. The circumstances of the Defendants' devious plan are set forth in detail in Weather King's Amended Complaint. *See* Doc. 26. Upon learning of Defendants' scheme, Weather King confronted Mr. Maupin on June 1, 2022, and immediately fired him, and the other Defendants resigned around the same time.

1

Weather King promptly inspected the computer devices and emails accounts the Defendants used while working for Weather King.  One laptop device had been factory reset, such that Weather King could not retrieve any data from the device.  Ex. 1, Coker Decl., ¶ 4.  The hard drive used by Defendant Barry Harrell appeared to have been crashed.  *Id.*  The hard drive on the computer used by Defendant Ryan Brown was completely removed from the computer.  *Id*

Much of the data on other Defendants' computers appeared to have been deleted.  However, an inspection of Mr. Maupin's Weather King email account revealed very troubling information.  For instance, Weather King discovered that, on March 4, 2022, Mr. Maupin covertly entered a Weather King owner's workstation, opened a sealed envelope with the officer's name on it, discovered that the envelope contained Weather King's profit & loss statement and balance sheet, took photographs of the information, emailed those pictures to himself, and then put the financial statements back in the envelope.  Redacted copies of the photographs are attached as Exhibits A and B to the Declaration of Jill Coker.  Ex. 1.  Although Mr. Maupin was not authorized to access those financial statements, *id.*, ¶¶ 6-7, he took the information to help launch Defendants' competing business enterprise.

During discovery and investigation, Weather King also learned that Defendants took other confidential information.  For instance, an examination of Defendant Stephanie Gillespie's work computer revealed that she deleted photographs of confidential information related to Weather King's raw materials and that she had been exporting Weather King's manufacturing data— apparently with the intent to establish their own software modeled after Weather King's software.  Ex. 1, Coker Decl., ¶¶ 6-7.

In March 2022, Mr. Maupin took proprietary information related to Weather King's lease arrangements and surreptitiously stole a lease relationship between Weather King and a property

owner in Arizona based on false representations that Weather King did not want the lease anymore. Ex. 4. A week before Defendants' departures, Defendant Ryan Brown sent to Mr. Maupin's personal email address a spreadsheet containing proprietary information concerning Weather King's western dealer and driver network. Coker Decl., Ex. F. Weather King also discovered that Defendants have taken engineering drawings Weather King used to manufacture its buildings in the western U.S. and used them for their competing business enterprise. *See* Doc. 26, Am. Compl., ¶¶ 59-63; Coker Decl., ¶ 20.

Weather King has pled nine causes of action against Defendants, including misappropriation of trade secrets claims under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.* ("DTSA") and the Tennessee Uniform Trade Secrets Act, T.C.A. §§ 47-25-1701, *et seq.* ("TUTSA"). Defendants have moved for summary judgment with respect to these two claims and further request that the Court dismiss Weather King's remaining claims for lack of subject matter jurisdiction. Their motion is supported by undated declarations of Defendants Maupin and Harrell that do not comply with 28 U.S.C. § 1746. Doc. 88-3; Doc. 88-5. Defendants' motion lacks merit and should be denied.

## OBJECTIONS TO RULE 56 EVIDENCE

Pursuant to Local Rule 56.1(e), Weather King objects to the following statements set forth in the Declarations of Jesse Maupin and Barry Harrell filed as Exhibits B and C to Defendants' motion for summary judgment:

### *Lack of Personal Knowledge*

1.      "None of the departing persons misappropriated any Weather King's [sic] trade secrets . . . or confidential information, or committed any other inappropriate actions." Doc. 88-3, Maupin Decl., ¶ 7; Doc. 88-5, Harrell Decl., ¶ 7.

3

2. "At Weather King the inventory counts are no secret; *every dealer knows their inventory on their sales lots and the lots of the other dealers*."  Maupin Decl., ¶ 44; Harrell Decl., ¶ 44 (emphasis added).

3. "Weather King's engineering drawings . . . are in the hands of thousands of individuals."  Maupin Decl., ¶ 50; Harrell Decl., ¶ 50.

Under Fed. R. Civ. P. 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out the facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").  As it relates to Statement No. 1, Mr. Maupin and Mr. Harrell may each only testify for himself, and they lack personal knowledge to claim that no other Defendants acted improperly.

The italicized testimony in Statement No. 2 should be stricken, because neither Mr. Maupin nor Mr. Harrell has personal knowledge about what "every dealer knows."  Similarly, neither of these witnesses has personal knowledge to support the assertion set forth in Statement No. 3, nor have they set forth any foundation for the assertion.

### *Legal Conclusions*

4. "An organized list of dealers does not in any case constitute a trade secret . . . ."  Maupin Decl., ¶ 45; Harrell Decl., ¶ 45.

5. "Weather King's profit and loss statements and balance sheets are not kept as trade secrets."  Maupin Decl., ¶ 48; Harrell Decl., ¶ 48.

6. "Weather King's engineering drawings are not trade secrets."  Maupin Decl., ¶ 50; Harrell Decl., ¶ 50.

"It is well settled in the Sixth Circuit that courts should disregard legal conclusions stated in affidavits." *Card-Monroe Corp. v. Tuftco Corp.*, No. 1:14-CV-292, 2015 WL 11109362, at *3 n.2 (E.D. Tenn. Feb. 19, 2015) (citing *Harrah's Entm't, Inc. v. Ace Am. Ins. Co.,* 100 Fed. Appx. 387, 394 (6th Cir. 2004)).  Thus, the Court should strike or ignore these legal conclusions.

