IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

| | |
|---|---|
| CONSOLIDATED INDUSTRIES, LLC<br>d/b/a/ WEATHER KING PORTABLE<br>BUILDINGS, <br><br>    Plaintiff,<br><br>v.<br><br>JESSE A. MAUPIN, BARRY D.<br>HARRELL, ADRIAN S. HARROD,<br>LOGAN C. FAGIN, STEPHANIE L.<br>GILLESPIE, RYAN E. BROWN, DANIEL<br>J. HERSHBERGER, BRIAN L. LASSEN,<br>ALEYNA LASSEN, and AMERICAN<br>BARN CO., LLC,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)  **Civil action no. 1:22-cv-01230-STA-jay**<br>)<br>)  **Chief Judge S. Thomas Anderson**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

RECEIVED NOV 13 2024
Wendy R Oliver, Clerk
U.S. District Court
W.D. OF TN, Jackson

## MOTION FOR RECONSIDERATION AGAINST THE "AGREED" ORDER GRANTING MOTION TO COMPEL FORENSIC EXAMINATION AND MOTION TO DENY CONTEMPT AGAINST MR. AND MRS. LASSEN

Comes now the defendants Brian L. Lassen and Aleyna Lassen to respectively ask for reconsideration by Chief Judge S. Thomas Anderson, in granting the motion to Compel Forensic Examination of their personal cell phones, computers, cloud data, tablets, thumb drives and any other portable electronic or storage devices (collectively "Devices"), and deny the associated Motion for Contempt. The defendants only got notice in the last week that their attorneys were negligent in not opposing this critical motion, and now realize that Judge Anderson had no choice but to grant the motion. Their counsel also turned over private email correspondence to the opposition attorneys, now being quoted against them in the Motion for Contempt.

1

Mr. and Mrs. Lassen strongly disagree with this decision by their attorneys that this was unopposed, and have now asked to be vacated from their representation. Mr. And Mrs. Lassen are seeking new counsel.

Mr. And Mrs. Lassen told the attorneys that they objected to this request by opposing counsel many months ago. They were told that being a civil action, they had no 1st, 4th, or 5th amendment rights. They feel that is felonious information, and their so-called attorneys have not worked in their best interests. Please see the following cases in regards to the falsity they were being told:

## THE CIVIL PROCEEDING

The rule that a party or a witness can plead the right against self-incrimination in civil proceedings has been well established by an abundance of authority. In Lefkowitz v. Turley, 414 U.S. 70, 77, 94 S.Ct. 316 (1973), the U.S. Supreme Court stated this rule as follows:

"The Amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future proceedings."

The subsequent decisions of Maness v. Meyers, 419 U.S. 449, 95 S.Ct. 584 (1975), and Pillsbury Company v. Conboy, 459 U.S. 248, 103 S.Ct. 608 (1983), serve only to buttress this basic principle and apply it to specific situations. This rule is followed by the federal appellate courts. See In re Kave, 760 F.2d 343 (1st Cir. 1985); National Life Ins. Co. v. Hartford Accident & Indemnity Co., 615 F.2d 595 (3rd Cir. 1980); Wehling v. Columbia Broadcasting System, 608 F.2d 1084 (5th Cir. 1979); In Re Corrugated Container Anti-Trust Litigation, 620 F.2d 1086 (5th Cir. 1980); In re Morganroth, 718 F.2d 161 (6th Cir. 1983); and United States v. Jones, 703 F.2d 473 (10th Cir. 1983).

Decisions on this point by various state courts reveal that this rule is not a modern one. In Morris v. McClellan, 154 Ala. 639, 45 So. 641, 645 (1908), that Alabama court acknowledged that a party in a civil case could claim the right against self-incrimination. In International Brotherhood of Teamsters v. Hatas, 287 Ala. 344, 252 So.2d 7, 21 (1971), the court held:

"The privilege against self- incrimination afforded by section 6 of the 1901 Constitution of Alabama has been held available to a party in a civil action."
Similar decisions have been made by courts in other States in the Union. In State ex rel. Hudson v. Webber, 600 S.W.2d 691, 692 (Mo. App. 1980), a judgment debtor pleaded his right against self-incrimination in answer to questions posed to him regarding his financial affairs, his fear of incrimination being related to federal taxes. The court sanctioned the answers of this party:
"This privilege is available to a judgment debtor in proceedings pursuant to sections 513.380-513.390, RSMO 1978."

