**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CONSOLIDATED INDUSTRIES, LLC d/b/a WEATHER KING PORTABLE BUILDINGS, | ) ) ) ) | Civil Action No. 1:22-cv-01230-STA-jay |
| Plaintiff, | ) ) | Chief Judge S. Thomas Anderson |
| v. | ) ) | |
| JESSE A. MAUPIN, et al. | ) ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SANCTIONS

Plaintiff "Weather King" has been forced to seek this Court's intervention on several instances because Defendants failed to produce responsive text messages, emails, and other documents that they steadfastly claimed not to possess. Ultimately, the Court ordered a forensic examination of Defendants' devices and cloud accounts that revealed they did in fact possess numerous responsive and highly-relevant documents, many of which are damning to their defense.

Recently confronted with this discrepancy at deposition, Defendants Jesse Maupin, American Barn Co., LLC ("ABCO"), Barry Harrell, Adrian Harrod, and Logan Feagin offered no viable explanation for Defendants' failure to comply with their discovery obligations or for multiple false representations that were made to the Court and Weather King. Moreover, Mr. Maupin and Mr. Harrod admitted interfering with Weather King's subpoenas to third parties seeking production of documents that Defendants failed to produce. Further, Mr. Harrod and Mr. Feagin admitted intentionally destroying evidence that Weather King demanded be preserved. And all of these Defendants admitted that their discovery responses are replete with inaccuracies.

The consequences of Defendants' game of cat and mouse have been costly. In addition to

needlessly incurring significant attorneys' fees, Weather King incurred more than $150,000 in forensic examiner fees and expenses to obtain documents that Defendants should have produced two years ago. This is not a case of an isolated inattentiveness to discovery obligations. The forensic examination and subsequent depositions show a pattern of willful and knowing efforts to conceal relevant information and to block Weather King's efforts to uncover additional facts supporting its claims. Defendants' discovery conduct is unacceptable and compels the imposition of severe sanctions.

## BACKGROUND

The background of this case is set forth in this Court's summary judgment ruling. *See* Doc. 119 at 2-3. The gravamen of Weather King's claims relates to nine former Weather King employees abusing their positions in the creation and operation of a competing entity, ABCO, to steal Weather King's Western U.S. operations, causing significant lost profits.

On June 13, 2022 (a few days after the former employees' separation from Weather King), Weather King served Defendants with letters demanding that they preserve documents relevant to its anticipated claims, including communications with each other and with other Weather King business relationships. Doc. 1-7. In January 2023, after suit was filed, Weather King served each of the Defendants with written discovery, including requests for production of documents, asking them to produce correspondence with each other, other Weather King employees, Weather King dealers, and others. *See, e.g.,* Ex. 1, Excerpt of discovery to Maupin. Inexplicably, not a single Defendant produced a single text message (with each other or with anyone else) and only one Defendant, Ryan Brown, produced any emails.[1]  Instead, when asked to produce "[a]ll

---

[1] Although Mr. Brown produced emails dating back to April 2020, he only produced one email during the crucial time period of February-May 2022.

correspondence and other documents" exchanged with various persons and entities, they each responded: "None."  *See generally* Responses to RFP Nos. 4-25 in Exs. 2-11 hereto.

A.    **Defendants' Evolving Explanations for Not Producing Responsive Documents**

After receiving Defendants' discovery responses, Weather King's counsel sent a letter to defense counsel, expressing "concern with the accuracy of the Defendants' responses that they do not have certain responsive documents[.]" Ex. 12, 3/24/23 letter at 1.  For instance, the letter stated that "Plaintiff is very surprised that Mr. Maupin represents that not a single document responsive to any of RFP No. 4-20 or 32 is within his custody, possession or control, particularly given Plaintiff's June 13, 2022, litigation hold demand letter." *Id.* at 2.

After "hav[ing] done a detailed investigation and follow up," defense counsel responded:

> I can confirm that in all cases where the Defendants have stated that they do not have responsive documents or devices those responses are <u>accurate</u> and are based on a <u>reasonable search</u> of available sources . . . . As to your continued references to the June 13, 2022 "document hold" letter, no documents or devices have been destroyed or deleted – **they simply never existed in the first place**.

Ex. 13, 4/14/23 letter at 1 (emphasis added); *see also id.* at 3, 7, 9, 11-12, 15-16.

Weather King, however, obtained correspondence from third parties confirming that Defendants' representation that the responsive documents "never existed in the first place" was flatly false.  *See, e.g.,* Doc. 1-1; Doc. 73-6; Doc. 73-9.  Although Weather King asked for an explanation, Ex. 14, 4/19/23 letter, defense counsel responded that "[w]e are not required to give you an explanation of the facts as they are." Ex. 15, 5/5/23 letter at 2.  Thus, Defendants pivoted from claiming that responsive documents "simply never existed in the first place," Ex. 13 at 1, to refusing to provide an explanation.  As this Court later noted:

> Defendants' responses were, in a word, lacking.  Plaintiff requested supplementation, which Defendants responded to with statements such as "[w]e are not required to give you an explanation of the facts as they are," or "[o]ne can't compel that which doesn't exist." ECF No. 73-1 at 4; ECF No. 73-11 at 3, 5.

Doc. 111, 8/29/23 Order at 4.

Under these circumstances, Weather King moved to compel Defendants to supplement their discovery responses and to cooperate in a forensic examination in May 2023. Doc. 73 & 75. Defendants opposed Weather King's motions. Doc. 81. In a response, Defendants represented that "[t]hey have provided all the documents that they possess, although Plaintiff refuses to believe it," and that "Plaintiff, despite Defendants' discovery responses and multiple confirmations by counsel, refuses to accept the simple fact that most of the documents requested simply do not exist in Defendants' hands." *Id.* at 1-2. Similarly, when pressed by the Court during a May 22, 2023 telephonic hearing,[2] defense counsel stated, "it's not that we're not producing the documents, or the text, or whatever he's seeking to compel, it's that they don't exist" and that "I have gone back to the well on this more times than you can imagine to make sure if the documents currently exist, they would be produced." Doc. 179 at 9:23-11:5; *see also* Doc. 111 at 3-4 n.1.

Soon thereafter, however, Defendants pivoted yet again. In a June 7, 2023 filing, Defendants made the following extraordinary representation: "Defendants have informed Plaintiff on numerous occasions that the cell phones and laptops Defendants used when working at Weather King were owned by Weather King and therefore returned to Weather King upon each Defendants discharge." Doc. 83 at 10; *see also id.* at 9, 11-12. As set forth in Weather King's filings, that claim is flatly untrue and Weather King did not own any of their cell phones. *See* Doc. 90 at 1-3. Defendants were forced to retract this explanation, claiming that it was a "mistake," which they

---

[2] That hearing pertained to Defendants' motion for a protective order to prevent Weather King from obtaining from third parties through subpoena correspondence and other documents that Defendants claimed not to possess. Following that hearing, the Court entered an order noting: "[A]t the telephonic hearing, the undersigned inquired as to whether Plaintiff had first sought these documents and copies of communications from Defendants themselves. According to Defendants' counsel, they have *no record* of any of the sought-after documentation or communication." Doc. 96 at 6 (emphasis in original); *see also* Doc. 111 (8/29/23 Order) at 3-4 n.1 (referencing same representation by defense counsel).

vaguely attributed to a "miscommunication." Doc. 99 at 3. Though Defendants retracted that

excuse, they did not offer a new explanation for why responsive documents were not produced.

