# EXHIBIT A



UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TENNESSEE

EASTERN DIVISION


CONSOLIDATED INDUSTRIES, LLC d/b/a WEATHER KING
PORTABLE BUILDINGS,

       Plaintiff,

v.                          Civil Action No. 1:22-cv-0123

JESSE A. MAUPIN, BARRY D. HARRELL, ADRIAN S. HARROD,
LOGAN C. FEAGIN, STEPHANIE L. GILLESPIE, RYAN E.
BROWN, DANIEL J. HERSHBERGER, BRIAN L. LASSEN,
ALEYNA LASSEN, and AMERICAN BARN CO., LLC,

       Defendants.

_____

VIDEOTAPED 30(b)(6) DEPOSITION OF


TIMOTHY BOYD


TAKEN ON

WEDNESDAY, MAY 7, 2025

8:55 A.M.


BUTLER SNOW, LLP

1320 ADAMS STREET, SUITE 1400

NASHVILLE, TENNESSEE 37208



Page 18

1　　A.　American Barn Group or American Barn
2　Company?
3　　Q.　American Barn Group.
4　　A.　I -- I think I know what you're talking
5　about, but I need some more information.
6　　Q.　It's my understanding that the American
7　Barn Group is a group of portable -- portable
8　building sellers that get together and kind of
9　combine their interests, and I'm wondering whether
10　Weather King approached that entity to discuss a
11　possible sale.
12　　A.　Not to my knowledge.
13　　Q.　Did you -- did Weather King investigate
14　other transactions in the same -- sort of the same
15　sale to see what a good purchase price might be?
16　　A.　No, we did not.
17　　Q.　Did Weather King's discussions with Old
18　Hickory regarding potential sale of assets begin
19　taking place prior to June 1st, 2022?
20　　A.　They did not.
21　　Q.　When did they start?
22　　A.　Late June of 2022, as I remember.
23　　Q.　And how did they come -- how did the
24　discussion with Old Hickory come about?
25　　A.　The members of Weather King were in

Page 19

1　discussions about what to do to try to salvage our
2　western operations, because it had had a wrecking
3　ball applied to it by Jesse Maupin and American Barn
4　Company.  And we had quite a few dollars of assets
5　that were out there that we needed to figure out how
6　to sell, and time was of the essence, and just in
7　our internal conversations Scott Berryman mentioned
8　that Old Hickory might be interested.
9　　Q.　Why was time of the essence?
10　　A.　Because we had no, quote, boots on the
11　ground in the western operations after June 1st,
12　2022.
13　　Q.　Did Weather King ever contemplate not
14　liquidating its remaining western assets?
15　　A.　It contemplated on what the best method
16　for it was, and it was determined that we did not
17　need to go forward as things stood.
18　　Q.　Did you consider adding more employees on
19　the western -- in the western operation to replace
20　the employees who had left?
21　　A.　We did not think it was feasible to do
22　that because to find quality people takes time, and
23　every day that went by put assets at risk.
24　　Q.　How did it put assets at risk?
25　　A.　Because we had several million dollars of

Page 20

1　finished goods and raw materials 1500 miles away,
2　and we had no oversight on them.
3　　Q.　Did you consider adding independent
4　contractors in the western operation?
5　　A.　At what time?
6　　Q.　In the June time frame.
7　　　　MR. JOHNSON:  June 2022?
8　BY MR. PASTERNAK:
9　　Q.　June '22 time frame.  Thank you.
10　　A.　No, not after June 1st, 2022.  Not to my
11　knowledge.
12　　Q.　Who initiated the sale to Old Hickory?
13　Was it Mr. Berryman calling his son?
14　　A.　Yes, Mr. Berryman called his son.
15　　Q.　Was the price negotiated?
16　　A.　The price was 65 percent of the retail
17　price for the finished goods, and cost on the raw
18　materials.
19　　Q.　Was that negotiated or was that just kind
20　of thrown out there and accepted?
21　　A.　That was just what was put out there.
22　　Q.　So it wasn't negotiated.
23　　A.　No, not to my knowledge.
24　　Q.　You said that there was a wrecking ball
25　thrown into Weather King's operations.  Besides

Page 21

1　selling assets to Old Hickory, did you do anything
2　else to try to minimize the damage?
3　　A.　Yes.  A group of us went out west to
4　survey the situation, and decided that it was not in
5　our best interest to try to continue on.
6　　Q.　Who was the group that went?
7　　A.　Scott Berryman went to some of the area,
8　and myself, and three of my employees went to some
9　of the area.
10　　Q.　Did Jesse Maupin travel with Scott
11　Berryman?
12　　A.　My understanding is that Jesse Maupin
13　traveled with Scott Berryman to go take physical
14　inventory at Las Vegas, New Mexico, and Milan, New
15　Mexico, plants.  Physical inventory of raw
16　materials.
17　　Q.　If -- if this bad situation had just
18　happened, why were they traveling together?
19　　A.　I do not know the answer to that.
20　　Q.　What was the timeline between what's been
21　called the event and -- and some context here when
22　the -- these Weather King employees were fired and
23　started their own company?  Between when that
24　happened and when the transaction closed, the
25　transaction being the sale of Weather King assets to

