# EXHIBIT 1

Page 1

1            UNITED STATES DISTRICT COURT
                     FOR THE
2            WESTERN DISTRICT OF TENNESSEE
3
4    CONSOLIDATED INDUSTRIES, LLC,  )
                                    )
5        Plaintiff,                 )
                                    )
6    vs.                            ) Civil Action No.
                                    ) 1:22-cv-01230
7    JESSE A. MAUPIN, et al.,       )
                                    )
8        Defendant.                 )
                                    )
9
10   ----------------------------------------------------
11
              THE VIDEOTAPED DEPOSITION OF
12
                     BRIAN BERRYMAN
13
              Wednesday, June 26, 2024
14
     ----------------------------------------------------
15
16
17
18
19
20
21
22
23
24
25

Page 2

```
 1  APPEARANCES:
 2  For the Plaintiff:  Mr. David Johnson, Esq
                        Butler Snow
 3                      150 3rd Avenue South
                        Suite 1600
 4                      Nashville, TN 37201
                        615-651-6700
 5                      david.johnson@butlersnow.com
 6  For Brian Berryman: Mr. Jeffrey Reed, Esq
                        Hudson, Reed & Christiansen, PLLC
 7                      16 Public Square North
                        Murfreesboro, TN 37130
 8                      615-893-5522
                        jreed@mborolaw.com
 9
    For the Defendant:  Mr. Thomas Pasternak, Esq
10                      Taft, Stettinius & Hollister
                        111 East Wacker Drive
11                      Suite 2600
                        Chicago, IL 60601
12                      312-527-4000
                        tpasternak@taftlaw.com
13
14  Also Present:       David Drumel - Videographer
                        Barry Harrell
15                      Jesse Maupin
                        Jill Coker
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1      The Videotaped Deposition of Brian Berryman, was
 2  taken by Counsel for the Defendant on Wednesday, June
 3  26, 2024, beginning at 9:00 A.M., at the Offices of
 4  Hudson, Reed & Christiansen, PLLC, 16 Public Square,
 5  North, Murfreesboro, Tennessee, 37130 for all purposes
 6  under the Tennessee Rules of Civil Procedure.
 7      It is agreed that Gina Hunter Licensed Court
 8  Reporter, may swear the witness, take the deposition,
 9  and afterwards reduce the same to typewritten form, and
10  that the reading and signing by the witness is waived.
11      All formalities as to caption, certificate,
12  transmission, filing, et cetera, is waived.  All
13  objections, except as to the form of the questions
14  are reserved to on or before the hearing.
15
16
17  ----------------------------------------------------
18                      INDEX
19  Brian Berryman,                           PAGE
20      Examination by Mr. Pasternak ..........  5
21      Examination by Mr. Johnson ............ 37
22
23
24
25
```

Page 4

```
 1                      EXHIBITS
 2  NUMBER          DESCRIPTION                   PAGE
 3  Exhibit No. 1   Subpoena to Produce Documents    8
                    Information or Objects or to
 4                  Permit Inspection of Premises
                    in a Civil Action
 5
                    Exhibit No. 2  Subpoena to Testify at a   8
 6                  Deposition in a Civil
                    Action
 7
                    Exhibit No. 3  Schedules A and B         10
 8                  Definitions and Instructions
 9  Exhibit No. 4   Text Messages                   19
10  Exhibit No. 5   Old Hickory Sheds LLC           22
                    Find Report
11
    Exhibit No. 6   Tax Asset Detail                23
12                  1/01/21-12/31/21
13  Exhibit No. 7   Text Messages                   30
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              THE VIDEOGRAPHER:  Good morning.
 2  Going on the record at 8:53 a.m., on June 26th, 2024.
 3  Please note that the microphones are sensitive and may
 4  pick up whispering and private conversations.  Please
 5  mute your phones at this time.  Audio and video
 6  recording will continue to take place unless all
 7  parties agree to go off the record.
 8              This is Media Unit 1, in the video
 9  recorded deposition of Old Hickory Sheds' Corporate
10  Representative Brian Berryman in the matter of
11  "Consolidated Industries vs. Jesse Maupin, et al.,"
12  filed in the United States District Court for the
13  Western District of Tennessee, Civil Action Number
14  1:22-cv-01230.  This deposition is being held at Hudson
15  Reed, located at 16 Public Square North in
16  Murfreesboro, Tennessee.  My name is David Drumel, I'm
17  the videographer.  The court reporter is Gina Hunter
18  with Veritext.
19              Counsel, please state your
20  appearances for the record, which will then be followed
21  by the swearing of the witness by the court reporter.
22              MR. PASTERNAK:  Tom Pasternak for the
23  defendants in the case.
24              MR. JOHNSON:  David Johnson for the
25  plaintiff.
```

Page 6

1  MR. REED: Jeff Reed for Brian
2  Berryman.
3      And let me just begin. I think we've
4  -- the counsel has discussed this before we started the
5  deposition today, but I understand the deposition --
6  all the exhibits that will be produced in this
7  deposition today will be covered by the protective
8  order that's previously been ordered by this court with
9  respect to the evidence in this case.
10     MR. JOHNSON: And as a matter of
11 clarification, Mr. Reed, you said you're counsel for
12 Brian Berryman, but did you mean Old Hickory Sheds,
13 too?
14     MR. REED: Yes. I, also, represent
15 Old Hickory Sheds, LLC.
16     BRIAN BERRYMAN,
17     having first been duly sworn or affirmed,
18     Testified as follows:
19         EXAMINATION
20 BY MR. PASTERNAK:
21 Q.  Good morning, Mr. Berryman.
22 A.  Good morning.
23 Q.  Have you ever been deposed before?
24 A.  Yes.
25 Q.  How many times?

