# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

CONSOLIDATED INDUSTRIES, LLC
d/b/a WEATHER KING PORTABLE BUILDINGS,

          Plaintiff

vs.                                    No. 1:22-cv-01230-STA-jay

JESSE A. MAUPIN, et al.,

          Defendants

VIDEO RECORDED DEPOSITION OF:

STEPHANIE GILLESPIE

Taken on behalf of the Plaintiff

Tuesday, May 20, 2025

10:16 a.m.

BERES & ASSOCIATES COURT REPORTERS
Virginia Dodge, RDR, CRR, LCR
P.O. Box 190461
Nashville, Tennessee  37219-0461
(615) 742-2550
virginia@beresandassociates.com

1    APPEARANCES:

2
     For the Plaintiff:
3
                John H. Dollarhide, Esq.
4               David L. Johnson, Esq.
                Butler Snow LLP
5               1320 Adams Street
                Suite 1400
6               Nashville, TN 37208
                (615) 651-6782
7               john.dollarhide@butlersnow.com
                (615) 651-6731
8               david.johnson@butlersnow.com

9

10   For the Defendants and the Witness:

11              Thomas G. Pasternak, Esq.
                Taft Stettinius & Hollister LLP
12              111 East Wacker Drive
                Suite 2600
13              Chicago, IL 60601
                (312) 836-4134
14              tpasternak@taftlaw.com

15
     Also Present:
16
                Jill Coker
17              Wade Etherton
                Jesse Maupin
18
                Brooke Stevens - Videographer
19              CMLV | Christopher Massey Legal Video
                Phone/Text:  (615) 364-8147
20              Email:  info@cmlv.us
                Website:  www.CMLV.us
21

22

23

24

25

```
1                          I N D E X

2

3              EXAMINATION OF STEPHANIE GILLESPIE

4                                                    PAGE
```

```
5    By Attorney Dollarhide ...........................10
     By Attorney Pasternak ...........................204
6

7

8                        E X H I B I T S

9                                                    PAGE

10   Exhibit 1, Notice of Deposition of Stephanie ........10
                Gillespie
11
     Exhibit 2, Email dated Monday, June 13, 2022 ........48
12              5:31 PM

13   Exhibit 3, First Amended Answer to First ............53
                Amended Complaint, Affirmative
14              Defenses and Demand for Jury Trial

15   Exhibit 4, Stephanie L. Gillespie's Responses .......54
                to Plaintiff's First Set of
16              Interrogatories, Requests for
                Production of Documents, and
17              Requests for Admissions

18   Exhibit 5, Stephanie L. Gillespie's First ...........55
                Supplemental Responses to
19              Plaintiff's First Set of
                Interrogatories and Requests
20              for Production of Documents

21   Exhibit 6, Stephanie L. Gillespie's Amended .........56
                First Supplemental Response to
22              Interrogatory No. 10

23   Exhibit 7, Letter dated April 14, 2023 ..............75

24   Exhibit 8, 19 messages on 1/19/2022 between .........83
                Jesse Allen Maupin and Stephanie
25              Parker
```

```
 1          The video recorded deposition of STEPHANIE
 2   GILLESPIE was taken by counsel for the Plaintiff
 3   pursuant to notice, at the offices of Butler Snow LLP,
 4   1320 Adams Street, Suite 1400, Nashville, Tennessee,
 5   commencing at 10:16 a.m. on Tuesday, May 20, 2025, for
 6   all purposes under the Federal Rules of Civil
 7   Procedure.
 8          The formalities as to notice, caption,
 9   certificate, et cetera, are waived.  It is agreed that
10   Virginia Dodge, being a licensed court reporter and
11   notary public for the State of Tennessee, may swear the
12   witness, and the reading and signing of the completed
13   deposition was not discussed.
14               *  *  *    *  *  *    *  *  *
15          THE VIDEOGRAPHER:  Here begins the deposition
16   of Stephanie Gillespie.  Today's date is May 20, 2025.
17   Time on the video monitor is 10:16.
18          Counsel, please identify yourselves and state
19   whom you represent.
20          ATTORNEY DOLLARHIDE:  John Dollarhide and
21   David Johnson of Butler Snow.  We represent the
22   plaintiff, Consolidated Industries.
23          ATTORNEY PASTERNAK:  Tom Pasternak for the
24   witness and for the defendants.
25          THE VIDEOGRAPHER:  Will the court reporter
```

```
 1    try to stay.  I just needed to leave.
 2         Q.   Do you recall getting a letter on or about
 3    June 13 from my partner David Johnson?
 4         A.   Yes.
 5              ATTORNEY DOLLARHIDE:  This is going to be 2.
 6                   (Email dated Monday, June 13, 2022
 7                   5:31 PM marked Exhibit 2.)
 8         Q.   (By Attorney Dollarhide)  Do you see what
 9    I've handed you as Exhibit 2?
10         A.   Yes.
11         Q.   Do you recognize this as the document I was
12    referring to?
13         A.   I can't say that I specifically remember
14    that's exactly what it looked like.  I would have to
15    take your word that this is what it was.
16         Q.   Well, let's go to the first page of it.  Is
17    that your email up at the top, stephanie.gillespie0429@
18    gmail.com?
19              Of the first page?
20         A.   Yes.
21         Q.   Is slp7386@hotmail.com your email address?
22         A.   Yes.
23         Q.   Go to the second page.  Is that your physical
24    address?
25         A.   Yes.
```

Stephanie Gillespie - May 20, 2025                                    49

```
 1        Q.    Do you dispute that you received this letter?
 2        A.    No.  I think this is probably it.  I'm sure
 3   it is.
 4        Q.    Did you read this letter?
 5        A.    I'm sure I did.
 6        Q.    Did you read in the second full paragraph
 7   where it says, "Weather King demands that you and
 8   everyone acting on your behalf immediately cease and
 9   desist from further violations of your legal
10   obligations"?
11        A.    Did you ask if I understand what that means?
12        Q.    I'm asking if you read it.
13        A.    Yes.
14        Q.    Did you read in the fourth full paragraph
15   where it starts, "Due to the anticipation of
16   litigation, Weather King further demands that you
17   immediately take measures to preserve and retain all
18   documents that are potentially relevant to such
19   litigation"?
20        A.    Yeah.
21        Q.    And then on the next page, did you read all
22   these categories of information that Weather King
23   demanded that you retain?
24        A.    Yes.
25        Q.    Did you read at the bottom -- in the bottom
```

1   full paragraph, the second sentence where it says,

2   "Please note that the, quote, 'documents' to be kept in

3   accordance with this letter include both paper

4   documents and electronically stored documents and

5   data"?

