

In the Matter of:

CONSOLIDATED INDUSTRIES, LLC

vs.

JESSE A. MAUPIN, et al.

# BRIAN NAPPER

*June 10, 2025*



www.LexitasLegal.com
Ph.(615) 595-0073

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F. California Firm Registration #179

Page 37

| | |
|---|---|
| 1 | B. NAPPER |
| 2 | and so that was somewhat consistent with some |
| 3 | of the observations I actually had in my |
| 4 | report, as to a, if you will, looking for |
| 5 | information, as to how the plaintiff might |
| 6 | have mitigated the damages or economic impact |
| 7 | of the departure of Mr. Maupin and the |
| 8 | defendants. |
| 9 | Q.   What did you do in response, how |
| 10 | did you change your report in response to |
| 11 | Mr. Pasternak's relaying you his observations |
| 12 | from the deposition? |
| 13 | A.   I don't think there was any |
| 14 | really material changes, obviously I didn't |
| 15 | have the transcript, but I had the download |
| 16 | and it seemed consistent with the observation |
| 17 | I had already made in my report related to |
| 18 | that issue. |
| 19 | Q.   And, you've since reviewed those |
| 20 | transcripts? |
| 21 | A.   I have. |
| 22 | Q.   And it's your testimony that you, |
| 23 | even after reviewing those transcripts, you |
| 24 | didn't make any material changes, you didn't |
| 25 | need to make any further material changes to |

Page 38

1  B. NAPPER
2  your report?
3      A.   That is correct, the testimony
4  seemed consistent with what Mr. Pasternak had
5  relayed to me after the depositions.
6      Q.   You said material changes, what
7  immaterial changes did you make?
8      A.   I think your question was
9  material changes, I don't think I made any
10 changes.  Let me see (perusing document.)
11 Yeah, I don't think -- I don't recall making
12 any changes to the report before filing.
13     Q.   All right, if you will -- so is
14 this report, as we sit here today, a complete
15 statement of all the opinions that you
16 expressed and the basis and reasons for those
17 opinions?
18     A.   I believe so.  Although as is
19 often the case in re-reviewing information, I
20 have a couple of additional observations that
21 are consistent with my overall opinions.
22     Q.   What are those?  Generally.  If I
23 need to get more specific, I'll ask and we
24 might get to them at that point in the report.
25     A.   Sure, I noticed I believe that

Page 39

1  B. NAPPER
2  your firm had filed some sort of motion
3  recently about the mitigation subject matter
4  and had attached some testimony that, from
5  Brian Berryman, that you all believed
6  supported your position on, I think, it's
7  called leave to amend or something like that.
8  I think you filed that fairly recently.  And
9  there was a focus on Brian Berryman's
10 deposition transcript, and something I had not
11 focused on before was that Mr. Brian Berryman
12 testified that Old Hickory had actually made
13 an acquisition of a company in this space, and
14 had paid four times the profits of that
15 company.
16     Q.   We will come back to that.
17         What other observations?
18     A.   Well, I've, subsequent to this
19 report of course, have now read the deposition
20 transcripts of Tim Boyd and Scott Berryman, so
21 I've read those transcripts now, I got those
22 subsequent to May 7th.
23     Q.   I'm sorry, I may have been
24 unclear in my question; I asked you if your
25 report is -- if it's complete and it states

Page 40

1  B. NAPPER
2  all the bases and reasons for your opinion,
3  you said you believed so, but you had
4  additional observations.  Plural.  One of
5  those was Brian Berryman's testimony about Old
6  Hickory acquiring a company for four X
7  properties; what are the other ones, what are
8  the other additional observations that you
9  had?
10     A.   Well, again, it was -- I reviewed
11 the transcript of Tim Boyd and Scott Berryman,
12 since I didn't have those on the day of my
13 report, I reviewed those and their testimony
14 seemed consistent or was consistent with what
15 Mr. Pasternak had essentially given me during
16 the conversation or discussion at the end of
17 the day of May 7, 2025 of those deposition
18 transcripts.
19     Q.   So, the other observation was
20 that those transcripts were consistent with
21 what Mr. Pasternak relayed to you on May 7th?
22     A.   Correct.
23     Q.   Any other additional observations
24 since you issued the report?
25     A.   Not that I recall.

