IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

| | |
|---|---|
| CONSOLIDATED INDUSTRIES, LLC ) <br> d/b/a WEATHER KING PORTABLE ) <br> BUILDINGS, ) <br>  ) <br> Plaintiff, ) <br>  ) <br> v. ) <br>  ) <br> JESSE A. MAUPIN, BARRY D. ) <br> HARRELL, ADRIAN S. HARROD, ) <br> LOGAN C. FEAGIN, STEPHANIE L. ) <br> GILLESPIE, RYAN E. BROWN, DANIEL ) <br> J. HERSHBERGER, BRIAN L. LASSEN, ) <br> ALEYNA LASSEN, and AMERICAN ) <br> BARN CO., LLC, ) <br>  ) <br> Defendants. ) | Civil Action No. 1:22-cv-01230-STA-jay <br><br> Chief Judge S. Thomas Anderson |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE CERTAIN OPINIONS OF BRIAN NAPPER

Plaintiff "Weather King" submits this brief in support of its motion to limit the opinions of Brian W. Napper, whom Defendants Jesse Maupin, Barry D. Harrell, Adrian S. Harrod, Logan C. Feagin, Stephanie L. Gillespie, Ryan E. Brown, Daniel J. Hershberger, and American Barn Co., LLC (collectively "the ABCO Defendants") designated as an expert.

### INTRODUCTION

The background of this case is set forth in this Court's summary judgment ruling. *See* Doc. 119 at 2-3. The gravamen of Weather King's claims is that nine former Weather King employees abused their positions in the creation and operation of a competing entity in the portable buildings industry, Defendant American Barn Co., LLC ("ABCO"), in a months-long, well-coordinated

scheme to secretly steal Weather King's Western U.S. operations, causing significant financial losses.

At the time that they were covertly conspiring to steal away Weather King's Western operations, a key element of Defendants' scheme was to place Weather King in a position where it could not salvage its Western operations, including by: (a) lining up all of Weather King's key employee, independent contractor, and dealer relationships in advance of leaving Weather King; (b) leaving Weather King *en masse*; and (c) catching Weather King by surprise so that it could not react. *See, e.g.,* Ex. 4, 1/12/22 text (Defendant Maupin announcing "I have everyone on board" 4½ months before Defendants left Weather King); Ex. 5, 3/3/22 text (noting "how important the element of surprise is to getting this thing up and going"); Ex. 6, Maupin Dep. 114:15-115:5, 125:19-126:22, 158:5-13, 237:19-238:3, 346:24-347:21 (admitting that it was Defendants' "goal . . . to catch Weather King by surprise and delay [their] departure until [they] had everything lined up" so that Weather King would be caught "scrambling around" "[l]ike a deer in the headlights" and to place "maximum pressure on Weather King" so that it would not be "able to put up a fight"); Ex. 7, 5/31/22 text (referencing a "hostel [sic] takeover").

Defendants' plan worked. As set forth in Exhibit 2 hereto, Weather King officer Jill Coker summarized the "mass chaos" that Weather King faced immediately after it learned of Defendants' scheme on June 1, 2022, including: all of the Western shop managers either not answering their phones or announcing that they and the employees in their shops were all quitting; one shop manager lying to employees that they had all been fired; dealers announcing that they were leaving; independent contractor drivers announcing that they were leaving; independent contractor builders being lured away; customers (prompted by Defendants) calling in to cancel their orders; dealers (prompted by Defendants) demanding that Weather King immediately pick up its remaining

2

inventory from their sales lots; and even pressure being placed on Weather King's Florida operations. Ex. 2, Coker Dep. 77-82. Weather King even sent one of its Florida plant managers across the country to Arizona in an effort to salvage the operations, but ABCO thwarted that effort in real time by paying him to leave Weather King and join ABCO's enterprise as well. *Id.* at 79:2-80:1.

Left with no builders to manufacture inventory, no managers to oversee operations, no drivers to transport inventory, and no effective dealers to market and sell remaining or future inventory to customers, Weather King had no choice but to abandon its Western operations. Without the ability to transport its remaining Western assets to the east coast without incurring significant freight charges, Weather King concluded that the best way to mitigate its losses was to sell its remaining inventory, raw materials, and equipment to another portable buildings manufacturer, Old Hickory Sheds, LLC ("Old Hickory"), at essentially wholesale value.

Napper works for an intellectual property and forensic accounting consulting company, where he specializes in valuation of intellectual property and other assets. Napper issued a report on May 7, 2025. Ex. 1. Most of his opinions pertain to critiquing Weather King's damages expert's opinions and offering his own damages measures. Weather King does not challenge those opinions here. Napper, however, departs from his expertise by suggesting that "Weather King did not mitigate its potential losses." *Id.* at 8. In addition to lacking relevance, Napper is not qualified to offer those opinions, which are not trustworthy.