## LEGAL ARGUMENT

To defeat Defendants' motion, Weather King merely needs to come forward with evidence that, when construed in the light most favorable to Weather King, creates a "genuine dispute as to any material fact." *Regions Bank v. Fletcher*, 67 F.4th 797, 802 (6th Cir. 2023); Fed. R. Civ. P. 56. If "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," the motion must be denied. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). A review of Weather King's response to Defendants' statement of purportedly undisputed facts demonstrates that Weather King has met its burden and that there are numerous disputes of fact.

As noted in Defendants' brief, although Weather King has brought claims under both the DTSA and the TUTSA, the analysis of the two Acts is essentially the same for purposes of Defendants' motion. *See* Doc. 88-1 at 6-7. Defendants also correctly note that Weather King bears the burden of proving: "(1) the existence of a trade secret; (2) misappropriation of a trade secret by the defendant; and (3) resulting detriment to the plaintiff." *ASC Engineered Solutions, LLC v. Island Indus., Inc.*, No. 2:20-cv-02284-JPM-CGC, 2021 WL 2583555, at *3-4 (W.D. Tenn. June 23, 2021).

Defendants' motion is predicated solely on Weather King's purported inability to establish the first element. To be clear, Defendants do not claim that Weather King lacks evidence to demonstrate that Defendants misappropriated alleged trade secrets or sustained damages, and thus, Weather King's filings do not address those elements.[1] Therefore, so long as Weather King presents evidence demonstrating at least a genuine issue of material fact concerning the existence

---

[1] Although Defendants' supporting declarations assert (albeit improperly through lack of personal knowledge) that no trade secrets were misappropriated; *see, e.g.,* Doc. 88-5, Harrell Decl., ¶ 7, these assertions are not included in Defendants' statement of undisputed facts or their brief. Thus, Weather King is not obligated to respond (but it certainly disputes these assertions).

of "*a* trade secret," *ASC Engineered Solutions,* 2021 WL 2583555, at *3 (emphasis added), Defendants' motion must be denied.

Defendants claim that there is no genuine dispute of material fact that Weather King failed to take reasonable measures to safeguard its information and that, even if it did, the pertinent information does not qualify as trade secrets as a matter of law. Both arguments lack merit.

**A.     Whether Weather King took "reasonable" measures to protect its trade secrets presents, at the very least, a question of fact for the jury.**

Both the DTSA and the TUTSA require a trade secret claimant to take "reasonable" precautions to maintain the information's secrecy. *See* 18 U.S.C. § 1839(3)(A) ("[T]he owner thereof has taken reasonable measures to keep such information secret"); T.C.A. § 47-25-1702(4)(B) (information must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy"). This is a low threshold. *See Hamilton-Ryker Group, LLC v. Keymon*, 2010 WL 323057, at *14 (Tenn. Ct. App. Jan 28, 2010) ("In contrast to the common law, for the information to be protectable under the Trade Secrets Act, the business need only show 'reasonable' efforts to maintain the secrecy of the information."); *Knox Trailer, Inc. v. Clark*, No. 3:20-cv-137, 2021 WL 2043188, at *7 (E.D. Tenn. May 21, 2021) (stressing that "absolute secrecy is not required" and that "the information need only be protected by secrecy measures that are 'reasonable under the circumstances'").

The law is very clear that what is "reasonable" is nearly always a fact question for the jury. In *Niemi v. NHK Spring Co., Ltd.*, 543 F.3d 294, 301 (6th Cir. 2008), the Court adopted findings by the Seventh Circuit in *Learning Curve Toys, Inc. v. Playwood Toys, Inc.*, 342 F.3d 714, 725 (7th Cir. 2003), that "[w]hether the measures taken by a trade secret owner are sufficient to satisfy the Act's reasonableness standard ordinarily is a ***question of fact for the jury***" and that "only in an ***extreme*** case can what is a 'reasonable' precaution be determined as a matter of law, because

the answer depends on a balancing of costs and benefits that will vary from case to case."
(Emphasis added).  Reversing the district court's award of summary judgment to the defendant,
the Sixth Circuit stated that "[t]he lesson is that, except where the evidentiary showing of
reasonable efforts could not conceivably support a judgment in favor of the plaintiff, the
reasonableness of the efforts is a question for the trier of fact."  543 F.3d at 303; *see also ASC
Engineered Solutions*, 2021 WL 2583555, at *3-4 (citing same and noting that "[t]he
reasonableness of [plaintiff's] actions or inactions with respect to protecting the confidentiality of
its trade secrets is a question for the jury" and that "it is the 'extreme case,' where the evidence of
reasonable efforts is so utterly lacking in substance as to warrant judgment as a matter of law");
*PGT Trucking, Inc. v. Jones*, No. 15-cv-1032, 2015 WL 4094265, at *2 (W.D. Tenn. July 7, 2015)
(citing *Niemi* and noting that "certain substantive elements, like reasonableness…, are so fact
bound that they should normally be reserved for the jury 'unless there is only one reasonable
determination possible'") (quoting *Snyder v. Kohl's Dep't Stores, Inc.*, 580 F. App'x 458, 461-62
(6th Cir. 2014)).

Defendants do not cite a single instance in a which a court determined at the summary
judgment stage that a trade secrets claimant failed to take reasonable precautions as a matter of
law.  There are many variables to consider when determining whether a trade secrets claimant has
taken reasonable precautions.  *See Shamrock Techs., Inc. v. Med. Sterilization, Inc.*, 808 F. Supp.
932, 937 (E.D.N.Y. 1992) (noting that "[s]ecrecy is a relative term" and that "'the entirety of the
circumstances surrounding the use of the secret'" must be considered") (quoting *K–2 Ski Co. v.
Head Ski Co.,* 506 F.2d 471, 474 (9th Cir.1974)); *Adler v. Loyd*, 496 F. Supp. 3d 269, 281 (D.D.C.
2020) ("A reasonable measure depends on the circumstances, not any bright-line rule.") (citing
*Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1112 (10th Cir. 2009)).  For instance, "[a]s part of the

7

reasonableness inquiry" it is appropriate to "consider[] the size and sophistication of the parties, as well as the relevant industry." *Learning Curve*, 342 F.3d at 726.