The great weight of other State authorities holds that the right clearly applies in civil cases. See Carson v. Jackson, 466 So.2d 1188 (Fla.App. 1985); Lewis v. First American Bank of Palm Beach, 405 So.2d 300 (Fla.App. 1981); Travis Meat & Seafood Co. v. Ashworth, 127 Ga. App. 284, 193 S.E.2d 166 (1972); In re Zisook, 88 Ill.2d 321, 430 N.E.2d 1037 (1982); Martincich v. City of Hammond, 419 N.E.2d 240 (Ind. App. 1981); Whippany Paper Board Co. v. Alfano, 176 N.J.S. 363, 423 A.2d 648 (1980); Banca v. Town of Phillipsburg, 181 N.J.S. 109, 436 A.2d 944 (1981); People ex rel. Anonymous v. Saribeyoglu, 131 Misc. 2d 647, 501 N.Y.S.2d 286 (1986); Byrd v. Hodges, 44 N.C.App. 509, 261 S.E.2d 269 (1980); Ohio Civil Rights Commission v. Parklawn Manor, Inc., 41 Ohio St.2d 47, 322 N.E.2d 642 (1975); Rey v. Means, 575 P.2d 116 (Okl. 1978); Caloric Corp. v. Unemployment Compensation Board of Review, 452 A.2d 907 (Pa. Comwlth. 1982); Ex Parte Stringer, 546 S.W.2d 837 (Tex.App. 1985); Smith v. White, 695 S.W.2d 295 (Tex.App. 1985); Affleck v. Third Judicial District Court of Salt Lake County, 655 P.2d 665 (Utah 1982); Eastham v. Arndt, 28 Wash. App. 524, 624 P.2d 1159 (1981); and In re Grant, 83 Wis.2d 77, 264 N.W.2d 587 (1978).
END NOTES:

[1] Pursuant to the 1982 TEFRA, summonses may now be issued solely for a criminal investigation, thus these decisions no longer have any effect.

[2] The statutory provisions regarding immunity grants are found in 18 U.S.C. §§ 6001, et seq.

Mr. And Mrs. Lassen did turn over the password to the email account for the Willcox plant. What they were telling their attorneys is that they objected to this mandatory downloading of their personal phones. None of these devices were company issued, and it is solely their personal property. They maintain there is nothing derogatory that was ever done or said, but are at a loss to understand why they should be compelled to help build the case and allegations against them by the

other side, and their own legal representation didn't oppose this motion.

## BACKGROUND

Mr. And Mrs. Lassen also want to set the record straight to the background comments that they recently received in the Motion for Contempt being asked for ruling against them. It was said that the Lassens "flagrantly violated their duty of loyalty to Weather King and committed other unlawful activities by, among other things conniving with the other defendants to steal away Weather King employees and other business relationships, while still employed by Weather King." This is an inflammatory statement, and is patently false.

When the Lassens were first employed to run the Willcox plant for Weather King, no one was more loyal and willing to go the extra miles to do whatever it took for the continued success of the company. They had several great years of operations, everyone was prospering, the employees became loyal to the Lassens due to their openness and extra efforts to maintain a great working relationship. They knew the Lassens had their backs, which is rare in so many companies.

Over time, discontent was growing however, due to the pay being cut. Many were scraping by, and not making even a minimum wage. Weather King was ultimately fined by the Federal Labor Board for approximately $500,000, Case #1950242, due to their cutting back on the wages **SEE EXHIBIT A**. They had even taken pay out of the Lassens pay – also being employees to have to pay any small amounts of possible overtime that employees needed to complete buildings, so the employee would at least get a pay check in a given time period, since they pay piece work. That equates to taking from one employee to pay another employee. The

Lassens were struggling to try and maintain employees, because employees were having to quit to find work elsewhere to make ends meet. There was talk about Weather King also having to face the Arizona State Labor Board over the same situations they were fined for at the Federal Level. That may still be up and coming.

During this time, when the pay was being cut, Weather King also spent upwards of $20,000 to install video cameras. Not for security from the outside, but to watch from their offices in Tennessee everything going on in the shop and even the break room. The employees were not happy about the constant surveillance while at work, especially in view of the cost, and the pay they were receiving. One camera was directly over Mr. Lassen's desk! He had to send emails of his activities. **SEE EXHIBIT B**

Also during this time, word was out about the $1,000,000 plus bonuses paid to the investors at Weather King to at least 5 people, while the employees were hardly or not making a minimum wage. Mr. Sullivan only made a trip or two to Arizona on a couple occasions to visit the plant operations. On one visit, Brian asked him if he'd like to meet the employees that so diligently were building his buildings, and creating great profits for him? His response was "Only the ones that matter." Add to that, Mr. Sullivan also runs a CPA business and the majority of his employees, including his partner in that company, also walked out on him, just before Christmas of 2021, being disgruntled employees there, as well.