As the Court noted, "[t]his, apparently, was based on a 'miscommunication' that Defendants

choose not to explain." Doc. 111 at 12.

The Court held an in-person hearing on Weather King's motions on August 24, 2023. *See*

Doc. 117, Hearing Tr. Although the Court afforded Defendants an opportunity to explain why

they failed to produce responsive correspondence and other documents, Defendants declined. *Id.*

at 9-11. According to defense counsel:

> I really don't disagree with anything Mr. Johnson has said. I have gone back to my
> clients on multiple, multiple occasions and asked them for the documents. I do have
> an explanation. I'm troubled by a waiver of attorney/client privilege, and I don't
> know that it's appropriate to give that answer today.

*Id.* at 10:14-11:4; *compare id.* at 39:22-24 (defense counsel stating: "I'm beating a dead horse,

Your Honor. I've asked and I've asked and I've asked, and I'm getting what I get.").

Following that hearing, the Court denied Weather King's motion for a forensic examination

without prejudice but afforded Defendants an opportunity to comply with their discovery

obligations and supplement their discovery responses. *See* Doc. 111. The Court reasoned that

"I'm anticipating that plaintiffs are going to receive, or plaintiff's counsel is going to receive a lot

of information that hopefully -- I don't know if it would necessarily moot the need for a forensic

examination, but I think it might allow counsel to really narrow what might need to be forensically

examined." Doc. 117, 8/24/23 Hearing Tr. at 63:1-9.

Defendants, however, did not produce any text messages or emails as part of their

supplementation. Ex. 16, Johnson Decl., ¶2. In the meantime, Weather King continued to collect

from third parties additional correspondence and other documents that Weather King demanded

Defendants preserve in its litigation hold letter but that Defendants inexplicably did not produce.

*See, e.g.,* Doc. 87-1, Doc. 87-2, Doc. 104-1. Consequently, when the forensic examination order was imminent, only then did Defendants *finally* agree to allow discovery of their mobile devices and cloud accounts (though Weather King was faced with initially footing the bill for *their* discovery obligations). *See* Doc. 121 (hereinafter "the Forensic Order").

**B.    Forensic Examination Contradicts Defendants' Representations**

In connection with the Forensic Order, the mutually-agreed third-party vendor, Repario, began collecting data from Defendants' mobile devices, computer devices, and cloud-based storage accounts in mid-December, 2023. In addition to searching for text messages, emails and other correspondence that Defendants represented they did not possess, Repario retrieved documents based on the parties' agreed-upon search terms.

Through this process, Weather King obtained more than 76,000 pages of documents, including hundreds of pages of text messages and emails that Defendants repeatedly assured the Court and Weather King did not exist or that they did not possess. Ex. 16, Johnson Decl., ¶3. These documents proved to be highly probative of Defendants' liability. *See, e.g.,* Ex. 17 (1/12/22 text from Mr. Maupin to Defendant Barry Harrell nearly six months before their employment with Weather King ended stating "[w]e've got all Shops and drivers and all the good dealers certain as of this trip"); Ex. 18 (1/12/22 text from Mr. Maupin stating "[t]hings have went very well out here and I have everyone on board"); Ex. 19 (4/1/22 texts between Mr. Maupin and Defendant Adrian Harrod discussing soliciting dealers); Ex. 20 (3/3/22 texts among ABCO's three owners stating "[g]uess who's got a copy of [Weather King's] P&L for 2021??," "Profit/loss… sweet! Gonna need that," and "Makes you wonder how big we can actually take this . . . And how important the element of surprise is to get this thing up and going"); Ex. 21 (6/4/22 texts involving Mr. Maupin and Defendant Stephanie Gillespie in which Ms. Gillespie stated: "freaking out," "I don't know if

what I did was criminal," and "Just don't let me go to jail"); and Ex. 22 (5/31/22 texts referring to a "hostel [sic] take over").

Weather King is not in a position to ascertain from the forensic examination whether these text messages: (a) were deleted from Defendants' in-boxes but recovered from their cloud-based storage; or (b) have been residing in Defendants' in-boxes all along but simply were not produced notwithstanding Defendants' steadfast representations to the Court that they did not possess them. Either way, it is clear that Defendants could have retrieved these responsive documents when first asked to produce them more than two years ago.

### C. Defendants Maupin and ABCO are Confronted at Their Deposition.

Needless to say, Defendants have had a lot of explaining to do about why Repario obtained from their devices and accounts correspondence that Defendants represented "simply never existed in the first place" and "simply do not exist in Defendants' hands." Ex. 13 at 1; Doc. 81 at 1-2. Weather King had the opportunity to confront Mr. Maupin and ABCO with these discrepancies during a consolidated deposition that took place from January 14-15, 2025. Mr. Maupin conceded that, in response to Weather King's discovery, he did not bother to take the time to look through his cell phone or iCloud storage to see whether he possessed text messages and other documents responsive to Weather King's requests. Ex. 23, Maupin Dep. 65:7-67:3.

Inexplicably, Mr. Maupin claimed that he did not do so because "I was told the cell phones will end up getting turned over and everything will be retrieved off that." *Id.* at 66:8-10; *see also id.* at 67:5-6. He further claimed he was under that impression from the outset of this lawsuit and that "other attorneys that I know" were the source of that belief. *Id.* at 67:7-20, 85:23-86:12. If, however, Mr. Maupin and the other Defendants genuinely assumed, from the outset of the lawsuit, that they would be turning over his devices, why did Defendants: (a) oppose Weather King's initial

request for a forensic examination (*see* Doc. 81); (b) respond "None" in their responses to Weather King's requests for production when asked to produce their correspondence (*see generally* Ex. 2-11 (Resp. to RFP Nos. 4-25); (c) represent, *inter alia*, that responsive documents "never existed in the first place," that "no responsive documents exist," that "[t]hey have provided all the documents that they possess," that the documents do not "currently exist," and that "most of the documents requested simply do not exist in Defendants' hands" (*see* pp. 3-4 above)?

The only other explanation that Mr. Maupin could muster at his deposition for why he failed to produce text messages and emails in response to Weather King's discovery is that he did not consider them to be "documents." Ex. 23, Maupin Dep. 80:13-81:3, 86:24-87:4. That explanation is also nonsensical and disingenuous. For instance, Weather King's requests for production sought "<u>correspondence</u> and other documents . . . ." *See, e.g.,* Ex. 2, RFP Nos. 4-24 (emphasis added). Text messages and emails plainly qualify as "documents" requested by Weather King, and even if Mr. Maupin truly "misunderstood," it is beyond refute that they qualify as "correspondence" as requested in Weather King's requests for production.

Further, in response to Weather King's repeated demands for an explanation as to why they failed to produce emails and text messages, Defendants **never** asserted that they did not consider those to be responsive to Weather King's requests for production. Instead, they provided differing explanations, such as that they "never existed in the first place," that they "do not exist in Defendants' hands," and that Weather King possessed their cell phones. *See* pp. 3-4 above.[3]

### D.    Defendants Harrell, Harrod, and Feagin Are Confronted With These Discrepancies at Their Depositions and Admit Spoliation of Evidence.