Case 1:22-cv-01230-STA-jay   Document 217-1   Filed 05/22/25   Page 4 of 4
PageID 3914

TIMOTHY BOYD
85030
May 07, 2025
26 to 29
30(b)(6)

Page 26

1   Q.   Were the -- there was a Peoria operation
2   and a Wilcox, Arizona, operation.  Were those
3   excluded from the sale of assets?
4   A.   No.  We -- we sold everything that was in
5   the west.
6   Q.   I'm going to skip ahead to Weather King's
7   damages.  And this is another one, David, where you
8   said you would do part.
9       MR. JOHNSON:  Yeah, Jill Coker is going to
10  handle -- that's number -- top of number 15 you're
11  referring to.
12      MR. PASTERNAK:  15.
13      MR. JOHNSON:  She's going to handle this
14  with the exception of, as I mentioned via email, one
15  element of our damages is economic impact and loss
16  of profits that we're seeking.  And we're primarily
17  presenting that through our disclosed expert Doug
18  Southard, but Mister -- to the extent you want a
19  company opinion about that topic, Mr. Boyd is
20  prepared to talk about it, but we're relying
21  principally on Mr. Southard.
22      MR. PASTERNAK:  And Ms. Coker too?
23      MR. JOHNSON:  No.  Ms. Coker will not
24  testify on it, but she'll handle all other elements
25  of damages.

Page 27

1       MR. PASTERNAK:  I'm still confused.  Is
2   she -- is she going to testify on topic 15, or?
3       MR. JOHNSON:  Yes.
4       MR. PASTERNAK:  Okay.  All right.
5   BY MR. PASTERNAK:
6   Q.   So what I want to ask you, Mr. Boyd, and
7   maybe it's not something you can answer because Ms.
8   Coker is going to answer it, or whatever, but
9   there's various causes of action in the complaint.
10  Are you familiar with the complaint and the various
11  causes of action?
12  A.   I have read the complaint.
13  Q.   Okay.  So Mr. Southard has rendered an
14  opinion, and it's not really clear what causes of
15  action he's referring to.  So what are the damages
16  to Weather King due to misappropriation of trade
17  secrets?
18      MR. JOHNSON:  Again, Miss -- or I'm sorry,
19  Ms. Coker is prepared to answer that.
20      MR. PASTERNAK:  So if I go through all of
21  the various causes of action, that will be Ms.
22  Coker?
23      MR. JOHNSON:  Correct, yes, sir.
24      MR. PASTERNAK:  Okay.
25  BY MR. PASTERNAK:

Page 28

1   Q.   Topic 8 is the valuations of Weather King
2   assets in 2018.  Are you -- are you familiar with
3   the numbers?
4   A.   We did no valuations back in those time
5   period.  There was no need to do -- to do that.
6   Q.   You started when?  Back in that time
7   period, 2018, did you start valuating assets at some
8   point?
9   A.   No.
10  Q.   Never have?
11  A.   Never have.
12  Q.   Well, some of these questions -- answers
13  are making my deposition short.
14      MR. JOHNSON:  I thought that one may be a
15  short topic.
16      MR. PASTERNAK:  Yeah, yeah.
17      MR. PASTERNAK:  And I'm going to actually
18  skip over topic 9 and leave that to the damages
19  expert.  I think if we take a break, I apologize for
20  being so short and getting your time out here, but
21  because of the topics you've had, it's a short
22  deposition.
23      Can I take a break?
24      MR. JOHNSON:  Sure.
25      MR. PASTERNAK:  And check my notes?

Page 29

1       THE VIDEOGRAPHER:  All right.  Please
2   stand by.  The time is 9:28 a.m. and we are off the
3   record.
4       (WHEREUPON, a recess was taken.)
5       THE VIDEOGRAPHER:  The time is 9:36 and we
6   are on the record.
7   BY MR. PASTERNAK:
8   Q.   Why wasn't the price with -- between the
9   -- for the asset sale to Old Hickory negotiated?
10  A.   On the raw materials, cost is cost.  It
11  would make no sense to try to charge a premium on
12  those.  And we felt that 65 percent of retail was a
13  fair price for the finished goods inventory under
14  the circumstances.
15  Q.   Did Old Hickory push back at all?
16  A.   I'm not aware of it if they did.
17  Q.   And then, could you summarize everything
18  Weather King did after the American Barn people
19  left, to try to minimize the damage?
20      MR. JOHNSON:  Object to the form, but you
21  can answer.
22      THE DEPONENT:  Well, our biggest problem
23  was we had no people power in the west to take care
24  of business on our behalf.  And to replace people
25  power takes time, and as I stated earlier, I believe