Page 7

1  A.  Once.
2  Q.  What was the occasion?
3  A.  It's confidential. Signed a confidentiality.
4  Q.  Okay.
5  A.  Can't say.
6  Q.  Are you familiar with the procedure of a
7  deposition?
8  A.  More or less.
9  Q.  Okay. The -- rather than going through rules
10 and things like that, like some lawyers do, I'd just
11 say if you're confused by a question, please let me
12 know --
13 A.  Okay.
14 Q.  -- is that fair?
15 A.  Yeah.
16 Q.  And if you don't let me know then I'll assume
17 that you understand my questions.
18 A.  Okay.
19     MR. REED: Let me say this, too.
20 Please be sure to speak up so that they pick you up
21 okay on the mic. And if the question is -- if there's
22 a question asked, it's probably be better to say yes or
23 no, so it's -- rather saying yep or yup, so people
24 understand your answer better.
25     THE WITNESS: I'll try.

Page 8

1      MR. REED: Okay.
2  BY MR. PASTERNAK:
3  Q.  What's your home address?
4  A.  Well, on my license it's 300 Pilot Knob Road,
5  but I've got more than one house, so...
6  Q.  You have more than one home?
7  A.  Yeah.
8  Q.  How many homes do you have?
9  A.  Two.
10 Q.  And where are they located?
11 A.  Is that necessary for this?
12     MR. REED: He has the right to ask
13 where you live, yes.
14     THE WITNESS: Okay. 6211 Murray
15 Lane, Brentwood, Tennessee.
16 BY MR. PASTERNAK:
17 Q.  And that's one, where's the other one?
18 A.  That's the main address. That's the main
19 house. 300 Pilot Knob Road, Readyville, is my farm.
20     MR. PASTERNAK: I'm going to ask the
21 court reporter to mark as Exhibits 1 and Exhibits 2,
22 two subpoenas in the case.
23     (Exhibit Nos. 1 and 2 were made part
24 of the record.)
25     THE COURT REPORTER: Does it matter

Page 9

1  which one?
2  BY MR. PASTERNAK:
3  Q.  Take a look at those.
4  A.  (Reviews documents.)
5  Q.  Have you seen these subpoenas before?
6  A.  I don't know. I didn't really look at them, I
7  just gave them to Jeff, so...
8  Q.  Do you understand that there's a subpoena, you
9  -- you're under subpoena here to testify on behalf of
10 Old Hickory, and to collect documents on behalf of Old
11 Hickory?
12 A.  That's the way I understood it.
13     MR. REED: And let me clarify for the
14 record, you're talking about Old Hickory Sheds, LLC.?
15     MR. PASTERNAK: Old Hickory Sheds,
16 LLC, yes. Thank you.
17     MR. REED: Okay.
18 BY MR. PASTERNAK:
19 Q.  Did you, actually, collect documents?
20 A.  Yeah.
21 Q.  How did you go about collecting documents?
22 A.  I've -- what do you mean? I just asked for
23 what you guys asked us for and went and found them.
24 Q.  And where did you collect them from?
25 A.  Our records.

3 (Pages 6 - 9)

Page 10

1  Q.    Did you collect them from your personal files?
2  A.    I don't know what that means.
3  Q.    You said you collect them from "our records,"
4  do you have -- do you have personal files?
5  A.    Company files.
6  Q.    Some company files?
7  A.    Yeah.
8  Q.    And did you review the schedule attached to
9  the subpoena to see what kind of documents you were
10 supposed to collect?
11 A.    Jeff did.
12 Q.    Jeff did -- your lawyer did?
13 A.    Uh-huh.
14 Q.    So you worked with your lawyer to collect
15 documents; correct?
16 A.    Uh-huh. Right.
17 Q.    All right.
18       MR. PASTERNAK: And let me mark it
19 Exhibit 3.
20       (Exhibit No. 3 was made part of the
21 record.)
22 BY MR. PASTERNAK:
23 Q.    These are -- Exhibit 3 are the schedules that
24 accompany those subpoenas, have you seen those
25 schedules before?

Page 11

1  A.    I think that if it's the same thing that you
2  mailed us, I have. I haven't -- I'm not reading it all
3  right this second, but -- I don't know if it's the same
4  thing as we mailed, I guess so.
5  Q.    If you turn to Page 6 of Exhibit 3, are you
6  prepared to testify on those topics?
7  A.    Yeah.
8  Q.    What did you do to prepare yourself to
9  testify?
10 A.    Not much.
11 Q.    Did you do anything?
12 A.    I mean, I -- no. I did the -- I supplied the
13 documents that were requested.
14 Q.    But as far as preparing yourself to testify on
15 the topics on Page 6, did you do anything?
16 A.    Not really.
17 Q.    Are you prepared to testify on those today?
18 A.    Yeah.
19 Q.    Can you give me your background since high
20 school? Educational background, I mean.
21 A.    Okay. I went to Murray State, got a degree in
22 physics.
23 Q.    Did you -- do you have any other formal
24 education?
25 A.    No.