6        A.   Yeah.

7        Q.   Going back up to the top, did you read where

8   it says, "All 'communications' (hereinafter defined to

9   include but not be limited to emails, text messages,

10  and other electronic communications) exchanged with any

11  current or former Weather King employees"?

12       A.   Mm-hmm.  Yes.

13       Q.   What, if anything, did you do in response to

14  this letter?

15       A.   I really don't remember.  I mean I know I

16  spoke with Jesse.  I was concerned.  I've never seen

17  any -- I've received a letter of any kind of --

18  anything like that before, so --

19       Q.   What did you speak with Jesse about?

20       A.   Like what does this mean?

21            And he was -- he just didn't feel like it was

22  anything we needed to be concerned about because we

23  didn't feel like we had done anything wrong.

24       Q.   Did you take steps to preserve evidence?

25       A.   I don't believe I had any evidence to take

1   care to preserve.  I don't -- I don't recall taking
2   anything.  I remember at this time thinking I didn't
3   have anything like that.
4          I mean I never deleted anything off of my
5   phone.  But I didn't have any, like, paper documents or
6   anything like that.  Electronic, anything other than
7   text messages, which to my understanding, you guys got
8   all of that.
9       Q.   There were -- so you said you didn't have any
10  paper documents and other things.  Your testimony just
11  a moment ago is that you didn't think you had anything
12  to preserve?
13      A.   Yeah.
14      Q.   Is that right?
15      A.   That's what I -- yes.
16      Q.   But you also said that there were some text
17  messages.
18      A.   Well, I did not get rid of any text messages.
19  And that would have just been the few where I said
20  earlier that I, like, corresponded with Jesse over
21  those couple of months to see where we were at when we --
22  when we were at because I didn't speak to anyone else.
23      Q.   So when you got this letter, Exhibit 2, on
24  June 13 or 14, you had text messages with Jesse at the
25  time?

1       A.    Yes.

2       Q.    And your testimony is that you never deleted

3   those text messages?

4       A.    I did not intentionally delete any text

5   messages.

6       Q.    Did you unintentionally delete text messages?

7       A.    The only thing that I think that could have

8   possibly happened, if there were any, was that, like,

9   my phone has a set number of messages that it will --

10  and then it deletes the oldest ones.  But I don't

11  believe that I did that or that that even happened.

12      Q.    Do you have an iPhone?

13      A.    No.

14      Q.    What kind of phone do you have?

15      A.    I had a Samsung.  I still have a Samsung.

16      Q.    Okay.  Does it have -- did you take any steps

17  when you -- in response to this letter or at any point

18  to change that setting on your phone where it would not

19  automatically delete old text messages?

20      A.    No, but the oldest messages I have with him

21  are so old, they weren't even near the time frame that

22  we were even talking about.

23            I do not feel like there was anything I

24  needed to do to change my phone to make sure that

25  anything wasn't going to be gone that wasn't supposed

1   to.

2        Q.   Did you ever talk about any other -- did you

3   ever talk to any of the other defendants about

4   preserving evidence?

5        A.   I don't recall.  I don't recall.

6        Q.   Before papers that are filed with the court

7   on your behalf in this case, did you review things that

8   got filed?

9        A.   Not really.

10       Q.   Have you reviewed drafts of letters that your

11   attorney has sent in this case before they're sent?

12       A.   I am not really sure.

13       Q.   You don't know if you did or didn't?

14       A.   I don't know.

15                   (First Amended Answer to First Amended

16                   Complaint, Affirmative Defenses and

17                   Demand for Jury Trial marked Exhibit 3.)

18       Q.   (By Attorney Dollarhide)  Do you see what

19   I've handed you as Exhibit 3?

20       A.   I see this stack.

21       Q.   Do you see in the middle where it says First

22   Amended Answer to First Amended Complaint, Affirmative

23   Defenses and Demand for Jury Trial?

24       A.   Yes, I see that.

25       Q.   Do you understand that this was a document

1   that was filed on your behalf?

2       A.   Yes.

3       Q.   Did you review this document at any point

4   before it was filed?

5       A.   I believe I did this one.  Yeah.  I mean I --

6   this has been going on for so long, I know I haven't

7   seen every document that's gone, but this one is about

8   me, so yeah, I read it.

9       Q.   Okay.  Did you have any input on this

10  document?

11      A.   I really don't remember.  I mean I really

12  don't remember.  I'd have to sit here and read them all

13  and --

14           Yeah.  I mean yeah, I think I did.

15      Q.   And you approved of this being filed on your

16  behalf?

17      A.   I would say yes.

18      Q.   Do you recall being served with written

19  discovery from Weather King?

20      A.   I mean the recollections that I have about

21  all of this stuff is really kind of vague.  I don't

22  have specific -- I don't really re -- I just don't

23  really remember.

24               (Stephanie L. Gillespie's Responses to

25                    Plaintiff's First Set of

```
1                        Interrogatories, Requests for Production

2                        of Documents, and Requests for

3                        Admissions marked Exhibit 4.)

4         Q.    (By Attorney Dollarhide)  Do you see what

5    I've handed you as Exhibit 4?

6         A.    I see this.

7         Q.    This is Stephanie L. Gillespie's Responses to

8    Plaintiff's First Set of Interrogatories, Request for

9    Production of Documents and Requests for Admission.

10        A.    Okay.

11        Q.    You've seen this document before?

12        A.    I believe so.

13        Q.    And you had input on this document?

14        A.    Yes.  I would say so.

15        Q.    Flip to page 6.

16              Is that your signature?

17        A.    Yes.

18                    (Stephanie L. Gillespie's First

19                    Supplemental Responses to Plaintiff's

20                    First Set of Interrogatories and

21                    Requests for Production of Documents

22                    marked Exhibit 5.)

23        Q.    (By Attorney Dollarhide)  I've handed you

24    Exhibit 5.  Do you recognize this document?  This is

25    your first supplemental responses?
```

1          A.    Looks vaguely familiar.

2          Q.    But this document was not verified and signed

3    by you like the other one.  Is there any reason why you

4    didn't verify this -- these interrogatory responses?