Page 137

```
 1              B. NAPPER
 2   Mr. Brian Berryman didn't name the company,
 3   but.
 4       Q.   Do you know what was purchased?
 5       A.   Well, the fact that he's
 6   describing it four times profit of a company
 7   that seemed to be in this space is my only
 8   takeaway from his testimony.  Which tells me,
 9   why would he be buying a company that makes
10   swimming pools, for example.
11       Q.   But I mean, do you know what was
12   included in the sale?
13       A.   I don't.  But I noticed that he
14   represented that it was four times profit.
15   So, Old Hickory was performing an income
16   approach and/or a market approach to value
17   that company that they purchased, which is
18   different than what happened here, with
19   respect to the $5 million transfer.
20       Q.   Is it income or market?
21       A.   It's a probably a little bit --
22   it's a combination of both, actually.
23       Q.   Do you know whether or not Old
24   Hickory's purchase of a company at four times
25   the profits included a dealer network?
```

Page 138

```
 1              B. NAPPER
 2       A.   I don't -- I don't, one way or
 3   the other.
 4       Q.   Again, what is your understanding
 5   of what the sale from Weather King to Old
 6   Hickory included?  It was just those items, it
 7   did not include a dealer network, it did not
 8   include manufacturing plant relationships, it
 9   did not include dealer relationships or driver
10   relationships; is that right?
11       A.   Well, that's interesting, because
12   it could have, I don't know what was
13   specifically transferred except for three
14   different buckets, and there is no asset
15   purchase agreement.  But what I mean by it
16   could have, if there's a dealer network
17   connection that would be helpful to Old
18   Hickory to take these assets and make money on
19   them, I assume the son could call the dad and
20   say, hey, help us out here.
21       Q.   Do you know?
22       A.   Do I know what?
23       Q.   Do you know whether dealer
24   network connections were included in what
25   assets were exchanged in Weather King's sale
```

Page 139

```
 1              B. NAPPER
 2   to Old Hickory?
 3       A.   To the extent I understand what
 4   dealer network is --
 5       Q.   What I mean by dealer network is
 6   the purchaser, also purchasing in addition to
 7   the assets themselves, a manner in which to
 8   generate revenue from those, and not
 9   incorporating them into an existing supply
10   chain.  Like, who was going to sell the
11   buildings, is what I'm asking?
12       A.   Well, I assume it was going to be
13   Old Hickory.  Old Hickory would take these
14   assets -- but, again, the asset purchase
15   agreement would give you some insight into
16   that.  But in any event, I would assume it
17   would be the acquirer, Old Hickory.  Having
18   said that, they are connected, so if there is
19   additional assistance in terms of a dealer
20   network -- if it's just a list of dealer
21   networks and who you know and who you could
22   possibly sell to, I don't know if that could
23   be shared between a 25% owner of one company
24   to a 100% owner of another company, I don't
25   know.  But that's not what was listed as what
```

Page 140

```
 1              B. NAPPER
 2   was sold, I would agree with that, to Old
 3   Hickory.
 4       Q.   Earlier you testified that you
 5   made additional observations after reviewing
 6   the testimony of Jill Coker, Tim Boyd and
 7   Scott Berryman and Brian Berryman, I think now
 8   that we've talked about it, you already had
 9   Brian Berryman's testimony at the time of your
10   report?
11       A.   That is true.
12       Q.   We talked about four pieces of
13   information that you reviewed since your
14   report, and included Brian Berryman in that?
15       A.   To be clear, I testified that I
16   reviewed the -- Counsel for Weather King
17   suggesting that, on mitigation if you will,
18   that there was a motion to not consider that,
19   I forget what the title was, and attached to
20   that was a section of Brian Berryman's
21   deposition transcript.  So, I reviewed that
22   pleading, and that's where my attention was
23   driven by the four times profit number.
24       Q.   You already had access to the
25   four times profit testimony on May 7th?
```