## LEGAL STANDARD

Federal Rule of Evidence 702 allows a witness to provide an expert opinion if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data;

3

(c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." This Court has summarized the gatekeeping standard for considering the reliability of an expert's opinion:

> The Supreme Court in *Daubert* provided the following non-exclusive list of factors for district courts to consider when evaluating the reliability of an opinion witness's testimony: (1) whether a theory or technique can be and has been tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) whether, with respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation, and (4) whether the technique enjoys general acceptance within the relevant scientific, technical, or other specialized community. *Id.* at 592–94, 113 S.Ct. 2786. The *Daubert* factors are not exhaustive, and not all of them apply in every case. *Dilts v. United Grp. Servs., LLC*, 500 F. App'x 440, 445 (6th Cir. 2012). In *Kumho Tire*, the Supreme Court explained that "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141–42, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).
>
> The district court acts as the "gatekeeper" on opinion evidence, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), and must exercise its gatekeeping function "with heightened care." *United States v. Cunningham*, 679 F.3d 355, 380 (6th Cir. 2012) (quoting *Surles, ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 295 (6th Cir. 2007)). The Court will not exclude expert testimony "merely because the factual bases for an expert's opinion are weak." *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 729 (6th Cir. 2012) (citations omitted). Rule 702 of the Federal Rules of Evidence does not "require anything approaching absolute certainty." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671–72 (6th Cir. 2010) (citing *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786).
>
> Under *Daubert*, experts are "permitted wide latitude in their opinions, including those not based on firsthand knowledge, so long as the expert's opinion has a reliable basis in the knowledge and experience of the discipline." *Dilts*, 500 F. App'x at 445 (quoting *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786) (internal quotation marks omitted). "*Daubert* and Rule 702 require only that the expert testimony be derived from inferences based on a scientific method and that those inferences be derived from the facts on the case at hand, not that they know the answer to all the questions a case presents-even to the most fundamental questions." *Jahn v. Equine Servs. PSC*, 233 F.3d 382, 390 (6th Cir. 2000) (internal citation omitted). By the same token, "the knowledge requirement of Rule 702 requires more than subjective belief or unsupported speculation." *Tamraz*, 620 F.3d at 670 (quoting *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786). "Red flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Dow v. Rheem Mfg. Co.*,

527 F. App'x 434, 437 (6th Cir. 2013) (citing *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012)).

*Hayes Outdoor Media, LLC v. Southern Trust Ins. Co.,* 574 F. Supp. 3d 565, 568-69 (W.D. Tenn. 2021).

"Once a litigant challenges the admissibility of proposed expert testimony, the proponent bears the burden of establishing, by a preponderance of the evidence, that it is admissible." *Jones v. Varsity Brands, LLC*, No. 2:20-cv-02892-SHL-tmp, 2024 WL 967684, at *2 (W.D. Tenn. Mar. 6, 2024) (citing Fed. R. Evid. 702 advisory committee's note to the 2023 amendments).

## ARGUMENT

The Court should preclude Napper from suggesting that Weather King failed to mitigate its damages. In opining that Weather King failed to mitigate its losses, Napper states that Weather King's asset sale to Old Hickory may not have reflected fair market value, and further, that Weather King could have done more to salvage its Western operations. Ex. 1, ¶¶ 43-62. Defendants did not assert failure to mitigate as an affirmative defense, however, so Napper's opinions on this topic are irrelevant and prejudicial. In any event, Napper (who has no experience in the portable buildings industry) is not qualified to weigh in on this topic, and his opinions are unreliable.

    **A.**    **Napper's opinions do not fit the facts of this case.**

Expert "testimony being offered must 'fit' the case in which it is to be given—that is, there must be a connection between the expert's knowledge and the facts at issue in the case." *Henry v. Allstate Prop. & Cas. Ins. Co.*, No. 08-2346, 2009 WL 10665236, at *2 (W.D. Tenn. Oct. 14, 2009) (citations omitted). Napper's mitigation of damages opinions do not fit the facts of this case because the ABCO Defendants did not assert failure to mitigate as a defense in their Amended Answer. *See* Doc. 31, p. 33. Although the ABCO Defendants have filed an untimely motion to

5

amend their Answer so as to assert the defense (Doc. 217), that motion should be denied for the reasons set forth in Weather King's response briefing (*see* Doc. 218, Doc. 225).