Here, Weather King is a small business operating from a small town—Paris, Tennessee. Leading up to the Defendants' departure, Weather King only had 20 employees working from its headquarters. Ex. 1, Coker Decl., ¶ 28. Further, the company has only been in existence for about 15 years. *Id.*, ¶ 27.

Defendants suggest that the measures Weather King took to safeguard its trade secrets were not reasonable as a matter of law because it did not do such things as implementing "rules or regulations requiring employees to stay at their original work stations," requiring "employee IDs, visitor IDs, or visitor escort procedures," implementing "sign-out/sign-in procedures for access to and return of the alleged trade secrets," or "requir[ing] the departing employee to sign a trade secret exit interview certification." Doc. 88-1 at 9-10. It is difficult to fathom that any employers in Henry County, Tennessee, have ever implemented any such measures, and there can be no doubt that ABCO does not employ any of those measures either. *See* Coker Decl., ¶29.

Weather King does, however, take measures to safeguard its proprietary information, and these measures were reasonable under the circumstances. For instance, Weather King:

- Keeps its office locked and protected by a security alarm system;

- Keeps its remote shops secured, including some with video surveillance;

- Requires each employee to have a unique user identification and password to log in to his or her computer;

- Isolates certain documents from others;

- Stores electronic data on a password-protected, firewall-protected server;

- Uses QuickBooks for its accounting software and restricts access to a limited number of employees;

8

- Restricts even those employees with access to QuickBooks such that they may only access certain categories of information within QuickBooks;

- Gives access to the financial statements to only four employees, none of whom are Defendants;

- Physically protects the server in a locked room and only grants access to three employees (none of which are Defendants) and the company's IT vendor;

- Shreds printed confidential information;

- Does not keep its tax returns in the office or on its computer system; and

- Restricts remote access to the server, such that no one has access to the server when out of the office unless permitted.

*See* Ex. 1, Coker Decl., ¶¶ 6, 9, 11, 13, 31-36.

In addition, Weather King demanded that each of the Defendants (following their departure) return all Weather King property, Doc. 1-7, and demanded that former Weather King dealers return or destroy all engineering drawings and other Weather King property. *Id.*, ¶ 24 & Ex. G thereto. Moreover, this lawsuit, in and of itself, demonstrates that Weather King takes the secrecy of its confidential information seriously. *See American Nat'l Prop. & Cas. Co. v. Campbell Ins., Inc.*, No. 3:08-cv-00604, 2011 WL 2550704, at *12 (M.D. Tenn. June 27, 2011) (litigation itself demonstrates that plaintiff takes measures to safeguard its trade secrets).

There certainly is, at least, a question of fact as to whether these safeguards were "reasonable under the circumstances." T.C.A. § 47-25-1702(4)(B); *see J.T. Shannon Lumber Co. v. Barrett*, No. 2:07-cv-2847, 2010 WL 3069818, at *4-5 (W.D. Tenn. Aug. 4, 2010) (recognizing issue of fact as to whether information qualified as a trade secret); *SKF USA Inc. v. Zarwasch-Weiss*, No. 1:10-cv-1548, 2011 WL 13362617, at *18-19 (N.D. Ohio Feb. 3, 2011) (concluding that claimant implemented reasonable safeguards even though "there were some questionable decisions in establishing security," such as having all computer users use the same password).

Indeed, courts have found that an employer is not bound to implement stringent requirements when the confidentiality of the information is self-evident. *See, e.g., A.H. Emery Co. v. Marcan Prods. Corp.*, 389 F.2d 11, 16–17 (2d Cir. 1968) (plaintiff did not need to have stringent requirements for protecting secrecy of "detailed manufacturing drawings" because the drawings' confidentiality would have been apparent to the experienced employees); *USM Corp. v. Marson Fastener Corp.*, 379 Mass. 90, 100, 393 N.E.2d 895, 901 (1979) ("It is not fatal that the blueprints and parts drawings were not labeled 'confidential' or 'secret' or that [plaintiff] had not expressly informed its employees that these parts drawings were considered secret").

In fact, Weather King has presented evidence directly contradicting the testimony of Defendants Maupin and Harrell. Both individuals, for instance, have represented under penalty of perjury that "[a]t Weather King, there is not a limited number of individuals having access to the alleged trade secrets," "there are no security levels on clearance," "no heightened protections are present," "access to the alleged trade secrets is not allowed only on a need-to-know basis," "there is not a limited number of individuals having access to the alleged trade secrets," "the alleged trade secrets are not segregated," and "there is no separation of components of trade secrets between or among departments and/or company personnel." Doc. 88-3, Maupin Decl., ¶¶ 23-31, Doc. 88-5, Harrell Decl., ¶¶ 23-31. As with other statements that Defendants have made in this litigation, these representations are flatly false. As explained by Weather King's Controller, Jill Coker, Weather King has placed multiple measures in place to restrict employees' access to certain information on a need-to-know basis. Ex. 1, Coker Decl., ¶¶ 6, 9, 11, 13, 33-34.

Indeed, the financial statements that Mr. Maupin stole are precisely that—information that was segregated such that only a limited number of people had access. *Id.*, ¶¶ 6-7. This information

was stored on QuickBooks—which was only accessible to four employees and only delivered to Weather King owners. *Id.*, ¶ 6.