Over time, the discontent was growing. Jesse Maupin was a staunch company man, as

was the rest of these defendants listed on their complaint. But it was growing to an unworkable situation. It was totally within the legal rights of each defendant to want to work for a more honest company, and without the sweat-shop wages, and surveillance. There were no NDAs, or non-compete papers signed.

There are also 30-40 dealers in Arizona selling the finished product. All but one or two of those existing dealers also changed their businesses to stay working with Jesse and American Barn Co., as opposed to staying with Weather King. Some had to change the names of their businesses because "Weather King" was used in their names. Weather King was one if not the only company in the shed business that graduated the pay to make higher percentages by the total gross sales for the month. Other companies in the industry were paying the higher percentage notwithstanding the amount of gross sales (Derksen in Texas, for example). None of that was by coercion on Jesse's part. It was simply the growing dissatisfaction of the Weather King operations.

When Mr. Sullivan got word of the possible branching off of business, he exploded and went through the office firing everyone on the spot, including firing the Peoria and Milan Plant managers, instead of any reasonable conversations about how this matter might be resolved.

Talk about Weather King selling out to another company was already happening in the time before American Barn Co. was formed, and Weather King almost immediately decided to sell out their interest in Arizona and New Mexico to another company called Old Hickory. Old

Hickory sent their representatives to Arizona, New Mexico and El Paso, TX, and proceeded to visit all the dealers in these states. Mike Major and Matt, the Old Hickory representatives, threatened to take over lots that were operating, which they did by going and offering exorbitant amounts of rent increases to get people to break their leases. They didn't return signs that dealers had paid for, and operated off the existing names that had spent years building up their clientele. They've done underhanded things like trying to buy out all the siding so American Barn Co., cannot continue to build. The representative for Sagebrush, where American Barn Co. was buying siding, skids and white lumber, told Jesse he can't sell to him anymore, due to Old Hickory demanding they stop. And since they're a bigger company, Sagebrush folded to their wishes. The owners of Old Hickory either own the companies that sell the hardware, doors and windows, and metal roofing, or have connections to the paint companies so that Jesse has not been able to get the supplies he needs, and has worked with those companies for all the preceding years. So, he's had to buy supplies from retailers like Home Depot at a greater expense, or find new suppliers willing to sell to him, since these big companies obviously have quite a cartel in the industry. It is inconceivable that this motion for contempt against Mr. And Mrs. Lassen is accusing them of stealing away the employees, and other business relationships in light of what has really been happening.

Weather King made a lot of money selling their interests to Old Hickory, but that is not good enough for them, and this lawsuit is all retribution against anyone that had the legal right to want to work with a company that they feel has had a great working relationship. This lawsuit is nothing more than trying to damage, as much as possible, any opposing company, and put them

out of business. Weather King has no evidence of any wrong-doing by anyone, and the Lassens don't feel compelled to have to turn over their personal phones and devices in order to help them try to formulate their case.

## CONCLUSION

For the foregoing reasons, Mr. And Mrs. Lassen are respectively asking the Court to reconsider the previous motion Granting to Compel Forensic Examination of Personal Devices, and to deny the associated Motion for Contempt against Mr. And Mrs. Lassen, and to deny the associated attorney fees to Weather King in connection with this motion.

_____   _____
Brian L. Lassen, *pro se*         Aleyna Lassen, *pro se*

## CERTIFICATE OF SERVICE

UNDER PENALTY OF PERJURY, I CERTIFY that a copy of the foregoing was provided by FedEx Overnight service to the following attorneys for Plaintiff and Defendants:

_____
Aleyna Lassen, *pro se*

David L. Johnson
John H. Dollarhide
BUTLER SNOW LLP
150 3rd Avenue South, Suite 1600
Nashville, TN 37201
(615) 651-6700
david.johnson@butlersnow.com
john.dollarhide@butlersnow.com
*Attorney for Plaintiff*

Thomas G. Pasternak
Benjamin S. Morrell
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Telephone: (312) 527-4000
Fax: (312) 527-4011
tpasternak@taftlaw.com
bmorrell@taftlaw.com
*Attorney for Defendant*

Daniel W. Van Horn
6075 Poplar Ave., Suite 500
Memphis, TN 38119
(901) 680-7200
danny.vanhorn@butlersnow.com
*Attorney for Plaintiff*

STATE OF ARIZONA
COUNTY OF COCHISE

BEFORE ME personally appeared Aleyna Lassen, Defendant who, being by me first duly sworn and identified in accordance with Arizona law, did execute the foregoing in my presence this 9th day of November 2024.

_____
Notary Public

My commission expires:



JULIE TEETERS
Notary Public, State of Arizona
Cochise County
Commission # 671225
My Commission Expires
June 27, 2028

9