Weather King deposed Defendants Harrell, Harrod, and Feagin on February 10-11, 2025.

---

[3] At his deposition, Mr. Maupin was unable to offer an explanation as to how that misstatement was presented to the Court. Ex. 23, Maupin Dep. 84:15-85:12

Each testified that his discovery responses and representations to the Court were truthful and accurate. Ex. 24 (Harrell Dep. 27:12-14, 57:7-58:10); Ex. 25 (Harrod Dep. 16:12-17:9, 44:9-46:1); Ex. 26 (Feagin Dep. 21:15-20, 37:6-25). In his discovery responses, Mr. Harrell (who holds a one-third ownership in ABCO together with Mr. Maupin and Wade Etherton) claimed that all of his conversations about ABCO were verbal and in person and that he possessed no correspondence with any of the other Defendants or Mr. Etherton. Ex. 27 (Harrell's 3d Supp. Resp. to Ig. No. 3); Ex. 3 (Resp. to RFP Nos. 5 & 7). At his deposition, he testified that those discovery responses were truthful and accurate and that he searched his cell phone to see whether he had responsive text messages, emails, and other documents. Ex. 24 (Harrell Dep. 27:12-29:16, 46:9-53:12, 65:4-22). Weather King confronted Mr. Harrell with text messages obtained from the forensic examination responsive to Weather King's requests that he did not produce and asked him to reconcile his supposedly truthful and accurate responses with what was found from the forensic examination. *See, e.g,* Exs. 17, 20, 28-30. The only responses Mr. Harrell could muster were: "Well, I guess I didn't see this," "I have no idea," "[a]pparently, I didn't think I had them," "[a]pparently, I didn't see them," and "I don't know." Ex. 24 (Harrell Dep. 53:5-10, 61:5-23; 62:25-63:10, 65:23-24, 68:5-20).

Asked further to reconcile what was obtained from the forensic examination with his repeated representations to the Court that he did not possess responsive documents,[4] Mr. Harrell conceded that "it's probably not hard" for him to have checked to see whether he had responsive text messages and offered "***no explanation***" for why they were not produced. Ex. 24 (Harrell Dep. 68:2-20 (emphasis added)).

Defendant Adrian Harrod similarly represented in response to Weather King's discovery

---

[4] Mr. Harrell testified that he reviewed drafts of Defendants' filings (including Doc. 81) before they were filed with the Court. Ex. 24 (Harrell Dep. 56:4-58:8).

that he possessed no correspondence with any of the other Defendants and that his only conversations with Mr. Maupin about ABCO were verbal. Ex. 4 (Harrod Resp. to Ig. No. 3 & RFP No. 7); Ex. 25 (Harrod Dep. 18:4-19:3). Moments after testifying that he regularly texted with Mr. Maupin and other Defendants "all the time," Ex. 25 (Harrod Dep. 26:19-22, 35:2), Mr. Harrod testified that he could not recall having any text messages with any then-current Weather King employees. *Id.* at 32:24-33:19. Asked to reconcile his testimony, he responded: "I don't know." *Id.* at 33:20-23.

Mr. Harrod then suggested that he did not produce text messages or other documents in response to Weather King's discovery because he was told to delete everything he had:

> **Q.  What was your understanding of what the court expected you to do to look for and produce documents in response to Weather King's request?**
>
> A.   Okay. Honestly, I swear there was something that said to get rid of the Weather King stuff off your, you know, that was not for your use.
>
> **Q.  Well, my question is, is what was your – your understanding of what the court expected you to do to look for and produce documents that were in response to Weather King's request?**
>
> A.   I guess look at my phone . . .
>
> **Q.  And did you look at your phone?**
>
> A.   That was a long time ago. <u>I'm sure I did because I tried to get rid of everything, you know</u>. Not incriminating, I mean, just anything that was on there that had to do with Weather King.

Ex. 25 (Harrod Dep. 39:18-40:15 (emphasis added; counsel objection omitted)).

According to Mr. Harrod, "***I tried my best after they issued that statement about deleting things to get rid of everything I had***." *Id.* at 27:22-24 (emphasis added). However, he expressed confusion about who supposedly provided him with any such directive. Mr. Harrod initially testified that, after receiving Weather King's June 13, 2022 litigation hold letter (Doc. 1-7), he felt

that it was important to get rid of evidence.  Ex. 25 (Harrod Dep. 28:19-29:4).  Confronted with language in the letter directing the exact opposite, however, Mr. Harrod shifted to saying that "somebody said to delete all the – the stuff."  *Id.* at 30:19-31:14.  Yet, he could not identify the source of this supposed direction other than suggesting that Weather King's counsel directed that Defendants delete all of their text messages and other responsive documents.  *See id.* at 55:3-56:2 (stating that "I deleted everything that I could possibly find," that "I tried" to delete text messages with Maupin, and that "I was probably too busy trying to get rid of everything").

Similarly, when confronted with why he did not produce correspondence with Weather King dealers that are known to exist (*see, e.g.,* Doc. 1-1) and that Weather King demanded that he preserve, Mr. Harrod blamed it on the unidentified letter supposedly telling him to destroy everything.  Ex. 25 (Harrod Dep. at 70:22-72:18).  Asked whether he looked for correspondence with dealers as requested in RFP No. 8, Mr. Harrod responded: "I did.  I mean I tried to you – you know, ***I tried to get rid of everything***."  *Id.* at 89:5-25 (emphasis added).

Weather King deposed Defendant Logan Feagin on February 11, 2025.  Although Mr. Feagin is only 29 years old, he testified "I don't recall" in response to more than 70 of Weather King's questions, including whether he had any discussions about ABCO before he left Weather King on June 1, 2022.  Ex. 26 (Feagin Dep. 24:3-25:13).  Mr. Feagin was confronted with numerous text messages to which he was a party making plans for ABCO (including lining up Weather King dealers for ABCO) between January 2022 and his last day with Weather King on June 1, 2022.  *See, e.g.,* Exs. 32-35; Ex. 26 (Feagin Dep. 32:20-33:11, 65:17-66:9).  Yet, like the other Defendants, Mr. Feagin did not produce these or a single other text message in response to Weather King's discovery, and instead, he responded that he possessed "None."  Ex. 5 (Resp. to RFP No. 6-8, 14).

Mr. Feagin initially offered no explanation for this discrepancy. Ex. 26 (Feagin Dep. 33:3-11 (emphasis added)). Pressed further, Mr. Feagin (similar to Mr. Harrod) testified that he deleted responsive documents because supposedly "[w]e got a letter that said to destroy documents from you." *Id.* at 34:10-11, 38:1-24. According to his legal counsel, that letter is that which is attached hereto as Exhibit 36 (and attached to his deposition as Exhibit 8). Ex. 26 (Feagin Dep. 34:14-20). Yet, that letter was not even sent to Mr. Feagin or any of the other Defendants and it does not demand that any correspondence be deleted. It was sent to a former Weather King dealer demanding that it destroy Weather King engineering drawings. Ex. 36 (11/16/22 letter to Lavecka Bade). Interestingly, Mr. Feagin and his own counsel appeared to disagree on what letter Mr. Feagin was even referring to. Ex. 26 (Feagin Dep. 35:9-36:5, 39:2-13).