Page 12

1  Q.    And, briefly, give me your employment since
2  high school.
3  A.    Played guitar for three or four years, and
4  hauled sheds the rest of the time. So I've been in Old
5  Hickory Buildings ever since.
6  Q.    And what's your position at Old Hickory
7  Buildings?
8  A.    The owner.
9  Q.    Is -- what's the proper corporate name of the
10 company? Is it Old Hickory Sheds or Old Hickory
11 Buildings?
12 A.    So we got Old Hickory Sheds, actually have a
13 partner, that's the Western U.S., the Eastern U.S., Old
14 Hickory Buildings is just me.
15       MR. REED: And for purposes to
16 clarify the record, there's Old Hickory Buildings, LLC,
17 and Old Hickory Sheds, LLC.
18       THE WITNESS: Uh-huh.
19       MR. REED: Those are two distinctive
20 different LLCs.
21 BY MR. PASTERNAK:
22 Q.    And one's the Western U.S. and one's the
23 Eastern U.S.?
24 A.    Uh-huh. Yeah. I'm 50 percent owner of the
25 Western company.

Page 13

1  Q.    You understand that I'm going to be asking you
2  some questions today about Old -- one of the Old
3  Hickory entities purchase of some Weather King assets?
4  A.    Uh-huh.
5  Q.    Which entity is it that --
6  A.    Old --
7  Q.    -- purchased --
8  A.    Old Hickory Sheds --
9  Q.    It's Old Hickory Sheds.
10 A.    -- LLC. Yeah.
11 Q.    Okay.
12       MR. REED: And all references of Old
13 Hickory Sheds -- will be Old Hickory Sheds, LLC.
14 BY MR. PASTERNAK:
15 Q.    How did the acquisition come about?
16 A.    Well, Dad called me sometime around June and
17 mentioned that Weather King might be liquidating, and I
18 should come up to Paris and meet with the Weather King
19 people.
20 Q.    When in June was this call?
21 A.    June-ish, somewhere in time -- sometime around
22 June, you've got the text there, so...
23 Q.    And you say your dad, who is your dad?
24 A.    Scott Berryman.
25 Q.    And what's his role at Weather King?

4 (Pages 10 - 13)

Page 14

1  A.   He's a partner.
2  Q.   What happened next after that phone call?
3  A.   I don't know, that's two years ago. I --
4  like, I hung up. I don't know. It's -- it seemed like
5  we got together a few weeks before -- a few weeks after
6  at Weather King's office and I met with the three of
7  the partners and they kind of gave me the history, what
8  all was going on, and offered a -- offered a proposal
9  to buy out their assets that -- or a partial buyout of
10 their assets, we didn't buy them all.
11 Q.   Who were the three partners at the meeting?
12 A.   Tim Boyd, David Sullivan, and Scott Berryman.
13 Q.   And what did -- you said they told you what
14 was going on, what did they tell you was going on?
15 A.   It was just pretty much what's in the lawsuit
16 here that -- you know, that they're -- lost all of
17 their outside operations, and that they didn't have the
18 management capabilities to right to ship and that,
19 really, the only thing they need to do was liquidate.
20 Q.   Did they liquidate?
21 A.   In the Southwest they did.
22 Q.   Did they liquidate in the rest of the country?
23 A.   Florida, no. As far as I know, I mean, I
24 don't know.
25 Q.   When did the -- or what assets of Weather King

Page 15

1  did Old Hickory Sheds, LLC, acquire?
2  A.   Raw materials at some of the shops, and the
3  completed buildings. Also, at some of the shops we
4  bought out the tools and equipment. And we didn't buy
5  -- we didn't buy all of the assets, though.
6         MR. JOHNSON: Whose phone is that?
7         MR. PASTERNAK: I think it might be
8  mine.
9         MR. JOHNSON: Okay.
10        MR. PASTERNAK: Let me turn it off.
11 BY MR. PASTERNAK:
12 Q.   Was there any discussion, at any time, during
13 the acquisition process of ABCO?
14 A.   I don't know if they had a name, yet. There
15 was a discussion about Jesse and the people that were
16 working.
17 Q.   What was the discussion?
18 A.   I don't remember. Basically, what I already
19 said, just that they had lost all their operation of
20 capabilities out in the field.
21 Q.   And when did the transaction close?
22 A.   August 1st.
23 Q.   If you had to put a date on when the
24 acquisition started, what would the date be?
25        MR. JOHNSON: Object to form.