5          A.    I have no idea.

6          Q.    Can you verify them now?

7                ATTORNEY PASTERNAK:  What does that mean,

8    counsel?  Do you want her to review it and say it's

9    accurate?

10               ATTORNEY DOLLARHIDE:  Yes.

11         Q.    (By Attorney Dollarhide)  I think it's only a

12   few, but you can take all the time you need.

13               So this would be number 10 and 11 is the ones

14   that you would be verifying.

15         A.    Yeah.  That's right.

16         Q.    All right.

17         A.    Well, I mean it looks like my other email

18   address is not on here.

19                     (Stephanie L. Gillespie's Amended First

20                     Supplemental Response to Interrogatory

21                     No. 10 marked Exhibit 6.).

22         A.    Yeah.

23         Q.    (By Attorney Dollarhide)  Exhibit 6 is your

24   Amended First Supplemental Response to Interrogatory

25   Number 10.

```
1              Now, this one, if you flip over to page 3,
2    this one is verified.  Is that your signature?
3         A.   Yes.
4         Q.   Go back to Exhibit 4, please.
5              ATTORNEY JOHNSON:  Did we have that marked as
6    an exhibit?
7              ATTORNEY DOLLARHIDE:  That was 6.
8         Q.   (By Attorney Dollarhide)  Tell me when you're
9    at 4.
10        A.   Okay.
11        Q.   Were all your responses to these questions
12   truthful and accurate?
13        A.   I feel like they were.  Yeah.
14        Q.   Have you been truthful and honest in these
15   court proceedings?
16        A.   Yes.
17        Q.   Everything you represented to Weather King
18   and the court been truthful?
19        A.   To Weather King?
20        Q.   Mm-hmm.
21        A.   What do you mean?
22        Q.   In the litigation.
23        A.   I don't think I understand the question.
24        Q.   Everything that has been filed on your
25   behalf, statements that you have made through your
```

1   attorneys, have those been truthful and accurate?

2        A.   Yes.

3        Q.   Are you aware that we filed a motion asking

4   the court to issue sanctions against you for lying

5   about your discovery responses?

6        A.   No.

7        Q.   Interrogatory number 1 asks you to identify

8   each business enterprise in the portable buildings

9   industry in which you played any role in the planning

10  its creation or formation.

11            And you responded, "I have not been involved

12  in the planning or creation of any such business

13  enterprise."

14            Is that a truthful statement?

15       A.   I mean yes.  I think so.

16       Q.   Can you reconcile that statement here in

17  response to interrogatory number 1 with your previous

18  testimony today about helping ABCo get started?

19       A.   Well, I didn't -- I was -- I think I was just

20  reading it like plain as text, did I -- was I involved

21  in the planning?  No, I wasn't.  I wasn't involved in

22  the creation.  I didn't -- I wasn't part -- I wasn't an

23  owner or partner.

24            So that's what I took that question to mean,

25  and that's how I answered it.

1        Q.   Interrogatory number 2 asks other than
2    Weather King, identify each business enterprise in the
3    portable buildings industry in which you held an
4    ownership interest and/or performed services since
5    January of 2021.  January 1, 2021.
6             And you responded, "I became the office
7    manager of American Barn on June 1, 2022."
8             Is it your testimony that you did not perform
9    services for ABCo prior to June 1, 2022?
10       A.   I wasn't an employee or anything like that.
11   So I did not see that that way.  I was not an employee
12   until my -- my start date's June 1.
13       Q.   What were you doing for ABCo prior to being
14   an employee of ABCo?
15       A.   I mean I just thought I was helping.  I
16   wasn't an employee or anything like that.  I wasn't a
17   partner.
18       Q.   Go over to number 6.  It asks, "Identify each
19   person and/or entity with whom you have discussed
20   funding, potential funding or providing any other
21   financial support to or for any business enterprise in
22   the portable buildings industry since January 1, 2021
23   as an investor, lender or in any other capacity."
24             And your response was "None."
25             Is that truthful?

1              Is that truthful?

2        A.   I believe so.  Yeah.

3        Q.   Okay.

4        A.   I don't have anything like that.

5        Q.   Go to the next page.  This will be page 7.

6   It's requests for production.

7              Number 1 asked you to produce all

8   correspondence and other documents related to the

9   creation or formation of any business enterprise in the

10  portable buildings industry.

11             And you responded, "None."

12             Is that truthful?

13       A.   Again, yes, because I -- I don't -- I wasn't

14  a part of the creation nor the formation of the

15  business.

16       Q.   Getting Order Time, getting the driver logs,

17  ordering office furniture?

18       A.   I really honestly did not think that that's

19  what that meant.  I thought creation and formation was

20  talking about the partners, owners.  I did not -- I did

21  not believe that to have -- to be pertaining to me.

22       Q.   Okay.  So if we have a broader definition of

23  creation or formation, what would your response be?

24  Would you have documents related to that?

25       A.   I don't know.  If you asked me now, like I

1    don't think I could put hands on anything like that at
2    this point, from that long ago.  And I really don't
3    think I did at the time.  But I'm not sure because,
4    like I said, I was reading that definitely as not
5    pertaining to me.
6          Q.    Was it your testimony earlier today that you
7    did not delete -- you said you did not intentionally
8    delete any text messages.
9          A.    Right.
10         Q.    Did you intentionally or unintentionally
11   delete any emails?
12         A.    No.
13         Q.    Number 2 asked to produce all documents that
14   set forth any relationship you had with any business
15   enterprise in the portable buildings industry since
16   January 1 of '21 other than Weather King.
17               And you responded, "None."
18               Is that truthful?
19         A.    Yeah.  I don't even know what document that
20   would -- what documents would that even be?  I don't
21   even understand what that would be.  So --
22         Q.    Number 3 --
23         A.    I didn't have like a contract or anything.
24         Q.    Okay.  Number 3 asks all correspondence or
25   other documents exchanged with any lenders or potential

1    lenders, including but not limited to FirstBank or

2    Centennial Park or any individuals, since 1/1/21

3    related to funding or financial support of any business

4    enterprise in the industry.