Page 141
```
1              B. NAPPER
2      A.   I did.  So, that was information
3   I had in my possession, I agree, I missed that
4   in my first pass of Mr. Brian Berryman's
5   deposition transcript, but I saw related to
6   this specific issue, that there is a reference
7   to his four times profit.
8      Q.   You testified, and rather than
9   have the court reporter go back and read it,
10  do you recall -- and I'm not holding you to
11  this, I'm basically I'm asking this question
12  again, and if it's inconsistent, that's okay.
13           What additional observations did
14  you form after reviewing Jill Coker, Tim Boyd
15  and Scott Berryman's depositions?
16     A.   Generally, from Ms. Coker's
17  testimony, she, I believe, was the subject
18  matter person for the trade secrets of Weather
19  King, and her testimony was essentially
20  somewhat consistent with the approaches I've
21  used in terms of identifying the trade secrets
22  approach, if you will, of a head start.
23  Because she testified on a number of occasions
24  that, yes, she believed that the defendants
25  having access to some of this information,
```

Page 142
```
1              B. NAPPER
2   like engineering drawings, would essentially
3   help -- in theory, help the defendant get into
4   the marketplace quicker.
5      Q.   Is that with respect to Jill
6   Coker?
7      A.   That's generally what I recall.
8      Q.   What about Tim Boyd?
9      A.   Tim Boyd was, no, nothing --
10  nothing really new -- nothing really new from
11  my review of Tim Boyd.
12     Q.   What about Scott Berryman?
13     A.   Nothing that I recall
14  specifically, no.  Except that they did talk
15  about the, you know, the quick sale, if you
16  will.
17     Q.   I think that's jogging my
18  recollection, I wanted to say that you did
19  mention something about Scott Berryman about
20  that?
21     A.   Yes.
22     Q.   In Paragraph 48, are you there?
23     A.   I am.
24     Q.   You mentioned close familial
25  relationship between the parties, the under
```

Page 143
```
1              B. NAPPER
2   two-month timeline needed to complete the deal
3   and a lack of an informal agreement, is there
4   anything else that you would be presenting to
5   the jury as an indication that the sale of
6   Weather King's assets to Old Hickory was not
7   at fair market value?
8           MR. PASTERNAK:  Asked and
9       answered.
10     A.   Right, and we did talk about
11  this.  The other part is the assets were
12  transferred at cost, but those assets are
13  going to drive income and profits.  So, it
14  understates the value, so anything I point to
15  as far as potential market value of the
16  western region, I think I have one example in
17  here, would be -- also should be considered in
18  determining whether this was a fair market
19  value, this being the $5.4 million for the
20  assets.
21     Q.   But it was in the best interest
22  of the Weather King's owners to get the
23  highest price possible, right?
24     A.   I mean --
25     Q.   Well, what I'm asking you is, why
```

Page 144
```
1              B. NAPPER
2   would Weather King's owners sell for less than
3   fair market value?
4           MR. PASTERNAK:  Objection, calls
5       for speculation.
6      A.   I can't read the minds of the
7   people, all I can say is, it was fairly quick,
8   very quick, and it wasn't documented.  Now,
9   what that suggests, I don't know.
10     Q.   Okay.
11     A.   And I have other indications that
12  it may be too low.
13     Q.   Okay, in Paragraph 49, you're
14  quoting from Brian Berryman's testimony, and
15  saying, "According to further testimony from
16  Brian Berryman, we had buildings go missing
17  that we thought we had."
18           Would you agree with me that's an
19  indication that Old Hickory overpaid?
20     A.   No, because he goes on to say,
21  "We had buildings show up that we didn't know
22  we had for months after the sale."  My
23  takeaway was we had buildings go missing but
24  we also found some buildings, but that
25  suggests more documentation, perhaps, that may
```