For this reason alone, the Court should exclude Napper's mitigation of damages opinions as irrelevant. *See Hopman v. Union Pac. R.R.*, 2021 WL 2694236, at *7 (E.D. Ark. June 30, 2021) ("Because the Court denied [defendant's] motion to amend its answer to plead the affirmative defense of direct threat, matters related to direct threat are no longer an issue in the case. Therefore, the Court grants [plaintiff's] motion to exclude [defense expert's] testimony on topics related to the unpled affirmative defense of direct threat."); *Wine Educ. Council v. Rangers*, 2021 WL 1573783, at *3 (D. Ariz. Apr. 22, 2021) (excluding expert opinion on whether party was legally entitled to receive charitable grant from donor advised fund where party had not pled illegality as an affirmative defense).

  **B. Napper is not qualified to critique the measures that Weather King took to attempt to salvage its Western operations.**

Even if Defendants timely disclosed a failure to mitigate defense, Napper is not qualified to suggest to the jury that Weather King should have taken more or different measures to try to salvage its Western U.S. operations or that the operations were salvageable.  According to Napper, "it is uncertain why Weather King would have accepted a relatively low purchase price, apparently based on acquisition costs, at which it ultimately sold its assets in 2022, and begs the question why Weather King did not pursue greater efforts to salvage any additional value from its assets." Ex. 1, Napper Rpt. ¶ 57.  Along those lines, he questions Weather King's "efforts (or lack thereof) to replace [Defendants] or otherwise mitigate its business losses," and further states that this "calls into question Plaintiff's efforts to not have attempted to extract value from these remaining employees and/or hire additional resources to maintain the historical financial success and performance of Weather King's Western Division." *Id.*, ¶¶ 58-59.

6

Comparing Weather King's Western operations with its Eastern operations, Napper also questions why Weather King "could not have contemplated implementing a business model which more closely resembled its Eastern Division operations," such as retaining independent contractors. *Id.*, ¶¶ 60-61.

These opinions are outside Napper's lane as an asset valuation expert. As Napper conceded, he has *no experience* in the portable buildings industry. Ex. 3, Napper Dep. 76:25-77:4. His credentials do not afford him special knowledge to assist the jury in understanding whether Weather King was capable of salvaging its Western operations. There is nothing about Napper's background that would give him expertise to critique Weather King's efforts at retaining or replacing employees. Nor can a witness without experience in the portable buildings industry offer an expert opinion that Weather King could have replicated its Eastern business model in the West.

Napper even concedes that, rather than offering a specific opinion, he is merely offering "economic perspective." Ex. 3, Napper Dep. 156:5-14 ("Q. "[W]ould you agree that you're not in a position to say what steps Weather King took or didn't took [sic] are reasonable, that that's a determination for the jury or the Court? A. I think it's up to the Court to decide, but I think I can provide some economic perspective of any steps that were done or steps that were not done."). He also admitted that he does not know whether his proposed steps would have been of any value. *Id.* at 162:18-165:24.

Napper, however, would improperly be providing a narrative summary of the ABCO Defendants' version of the facts under the veneer of expertise. Although an expert may set forth the factual basis for a proper expert opinion:

> " '[A]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence.' " *Shall v. Suzuki Motor of Am., Inc.*, No. 4:14-CV-00074-JHM, 2020 WL 1162193, at *5 (W.D. Ky. Mar. 10, 2020) (citing *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y.

7

2009); *Highland Cap. Mgmt., LP v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005)). To the extent such evidence is admissible, it is "properly presented through percipient witnesses and documentary evidence." *Id.* (citing *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1330 (M.D. Fla. 2015)). "However, as opposed to providing a mere factual narrative, [an] expert is allowed to articulate the 'factual underpinning' upon which [he or she] bases [his or her] opinion." *Id.* (quoting *Pledger v. Reliance Tr. Co.*, No. 1:15-CV-4444-MHC, 2019 WL 4439606, at *12 (N.D. Ga. Feb. 25, 2019)).

*Jones v. Varsity Brands, LLC*, No. 2:20-cv-02892-SHL-tmp, 2024 WL 967684, at *7 (W.D. Tenn. Mar. 6, 2024); *see also University of Tenn. Research Found. v. Caelum Biosciences, Inc.*, 2024 WL 3381685, at *5 (E.D. Tenn. July 11, 2024) ("[E]xpert testimony which 'merely regurgitates factual information that is better presented directly to the jury rather than through the testimony of an expert witness' should be excluded.") (citations omitted); *United States v. Stone*, 222 F.R.D. 334, 341 (E.D. Tenn. 2004), *aff'd,* 432 F.3d 651 (6th Cir. 2005) ("The last obligation placed on the trial court is that it must ensure that the expert witness is truly testifying as an expert and not merely serving as a conduit through which hearsay is brought before the jury.").