> Referring to himself in the third-person, Mr. Maupin testifies:
>
> 48.    Weather King's profit and loss statements and balance sheets are not kept as trade secrets. For example, Mr. Maupin easily found them in a folder in an unoccupied cubicle, showing that Weather King does not treat them as trade secrets.

Doc. 88-3.   Mr. Maupin, however, conveniently neglects to mention that: (a) these financial statements were left in a cubicle used by Tim Boyd, one of Weather King's owners; (b) they were in an envelope **with Mr. Boyd's name on it**; and (c) the envelope was ***sealed***.   Coker Decl., ¶ 7.[2]

Was it reasonable for Weather King to assume that one of its long-serving management employees could be trusted not to walk into a cubicle he did not use, take a sealed envelope addressed to someone other than himself, unseal the envelope, and then take photographs of the sensitive financial information contained therein?   At the very least, that is a question for the jury.[3]

In *Hickory Specialties, Inc. v. B&L Labs., Inc.*, 592 S.W.2d 583, 587 (Tenn. Ct. App. 1979), the manufacturers of a liquid smoke product alleged that a former employee stole trade secrets relating to the product's manufacturing process.   Claiming that the plaintiffs did not adequate safeguard the secrecy of the information, the defendants offered similar testimony that the plaintiff did not instruct all of its employees about secrecy, that its gates were unguarded, and "the employees do not wear badges or carry identification cards."   *Id.*   The plaintiffs responded that their plant was surrounded by a fence, the gate was locked every night, and signs were posted indicating that only authorized personnel were allowed.   *Id.*   The court found these precautions to be reasonable as a matter of law.   *Id.*   According to the court, "plaintiffs took some steps to keep

---

[2] Ms. Coker only left them in the cubicle on one occasion and only because she had to leave the office early and knew Mr. Boyd would be there the following day. *Id.*

[3] In fact, Weather King submits that the Court may find as a matter of law that Weather King took reasonable measures to safeguard the secrecy of those documents.

its operations confidential," and that "[w]hile absolute secrecy is not required, there must be a substantial element of secrecy so that a third person would have difficulty in acquiring the necessary information for manufacturing the product without resorting to the use of improper means of acquiring the secret." *Id.*

Here, as in *Hickory Specialties*, it was difficult for Mr. Maupin (or any other Weather King employee) to obtain access to the financial statements, and the only way he obtained access was through improper means—removing information from a sealed envelope addressed to a Weather King owner. The essence of Defendants' defense is: "We're not thieves because you made it too easy for us to steal from you."

**B.    Weather King has identified legally protectable trade secrets.**

Defendants alternatively argue that "none of the alleged trade secrets qualify as actual trade secrets." Doc. 88-1 at 11. In determining whether information qualifies as a trade secret, Tennessee courts consider the following factors:

> (1) the extent to which the information is known outside of the business;
> (2) the extent to which it is known by employees and others involved in the business;
> (3) the extent of measures taken by the business to guard the secrecy of the information;
> (4) the value of the information to the business and to its competitors;
> (5) the amount of money or effort expended by the business in developing the information;
> (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Venture Express, Inc. v. Zilly,* 973 S.W.2d 602, 606 (Tenn. Ct. App. 1998).

"Confidential or trade secrets status may be established by affidavit." *Universal Del., Inc. v. Comdata Network, Inc.*, 3:10-mc-00104, 2011 WL 1085180, at *4 (M.D. Tenn. Mar. 21, 2011). Weather King has proffered a declaration of one of its officers, Jill Coker, to demonstrate the trade

secrets status of the information at issue.  *See* Ex. 1.  Her declaration addresses in detail the factors

set forth in *Zilly*.  *See id.*

Defendants focus on arguing that certain aspects of information that Weather King claims

to be secret are known or are accessible outside of Weather King.  It is well settled, however, that

the ***aggregation*** of information—even if information is publicly available—may rise to the level

of trade secret protection.  Thus, as noted by the Tennessee Court of Appeals:

> [E]ven if individual pieces of information may be publicly known, the integration
> of the information into a unified process may be confidential or a trade secret:
>
> > "The fact that some or all of the components of the trade secret are
> > well-known does not preclude protection for a secret combination,
> > compilation, or integration of the individual elements." Restatement
> > of the Law 3d, Unfair Competition (1995), § 39(f), p. 432.  Hence
> > courts have recognized that "a trade secret can exist in a combination
> > of characteristics and components, each of which, by itself, is in the
> > public domain, but the unified process, design and operation of
> > which in unique combination, affords a competitive advantage and
> > is a protectible secret."
>
> *Essex Group,* 501 S.E.2d at 503 (quoting *Water Services, Inc. v. Tesco Chemicals,
> Inc.,* 410 F.2d 163, 173 (5th Cir. 1969)).  Thus, even if portions of the information
> used are in the public domain, the integration of the information into a process not
> commonly known may be protectible.

*Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 589 (Tenn. Ct. App. 2001)

In *Hamilton-Ryker Group, LLC v. Keymon,* 2010 WL 323057, at *4-7 (Tenn. Ct. App. Jan

28, 2010), the plaintiff brought a trade secrets action against a former employee who took many

of her employer's documents relating to its service for a customer—such as a production schedule,

a profit-loss analysis, address listings, and invoices—and used them to offer competing services

for the same customer.  The plaintiff argued that none of the documents she took were trade secrets

because "she could have easily obtained the same information directly from" the customer and

much of the information "constituted general knowledge that was well known or easily ascertainable." *Id.* at *15.