None of these Defendants was able to reconcile his testimony with the representations made to the Court about why they failed to produce responsive text messages. In their Court filings, and when confronted by both Weather King and Magistrate Judge York, Defendants never claimed that they did not possess text messages on the basis that Weather King supposedly instructed them to delete them. This was a brand-new excuse that was presented for the first time on February 10, 2025. In fact, their own counsel assured Weather King in 2023 that "no documents or devices have been destroyed or deleted." Ex. 13 at 1 (emphasis added).

Although Defendants Daniel Hershberger, Stephanie Gillespie, Ryan Brown, Brian Lassen, and Aleyna Lassen have not yet been deposed, Weather King obtained from the forensic examination highly-relevant text messages, emails, and other documents that these Defendants also did not produce and claimed not to possess. *See, e.g.*, Ex. 21, Exs. 37-40, 55, 57-59.[5]

### E.    Defendants' Interference with Weather King's Subpoenas

---

[5] Weather King is in the process of scheduling the other Defendants' depositions, which may necessitate supplementation of Weather King's briefing.

Not only did Defendants make false representations and, only after being caught, offer flimsy explanations, they went to great lengths to prevent Weather King from obtaining relevant information from third parties. After filing suit, Weather King began serving former Weather King business relationship personnel who switched to ABCO (and others) with subpoenas. It was particularly interested in the extent to which Defendants were lining up these relationships with ABCO while still employed by Weather King in violation of their duty of loyalty.

Despite refusing to produce responsive correspondence, Defendants immediately took measures to thwart Weather King's efforts. First, they filed a meritless motion for protective order, which the Court denied on June 20, 2023. Doc. 33; Doc. 96. Second, even after the Court denied that motion, Weather King received curiously-identical form letters from third parties objecting to the subpoenas. *See* Ex. 16, Johnson Decl., ¶4 & Ex. A thereto. For instance, the letters objected "pursuant to Federal Rule 45(c)(2)(A) in that Nashville, TN is not within 100 miles of where we reside, are employed, or regularly transact business," notwithstanding the fact that Defendants chose not to include that ground in their motion for protective order after Weather King demonstrated that it lacked merit. *See* Johnson Decl., ¶4, Exs. A & B.

At his deposition, Mr. Maupin admitted that he and ABCO suggested that the third parties object and not respond and that Defendants sent the third parties the form letters. Ex. 23 (Maupin Dep. 478:13-479:17). He testified that Douglas Hines—an Illinois attorney whose company, Jade Rentals, is a major ABCO investor—helped craft the letters. *Id.* at 479:18-23.

Notably, even though Weather King ended up obtaining from the forensic examination responsive correspondence between Defendants and third parties, Mr. Maupin and others with ABCO suggested that the third parties simply respond to Weather King's subpoenas by claiming that they did not possess responsive documents. Ex. 23 (Maupin Dep. 480:2-10).

Mr. Maupin was also presented with text messages that he had with a dealer, Levi Reed, on August 3, 2023—more than a month <u>after the Court denied Defendants' motion for a protective order seeking to prevent Weather King from subpoenaing documents from third parties</u>. *See* Doc. 96; Ex. 23 (Maupin Dep. 481:22-482:22); Ex. 41 (8/3/23 text messages between Maupin and Reed). Therein, Mr. Maupin stated that "they are thiking [sic] that there is all of electronic conversations And there just ain't brother [sic]." *Id.* He further stated "our lawyer is gonna respond for everyone that doesn't have anything which is pretty much every everybody." *Id.* When asked at his deposition "[w]hy would your lawyer be responding on behalf of third parties who are issued subpoenas in this litigation," Mr. Maupin responded: "I don't know." Ex. 23 (Maupin Dep. 483:5-8).

Similarly, in an October 2023 email (well after the Court denied Defendants' motion for protective order), dealer Colby Fryar sent ABCO a letter he received from Weather King's counsel dispelling the frivolous objections included in the form letter that ABCO sent Mr. Fryar to forward to Weather King. *Id.* at 484:19-486:5; Ex. 42 (10/4/23 emails between Harrod, Maupin, and Fryar). Defendants Maupin and Harrod discussed responding on behalf of Mr. Fryar and then told Mr. Fryar: "We can reply as verbal in nature and really no written communication to relay . . . ." *Id.* Ultimately, Weather King obtained from the forensic examination responsive documents that Fryar failed to produce in response to the subpoena based on ABCO's instructions. *See, e.g.,* Ex. 16, Johnson Decl., ¶6; Ex. 53 (6/3/22 email from Harrod to Fryar, *et al.*). Confronted with this, Mr. Maupin testified:

> **Q.    Mr. Maupin, why not just let Mr. Fryar check his own devices and see
> if he has information responsive to Weather King subpoenas?**
>
> A.    <u>I don't know</u>.
>
> **Q.    Well, the real reason was that you didn't want him to cooperate with**

 the subpoenas; correct?

A.     I didn't say that to him.

**Q.     Well, Adrian Harrod did, didn't he?**

A.     <u>Yes, sir</u>.

Ex. 23 (Maupin Dep. 486:6-14 (emphasis added)); *see also id.* at 480:15-481:17; Ex. 43 (acknowledging ABCO helping another dealer "not to cooperate" with Weather King's subpoena nearly two months after the Court denied Defendants' motion for protective order); Ex. 44 (8/14/23 email from Cherie Austin asking Harrod how to object to Weather King's subpoena).

At his deposition, Mr. Harrod admitted that Mr. Fryar did not produce responsive documents because he encouraged Mr. Fryar not to do so and because he and Mr. Maupin did not want him to produce documents responsive to the subpoena. Ex. 25 (Harrod Dep. 105:2-108:25). He also admitted emailing a form objection letter to dealers—after the Court denied Defendants' motion for protective order—asking them to "date and sign as you are not responsible for this" and "it should take care of the issue once and for all." *Id.* at 113:22-115:24; Ex. 45; *see also id.* at 110:2-113:6; 116:13-117:10 (encouraging other dealers not to produce documents in response to Weather King's subpoenas). According to Mr. Harrod, Mr. Maupin's mantra was "[i]f you have nothing, you have nothing." *Id.* at 113:2-18; Ex. 46 (8/3/23 text messages between Harrod and Levi Reed).

**F.     Defendants Maupin and ABCO's Incomplete and False Discovery Responses**

Due to significant deficiencies with Defendants' discovery responses, Weather King was forced to move to compel them to supplement their responses. *See* Doc. 75. Although the Court ordered Defendants to supplement their responses, it denied without prejudice Weather King's motion for sanctions. Doc. 111. Thereafter, Defendants supplemented their discovery responses

through numerous amendments and supplements (with Weather King being forced to explain why their responses continued to be deficient).

Despite these supplementations, it became clear that Defendants continued to neglect their discovery obligations and that their discovery responses—even as supplemented—were replete with inaccuracies. For instance, Mr. Maupin stated under oath that all communications related to the creation, funding, or operation of ABCO were "in person" and did not disclose that he emailed or texted with *anyone*. Ex. 47 (Maupin 2d Amended & Supp. Resp. to Ig. No. 3). At his deposition, he doubled down, claiming that his response was truthful and accurate and that he did not recall speaking on the phone or texting with anyone about this. Ex. 23 (Maupin Dep. 61:3-62:23). Yet, numerous emails and text messages obtained from the forensic examination contradict this. *See, e.g.,* Exs. 17-21, 31, 33-35, 37-40. Confronted with this, Mr. Maupin testified that, in response to Weather King's discovery, he did not bother to review his text messages. Ex. 23 (Maupin Dep. 93:11-94-6); *see also id.* at 153:2-23, 169:14-170:21 (similar).