Page 16

1         THE WITNESS: I would say that August
2  1st is when the acquisition took place. I'm not sure
3  if I understand.
4  BY MR. PASTERNAK:
5  Q.   When -- when did you start talking to them
6  about acquiring assets?
7  A.   Oh, in June.
8  Q.   Well, you can't pin down any specific time in
9  June?
10 A.   It was in the text, the day that Dad picked me
11 up from the airport.
12 Q.   Were any of their assets excluded from the
13 sale?
14 A.   Uh-huh.
15 Q.   What was excluded?
16 A.   Some of the inventory at Las Vegas, New
17 Mexico, almost all the inventory in Colorado.
18 Q.   Why was it excluded?
19 A.   Because we didn't buy it.
20 Q.   And why didn't you buy it?
21 A.   Because Jesse bought it and Cumberland Sheds
22 bought it. I assume, I mean, I don't have firsthand
23 knowledge of that. That's what I was told.
24 Q.   Who decided what assets that were acquired?
25 A.   Weather King did. Jesse may have in Las

Page 17

1  Vegas. The way I understood it, he got to pick and
2  choose what he wanted, and all the garbage that they
3  didn't want we had to buy and come get it.
4  Q.   What was the total amount spent on the
5  acquisition?
6  A.   Approximately, 5 million. It's -- I think we
7  gave a statement.
8  Q.   If Weather King hadn't lost assets to ABCO,
9  would you have bought those assets, as well?
10 A.   Possibly. It's -- see we didn't get the Las
11 Vegas shop, so we had no way to service that territory,
12 so we didn't -- we didn't want that. But if they
13 would've told us we had to buy the inventory and haul
14 it out of the shop, we probably -- we might have, I
15 guess.
16 Q.   With my -- I don't think you answered my
17 question. If Whether King hadn't lost a bunch of
18 assets to ABCO, would you have bought those, as well?
19        MR. REED: Object to the form of the
20 question.
21        MR. JOHNSON: Same objection. Can I
22 just ask, Mr. Pasternak, if Mr. Reed makes an objection
23 that I want duplicate it rather than me duplicating it?
24        MR. PASTERNAK: That's fine.
25        MR. JOHNSON: Make that be considered

5 (Pages 14 - 17)

Page 18

1  my objection, as well, so we don't clutter the record.
2        THE WITNESS: Yeah. And I -- and
3  lost assets, I guess.
4        MR. REED: Yeah. I don't -- I guess,
5  terminology "were lost." I'm not sure exactly what you
6  mean by lost. So, I guess, that's one of the reasons
7  for this objection.
8  BY MR. PASTERNAK:
9  Q.   Well, isn't it true that, at some time during
10 the acquisition or before the acquisition or at some
11 point, ABCO took some Weather King assets; correct?
12 A.   I have no idea on that.
13 Q.   Oh, you don't know that?
14 A.   I'm not -- I have some speculations, but, you
15 know, I couldn't say for sure.
16 Q.   Assuming that they did, would Old Hickory
17 Sheds, LLC, have bought those assets, as well?
18        MR. JOHNSON: Object to form.
19        MR. PASTERNAK: You can answer.
20        MR. REED: I -- we don't understand
21 the question. I don't think -- I don't know --
22        THE WITNESS: Would I buy something
23 that he stole, is that what he's asking?
24 BY MR. PASTERNAK:
25 Q.   No. That's not what I'm asking.

Page 19

1  A.   I don't understand, man.
2  Q.   I'm asking if those -- if those assets had
3  still been in place, would you have bought them?
4        MR. REED: Which assets are you
5  talking about?
6        THE WITNESS: Yeah.
7        MR. PASTERNAK: The assets that ABCO
8  took?
9        MR. JOHNSON: Object to form.
10       THE WITNESS: If they were physically
11 there, we would've bought them. If they were stolen or
12 disposed of, no. We wouldn't have bought them.
13       MR. PASTERNAK: Okay.
14       THE WITNESS: Does that answer?
15       MR. PASTERNAK: Yes.
16       I'm going to have the court reporter
17 mark Exhibit 4, some texts.
18       (Exhibit No. 4 was made part of the
19 record.)
20 BY MR. PASTERNAK:
21 Q.   Can you take a look at that, sir, and tell me
22 if you've seen it before?
23 A.   (Reviews document.) Yep.
24 Q.   Are these texts you sent?
25 A.   Yeah. The blue ones or whatever -- grey.

Page 20

1  Q.   Now, you refer -- you refer to a text sent
2  from the airport. Is one of those texts in this?
3  A.   Not that one. I don't know. Which side am I
4  looking at?
5  Q.   Looking at the whole thing.
6  A.   Let's see. "I received a call about" -- so
7  the one on 6/8, I think, was the first time I had any
8  knowledge about what was going on. Jesse called our
9  engineer trying to get our engineer to do plans for
10 him, and I texted a copy of the e-mail from the
11 engineer to my dad. And he said he was at a funeral,
12 and I said, "I'm sorry. I don't -- need to call
13 later."
14       And then Dad said, "No. He doesn't have my
15 blessing, I'll call later."
16       So I said, "That's what I suspected, we don't
17 have any time to take on any extra work, anyway, so..."
18       Then we talked about riding bikes. So, at
19 that point, I didn't know that there would be any
20 opportunity for Old Hickory or anything, I just knew
21 that Jesse was trying to buy plans from us for some
22 reason. So it all -- it -- from that point on, I
23 believe it kind of all unfolded.
24       MR. REED: And for the record, I want
25 -- if it's agreeable, this exhibit was marked on the

Page 21

1  back of the exhibit -- these pages rather than the
2  front, so if it's acceptable, I'm going to move this
3  sticker --
4        MR. PASTERNAK: That's fine.
5        MR. REED: -- of Exhibit 4 to the
6  first page.
7  BY MR. PASTERNAK:
8  Q.   There's a text dated 7/19.
9  A.   Okay.
10 Q.   It's like on the front page of the last page.
11 A.   What page? It's the front of the last page,
12 okay. All right.
13 Q.   And it says, "We are moving forward with
14 American Barn Company." Do you see that?
15 A.   Yeah.
16 Q.   What were you referring to there?
17 A.   That was a copy and paste from a dealer that
18 somebody sent to us, I think.
19 Q.   And what was the dealer saying then that
20 they're moving forward with American Barn Company?
21 What did it mean by that?
22 A.   That means, "Come get our buildings, we hate
23 you guys. We're done, so..." -- and, I guess, that
24 means that dealer is going with American Barn Company.
25 That was to Weather King, not to me.