5            And you responded, "None."

6            Was that truthful?

7       A.   Yeah.  I've never had anything to do with

8    funding or potential funding or financial support.

9       Q.   What about banking?

10      A.   I mean I don't really know what -- what --

11   that's not even listed here.

12           Just banking?  We -- I mean I don't know what

13   that means.  What do you mean?

14      Q.   Banking.  Did you speak to anybody about

15   banking for ABCo?

16      A.   Like having a bank account?  I don't -- I

17   really don't recall.

18      Q.   Okay.  Number 6, all correspondence and other

19   documents exchanged with any former Weather King

20   employees between 1/1/22 and 7/1/22.

21           And you responded, "None."

22           Is that truthful?

23      A.   I don't -- sorry.  Heartburn.

24           I don't really know.  I know I never spoke

25   with anyone regarding ABCo at all.  And then you guys

1   got all of my call and text message stuff.  So I'm not --

2   I'm not sure.  I don't really know how to answer that,

3   I feel like.

4        Q.   You responded, "None."  That is a

5   representation that you had no documents.  Was that

6   truthful?

7        A.   I don't think that I had any documents.  No.

8   I mean no.  Documents?  No.

9        Q.   What about correspondence?

10       A.   I don't have my phone -- like I don't have

11  the phone with me now that -- I don't --

12            I don't really know.  That doesn't really

13  seem right.  I'm sure that there were conversations

14  with my coworkers about -- totally unrelated to

15  anything, but I don't -- I don't know.  I can't really

16  say.

17            I don't have it now.  I don't have access to

18  anything like that.

19       Q.   So you may have had stuff before that was

20  responsive, but you don't have it anymore?

21       A.   I don't even have the same phone now that I

22  had three years ago, but I don't -- I'm not sure how to

23  answer that question.

24       Q.   When did you change phones?

25       A.   Last year.

1          Q.   When?

2          A.   I'm not sure.  September, October.  I'm not

3    really sure.  I'd have to look up --

4          Q.   Was that after you --

5          A.   It was well after all of this stuff was over.

6    I mean I had not --

7          Q.   Was it after your phone was collected by the

8    forensic vendor?

9          A.   Yes.

10         Q.   Number 7 asks for all correspondence and

11   other documents exchanged with any then-current Weather

12   King employees after January 1 of '22.

13              And you responded, "None."

14              Is that truthful?

15         A.   Yeah.  Nobody spoke to me ever again from

16   Weather King.

17         Q.   Yeah.  So then -- I want to -- I do want to

18   make sure this is clear.

19              The question asks for any documents or

20   correspondence exchanged with any then-current Weather

21   King employees.  So at any time after January 1, did

22   you have any correspondence --

23         A.   January.

24         Q.   -- with someone who was a then-current

25   Weather King employee?

1    A.    Yeah, I did.  I don't really feel like that
2    response is correct.  I'm sure that there were texts,
3    just regular -- unless I just understood it to mean in
4    regards to this, but I don't really know.
5         Q.    Does it say "none" because you just weren't
6    paying very much attention to these discovery
7    responses?
8         A.    Perhaps.  I was just reading them
9    incorrectly.  I didn't have any kind of, like -- there
10   wasn't anyone helping me.
11        Q.    There was no one helping you?
12        A.    I've never done anything like this before.
13        Q.    No one helped you?
14        A.    No.
15        Q.    Go to number 14.  This is asking you to
16   produce all nonprivileged correspondence or other
17   documents related to several things, but I'm going to
18   skip to (e), which says "any of the defendants'
19   possession of or use of any Weather King property."
20             And you responded, "None."
21             Is that your -- is that a truthful response?
22   That you did not have any documents or correspondence
23   related to any of the defendants' possession or use of
24   any Weather King property?
25        A.    I believe that's correct.

1           Q.    Number 14, "One or more of the other

2    defendants has made use of Weather King property in

3    furtherance of an interest other than Weather King's

4    business."

5                 You said you had no knowledge of that

6    request.

7                 Is that truthful?

8           A.    I believe so.

9           Q.    Do you have any understanding of what was

10   expected of you to look for and produce documents in

11   response to Weather King's requests?

12          A.    I feel like I just did the best that I could

13   to understand the questions and give most -- my

14   truthful answer.

15          Q.    And it was your testimony that nobody helped

16   you or assisted you or gave you any advice or counsel

17   about --

18          A.    This is the first time I've met --

19                ATTORNEY PASTERNAK:  Hold on.  Hold on.

20   Don't answer that question.  You're getting into

21   attorney-client privilege.  Don't answer that question.

22                ATTORNEY DOLLARHIDE:  Ms. Gillespie, I'm not

23   asking you to reveal the contents of any

24   communications.  I'm asking about whether conversations

25   occurred.

1           ATTORNEY PASTERNAK:  Don't answer that
2   question because it's inherent, and you're asking about
3   the substance of the conversation.
4       Q.  (By Attorney Dollarhide)  Well, let me ask it
5   again this way.
6           Did you have any assistance in answering your
7   discovery -- in answering the discovery requests that
8   were addressed to you?
9       A.  No.
10      Q.  What did you do to look for responsive
11  documents?
12      A.  I don't recall.
13      Q.  Did you do anything to look for responsive
14  documents?
15      A.  I really don't recall.
16      Q.  Did you scroll through your cell phone?
17      A.  I'm sure I did do that.
18      Q.  Is it your testimony that scrolling through
19  your cell phone, you found no responsive documents?
20      A.  I believe so.
21      Q.  Is your Android phone backed up to a cloud
22  backup?
23      A.  I don't think -- I mean like pictures used to
24  get saved to it, but it doesn't anymore because there's
25  no storage available.