Indeed, when asked at his deposition about his failure to mitigate opinions, Napper responded: "I would say that what Weather King did do is just exactly what happened, which is a ***fact observation*** . . . ." Ex. 3, Napper Dep. 157:25-158:5 (emphasis added); *see also id.* at 99:10-16, 101:1-9, 167:14-168:9, 191:19-25, 203:6-20 (offering "observations"). The Court should not allow Napper to serve as Defendants' mouthpiece relating to factual "observations," which are not helpful to the jury and would cause Weather King to be unfairly prejudiced.

    **C.**    **Napper's opinions are unreliable.**

8

In addition, Napper's mitigation of damages opinions are untrustworthy. Not only are they unreliable due to his lack of expertise on the subject matter, Napper has a fundamental misperception of the underlying facts (and therefore does not reliably apply his observations to the case).

First, Napper has a critical misunderstanding of the manpower Weather King had remaining in the West after Defendants and other employees and independent contractors left *en masse* in June 2022. According to Napper:

> 59. Mr. Maupin testified that Weather King had between 25 – 30 employees who "were either working out west or helping service the west". After accounting for the seven Defendants who I understand each ceased their employment with Weather King around late May – early June 2022, this implies ***around 16 – 21 employees would have remained servicing the Weather King Western Division***. Again, this calls into question Plaintiff's efforts to not have attempted to extract value from these remaining employees and/or hire additional resources to maintain the historical financial success and performance of Weather King's Western Division.

Ex. 1, ¶ 59 (emphasis added).

Napper, however, overlooks that when the nine individual Defendants (not "seven" as stated by Napper) left Weather King, they were not the only ones who left; instead, they orchestrated a mass exodus of most of Weather King's Western employees. *See generally* Ex. 2, Coker Dep. 76:8-82:2. For instance, the interrogatory responses of Defendant Brian Lassen, who managed Weather King's shop in Peoria, Arizona, confirm that 12 Weather King employees (in addition to Defendant Aleyna Lassen) joined him in leaving Weather King on June 1, 2022—the date of the mass exodus. Ex. 8. And Defendant Ryan Brown, who operated Weather King's shop in Milan, New Mexico, testified that all employees at that plant quit at the same time on June 1,

9

2022. Ex. 9, Brown Dep. 85:20-86:15.[1]  Thus, Napper's opinion that Weather King had plenty of employees to continue to service the West is predicated on a false premise.

Moreover, in Paragraphs 60-61 of his report, Napper "question[s] why the Weather King Western Division, around the time of its sale in 2022, could not have contemplated implementing a business model which more closely resembled its Eastern Division operations," and specifically, retaining independent contractor builders (as in Florida). Ex. 1. Aside from Napper's utter lack of qualifications to critique portable buildings industry business models, his opinion, again, is predicated on a fundamental misunderstanding of the facts. In addition to operating three shops in the West managed by Defendants Lassen, Brown, and Hershberger, Weather King *did in fact work with independent contractors* in the West—entities operated by Kerry Ratzlaff and Ryan Woods. Ex. 6, Maupin Dep. 16:19-18:3. Before June 1, 2022, Defendants admittedly lined up and stole away **both** of those independent contractors. *Id.* at 44:11-21, 129:11-130:6; *see also* Ex. 4, 1/12/22 text message (stating that "I have everyone on board"). Napper's opinion is based solely on his "discussions with [Defendant Jesse] Maupin," Ex. 1, ¶ 61, which he credited while disregarding Mr. Maupin's irreconcilable sworn deposition testimony under oath.

Adding to the unreliability of Napper's opinions, he further testified that he does "not have enough information" about Weather King's ability to retain dealers in the West after the mass exodus. Ex. 3, Napper Dep. 166:4-8. He was likewise unaware of Weather King's ability to retain shop managers to replace Defendants Lassen, Brown, and Hershberger and run plants in the West. *Id.* at 166:9-18, 187:25-188:12. His report did not account for the fact that Weather King sent Ben Miller, a Florida shop manager, to the West to attempt to salvage operations but that Defendants hired him away, too. *Id.* at 188:13-189:18, Ex. 2, Coker Dep. 79:2-90:1.

---

[1] Further, as discussed below, Defendants also recruited away Weather King's two independent contractor builders.

10

Napper's opinion is also unreliable because he failed to take into account important information about Weather King's efforts to salvage its Western operations. Section III.C.2 of Napper's report does not take into account testimony of any Weather King witnesses and, instead, appears to be predicated on selective testimony of Maupin, specifically Napper's informal discussions with Maupin (who was privy to virtually none of Weather King's efforts to salvage its operations). In written discovery, Defendants did not ask Weather King to detail its efforts, so no such information was available for Napper's review.