Affirming the trial court's finding that the information qualified as trade secrets, the Tennessee Court of Appeals found:

> Regardless of whether [defendant] could have acquired the [information] directly from [the customer], the aggregate of the information that Keymon emailed to herself may be considered a trade secret. Even if [defendant] could have obtained "individual pieces of information" by other means, the **integration and aggregation of it may be deemed confidential or a trade secret**. *See Grisoni,* 135 S.W.3d at 589 (quoting *Essex Group, Inc. v. Southwire Co.* 269 Ga. 553, 501 S.E.2d 501, 503 (Ga.1998)). Moreover, even if the information could have been developed by independent means, "it may be protectible **if the former employee does not develop it by independent [means]** but in fact obtains his knowledge ... from his former employer and then uses this knowledge to compete with the former employer." *Id.*

2010 WL 323057, at *15 (emphasis added).

The court also noted that "the speed with which [defendant] utilized this information to begin competing directly with [plaintiff]-a mere six days elapsed between the acquisition of the information and the commencement of billable work by [defendant]-demonstrates its independent economic value." *Id.*; *see also American Nat'l Prop. & Cas. Co. v. Campbell Ins., Inc.*, No. 3:08-cv-00604, 2011 WL 2550704, at *10 (M.D. Tenn. June 27, 2011) (quoting same and noting that the economic value of the taken documents "is demonstrated by the mere fact that [defendant] sought copies of the [documents] and successfully used the information contained therein to"); *Fidelity Brokerage Serv. LLC v. Clemens*, No. 2:13-cv-239, 2013 WL 5936671, at *9 (E.D. Tenn. Nov. 4, 2013) ("[T]he speed with which [defendant] utilized this information to begin competing with [plaintiff] demonstrates its independent economic value"); *Knox Trailers*, 2021 WL 2043188, at *7 (evidence that the defendants "took the information in an effort to save time and money . . . is evidence of its value to Defendants").

14

Here, regardless of whether certain aspects of the information at issue was accessible outside of Weather King, the integration of the information rendered it protectable. The information was not easily duplicated and, as in *Hamilton-Ryker*, the speed by which Defendants were immediately competing with Weather King after June 1 demonstrates its economic value. *See* Ex. 2 (noting on June 9, 2022 that "sales are coming in quickly every day"). If, as Defendants suggest, the information was of no value to them, why did they steal it?

Each of the categories of information referenced by Defendants is addressed below.

### 1. *Inventory Counts by Location*

One document that Mr. Maupin emailed to himself is a document showing Weather King's finished building inventory count organized by state, and it appears that Defendant Gillespie took raw material inventory information. *See* Coker Decl., ¶¶ 5.c, 16. As explained in Ms. Coker's declaration, this information is valuable to Weather King. *Id.*, ¶¶ 9-10, 16.

Defendants claim that this information is not secret on the basis of testimony from Mr. Maupin and Mr. Harrell that "every dealer knows their inventory on their sales lots and the lots of the other dealers." Doc. 88-3, Maupin Decl., ¶ 44; Doc. 8-4, Harrell Decl., ¶ 44. The assertion that every dealer knows the inventory on lots owned by *other* dealers—made under penalty of perjury—is absurd on its face.[4] First, as set forth above, the testimony should be stricken, because neither Mr. Maupin nor Mr. Harrell have personal knowledge about what "every dealer knows." *Id.*; *see* Tenn. R. Civ. P. 56(c)(4). Second, the unfounded testimony is false. Weather King does not share its inventory counts among its dealers. Ex. 1, Coker Decl., ¶ 9. Defendants do not explain how a dealer in Colorado, for example, would have any way of knowing (or caring) what

---

[4] Weather King transports portable buildings to independent dealers who, in turn, sell the buildings directly to the end user/customer.

15

inventory was on the lot of another Weather King dealer—particularly in another state such as Arizona or Florida.

Defendants also argue that "every person, and not a limited number of persons, in the Weather King headquarters has and uses the inventory counts to turn in requisitions to get inventory built for their dealers." Doc. 88-1. Defendants cite no authority to support the notion that information is not protectable as a trade secret merely because it is known to the main-office employees of a small business. The key questions are whether the information is valuable and if the claimant could be harmed if the information is used by a competitor. Weather King's proof demonstrates at least a genuine issue of material fact. Coker Decl., ¶¶ 9-10.

### 2. Organized Dealer/Driver Contact Information

On May 24, 2022—merely a week before Defendants' departure from Weather King— Defendant Ryan Brown surreptitiously sent an email to Mr. Maupin's personal email address that included a spreadsheet reflecting a "Driver Dealer List" for Weather King's Western United States operations. *See* Coker Decl., Ex. F.[5] The list includes the identity and contact information for each independent contractor driver that Weather King retained in the West, followed by a listing (with contact information) for each Weather King dealer that each respective driver serviced.[6] *Id.* The document was valuable to Weather King because it compiled and integrated all of the pertinent information into one easy-to-view spreadsheet. Coker Decl., ¶¶ 18-19.

Defendants argue that the document is not a trade secret because "dealers [sic] contact information is on Weather King's website and is not a secret." Doc. 88-1 at 11. Defendants, however, ignore that it is not the *dealer* information that Weather King claims to be protected.

---

[5] Weather King has not filed this document under seal because it is no longer valuable to Weather King after Defendants stole its western operations.

[6] Drivers are important in the portable buildings industry. They are responsible for hauling finished buildings to dealer lots and to purchasers' property, where the driver installs the building.