As set forth in the chart filed herewith as Exhibit 62, ABCO and Messrs. Maupin, Harrell, Harrod and Feagin conceded that many other discovery responses are inaccurate. Rather than acting in good faith to fulfill their discovery obligations, Defendants have hidden the ball, played fast and loose, and, at nearly every turn, thwarted Weather King's efforts to obtain basic discoverable documents, including from third parties.

**ARGUMENT**

I. **Defendants should be sanctioned for their misconduct in failing to cooperate with Weather King's discovery requests.**

"The Federal Rules of Civil Procedure authorize the court to impose sanctions for discovery abuse[.]" *Polinski v. Sara Lee Corp.*, No. 04-2912-M1/P, 2005 WL 2174421, at *1 (W.D. Tenn. Sept. 2, 2005). Further, "[t]he court has inherent authority to issue sanctions where

'a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, or has engaged in conduct tantamount to bad faith.'" *Iannone v. AutoZone, Inc.,* No. 19-cvV-2779-MSN-TMP, 2022 WL 4122226, at *4 (W.D. Tenn. Sept. 9, 2022). Sanctions are warranted as a consequence of Defendants' egregious failures to produce documents responsive to Weather King's discovery requests and their repeated failures to be candid with the Court and Weather King.

As demonstrated above, Defendants repeatedly lied to Weather King and the Court that they did not possess documents that they, in fact, possessed all along. The Court-ordered forensic examination demonstrated that Defendants made multiple false representations and that they acted in bad faith. This conduct cannot be tolerated.

In denying Weather King's initial motion for sanctions without prejudice in its August 29, 2023 Order, the Court found:

> At this time, the Court finds sanctions are not warranted. The Court accepts Defendants' assertions that they do not remember certain events, they may not understand the definition of some terms such as "financial support," **or even that they may no longer possess some documents**. However, Defendants are reminded of their discovery obligations, and that they are expected to fully comply with the Court's present Order to supplement their responses to Plaintiff's requests. As such, Plaintiff's Motion for Sanctions is DENIED WITHOUT PREJUDICE. Any further obfuscation on Defendants' part may result in sanctions, which could include judgment entered in Plaintiff's favor and/or a finding that hold Defendants are in contempt. FED. R. CIV. P. 37(b)(2)(A)(vi)-(vii).

Doc. 111 at 13 (emphasis added).

Ten different Defendants did not separately and fortuitously make an innocent mistake with respect to their discovery obligations. In reality, Defendants possessed responsive documents; they simply chose to gamble on whether anyone would ever find out. Forced to resort to an expensive forensic examination, Weather King confirmed that, all along, Defendants possessed the same documents they repeatedly represented "never existed in the first place" or that "do not exist in Defendants' hands." Ex. 13 at 1; Doc. 81 at 1-2. Further, Defendants' discovery responses

were evasive, incomplete and false.

## II.     Defendants ABCO, Maupin, and Harrod should be sanctioned further for interfering with Weather King's subpoenas.

Sanctions are also warranted against Defendants Maupin, Harrod, and ABCO for interfering with Weather King's lawful subpoenas to third parties.  Courts have found that similar behavior is improper and merits sanctions.  For instance, in *Moses v. American Apparel Retail, Inc.*, No. 13-cv-2753-SHL-dkv, 2015 WL 4665968, at *8 (W.D. Tenn. Aug. 6, 2015), the plaintiff emailed an "Objection" to third parties whom the defendant had subpoenaed and suggested that they not comply with the subpoenas.  To make matters worse, the evidence suggested that the plaintiff doctored the objection to appear as if it was sent by attorney Michael Working.  *Id.*  In a report and recommendation adopted by Judge Lipman, Magistrate Judge Vescovo found that "Rule 45 does not contemplate that the adversary of the party seeking information may advise the non-party commanded by the subpoena to ignore the subpoena's command."  *Id.* at *13.  The court concluded that the plaintiff's was "action is a clear violation of Rule 45," "willful bad faith," and a "clear attempt to subvert the discovery process" and "usurp the authority of the court."  *Id.*

Recently, an Ohio federal district court cited *Moses* in a case involving similar circumstances.  In *Covert Mfg., Inc. v. Covert Innovations, LLC*, No. 1:21-cv-1682-DAR, 2024 WL 904404, at *8 (N.D. Ohio Mar. 1, 2024), the plaintiff contacted third parties subpoenaed by the defendants and advised them not to respond.  Holding that the plaintiff "unilaterally directing the third parties not to comply without any authority was in bad faith," the court stated that "commanding a non-party to ignore the subpoena of their adversary constitutes bad faith and is sanctionable" and that "engag[ing] in vigilantism" is improper.  *Id.*; *see also Southall v. USF Holland, Inc.,* 2021 WL 1397221, at *7 & n.17 (M.D. Tenn. Feb. 10, 2021) (finding similar conduct to be "vexatious"); 9A Fed. Prac. & Proc. Civ. (Wright & Miller) § 2459 (3d ed.) ("Courts

may also impose sanctions on attorneys who instruct subpoena subjects not to comply."); *United States v. Graves*, 806 F. App'x 414, 416–17 (6th Cir. 2020) (finding that defendant's encouragement of a witness to engage in fraud to resist a subpoena amounted to witness tampering in violation of 18 U.S.C. § 1512(b)(2)(A)).

Defendants Maupin, Harrod, and ABCO have engaged in similarly sanctionable behavior and should be punished accordingly. In fact, their actions are particularly egregious given that they were obstructing Weather King's ability to utilize subpoenas *after* the Court denied their motion for protective order where they asked the Court to prevent enforcement of Weather King's subpoenas. *See* Doc. 33 (motion) and Doc. 96 (order denying same).

**III.    Defendants Harrod and Feagin should be sanctioned for spoliation of evidence.**

Rule 37(e) authorizes a court to impose sanctions in the event that a party destroys discoverable electronically stored information. As explained in detail in *Teran v. Lawn Enf't, Inc.*, No. 22-cv-02338-JTF-tmp, 2024 WL 5112756, at *3 (W.D. Tenn. Dec. 13, 2024), district courts also have inherent authority to sanction parties who destroy evidence. "A party seeking sanctions for spoliation of evidence must establish the following: '(1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the party destroyed the evidence with a culpable state of mind; and (3) the destroyed evidence was relevant to the opposing party's claim or defense.'" *Id.* (citation omitted).

First, there can be no dispute that Defendants owed a duty to preserve their text messages, particularly after receiving Weather King's litigation hold letter on June 13, 2022, demanding that they do so. *See* Doc. 1-7; *Nacco Materials Handling Grp., Inc. v. Lilly Co.*, 278 F.R.D. 395, 402 (W.D. Tenn. 2011). Second, Defendants Harrod and Feagin had a culpable state of mind because they acted "knowingly" as well as "negligently." *Teran*, 2024 WL 5112756, at *3. They both

testified that they knowingly deleted responsive documents at some point after receiving Weather King's litigation hold letter.  *See* pp. 10-12 above.