6 (Pages 18 - 21)

Page 22

1  MR. PASTERNAK: Counsel, do you have
2  the -- this spreadsheet separately marked so I don't
3  have --
4  MR. REED: I --
5  MR. PASTERNAK: -- the --
6  MR. REED: Well, I have got separate
7  copies of it here.
8  MR. PASTERNAK: Yeah.
9  MR. REED: So we can use that if you
10 want.
11 MR. PASTERNAK: Can you mark this as
12 Exhibit 5?
13 (Exhibit No. 5 was made part of the
14 record.)
15 BY MR. PASTERNAK:
16 Q.   I'm handing you what's marked Exhibit 5, a
17 document titled --
18 A.   Uh-huh.
19 Q.   -- "Old Hickory Sheds, LLC, Find Report" --
20 A.   Uh-huh.
21 Q.   -- "All Transactions." Have you seen this
22 document before?
23 A.   Yeah.
24 Q.   And what is this document showing?
25 A.   That's showing all the payments that we made

Page 23

1  to Weather King to buy the assets and tools and
2  equipment; I guess, they're all assets.
3  Q.   So the total is 5 million and some --
4  A.   Uh-huh.
5  Q.   -- it's a little more than 5 million is how
6  much you totally paid to Weather King; correct?
7  A.   Best of my knowledge, yes. It was kind of a
8  messy sale, so we did our best to find everything.
9  Q.   What do you mean by "it was a messy sale"?
10 A.   Well, we had buildings go missing that we
11 thought we had, we had buildings show up that we didn't
12 know we had for months after the sale.
13      So, you know, we did our best to go back
14 through all the accounting and find all the -- you
15 know, all the payments that we made. It should match
16 up with Weather King's, but, you know, we just filtered
17 our accounting software and found everything we could
18 find.
19 MR. PASTERNAK: Mark it -- mark it
20 Exhibit 6.
21 (Exhibit No. 6 was made part of the
22 record.)
23 THE COURT REPORTER: Yes.
24 MR. PASTERNAK: A group of documents.
25 And it bears production numbers, I've designated it as

Page 24

1  WK1 through WK64.
2  BY MR. PASTERNAK:
3  Q.   And just, generally, can you tell me what
4  these documents are?
5  MR. JOHNSON: I'm sorry to interrupt.
6  These are documents that Old Hickory produced, Tom?
7  MR. PASTERNAK: Yes.
8  THE WITNESS: Uh-huh.
9  MR. JOHNSON: Okay. I'm just
10 wondering if our -- if -- the way you Bates stamped
11 these with a "WK," I want to make sure that's distinct
12 in the -- our document production, but we -- I don't
13 know if we started with WK or not? But I --
14 MR. PASTERNAK: It probably should
15 have been Old Hickory.
16 MR. JOHNSON: Yeah. So we may want
17 to re-Bates stamp these later.
18 MR. PASTERNAK: Yep. I'll do that,
19 and I'll Bates stamp the rest of the documents
20 produced.
21 BY MR. PASTERNAK:
22 Q.   Can you, generally, tell me what these
23 documents are, sir?
24 A.   Yeah. The first ones are the assets at the
25 shops, from what I can see. (Reviews documents.)

Page 25

1  Yeah. From what I can tell all the way through Number
2  10, they're just asset lists from the shops. It was, I
3  guess, off of their depreciation schedule.
4       So they -- some of the things weren't even
5  there that was on the list, so we went and tried to
6  find a lot of the stuff, a lot of it was not there. So
7  we just -- we kind of came up with a -- well, I guess,
8  David Sullivan just put a number at the bottom of them
9  that he'd be willing to take for the assets, and it
10 seemed fair to me, so we took it.
11      And then from Number 11, I believe, these are
12 shop leases that Consolidated would've been obligated
13 to pay for years to come that we agreed to take over.
14 (Reviews documents.) I think, maybe there's some
15 assignments in here where they had the -- we had the
16 leases assigned to us.
17      And then 38 starts the invoices based -- I
18 believe, based on the tax for the depreciation
19 schedules for the tools and equipment assets. Forty-
20 seven is another lease assignment, I believe. Forty-
21 eight seems to be the same as Exhibit 5.
22      I think 49 is probably the detail of -- let's
23 see. Okay. I think 49 may be all payments to Weather
24 King that we could find, and some of these were not --
25 I don't think related to the asset sale like

Page 26

1 reimbursements. I think there may be some
2 reimbursements on here. Yeah. So Weather King kept
3 paying the leases on some of these because the
4 assignments took a while to get from some of the
5 landlords and Weather King kept paying the rent until
6 we could get the assignment done and we just paid them
7 back to reimburse on the rent. So that's what "Rent
8 Reimbursement" means.
9      "Equipment Purchases, Inventory Purchase,"
10 that would be part of the sale. Yeah.
11      So, I believe, 48 is what we would consider
12 the asset sale purchase price, and, I believe, 49 and
13 50 would be a total of all payments we could find made
14 to Weather King.
15      And then 51 would be the completed -- I
16 believe, that's the completed buildings. And then 52,
17 56, 57, 58, 59, 61 -- I think the rest of it is just a
18 listing of serial numbers of buildings by state.
19 Q.   Is it fair to say these are all documents
20 related to the purchase by Old Hickory Sheds of Weather
21 King assets?
22 A.   Yeah. They all seem to be related to it.
23 Q.   Was there an asset purchase agreement during
24 this -- during this transaction?
25 A.   No.