1        ATTORNEY PASTERNAK:  Do you need a break?
2   We've been going more than an hour.
3        ATTORNEY DOLLARHIDE:  I've got one --
4        ATTORNEY PASTERNAK:  Okay.
5        ATTORNEY DOLLARHIDE:  -- one more portion,
6   and then I want to take a break, if that's okay with
7   you.
8        THE WITNESS:  Sure.
9   Q.   (By Attorney Dollarhide)  Your response to
10  these discovery requests were made in March of 2023.
11  And you represented in those responses that you didn't
12  have a single text message, email or any other document
13  responsive to these requests.
14  A.   I did not feel like I had anything that was
15  relevant to what was being asked.
16  Q.   Okay.  Are you aware that your counsel has
17  represented to the court and to Weather King that you
18  didn't possess any text messages or other documents
19  responsive to Weather King's request?
20  A.   I just -- just from what you just explained
21  to me about how this works.
22               (Letter dated April 14, 2023 marked
23               Exhibit 7.)
24  Q.   (By Attorney Dollarhide)  This is Exhibit 7.
25  It's a April 14, 2023 letter from your attorney to my

1    partner Mr. Johnson.

2            And in it in the second full paragraph, it

3    says, "I can confirm that in all cases where the

4    defendants have stated that they do not have responsive

5    documents or devices, those responses are accurate and

6    are based on a reasonable search of available sources."

7            And then at the end of that paragraph, it

8    says, "No documents or devices have been destroyed or

9    deleted.  They simply never existed in the first

10   place."

11           Is that an accurate statement?

12       A.   I believe so.  I mean I definitely -- I

13   guess.  I'm not sure how to answer the question.

14       Q.   Did you review this letter at any time?

15       A.   I really don't recall.  I may -- I probably

16   did.

17       Q.   If that was not true, if you did have

18   documents, would you have told him, "Hey, that's not

19   true.  Don't send that out"?

20       A.   Yeah.  I mean yeah, I guess so.  I mean sure.

21   I would.

22       Q.   You didn't delete any text messages?

23       A.   Not -- I don't believe so.  I don't believe

24   so.  No.  I don't believe so.

25       Q.   Is there a possibility that you deleted text

1   messages?

2        A.   I don't delete text messages as a general

3   rule.  I don't delete text messages.  Like, as I told

4   you before, if it was a situation where it was old and

5   it got taken out like that, that was -- I did not do

6   that intentionally.  I did not delete messages.

7        Q.   How old are these old text messages that

8   you're talking about that get deleted?

9        A.   It's not really a date thing.  It's like how

10  many messages are in the thread.  I think it's after

11  200 messages.  So I don't believe anything was deleted,

12  even because of that.

13            I'm just -- I feel like I'm being trapped so

14  I'm not sure how to answer the question.  Because I did

15  not intentionally delete messages.

16       Q.   Did you delete any emails?

17       A.   I don't think so.  No.  I mean I don't think

18  so.  I really don't even generally delete emails at

19  all.  So I don't believe so.

20       Q.   You testified that there were some text

21  messages, you said a few text messages between you and

22  Jesse.  Why didn't you produce those?

23       A.   I'm not sure.  I don't know.

24       Q.   Were you aware that you had those text

25  messages?

```
 1         A.    I mean I would say -- trying to put myself
 2   back in the frame of mind three years ago.  I mean I
 3   definitely felt like I was answering everything
 4   truthfully.  So I don't think that I -- maybe I didn't
 5   even understand how to do that, how you would even do
 6   that.
 7         And then they were saying there were going to
 8   be copies of the phones, so I thought that anything
 9   that was there would be there anyway.
10         Q.    Who was saying there was copies of the
11   phones?
12         A.    Like Jesse was -- had said that they'll
13   probably just make copies of things.
14         But I don't remember even time frames of all
15   of this stuff now.  It's been so long.  Not to mention
16   how many times it seemed like it was going to be over,
17   and then it wasn't over, and there's more, and then
18   it's not.
19         I just don't -- it's all kind of muddled.
20         Q.    Are you aware that Weather King was forced to
21   file a motion to compel with the court about the lack
22   of text messages and emails?
23         A.    I don't know about that.  I don't know.
24         Q.    Are you aware that Weather King spent a
25   considerable amount of attorney's fees going to court,
```

1   trying to get the court to order you to produce text
2   messages and emails?
3        A.   I never heard -- I don't know anything about
4   that.
5        Q.   Are you aware of what was found on your phone
6   and your email?
7        A.   No.
8        Q.   No one's -- you don't know anything about
9   what was on your phone -- what was found on your phone
10  and on your email?
11       A.   I don't recall.
12       Q.   Did you have conversations with any of the
13  other defendants about deleting information or not
14  having information?
15       A.   I mean we -- I don't feel like -- I don't
16  really know how to answer the question the way you
17  worded it.  Say it again.
18       Q.   Did you talk with any of the other defendants
19  about deleting information or not having information?
20       A.   Of my own?
21       Q.   Responsive to Weather King's discovery
22  requests.
23       A.   I really don't recall.  I mean I may have had
24  conversation, but I didn't -- I just didn't real -- I
25  mean I just don't know how to answer that question.  I

1   really don't recall having conversations with -- about
2   specifically that.
3        Q.   Okay.  Your testimony is that you didn't
4   intentionally delete any text messages or emails,
5   right?
6        A.   Yes.
7        Q.   Did you have -- are you aware of any
8   conversations with any of the other defendants about
9   anyone deleting text messages or emails?
10        A.   I -- no.  I don't know what you're talking
11   about.  I don't remember anyone ever saying that anyone
12   was deleting any messages, that anybody thought that
13   they should or that there was or anything.  I don't --
14   I don't recall any conversation like that.
15        Q.   Do you recall any conversations with any of
16   the other defendants about preserving, not deleting,
17   any text messages or emails?
18        A.   Yeah.  That's what Jesse said to do because
19   this stuff -- that's what this said to do.  Yeah.
20        Q.   When did Jesse say to do that?
21        A.   I don't know.
22        Q.   In 2022?
23        A.   I was -- I would say right after all of this
24   started.
25        Q.   And did you do that?

| | | |
|---|---|---|
| 1 | A. | Did I do what? |
| 2 | Q. | Did you preserve relevant information? |
| 3 | A. | I did not believe I had any relevant |

information to preserve. I didn't do anything to not
preserve or to pre -- I didn't think I had anything
relevant.