After Napper issued his report, the ABO Defendants deposed Jill Coker, who testified at length about Weather King's efforts to salvage Western operations. *See* Ex. 2. Yet, incredibly, Napper testified:

> Q. Did you read Jill Coker's deposition testimony?
>
> A. I did.
>
> Q. You didn't see anything in there about efforts that Weather King made to salvage its western operations?
>
> A. **<u>Not really, no</u>**.

Ex. 3, Napper Dep. 166:19-25 (emphasis added).

Plainly, Napper chose to craft his opinions based solely on the side of the story told by the parties who were paying him (and who were not even privy to Weather King's efforts) rather than considering all of the material facts. Courts have stressed that an expert's opinion is not reliable if he/she selectively chooses information to rely on and disregards contrary material evidence:

> The Sixth Circuit has observed that "cherry-picking data is just as bad as omitting it or making it up altogether." *United States v. Lang*, 717 F. App'x 523, 536 (6th Cir. 2017) (citing *EEOC v. Freeman*, 778 F.3d 463, 468–71 (4th Cir. 2015) (Agee, J., concurring)). Thus, "[t]here is some merit to [the] argument that an expert cannot 'cherry-pick' only favorable data." *Id.* As one district court has put it:

11

> Result-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion. [C]ourts have consistently excluded expert testimony that "cherry-picks" relevant data. This is because such an approach does not reflect scientific knowledge, is not derived by the scientific method, and is not "good science."
>
> *In re Onglyza (Saxagliptin) & Kombiglyze XR (Saxagliptin & Metformin) Prod. Liab. Litig.*, No. 5:18-MD-2809-KKC, 2022 WL 43244, at *18 (E.D. Ky. Jan. 5, 2022) (internal citations and quotations omitted). Relying on this reasoning, courts in this Circuit have excluded testimony based on data that was purposefully selected, or cherry-picked, with no reason other than to support a particular conclusion. *See Sheffield v. Int'l Paper Co.*, No. 2018-cv-02701-JPM-cgc, 2020 WL 1882906, at *2 (W.D. Tenn. Feb. 26, 2020) (excluding testimony where an expert's conclusions demonstrated "cherry-picking an isolated and self-serving data point rather than responding to the reality of the case."); *Seawell v. Brown*, No. C-1-08-614, 2010 WL 11561287, at *8 (S.D. Ohio Sept. 9, 2010) (holding that an expert in an ERISA case who identified the highest performing fund managers and determined their average rates of return in hindsight had not used reliable methodology to determine the plaintiffs' losses).

*Iannone v. AutoZone, Inc.*, 344 F.R.D. 319, 335–36 (W.D. Tenn. 2023). That is precisely what Napper has done in formulating his mitigation of damages opinions. They should be excluded.

## CONCLUSION

For the foregoing reasons, the Court should preclude Napper from offering any opinions related to Weather King's alleged failure to mitigate its damages.

Respectfully submitted,

*/s/ David L. Johnson*
David L. Johnson, BPR #18732
John H. Dollarhide, BPR #40041
BUTLER SNOW LLP
The Neuhoff Building
1320 Adams Street, Suite 1400
Nashville, TN  37208
Telephone: (615) 651-6700

12

>> Fax:  (615) 651-6701
>> david.johnson@butlersnow.com
>> john.dollarhide@butlersnow.com
>>
>> Daniel W. Van Horn, BPR #18940
>> 6075 Poplar Ave., Suite 500
>> Memphis, TN 38119
>> Telephone: (901) 680-7200
>> Fax: (901) 680-7201
>> Danny.VanHorn@butlersnow.com
>>
>> *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2025, I filed the foregoing Notice with the Court using the ECF system, which will provide notice and a copy to counsel of record:

>Thomas G. Pasternak
>Benjamin S. Morrell
>TAFT STETTINIUS &HOLLISTER LLP
>111 East Wacker Drive, Suite 2600
>Chicago, IL 60601
>Telephone: (312) 527-4000
>Facsimile: (312) 527-4011
>tpasternak@taftlaw.com
>bmorrell@taftlaw.com
>*Attorneys for Defendants*

And to the following via U.S. Mail and email.

>Brian L. Lassen
>Aleyna Lassen
>1405 N. Fort Grant Road
>Willcox, AZ 85643
>willcoxbuildings@pm.me

>>*/s/  David L. Johnson*
>>David L. Johnson

94133713.v1