Instead, it is the *driver* listing and contact information as organized by dealer.  Coker Decl., ¶ 19. Further, Defendants' contention that "an assembly of publicly available information that has been organized" is not protectable, Doc. 88-1 at 11, is not supported by citation to any legal authority, and in fact, is refuted by well-established law that, "even if individual pieces of information may be publicly known, the integration of the information into a unified process may be confidential or a trade secret."  *Wright Med.*, 135 S.W.3d at 589; *see also James R. Oswald Co. v. Stratos Wealth Partners, Ltd.*, No. 1:18-cv-2114, 2020 WL 13454004, at *7-9 (N.D. Ohio Sept. 30, 2020) (finding a factual dispute about whether a client list was a trade secret notwithstanding defendant's argument that information on the list was publicly available).

### 3.   *Vendor Information & Pricing*

Weather King also possesses important proprietary information revealing the vendors from whom it purchases raw materials, the types and amounts of materials purchased, the inventory, and the pricing for those materials. Ex. 1, Coker Decl, ¶ 25.  Defendants claim that this information is publicly available and can be obtained from the vendors.  *See* Doc. 88-1 at 11.  Defendants, however, ignore that the pricing that vendors advertise is different than the special pricing that Weather King was able to negotiate.  Coker Decl., ¶ 26.  Prices vendors charge Weather King are not publicly available.  *Id.*

The information specific to Weather King's business and needs is not publicly available. *Id.*  Regardless, "even if portions of the information used are in the public domain, the integration of the information" renders it protectable.  *Wright Med.*, 135 S.W.3d at 589.

### 4.   *Cost Estimates & Related Information*

Over the course of many years, Weather King has also developed and compiled critical information that estimate its costs to manufacture each of its buildings and an estimated profit

margin.  *See* Coker Decl., ¶¶ 14-15 & Ex. D thereto.  Weather King has reason to believe that Defendants have misappropriated this information.  Further, Ms. Gillespie's hard drive contained an export of many, if not all, data components of Weather King's manufacturing software, NumberCruncher.  Coker Decl., ¶17. There were around 100 pages of manufacturing data such as item numbers, type of building, part type, item description, price, and cost. Like the cost estimates, this data took years and enormous effort to compile, and was used on a daily basis to operate and monitor Weather King's building construction process. Having this data exported to just a few documents, which Ms. Gillespie was not authorized to do, allowed the Defendants to quickly replicate Weather King's software infrastructure. *Id.*

Defendants argue that this information is somehow not protectable because it was "available for every Weather King employee to see."  Doc. 88-1 at 11.  Again, Defendants cite no authority to support the notion that a business's information is not a trade secret merely because its employees have access to it.  Further, even if certain of the information is shared with dealers or customers, the aggregation of the information renders it protectable.

Finally, Defendants argue that the cost estimates lack value "because they are consistently varying."  Doc. 88-1 at 11.  Weather King disputes this.  Coker Decl., ¶ 14.  Nevertheless, the information certainly has at least short term value, and the fact that ABCO was operating and competing immediately after Defendants' departure evidences its value.  *See Hamilton-Ryker*, 2010 WL 323057, at *15 ("[T]he speed with which [defendant] utilized this information to begin competing directly with [plaintiff]-a mere six days elapsed between the acquisition of the information and the commencement of billable work by [defendant]-demonstrates its independent economic value.").

### 5.    *Financial Information*

In a strained argument, Defendants claim that the balance sheets and profit and loss statements that Mr. Maupin stole from a sealed envelope addressed to a Weather King owner are somehow not trade secrets.  Weather King's financial statements are very valuable to the company. Ex. 1, Coker Decl., ¶ 8.  They reveal how the company has performed, reflect its assets and liabilities, and help its owners posture the company for sustainability and growth.  *Id.*  As with any other company, Weather King does not want this information to be in the hands of competitors, who could use it to their advantage.  *Id.*  Nor does it want the information in the hands of a *potential* competitor (such as Defendants), who could use the information to obtain funding and establish a competing business.  *Id.*

Other than arguing that Weather King did not employ reasonable security measures, Defendants make no attempt to argue that the balance sheets do not qualify as trade secrets.  *See* Doc. 88-1 at 11-12.  Defendants' only attempt to argue that the profit and loss statements stolen by Mr. Maupin are not trade secrets is the following meager statement: "P+L statements are backwards-looking and derive no independent economic value, as all they show is past performance of the company."  *Id.* at 12.  This assertion is flawed for many reasons.

Perhaps most glaringly, Defendants cannot reconcile this assertion with the position they, themselves, have taken in this litigation.  During discovery, Defendants produced ABCO's profit and loss statements and stamped them "CONFIDENTIAL" in accordance with the Court's Agreed Protective Order.  *See* Ex. 3; Doc. 66.  Apparently, Defendants would lead the Court to believe that *their* backwards-looking profit and loss statements are trade secrets while *Weather King's* profit and loss statements somehow are not.  *Compare TPC Mgmt. Co. v. Stewart*, No. 3:15-cv-1011, 2016 WL 11888062, at *4 (M.D. Tenn. Jan. 7, 2016) (noting that defendant's claim that a

document was not confidential was refuted by defendant's designation of a similar document as "confidential" under the parties' protective order).

In any event, the notion that a company's financial information is not confidential because it is "backwards-looking" is illogical. Just because a document reflects data from the past does not mean that it lacks economic value or that it would not be useful to a competitor or potential competitor. Defendants cite no legal authority in support of their novel position, and in fact, other courts have routinely found that such documents are trade secrets. For instance, in *Kendall v. Arbor Place of Puryear, Inc.*, No. 07-cv-1058 (T/An), 2007 WL 9706502, at *2 (W.D. Tenn. Dec. 5, 2007), then-Magistrate Judge Anderson found that "Defendant's balance sheet, statement of profit and loss, statement of retained earnings and shareholder distributions, and tax returns ***for the last three years*** are confidential." (Emphasis added).