Third, "[a]s for relevance, the question is not 'whether the lost or destroyed evidence was dispositive,'" but "rather, the party seeking a spoliation sanction must 'ma[ke] some showing indicating that the destroyed evidence would have been relevant to the contested issue.'"  *Kean v. Brinker Int'l, Inc.*, 2024 WL 1815346, at *9 (M.D. Tenn. Apr. 25, 2024) (citation omitted).  An example of relevant evidence that Mr. Harrod destroyed is the partial text sequence filed as Doc. 1-1.  Therein, Mr. Harrod—while still employed by Weather King—is notifying certain dealers that Defendant Gillespie quit her job at Weather King and not to "spill the beans" about ABCO to another Weather King employee named Shelby.  This text exchange was prompted by Mr. Maupin's May 31, 2022 text instruction to Mr. Harrod: "You might let key dealers know that Steph being gone is ok I don't want them to slip and say something to Shelby."  Ex. 51 (5/31/22 text messages between Harrod and Maupin).  The identity of the dealers to whom Mr. Harrod sent the text is unclear, and Weather King also does not have the remainder of the text chain that may have additional relevant information.

The text exchange was not recovered as part of the forensic examination (Ex. 16, Johnson Decl., ¶6)—revealing that Mr. Harrod successfully destroyed the evidence.  Further, when Weather King served Mr. Harrod with an interrogatory asking him to identify the recipients to the text message, he claimed not to recall the identity of a single one of the recipients, even though the interrogatory was served a few months after he sent the email.  *See* Ex. 4 (Harrod Resp. to Ig. No. 11).  Mr. Harrod also claimed not to recall which dealers he spoke with about ABCO before he left Weather King.  Ex. 4 (Resp. to Ig. No. 11); Ex. 25 (Harrod Dep. 49:22-50:10).

The forensic examination also was insufficient to recover certain relevant evidence that

Mr. Feagin intentionally deleted.  Despite representing that he never communicated with a single Weather King dealer about ABCO or his departure from Weather King while he was still employed by Weather King (Ex. 5, Feagin Resp. to Ig. Nos. 3 & 4), Weather King previously filed the Declaration of Thomas Stewart, a dealer, attesting that Mr. Feagin (while employed by ABCO) verbally encouraged him to switch to ABCO and texted him to "[j]ust keep between us for now until we are ready to pull the trigger."  Doc. 87-2.[6]  Mr. Feagin did not dispute Mr. Stewart's account.  Ex. 26 (Feagin Dep. 43:9-44:10).  That text correspondence, however, was not obtained from the forensic examination, thus demonstrating that Mr. Feagin successfully destroyed evidence that Weather King demanded be preserved and that was responsive to Weather King's discovery.  Ex. 16 (Johnson Decl., ¶6); Ex. 5 (Feagin Resp. to RFP No. 8 & 14).

Particularly given that Weather King directed Mr. Harrod and Mr. Feagin on June 13, 2022, to preserve their text messages with dealers (Doc. 1-7, PageID 74, No. 6), they should not be allowed to profit from the fact that they chose to disregard Weather King's directive and delete relevant evidence.  Further, the fact that the aforementioned text messages were not recovered from the forensic examination demonstrates the high probability that these Defendants deleted other relevant correspondence and other documents that Weather King has not been able to obtain from the forensic examination or otherwise.

Finally, even if Weather King was able to recover information that these Defendants tried to destroy, they should still be sanctioned for their wrongdoing.  As noted by one court:

> *A fortiori*, the Court's inherent power is certainly not restricted when the procedural rule does not sanction the precise conduct at issue—Plaintiff's unsuccessful attempt to destroy or alter evidence.

---

[6] After Weather King filed that declaration, Mr. Feagin supplemented his response to Interrogatory No. 4 (but not Interrogatory No. 3) to identify Mr. Stewart.  Ex. 52 (Feagin 3d Supp. Resp.).  At his deposition, however, Mr. Feagin was confronted with other evidence that he solicited other Weather King dealers not identified in response to his interrogatories.  Ex. 26 (Feagin Dep. 52:3-53:14); Ex. 35 (5/12/22 texts between Maupin and Feagin).

> To allow a party to avoid sanctions merely because the attempt to destroy evidence was unsuccessful would be to ignore one of the primary goals of sanctioning spoliative conduct. "A party's falsification of evidence and attempted destruction of authentic, competing information threatens the integrity of judicial proceedings even if the authentic evidence is not successfully deleted." *CAT3, LLC v. Black Lineage*, Inc. 164 F.Supp.3d 488 (S.D.N.Y. 2016).

*Guarisco v. Boh Bros. Constr. Co., LLC*, 421 F. Supp. 3d 367, 381 (E.D. La. 2019).

## IV.    <u>Judgment by default is warranted.</u>[7]

"The imposition of sanctions, or the type of sanctions imposed, is within the sound discretion of the Court based on the facts of each particular case." *King v. Lacefield*, No. 2:21-cv-2613-JTF-atc, 2023 WL 346818, at \*2 (W.D. Tenn. Jan. 20, 2023) (citation omitted). "[F]ederal courts have the inherent power to manage their own dockets and are imbued with powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Mid-America Apt. Communities, Inc. v. Philipson*, No. 2:23-cv-02186-SHL-cgc, 2024 WL 2000064, at \*6 (W.D. Tenn. May 6, 2024) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)).

As it relates to Defendants Harrod's and Feagin's spoliation of evidence, Rule 37(e)(2)(C) allows a court to "enter a default judgment" as a sanction.

In addition, Rules 16(f) and 37(b)(2) allow the Court to issue a default judgment and other sanctions in the event of a violation of an order. *See, e.g., id.* at \*6 n.5 ("Rules 16(f) and 37(b)(2)(A)(vi) authorize the Court to render default judgment against the disobedient party.") (quoting *Stewart v. Complete Care Home Care Servs. of Tenn., Inc.*, No. 1:19-cv-00082, 2021 WL 3037499, at \*4 (M.D. Tenn. July 19, 2021)). At the conclusion of the August 24, 2023 hearing in this case, the Court stated:

---

[7] Insofar as Weather King has already obtained a default judgment against Defendants Brian and Aleyna Lassen (Doc. 181), this request for relief is moot as it relates to those Defendants.

> I think in light of granting Plaintiff's Motion to Compel Supplementation of Discovery Responses, I'm anticipating that plaintiffs are going to receive, or plaintiff's counsel is going to receive a lot of information that hopefully -- I don't know if it would necessarily moot the need for a forensic examination, but I think it might allow counsel to really narrow what might need to be forensically examined. So I'm going to deny it without prejudice.
>
> Let's get all this additional information, and see what information that you have, and how it can be narrowed as far as any additional examination that might need to be required.
>
> I'm also going to do the same with sanctions. Some of these responses and objections and some of the developments that has occurred are concerning to me. However, at this time I'm more concerned with getting discovery moving and getting relevant discoverable information to each other so this case can move forward. So I'm going to deny that without prejudice as well.

Doc. 117 at 63:1-21.