Page 27

1 Q.   Why not?
2 A.   Because my dad and my cousin are half owners,
3 so didn't see the need. A waste of money to have it
4 made. We've all been doing business for 25 years,
5 didn't think we'd -- we could trust -- we thought we
6 could trust each other. And we really didn't know
7 until we got into it, what it was going to end up
8 costing, so...
9 Q.   You mentioned a text that may have a day on it
10 when the -- you first heard about the transaction?
11 A.   Yeah. We were --
12 Q.   It wasn't in --
13 A.   -- looking at here.
14 Q.   -- a stack of texts that I showed you. Is
15 that something you've produced?
16 A.   It's this first one right here.
17 Q.   Oh, it is?
18 A.   Yeah. I was talking about it when we were
19 reading it.
20 Q.   Well, this is when you first heard about ABCO
21 going out; correct?
22 A.   Excuse me?
23 Q.   This is when you first heard about ABCO going
24 out?
25 A.   Or Jesse. I --

Page 28

1 Q.   Or Jesse going out?
2 A.   I think so. You know, it was two years ago.
3 I think that was the first time, because I was kind of
4 shocked that somebody was calling asking for plans, I
5 do remember that, but I think that's the first time. I
6 can't remember.
7      Me and Dad talked on the phone a time or two
8 early June and I can't remember -- to be honest, I
9 can't remember if he called me before or after this
10 text, but it was -- I know it was all within the first
11 part of June right then, so...
12 Q.   It was in the first part of June that he
13 called you about Weather King may be having to
14 liquidate; correct?
15 A.   Uh-huh. Yeah. Yeah. That's the first I
16 heard of it.
17 Q.   Have you ever talked to anyone about the --
18 about the ABCO litigation?
19 A.   Did I ever talk to anyone about ABCO
20 litigation?
21 Q.   Yeah.
22 A.   Yeah. I mean, talked to Tim and David and
23 Dad.
24 Q.   Did you talk to Midco about it?
25 A.   Midco? Well, I mean, Dad owns Midco. So if

Page 29

1 talking to Dad means talking to Midco, maybe so. He's
2 the only one I ever talked to at Midco.
3 Q.   Do you know why ABCO lost Midco as a supplier?
4 A.   Not exactly. You can ask Dad, I guess.
5 Q.   Did you ever talk to someone at FirstBank
6 about this litigation?
7 A.   Uh-huh.
8 Q.   Who did you talk to?
9 A.   Chris Holmes.
10 Q.   And why did you talk to him?
11 A.   Because I have a lot of money that I have at
12 FirstBank and they have my financials and I didn't want
13 Troy Buttrey seeing my financials.
14 Q.   Why would he see your financials?
15 A.   Because he's the market president at
16 FirstBank.
17 Q.   What does that have to do with the litigation,
18 though?
19 A.   Well, I just have heard that he is in -- is
20 heavily involved in ABCO, and I didn't think that it
21 would be really good for somebody that's competing with
22 me to have my financials. Does that make sense?
23 Q.   It does.
24 A.   Okay. And I wouldn't want a market president
25 from a bank that I had millions of dollars borrowed

Page 30

1  from to be competing with me. That should make sense,
2  too; right?
3          MR. PASTERNAK: Why don't we take a
4  break? It's probably going to be a short deposition,
5  but I want to check through my notes.
6          MR. REED: Okay.
7          THE VIDEOGRAPHER: We're going off
8  the record, the time is 9:30 a.m.
9          (Off the record.)
10         THE VIDEOGRAPHER: We are returning
11 to the record. The time is 9:45 a.m.
12         MR. PASTERNAK: The next exhibit,
13 Ms. Court Reporter, I'm not sure what number it is.
14         THE COURT REPORTER: It's seven.
15         MR. PASTERNAK: Seven?
16         THE COURT REPORTER: Yes.
17         (Exhibit No. 7 was made part of the
18 record.)
19 BY MR. PASTERNAK:
20 Q.    I'm handing you -- sir, I'm handing you
21 another set of text messages and ask if you've seen
22 these before?
23 A.    Yeah. I've seen these.
24 Q.    When you refer to grievances with Weather
25 King, what were you were referring to?