ATTORNEY DOLLARHIDE:  Okay.  We can take a
break.

THE VIDEOGRAPHER:  Going off the record.
Time on the monitor is 11:39.

(A recess was taken.)

THE VIDEOGRAPHER:  Going back on the record.
Time on the monitor is 11:51.

Q.  (By Attorney Dollarhide)  Ms. Gillespie,
we're back from a break of about 10 minutes or so.  Did
you talk with anyone during the break about your
testimony?

A.  No.  Oh, I mean he said, "You're doing a good
job."

I said, "Thanks."

Q.  You didn't talk specifically about documents
or texts or emails or anything like that?

A.  No.

Q.  Okay.  One thing I wanted to clarify about
the text messages and emails, your testimony is --

 1   correct me if I'm wrong -- that when the discovery
 2   requests were sent to you -- or really as of June 2022,
 3   even earlier than that, when you got the preservation
 4   letter -- do you remember that?
 5             Do you know what I mean when I say
 6   preservation letter?
 7        A.   Yeah.
 8        Q.   I think it's Exhibit 2.
 9        A.   Yes.
10        Q.   Okay.  So when you got that and then when you
11   responded -- later on, when you responded to the
12   discovery requests, your testimony is that you did not
13   have any relevant documents?
14        A.   I did not believe I had any relevant
15   documents.
16        Q.   Is that because -- I want to clarify
17   something.
18             Does your answer mean that you had relevant
19   documents at some point in time, but no longer had them
20   at those times?
21        A.   No.  I don't believe I had relevant
22   documents.
23        Q.   At all, ever?
24        A.   I did not believe I had relevant documents.
25        Q.   Okay.

1      A.     What they were asking for.

2                    (19 messages on 1/19/2022 between Jesse

3                    Allen Maupin and Stephanie Parker marked

4                    Exhibit 8.)

5      Q.     (By Attorney Dollarhide)  Ms. Gillespie, I've

6   handed you what's been marked as Exhibit 8.  This is a

7   January 19, 2022 text message thread between Mr. Maupin

8   and you, correct?

9      A.     That's what it looks like.

10     Q.     All right.  And so January 19, 2022 at 8:57,

11  Mr. Maupin asks, "How much an hour do you make?"

12             And you say, "I just got my first raise in

13  six years.  It put me at $18."

14     A.     I obviously did not remember that, that that

15  happened.

16     Q.     Okay.  Then at 9:30, it says, "I need to talk

17  to you sometime one on one.  And not in this building."

18             And you said, "I see.  I see."

19             Is that the beginning conversation about

20  ABCo?

21     A.     I guess so.  Yeah.  I would -- I would think

22  that -- yeah.

23     Q.     So it was not in February.  It was in

24  January?

25     A.     I believe -- I guess so.  I did not think it

 1   was before February, but --

 2              I'm not sure when we talked.  We spoke on the

 3   phone.  I don't think it was this day, but I don't

 4   know.  I was thinking it was February.

 5        Q.   Do you know why this wasn't produced?

 6              So let me tell you something.  Anything that

 7   looks like this on the front page of Exhibit 8 that

 8   says Short Message Report, that was obtained from the

 9   forensic examination of your phone and your email.

10        A.   Okay.

11        Q.   Is there any reason why this was not

12   produced?

13        A.   I --

14        Q.   Let me ask -- let me ask that a different

15   way.  Do you have any explanation for why this was not

16   produced?

17        A.   I didn't realize that I even had this.

18        Q.   Is this -- I think you said that you

19   scrolled -- you would have scrolled through your phone.

20   Was this not something that you found on your phone?

21        A.   I'm not sure.  I don't believe -- I don't

22   know.

23              (Email dated 3/1/2022 12:36:20 PM marked

24              Exhibit 9.)

25        Q.   (By Attorney Dollarhide)  I've handed you

## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE
## EASTERN DIVISION

| | |
|---|---|
| **CONSOLIDATED INDUSTRIES, LLC**<br>**d/b/a WEATHER KING PORTABLE**<br>**BUILDINGS,** | )<br>)<br>)<br>) |
| **Plaintiff,** | )<br>) |
| | )   **Civil Action No. 1:22-cv-01230** |
| **v.** | )<br>) |
| **JESSE A. MAUPIN, BARRY D.**<br>**HARRELL, ADRIAN S. HARROD,**<br>**LOGAN C. FEAGIN, STEPHANIE L.**<br>**GILLESPIE, RYAN E. BROWN, DANIEL**<br>**J. HERSHBERGER, BRIAN L. LASSEN,**<br>**ALEYNA LASSEN, and AMERICAN**<br>**BARN CO., LLC,** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| | ) |
| **Defendants.** | ) |

### STEPHANIE L. GILLESPIE'S RESPONSES TO PLAINTIFF'S
### FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF
### DOCUMENTS, AND REQUESTS FOR ADMISSION

Pursuant to Fed. R. Civ. P. 26, 33, 34, and 36, Stephanie L. Gillespie by and through her

attorneys, state the following responses.

### INTERROGATORIES

1.    Identify each business enterprise that has been engaged in the Portable Buildings

Industry with which you played any role in planning its creation or formation and, with respect to

each such enterprise, identify: (a) your specific role(s) relating to the creation/formation; (b) the

dates in which you were involved in the planning; and (c) all other individuals and entities who

were involved in planning the creation/formation.

### RESPONSE:

68563555;1



I have not been involved in the planning or creation of any such business enterprise.

2.      Other than Weather King, identify each business enterprise in the Portable Buildings Industry in which you have held an ownership interest and/or performed services (whether as an employee, an independent contractor, or in any other capacity) since January 1, 2021, and, with respect to each such enterprise, identify: (a) your specific relationship with the entity, including but not limited to all titles and positions you have held; (b) the nature and extent of any ownership interest in the enterprise; (c) the dates of your relationship; and (d) your role and duties for the entity.

**RESPONSE:**

Gillespie objects to this interrogatory as unduly broad, overly burdensome, and not proportional to the needs of the case, nor relevant to any issue in the case. To collect all of this information would impose an unnecessary burden on Gillespie. Subject to and without waiving those objections, Gillespie states as follows: I became the Office Manager of American Barn on June 1, 2022. I hold no ownership interest.