Many other courts have routinely found that similar financial information qualifies as protectable trade secrets. For example, in *In re: Integrated Health Serv., Inc.*, 258 B.R. 96, 103 (D. Del. 2000), the court applied Tennessee trade secrets law and had no difficulty finding that "the Debtors' financial information and customer lists are confidential trade secrets" under the *Zilly* six-factor test. According to the court:

> The Debtors' financial information is clearly not known outside the business. While the costs of certain products and the amount of reimbursable costs may be ascertainable, the Debtors' fixed costs and profitability are not widely known or public knowledge. Additionally, there is no evidence that any of the Debtors' rank-and-file employees had knowledge about the Debtors' financial information. That information clearly has value, both to the Debtors, and to their competitors. Accordingly, we conclude that the Debtors' financial information is confidential.

*Id.* at 103-04; *see also Chromalox, Inc. v. Georgia Oven*, No. 3:06-cv-0546, 2007 WL 221834, at *5 (M.D. Tenn. Jan. 25, 2007) (quoting same); *American Furukawa, Inc. v. Hossain*, No. 14-13633, 2017 WL 4324945, at *4-5 (E.D. Mich. Sept. 29, 2017) (finding that a "profit and loss

statement, balance sheet," and other financial information were "protectable trade secret[s]"); *HCTec Partners, LLC v. Crawford*, 2022 WL 554288, at \*4, \*12 (Tenn. Ct. App. Feb. 24, 2022), *appeal dismissed* (June 20, 2022) (finding similar information to be confidential); *Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1118 (Fed. Cir. 1996) (balance sheets and other financial statements deemed trade secrets).

Weather King has more than met its burden of presenting evidence that a reasonable fact finder could determine that its financial statements are protectable trade secrets.

### 6.   *Sales Lot Lease Information*

Weather King rents property from third-parties to be used as sales lots for its portable buildings.  It retains information relating to those arrangements, including the lease documents and other information showing the lessors, location, rent amount, and other terms and conditions.  Ex. 1, Coker Decl., ¶ 11.  Although Defendants argue that this information "derives no independent economic value," Doc. 88-1 at 12, Weather King has refuted this assertion.  *Id.*

Defendants have misappropriated this information for their own benefit.  For instance, Weather King formerly leased property in Globe, Arizona, from James and Sharon Kowalzyk that it used as a sales lot, and, as Mr. Maupin was aware, the lease was set to expire on May 31, 2022. Ex. 4.  On March 24, 2022—two months before his departure from Weather King—Mr. Maupin sent an email to Mr. Kowalzyk, stating:

> Good afternoon Mr. Jim I hope all is well your way. I know the lease is up May 31st and ***Weather King isn't really wanting to lease lots anymore*** but I do good sales there and you and I go way back. Would it be possible for me to lease the property so I can keep my sales lot open and continue to sell there??

*Id.* (emphasis added).

Mr. Maupin's statement that Weather King was no longer interested in leasing the Kowalzyks' property was a lie, and through Mr. Maupin's deception, Defendants ended up stealing

21

Weather King's lease of that property.  Thus, the lease information plainly has economic value because Defendants were able to capitalize off the information and use the property for their own competitive benefit.

Defendants do not claim that this or other Weather King information is publicly available. Instead, they argue that the information is not a trade secret because "every lot that Weather King leases is reclaimed out of the dealer's commission each month, and this is shown on the dealers settle sheet each month, which all employees have access to."  Doc. 88-1 at 12.  The referenced "dealers settle sheet," however, does not include all of the pertinent terms of the lease, only the rent that gets passed on to the dealer and deducted from his or her commission.  Ex. 1, Coker Decl., ¶ 13.  This information is not shared among all dealers; a given dealer only knows his or her lot rent amount, not every dealer's. *Id.*  Moreover, the lease information is not shared within Weather King. It is not stored on the server but are kept in the Controller's office. *Id.*, ¶11.

### 7.    *Engineering Drawings*

As discussed, Defendants took drawings Weather King paid an engineer tens of thousands of dollars to prepare and used them for their competing business enterprise.  *See* Coker Decl., ¶ 20.  These drawings have independent economic value because they are necessary to ensure that the buildings are manufactured in conformance with the specifications and because many state and local governmental authorities require approved drawings from a licensed engineer. *Id.*

"[I]t is well settled that detailed manufacturing drawings . . . are prima facie trade secrets." *Source Prod. & Equip. Co. v. Schehr*, 2019 WL 4752058, at *7 (E.D. La. Sept. 30, 2019) (quoting *A.H. Emery Co. v. Marcan Prods.*, 389 F.2d 11, 16 (2d Cir. 1968)); *see also Envirotech Corp. v. Callahan*, 872 P.2d 487, 495 (Utah Ct. App. 1994) ("[T]he trial court properly concluded that all '[plaintiff's] detail drawings in their entirety are the secret and confidential property of

[plaintiff].'"  Thus, in *Steede v. General Motors LLC*, No. 2:11-cv-02351-STA-DKV, 2012 WL 12358928, at *2 (W.D. Tenn. Apr. 11, 2012), Magistrate Judge Vescovo found that the defendant's engineering drawings were protectable because "engineering information about the vehicle is still valuable" and "the design and engineering information has economic value" to the defendant.

According to Defendants, the drawings are not trade secrets because they supposedly are publicly available on a website operated by the State of Florida.  *See* Doc. 88-1 at 12.  Unlike other states, Florida law is unique insofar as the state posts all approved drawings on a website.  Coker Decl., ¶¶ 21-22.