Thereafter, the Court issued its August 29, 2023 Order finding that "Defendant's responses were, in a word, lacking." Doc. 111 at 4. According to the Court: "At the hearing regarding these Motions, the Court noted that because it will compel Defendants to supplement their responses to Plaintiff's interrogatories and requests for production, it will not order forensic examination at this time." *Id.* at 5. Denying Weather King's request for sanctions without prejudice, the Court found:

> At this time, the Court finds sanctions are not warranted. The Court accepts Defendants' assertions that they do not remember certain events, they may not understand the definition of some terms such as "financial support," or even that they may no longer possess some documents. However, Defendants are reminded of their discovery obligations, and that they are expected to fully comply with the Court's present Order to supplement their responses to Plaintiff's requests. As such, Plaintiff's Motion for Sanctions is DENIED WITHOUT PREJUDICE. ***Any further obfuscation on Defendants' part may result in sanctions, which could include judgment entered in Plaintiff's favor and/or a finding that hold Defendants are in contempt.*** FED. R. CIV. P. 37(b)(2)(A)(vi)-(vii).

*Id.* at 13 (emphasis added).

The Court ordered Defendants to supplement their discovery responses within 45 days, Doc. 117 at 64:9-18. Although Defendants, through several iterations, supplemented their

discovery responses, Defendants failed to provide the requested text messages and other correspondence.  Ex. 16, Johnson Decl., ¶2.  Nor did they offer any explanation as to why the documents were not provided after the Court demanded supplementation.  Instead, Defendants chose to continue their evasive tactic of not providing any explanation at all and keeping the wool pulled over Weather King's and the Court's eyes.  *See, e.g.,* Ex. 15, 5/5/23 letter at 2 ("We are not required to give you an explanation of the facts as they are."); Doc. 117 at 10:14-11:4 ("I don't know that it's appropriate to give that answer today.").

Courts consider the following factors when determining whether a party's actions are sufficiently egregious to warrant dismissal or default judgment: "(1) whether the party's failure is due to willfulness, bad faith, or fault; (2) whether the adversary was prejudiced by the dismissed party's conduct; (3) whether the dismissed party was warned that failure to cooperate could lead to dismissal; and (4) whether less drastic sanctions were imposed or considered before dismissal was ordered."  *Mid-American Apt.*, 2024 WL 2000064, at *6 (citation omitted); *see also Builders Insulation of Tenn., LLC v. S. Energy Sols.*, No. 17-cv-2668-TLP-tmp, 2020 WL 265297, at *5-6 (W.D. Tenn. Jan. 17, 2020).

### 1.    *Defendants acted willfully, in bad faith, and with fault.*

As noted in *Builders Insulation, supra*:

> In seeking default judgment as a discovery sanction, willfulness or bad faith "requires a clear record of delay or contumacious conduct." *Carpenter v. City of Flint*, 723 F.3d 700, 704 (6th Cir. 2013). "Contumacious conduct means 'behavior that is perverse in resisting authority and stubbornly disobedient.' " *Phipps v. Accredo Health Group, Inc.*, No. 2:15-cv-02101-STA-cgc, 2017 WL 685579, at *4 (W.D. Tenn. Feb. 21, 2017) (quoting *Carpenter*, 723 F.3d at 704-05). The purportedly wrongful conduct "must display either an intent to thwart judicial proceedings or a reckless disregard for the effect of [the] conduct on those proceedings." *Carpenter*, 723 F.3d at 705 (quoting *Tung-Hsiung Wu v. T.W. Wang, Inc.*, 420 F.3d 641, 643 (6th Cir. 2013)).

2020 WL 265297, at *6.

Defendants' conduct meets this standard. The Court afforded Defendants multiple opportunities to come clean. Instead, they provided multiple inconsistent, cryptic, and false accounts as to why they did not produce text messages and other documents in response to Weather King's requests. In similar circumstances, courts have found that a party acted in bad faith.

For example, in *Mid-America Apt.*, *supra*, the defendant "made inconsistent representations to [the plaintiff] regarding the existence of documents that he may have that are responsive to the discovery requests" and "treated discovery as a game of cat-and-mouse." 2024 WL 2000064, at *7-8. The Court found that the party's "refusal to engage in discovery, to honor his discovery obligations, and his repeated flouting of this Court's orders, is willful, in bad faith, and the sort of contumacious conduct warranting default judgment as a sanction[.]" *Id*. at *8; *see also Tisdale v. Fed. Exp. Corp.*, 415 F.3d 516, 526 (6th Cir. 2005) ("[W]e conclude the district court's sanction of striking the front-pay claim was an appropriate response to [plaintiff's] failure to respond fully to [defendant's] discovery requests"); *Scott v. Metro. Health Corp.*, 234 F. App'x 341, 368 (6th Cir. 2007) (affirming Rule 26(g) sanctions against a party who submitted knowingly false discovery responses); *Munoz v. Rare Hospitality Int'l, Inc.*, No. 3:22-cv-00999, 2024 WL 4714324, at *4 (M.D. Tenn. Sept. 16, 2024) (plaintiffs "failed to comply with their discovery obligations and the directives of this Court ... despite ample opportunities to do so after being notified of their deficient responses").

### 2.    *Weather King has been prejudiced.*

"A defendant is prejudiced by a plaintiffs dilatory conduct if the defendant is required to waste time, money, and effort in pursuit of cooperation which the non-compliant party was legally obligated to provide." *Builders Insulation,* 2020 WL 265297, at *7 (cleaned up). As a result of Defendants' failure to provide responsive documents that they possessed all along, Weather King

25

has been forced to pay more than $150,000 to Repario in connection with the forensic examination.

Ex. 16, Johnson Decl., ¶8.  Weather King has also been forced to spend more than $165,000 in

attorneys' fees in connection with Defendants' discovery malfeasance.  *Id.*, ¶9; *Munoz*, 2024 WL

4714324, at *5 (finding prejudice under similar circumstances).  Furthermore, Defendants' actions

have caused the trial (originally scheduled to take place on May 20, 2024) to be delayed until

October 27, 2025.  *See* Doc. 64; Doc. 148; Doc. 151; *Moses,* 2015 WL 4665968, at *8 (party was

prejudiced because "it has been unable to move forward in its trial preparation").

### 3.    *Defendants were warned.*

In its August 29, 2023 Order, the Court warned that "[a]ny further obfuscation on

Defendants' part may result in sanctions, which could include ***judgment entered in Plaintiff's***

***favor*** and/or a finding that hold Defendants are in contempt."  Doc. 111 at 13 (emphasis added).

Rather than coming clean and producing responsive documents after the Court's August 24, 2023

Order, Defendants continued playing "hide-the-ball," necessitating the forensic examination.  And

around the same time that the Court warned Defendants about obfuscation—including in October

2023—Defendants were encouraging third parties not to produce documents responsive to

Weather King's subpoenas.  *See* pp. 13-15 above.

Even if the Court had not explicitly warned Defendants that continued discovery violations

could result in judgment being entered against them, default judgment is still appropriate under

the totality of Defendants' truly egregious conduct.  *See, e.g.*, *Mid-America Apt.*, 2024 WL

2000064, at *8 ("The fact that the Court has not recently warned him that a default judgment might

be entered against [defendant] does not forestall the entry of a default judgment in light of his

ongoing contumacious conduct."); *Builders Insulation*, 2020 WL 265297, at *8 ("Because the

[defendants] engaged in bad faith and contumacious conduct, the third prong of this inquiry affords

them little protection here.").