Page 31

1  A.    Excuse me?
2  Q.    In the text you say you understand there are a
3  lot of grievances with Weather King.
4  A.    I didn't write that.
5  Q.    Did you write any of these texts?
6  A.    Not that one. This doesn't even have all of
7  them.
8  Q.    Well, it says --
9  A.    My reply is not on here. Wait a minute.
10 Let's see. Oh, yeah. Wait, wait, wait. I'm sorry. I
11 did write that. There's a -- there was something I was
12 replying to that I would rather be the exhibit than
13 this. I don't think it's in --
14 Q.    Well, this is the --
15 A.    -- it's not in context the way it is.
16 Q.    -- this is the exhibit we have, and I'm asking
17 you --
18 A.    No. We've got more than that.
19 Q.    No. We don't.
20 A.    I don't want to reply to that without having
21 the full thing that I was replying to on there.
22 Q.    I'm asking you what you were saying when you
23 referred to "grievances with Weather King."
24 A.    Well, I was replying to the text that's above,
25 that's not on here.

Page 32

1  Q.    What are the -- what were the grievances you
2  remember?
3  A.    Well, where's the text? I supplied the text.
4  Q.    No.
5  A.    It's not fair to take this out of context.
6  Q.    Well, you -- can you answer my question, sir?
7  A.    I was replying to the previous text.
8  Q.    And you can't tell me what the grievances
9  were?
10 A.    Nope.
11 Q.    Okay.
12 A.    Because I don't know. I was replying to the
13 text. It is not fair to take mine out of context. I
14 was being very nice considering what had just been said
15 to me.
16 Q.    Separate and apart from this text --
17 A.    It's upsetting to me to have this taken out of
18 context.
19 Q.    Oh, I apologize. But, separate and apart from
20 this text, do you understand there to be grievances at
21 Weather King?
22 A.    I mean, it was obvious they're liquidating
23 because their operational team, basically, ruined their
24 company. Obviously, there's grievances.
25 Q.    Can you remember what any of them were?

Page 33

1  A.    I mean -- I guess, depending on whose side. I
2  mean, I don't know. You may have to be more specific
3  in what you're asking. It's kind of vague, I guess.
4  Q.    At any point, do you remember talking to
5  someone about -- texting or talking to someone about
6  Weather King grievances?
7  A.    Okay. So, I guess, you're talking about from
8  ABCO, Jesse's side. I had heard from the Weather King
9  people that Jesse was unhappy, but I don't really know
10 the specifics. The grievances had been pretty well
11 listed in the text before this, and it's all out of
12 context here.
13 Q.    Do you remember what any of them were?
14 A.    Well, we can read the -- if you want to admit
15 the whole text as an exhibit, it says. It's two years
16 ago, I can't remember everything.
17 Q.    So you're not going to answer my question as
18 to what the grievances were?
19 A.    I did answer your question.
20        MR. JOHNSON: Objection: form.
21        THE WITNESS: I answered it. Look at
22 the text I provided.
23 BY MR. PASTERNAK:
24 Q.    You didn't provide this text, sir.
25 A.    Yes. I did.

9 (Pages 30 - 33)

Page 34

1  Q.    No. You didn't. All right. I'll move on
2  because you're not going to answer the question.
3  A.    I'm pretty sure it was --
4         MR. JOHNSON: I object.
5         THE WITNESS: I'm pretty sure it was
6  provided. I provided it to Jeff. I don't know where
7  it went from there.
8         MR. JOHNSON: Objection to the
9  statement.
10 BY MR. PASTERNAK:
11 Q.    What Old Hickory entity was paid the
12 approximately $5 million?
13 A.    No Old Hickory entity was paid $5 million.
14 Q.    Well, we've looked at documents that said the
15 total -- or what -- I'm sorry.
16        What Old Hickory entity paid $5 million?
17 A.    Old Hickory Sheds, LLC.
18 Q.    Do you have any written evidence that can
19 prove that you first started talking about this
20 acquisition in early June?
21 A.    Other than what I provided, and we already
22 looked at.
23 Q.    What did we look at that provides that date?
24 A.    Well, the first text -- first page of the
25 text. Right here.

Page 35

1  Q.    So that's written -- in your view, is written
2  evidence that establishes when it first started talking
3  about the acquisition?
4  A.    That's the first I remember talking about it.
5  Q.    So that -- and that's the first written
6  evidence you can think of?
7  A.    Uh-huh.
8  Q.    Is that answer yes?
9  A.    Yes.
10 Q.    During the acquisition, was there ever any
11 discussion of ABCO?
12 A.    What's that?
13 Q.    During the acquisition, was there ever any
14 discussion of ABCO?
15 A.    Well, I don't know if they had a name yet,
16 but, yeah. I mean, I think so.
17 Q.    All right. What was the discussion of that
18 entity?
19        MR. JOHNSON: Object to form.
20        THE WITNESS: I mean, we talked every
21 day. I don't know it's -- just in summary, the overall
22 gist I got was that a bunch of people from ABCO had --
23 or a bunch of previous Weather King employees formed a
24 company called "ABCO."
25        They made deals with shops and

Page 36

1  contractors and dealers to all leave Weather King all
2  at once to kind of just almost like, you know, trying
3  to use overwhelming force to sink Weather King, is kind
4  of what I took it as. And I kind of felt like that
5  maybe Jesse was trying to get them to come to the
6  negotiating table and liquidate to them.
7  BY MR. PASTERNAK:
8  Q.    Do you know who Craig Turner is?
9  A.    Yeah. He's my partner.
10 Q.    Do you remember him making a trip on July
11 11th?
12 A.    I don't know the exact date, but we traveled
13 together with Craig to visit shops to do inventory, me
14 and him and Dad.
15 Q.    And say, again, what the point of the trip
16 was?
17 A.    To count inventory.
18 Q.    And was this after the acquisition was in
19 progress?
20 A.    Yeah. I think I -- just from memory, I think
21 we met -- like, I had some texts that showed the date I
22 was at the airport. So we visited in -- sometime in
23 early July we visited with the -- at the Weather King
24 office, and then after that me and Dad planned a trip
25 to meet up with Craig out west to go count inventory at