3.      Identify each communication you have had with any person or entity (other than confidential communications solely with your legal counsel, your spouse, or your accountant) between January 1, 2021, and through the day of the termination of your employment with Weather King (including but not limited to communications with lenders or potential lenders, investors or potential investors, business partners or potential business partners, Weather King employees, Weather King contractors, Weather King dealers, Weather King builders, Weather King drivers, other Weather King business partners, rental companies, and Weather King customers) relating to the creation/formation or potential creation/formation of, funding or potential funding of, and/or operation or potential operation of any business enterprise in the Portable Buildings Industry (other

- 2 -

than Weather King) and, with respect to each such communication, identify: (a) the substance of the communication; (b) all parties to the communication; (c) the date of the communication; and (d) the mode of the communication (*i.e.*, telephonic conversation, email, text message, etc.).

**RESPONSE:**

Gillespie objects to this interrogatory as unduly broad, overly burdensome, and not proportional to the needs of the case, nor relevant to any issue in the case. To collect all of this information would impose an unnecessary burden on Gillespie. Subject to and without waiving those objections, Gillespie states as follows: The only person that I spoke with on these issues was Jesse Maupin, and I don't recall the dates or exact substance of the conversation.

4.      Identify each communication you had between January 1, 2021, and through the day of the termination of your employment with Weather King with any person then-employed by Weather King relating to that person's potential departure from Weather King and/or your potential departure from Weather King and, with respect to each such communication: (a) describe in detail the substance of the communication; (b) identify all parties to the communication; (c) identify the date of the communication; and (d) identify the mode of the communication (*i.e.*, telephonic conversation, email, text message, etc.).

**RESPONSE:**

See Response to Interrogatory No. 3.

5.      Identify each communication you had between January 1, 2021, and the day of the termination of your employment from Weather King with any person or entity who, at the time of the communication, was a Weather King dealer, driver, customer, lender, landlord, rental company, or other business partner relating to your potential departure from Weather King and, with respect to each such communication: (a) describe in detail the substance of the

- 3 -

communication; (b) identify all parties to the communication; (c) identify the date of the communication; and (d) identify the mode of the communication (*i.e.*, telephonic conversation, email, text message, etc.).

**RESPONSE:**

No such communications occurred.

6.      Identify each person and/or entity with whom you have discussed funding, potential funding, or providing other financial support to or for any business enterprise in the Portable Business Industry since January 1, 2021, whether as an investor, a lender, or in any other capacity.

**RESPONSE:**

None.

7.      Identify all property of Weather King (including but not limited to electronically stored information) that has been in your possession at any time after the date of the termination of your employment with Weather King and, with respect to the property, (a) identify where or how it has been stored; and (b) set forth in detail the circumstances in which you have made use of, copied,  or shared the property with anyone else (including but not limited to the identity of the person or entity and the date(s) in which the property was shared).

**RESPONSE:**

None.

8.      Identify all Weather King property, whether tangible or intelligible (including but not limited to financial information and inventory count information) of which you were not an authorized recipient but that you accessed or obtained without a Weather King officer's permission and, with respect to each such item, identify: (a) the specific property you accessed or obtained; (b) the circumstances in which you accessed or obtained it, including but not limited to the date(s)

- 4 -

68563555;1

of access or obtainment; (c) the circumstances in which you shared the property with anyone else, including but not limited to the identity of all such person and the date(s); and (d) the circumstances in which you otherwise made use of the property.

**RESPONSE:**

None.

9.    Identify all Weather King property, whether tangible or intelligible (including but not limited to financial information and inventory count information) to which you had authorized access but that you shared with a third-party or otherwise made use of the property for any purpose other than the furtherance of Weather King's business and, with respect to each such item, identify: (a) the specific property; (b) the circumstances in which you shared the property with anyone else, including but not limited to the identity of all such person and the date(s); and (c) the circumstances in which you made use of the property for any purpose other than the furtherance of Weather King's business.

**RESPONSE:**

None.

10.    Identify all email accounts, cell phone numbers (and providers), messaging services, Google drive accounts, Dropbox accounts, and any other cloud-based account that you have used at any time since January 1, 2022, through the present.

**RESPONSE:**

Gillespie objects to this interrogatory as being overly burdensome, unduly broad, and not proportional to the needs of the case,

11.    Identify each device in your possession, custody, or control, including but not limited to laptop computers, desktop computers, cell phones (including number and provider),

- 5 -

68563555;1

tablets, or other portable electronic or storage devices, that contains or contained any information that refers to, relates to, or was created by Weather King.

**RESPONSE:**

None.

12.    For each lawsuit, bankruptcy proceeding, criminal proceeding, or administrative proceeding, including divorce proceedings, to which you have been a party, state: (a) the court or agency in which said proceeding was instituted, the names of the parties to the proceeding, the docket number of said proceeding, the date the proceeding was filed and the date the proceeding was finally terminated; (b) the nature of the proceeding, including a description of the claims and defenses, if applicable, and (c) the manner in which the proceeding was resolved (for example, by settlement, by court order).

**RESPONSE:**

None.

## VERIFICATION

I, Stephanie L. Gillespie, declare under penalty of perjury that the foregoing responses to Plaintiff's First Set of Interrogatories are true and correct to the best of my knowledge, information, and belief.

Stephanie L. Gillespie

DATE: 3/21/23

- 6 -

68563555;1

## REQUESTS FOR PRODUCTION

Please produce the following:

1.    All correspondence and other documents relating to the creation or formation of
any business enterprise in the Portable Buildings Industry.

### RESPONSE:

None.

2.    All documents which set forth the relationship you have had with any business
enterprise in the Portable Buildings Industry since January 1, 2021, other than Weather King.

### RESPONSE:

None.

3.    All correspondence and other documents exchanged with any lenders or potential
lenders (including but not limited to FirstBank and Centennial Bank and any individuals) since
January 1, 2021, relating to funding or potential funding or other financial support of any business
enterprise in the Portable Buildings Industry.

### RESPONSE:

None.