Defendants, however, ignore that the drawings at issue used in the western U.S. operations are materially *distinct* from the drawings Weather King uses in Florida and that are posted on the Florida website.  *Id.*  As explained in detail in Ms. Coker's declaration, portable buildings are manufactured consistent with respective state regulations.  *Id.*  Thus, whereas Florida's regulations are targeted to ensure that the buildings withstand wind/hurricane damage, regulations in a state such as Colorado are targeted to ensure that the buildings can withstand snow and other conditions specific to that state.  In short, the drawings available on the Florida website (which Weather King does not allege were misappropriated) are virtually useless for anyone outside of the State of Florida.  *Id.*

Defendants also argue that the drawings are not trade secrets because they are possessed by dealers and customers.  Customers, however, do not possess an entire compilation of all of Weather King's drawings, but instead, only the drawings specific to the particular unit that they purchased.  *Id.*, ¶ 23; *see Knox Trailer, Inc. v. Clark*, No. 3:20-cv-137, 2021 WL 2043188, at *7 (E.D. Tenn. May 21, 2021) (finding that, even though pieces of data were publicly available, "the entire collection of data is not publicly available").  Similarly, dealers do not possess all of Weather

King's drawings, but instead, only those drawings applicable to the units sold in their respective state.  Coker Decl., ¶ 23.  In any event, Weather King demanded that those dealers no longer retain its drawings once their relationship with Weather King ended.  *Id.*, ¶ 24; Ex. G thereto.

**C.      In the alternative, additional time is warranted to ascertain during discovery what other trade secrets Defendants have accessed and misappropriated.**

Under Fed. R. Civ. P. 56(d), a court may defer consideration of a motion for summary judgment if the proof is not sufficiently developed.  Defendants filed their motion before a single deposition has been taken.  Weather King has delayed deposing Defendants because they have not produced responsive documents and Weather King has requested that the Court compel Defendants to produce their cell phones and other computer devices for a forensic examination—important information that is needed before depositions may take place.  *See* Doc. 73.

Quite simply, Weather King does not know the extent of the types of trade secrets that Defendants may have misappropriated, and one may only speculate about what the forensic examination and other discovery—including subpoenas to third parties that Defendants also obstructed (see Doc. 96)—will unearth.   The fact that Defendants appear to have deleted information from their work computers (and also removed a hard drive) also raises inferences. Ex. 1, Coker Decl., ¶ 4; *Rezult Group, Inc. v. Turkheimer*, No. 3:22-cv-00567, 2023 WL 1975239, at *9 (M.D. Tenn. Feb. 13, 2023) (finding that "the allegation that [defendant] deleted data from his laptop does give rise to a reasonable inference that he did so in order to 'cover his tracks' and, more specifically to hide from [plaintiff] what confidential information belonging to [plaintiff] he sent himself from [plaintiff's] laptop before he left the company," and thus, "[i]t does not take a large leap of the imagination to infer from the fact that he allegedly wiped his computer before going to work for a direct competitor that he first forwarded confidential documents to himself, thus taking confidential information to which he was not entitled").

Thus, if the Court concludes that *at present* Weather King has not offered sufficient evidence that the documents taken by Defendants were protected trade secrets, the Court should delay consideration of Defendants' motion until after the close of discovery.

**D.      In the alternative, the Court should retain jurisdiction.**

Finally, even if Defendants had somehow met their burden of demonstrating that Weather King's trade secrets claims should be dismissed, the Court can and should exercise its discretion to retain supplemental jurisdiction over the state law claims given the complexity and advancement of this action. *See Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012) ("[S]upplemental jurisdiction does not disappear when the federal claim that gave rise to original jurisdiction in the first place is dismissed"); *Vittetoe v. Blount County*, No. 3:17-CV-397-HBG, 2020 WL 5038790, *10 (noting that judicial economy, convenience, fairness, and comity may support retention of state law claims).

## CONCLUSION

Mr. Maupin's theft of Weather King's financial statements—in and of itself—is sufficient to defeat Defendants' motion for summary judgment. Nevertheless, Weather King has presented ample evidence that meets its burden of demonstrating a genuine issue of material fact concerning whether other categories of information are protectable trade secrets. Accordingly, Defendants' motion for summary judgment should be denied and this Court should retain jurisdiction over Weather King's claims.[7]

---

[7] The Court should also deny Defendants' alternative request to "rule that certain of Weather King's alleged trade secrets are not actually trade secrets." Doc. 88-1 at 12-13. Even if Defendants were able to meet their burden of proof with respect to certain categories of information (which they have not), such an issue is better addressed in conjunction with a motion in limine after discovery has concluded.

Respectfully submitted,

BUTLER SNOW LLP

*/s/ John Dollarhide*
David L. Johnson, BPR #18732
John H. Dollarhide, BPR #40041
150 3rd Avenue South, Suite 1600
Nashville, TN 37201
(615) 651-6700
david.johnson@butlersnow.com
john.dollarhide@butlersnow.com

Daniel W. Van Horn, BPR #18940
6075 Poplar Ave., Suite 500
Memphis, TN 38119
(901) 680-7200
Danny.VanHorn@butlersnow.com

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2023, I filed the foregoing with the Court using the ECF system, which will provide notice and a copy to counsel of record:

Thomas G. Pasternak
AKERMAN LLP
71 South Wacker Drive, 47th Floor
Chicago, IL 60606
thomas.pasternak@akerman.com
Attorneys for Defendants

*/s/  John Dollarhide*
John Dollarhide

80393065.v1

26