      **4.     *Less drastic sanctions are insufficient.***

Finally, the Court should consider "whether less drastic sanctions were first imposed or considered." *Builders Ins.*, 2020 WL 265297, at *8. Although the Court has not previously sanctioned Defendants, it expressed concerns about their failure to fulfill their discovery obligations and denied Weather King's initial motion for sanctions without prejudice. Doc. 111. The Court's warning, however, did not deter Defendants, who continued to fail to produce responsive documents, offered illogical excuses for failing to do so, provided incomplete and inaccurate supplementations, and sabotaged Weather King's attempts to obtain from third parties documents that Defendants secreted from discovery.

Based on the consideration of all four factors, judgment by default is the appropriate remedy. Indeed, this does not involve an isolated incident. This was a coordinated, ongoing scheme over several months to: (1) hide incriminating documents from Weather King; (2) provide Weather King and the Court with false and inconsistent explanations for why the documents were not produced; (3) interfere with Weather King's ability to obtain from third parties documents that Defendants should have produced; and (4) provide untruthful discovery responses. *See Stonex Grp., Inc. v. Shipman*, 2024 WL 3356989, at *4 (S.D.N.Y. July 10, 2024) (finding that dismissal was particularly warranted given "false testimony" of what he had done); *Miller v. Time-Warner Commc'ns, Inc.*, 1999 WL 739528, at *3 (S.D.N.Y. Sept. 22, 1999) (finding that "plaintiff's deliberate attempt to destroy evidence was exacerbated by her repeated perjury on that subject" and that "[h]er blatant and repeated perjury demonstrates such a total disrespect for the Court and the process by which justice is administered that the sanction of dismissal is appropriate").

Even after the Court's stern warning, Defendants continued to engage in contumacious

conduct. Any lesser sanction would be a win for Defendants, who were clearly warned that default judgment was on the table if they continued to obfuscate discovery. Moreover, any lesser sanction provides a roadmap for other similar-minded parties to take if they have the means to pay a monetary-only sanction.

## V.   The Court should also award Defendants' attorney's fees and expenses associated with Repario's forensic examination.

In addition to entering default judgment, the Court should require Defendants to reimburse Weather King for expenses it incurred as a result of their bad faith conduct, including: (a) Repario's fees in connection with the forensic examination (totaling $154,435.76 presently); and (b) Weather King's attorneys' fees and expenses incurred in connection with seeking the documents that Defendants should have produced at the outset and pursuing related relief against Defendants (totaling approximately $167,000 through February 24, 2025). Weather King's counsel's declaration filed as Exhibit 16 sets forth a breakdown of those calculations.[8]

The authorities cited in Section IV above allow the Court to issue monetary sanctions for discovery abuses, misrepresentations to the Court, and spoliation of evidence like what has occurred here. *See also Franklin v. Shelby Cnty. Bd. of Educ.*, No. 2:20-cv-02812-JPM-TMP, 2021 WL 5449005, at *4 (W.D. Tenn. Nov. 22, 2021) (noting that monetary sanctions may be awarded for spoliation of evidence; *Yoe v. Crescent Sock Co.*, No. 1:15-cv-3-SKL, 2017 WL 5479932, at *14 (E.D. Tenn. Nov. 14, 2017) (similar).

Further, under Rule 37(a)(4), "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer or respond," and Rule 37(a)(5) allows the Court to order a non-compliant party to reimburse the other party for attorney's fees incurred in demanding compliance. As noted above, the Court dismissed Weather King's initial motion for sanctions

---

[8] Because these expenses continue to accrue, these calculations will be updated.

without prejudice. Doc. 111 at 13. If Defendants are not, at a minimum, required to reimburse Weather King for the financial harm their actions have caused, they will have been allowed to get away with their discovery abuses. *See Blue v. City of River Rouge, MI*, 2019 WL 8331459, at *3 (6th Cir. Nov. 6, 2019) (finding that plaintiff's "pattern of noncompliance throughout the discovery period—and his blatant disregard of the court's multiple warnings—demonstrates that he acted willfully and in bad faith").

In addition, Paragraph 15 of the Forensic Order contemplates that the Court would "reserve ruling until a later date concerning which party(ies) shall ultimately assume responsibility for Repario's expenses." Doc. 121. Because Defendants' conduct necessitated the forensic examination, they must be held accountable and be assessed the financial responsibility for the consequences of what we now know to be severe and contumacious discovery abuses. *See Nacco Materials Handling Grp., Inc. v. Lilly Co.*, 278 F.R.D. 395, 406 (W.D. Tenn. 2011) ("Because [defendant's] deficient preservation and collection efforts necessitated these actions, the court finds that [defendant] should bear these costs" of a forensic examination); *see also id.* at 407 ("It bears repeating. [Defendant] is required to bear these costs because its preservation and collection efforts were woefully inadequate."); *id.* (finding that plaintiff was "entitled to an award of reasonable costs, including its attorney fees, associated with bringing the motion); *EEOC v. New Breed Logistics*, 2012 WL 4361449, at *8 (M.D. Tenn. Sept. 25, 2012) ("[Defendant] must bear all of the costs associated with restoring and examining the [computer backup] tapes because its preservation and collection efforts were inadequate."). To be certain, it would not have been necessary for Weather King to have incurred these expenses and attorneys' fees had Defendants complied with the rules and the Court's expectations.

## VI.    The Court should provide adverse inference instructions with respect to Defendants Harrod and Feagin.

Under Rule 37(e)(2)(B), the Court may "instruct the jury that it may or must presume the [destroyed] information was unfavorable to the party." Based on the circumstances, the Court should instruct the jury that it should presume that Mr. Harrod and Mr. Feagin exchanged text correspondence with dealers and the other Defendants that are unfavorable to their defenses of Weather King's claims.

## CONCLUSION

For the foregoing reasons, Weather King respectfully requests that the Court enter a default judgment against each Defendant (with the exception of the Lassen Defendants), order Defendants to reimburse Weather King for expenses and attorneys' fees incurred as a result of their wrongdoing, and provide an adverse inference instruction to the jury relating to Defendants Harrod and Feagin's spoliation of evidence.

Respectfully submitted,

BUTLER SNOW LLP

*/s/ David L. Johnson*
David L. Johnson, BPR #18732
John H. Dollarhide, BPR #40041
150 3rd Avenue South, Suite 1600
Nashville, TN 37201
(615) 651-6700
david.johnson@butlersnow.com
john.dollarhide@butlersnow.com

Daniel W. Van Horn, BPR #18940
6075 Poplar Ave., Suite 500
Memphis, TN 38119
(901) 680-7200
Danny.VanHorn@butlersnow.com

*Attorneys for Plaintiff*

30

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 27, 2025, I filed the foregoing with the Court using the

ECF system, which will provide notice and a copy to counsel of record listed below and by US

Mail and Email to the Lassens:

Thomas G. Pasternak
Benjamin S. Morrell
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Telephone: (312) 527-4000
tpasternak@taftlaw.com
bmorrell@taftlaw.com

Brian L. Lassen
Aleyna Lassen
1405 N. Fort Grant Road
Willcox, AZ 85643
willcoxbuildings@pm.me

*/s/ David L. Johnson*
David L. Johnson