Page 37

1  the shops.
2         MR. PASTERNAK: I have no further
3  questions. Thank you for your time.
4         THE WITNESS: Okay.
5         MR. JOHNSON: I've got a few
6  questions if somebody can pass me a mic.
7         MR. PASTERNAK: Here.
8         EXAMINATION
9  BY MR. JOHNSON:
10 Q.    Mr. Berryman, we met this morning. I'm David
11 Johnson, Weather King's counsel.
12 A.    Okay.
13 Q.    Before June 1, 2022, did you have any reason
14 to think that Weather King had any interest in selling
15 any of its assets or business operations in the Western
16 United States?
17 A.    No.
18 Q.    No discussions with Old Hickory about that.
19 A.    Huh-uh.
20        THE COURT REPORTER: What did he say.
21 Sir?
22        MR. REED: You need to answer
23 questions, yes or no.
24        THE WITNESS: Oh, no. No. I had a
25 phone call with Dad. I don't know if it was a week or

Page 38

1 two before this text or a week after it, but -- or
2 slightly after. So I know that I had talked to Dad on
3 the phone at some point early June. I don't -- I mean,
4 could it have been May 31st, I don't know. I don't
5 think so.
6          MR. JOHNSON: Understood.
7          THE WITNESS: So it was right about
8 that time -- right about the same time as this text.
9 BY MR. JOHNSON:
10 Q.    And you told us today the extent of the assets
11 that Old Hickory purchased from Weather King; correct?
12 A.    Uh-huh.
13 Q.    Is that a yes?
14 A.    Yes.
15 Q.    All right.
16 A.    Sorry.
17 Q.    No worries. Was any goodwill purchased as
18 part of that acquisition?
19 A.    It was -- there was absolutely no goodwill.
20 Q.    Okay. And tell me about that. Why was there
21 no goodwill?
22 A.    Oh. It was the hardest thing I've ever tried
23 to do is to try to recreate what Weather King had in
24 the Southwest. It was just totally gutted. I mean, it
25 -- you had -- it would've been easier to start it from

Page 39

1 scratch.
2 Q.    And you've been in this business for how many
3 years?
4 A.    Since '96.
5 Q.    Do you have an opinion about what the value
6 would've been if you had purchased Weather King's
7 Western U.S. operations before June 1st, 2022, before
8 all the drama, for lack of a better term --
9 A.    Oh, yeah.
10 Q.    -- happened to Weather King versus what you
11 ended up purchasing the assets for?
12         MR. PASTERNAK: Objection to form.
13 BY MR. JOHNSON:
14 Q.    Do you have an opinion?
15 A.    Yeah.
16 Q.    And what is your opinion?
17 A.    Well, you know, companies sell for multiples
18 of profit. So I -- you know, I don't know exactly what
19 they were making, but, you know, the goodwill would've
20 been significantly more.
21 Q.    And when you say "significantly more," are we
22 talking in the millions?
23 A.    Oh, yeah.
24 Q.    Okay.
25 A.    You know, I bought out my cousin's company

Page 40

1 for, roughly, a four multiple of profits, and I thought
2 that was a great deal, so...
3 Q.    Would you want anyone to do to your company
4 what the defendants did to Weather King?
5 A.    No. I worry about that all the time, to be
6 honest, but no. I, you know, spent a lot of time
7 managing, you know, relationships and people just
8 because I fear for that, you know.
9 Q.    Do you think that was dirty?
10 A.    Uh-huh.
11         MR. PASTERNAK: Objection to form.
12 BY MR. JOHNSON:
13 Q.    Is that a yes?
14 A.    Yes.
15         MR. JOHNSON: Okay. No further
16 questions. Thank you.
17         THE VIDEOGRAPHER: All right. Is
18 that it? Okay. All right.
19         MR. REED: That's it.
20         THE VIDEOGRAPHER: So that concludes
21 today's testimony. We're off the record at 9:58 a.m.
22         (Proceedings concluded at (9:58 a.m.)
23
24
25

Page 41

1         REPORTER'S CERTIFICATE
2     I, Gina R. Hunter, Licensed Court Reporter,
3 and Notary Public for the State of Tennessee, hereby
4 certify that I reported the foregoing proceedings at
5 the time and place set forth in the caption thereof;
6 that the proceedings were stenographically reported
7 by me; and that the foregoing proceedings constitute
8 a true and correct transcript of said proceedings
9 to the best of my ability.
10    I FURTHER CERTIFY that I am not related to
11 any of the parties named herein, nor their counsel,
12 and have no interest, financial or otherwise, in the
13 outcome or events of this action.
14    IN WITNESS WHEREOF, I have hereunto affixed
15 my official signature on this 11th day of July.
16
17
18
19     GINA R. HUNTER, LCR
20     LCR No. 639 Expires July 1, 2024

11 (Pages 38 - 41)