4.    All correspondence and other documents exchanged with any investors or potential
investors since January 1, 2021, relating to any business enterprise in the Portable Buildings
Industry.

### RESPONSE:

None.

5.    All correspondence and other documents exchanged with Virgil W. Etherton
between January 1, 2021, and July 1, 2022.

- 7 -

68563555;1

**RESPONSE:**

None.

6.      All correspondence and other documents exchanged with any former Weather King

employees between January 1, 2022, and July 1, 2022.

**RESPONSE:**

None.

7.      All correspondence and other documents exchanged with any then-current Weather

King employees after January 1, 2022.

**RESPONSE:**

None.

8.      All correspondence and other documents exchanged with any then-current Weather

King dealers (including but not limited to employees and agents of those dealers) between January

1, 2022, and July 1, 2022.

**RESPONSE:**

None.

9.      All correspondence and other documents exchanged with any then-current Weather

King builders (including but not limited to employees and agents of those builders) between

January 1, 2022, and July 1, 2022.

**RESPONSE:**

None.

10.     All correspondence and other documents exchanged with any then-current Weather

King customers (including but not limited to employees and agents of those customers) between

January 1, 2022, and July 1, 2022.

- 8 -

68563555;1

**RESPONSE:**

None.

11.      All correspondence and other documents exchanged with any then-current Weather

King drivers (including but not limited to employees and agents of those drivers) between January

1, 2022, and July 1, 2022.

**RESPONSE:**

None.

12.      All correspondence and other documents exchanged with any Portable Buildings

Industry rental companies and/or rental companies being formed (including but not limited to

employees and agents of those entities) between January 1, 2022, and July 1, 2022.

**RESPONSE:**

None.

13.      All correspondence and other documents exchanged with BPS, LLC, BPS Rentals,

LLC, Keith Priestley, Jerry Sawyer or Troy Buttrey between July 1, 2021, and July 1, 2022.

**RESPONSE:**

None.

14.      All non-privileged correspondence and other documents related to:

(a) any of the Defendants' departure from Weather King;

(b) any of the Defendants' communications with any Weather King employees about the

possibility of leaving Weather King or joining ABCO;

(c) any of the Defendants' communications with any Weather King builders, dealers,

drivers, rental companies, or contractors, about the possibility of doing business with

ABCO or ceasing doing business with Weather King;

- 9 -

68563555;1

(d) any claims or potential claims made by Weather King against any of the Defendants;

(e) any of the Defendants' possession of or use of any Weather King property; or

(f) derogatory remarks made by any of the Defendants relating to Weather King;

### RESPONSE:

None.

15.     All correspondence and other documents exchanged with any person or entity related to the leasing or potential leasing of any property located in Arizona or New Mexico.

### RESPONSE:

None.

16.     All emails and attachments sent from your Weather King company email address to any personal email address since January 1, 2021.

### RESPONSE:

Responsive documents will be produced.

17.     All correspondence and other documents referencing or relating to any Weather King drawings, blueprints, or other engineering plans, including but not limited to plans prepared by Kevin Nolan, P.E.

### RESPONSE:

None.

18.     All documents relating to any sales of units using any Weather King drawings, blueprints, or other plans, including but not limited to plans prepared by Kevin Nolan, P.E.

### RESPONSE:

None.

- 10 -

## Short Message Report

Conversations: 1
Total Messages: 19

Participants: 3
Date Range: 1/19/2022

### Outline of Conversations

💬    **+19312376048 · 19 messages on 1/19/2022** · Jesse Allen Maupin <2709709453> · Stephanie Parker
<9312376048>



**Messages in chronological order** (times are shown in GMT -06:00)

| 😃 | **+19312376048** | |
|---|---|---|
| | **Jesse Allen Maupin <2709709453>**<br>🌿 | 1/19/2022, 7:08 AM |
| | **Jesse Allen Maupin <2709709453>**<br>📷 | 1/19/2022, 8:03 AM |
| | **Jesse Allen Maupin <2709709453>**<br>Hey I need to ask you something and if you don't wanna answer It i totally understand | 1/19/2022, 8:38 AM |
| SP | **Stephanie Parker <9312376048>**<br>What's up? | 1/19/2022, 8:44 AM |
| | **Jesse Allen Maupin <2709709453>**<br>How much an hour do you make | 1/19/2022, 8:57 AM |
| SP | **Stephanie Parker <9312376048>**<br>I just got my first raise in 6 years and it put me at $18 | 1/19/2022, 9:03 AM |
| SP | **Stephanie Parker <9312376048>**<br>Just curious why? | 1/19/2022, 9:03 AM |
| SP | **Stephanie Parker <9312376048>**<br>Obviously I know you know not to tell anyone that 😅 | 1/19/2022, 9:04 AM |
| | **Jesse Allen Maupin <2709709453>**<br>Just wondering and I would never say a word I promise that | 1/19/2022, 9:15 AM |
| SP | **Stephanie Parker <9312376048>**<br>I already knew haha. | 1/19/2022, 9:16 AM |
| | **Jesse Allen Maupin <2709709453>**<br>📷 | 1/19/2022, 9:16 AM |
| | **Jesse Allen Maupin <2709709453>**<br>Well I wouldn't ever tell anyone | 1/19/2022, 9:28 AM |
| SP | **Stephanie Parker <9312376048>**<br>Hell it's probably about to change to $0 when I finally get the boot 🔫 | 1/19/2022, 9:29 AM |
| | **Jesse Allen Maupin <2709709453>**<br>I need to talk to you sometime one on one | 1/19/2022, 9:30 AM |
| | **Jesse Allen Maupin <2709709453>**<br>And not in this building | 1/19/2022, 9:30 AM |
| SP | **Stephanie Parker <9312376048>**<br>I see I see. | 1/19/2022, 9:30 AM |
| SP | **Stephanie Parker <9312376048>**<br>Am I getting fired? 😂 | 1/19/2022, 9:30 AM |

Confidential

**Jesse Allen Maupin <2709709453>**                                          1/19/2022, 9:34 AM
Not that I know of and it's not anything that you should worry about

SP    **Stephanie Parker <9312376048>**                                     1/19/2022, 9:34 AM
Word well ok we'll talk later.