

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TENNESSEE

EASTERN DIVISION


CONSOLIDATED INDUSTRIES, LLC d/b/a WEATHER KING

PORTABLE BUILDINGS,

        Plaintiff,

Vs.        Civil Action No. 1:22-cv-01230-STA-jay

JESSE A. MAUPIN, et al,

        Defendants.



DEPOSITION OF

DOUGLAS K. SOUTHARD


TAKEN ON

JUNE 26, 2025

8:55 A.M.


1320 ADAMS STREET, SUITE 1400

NASHVILLE, TENNESSEE 37208



NAEGELI
DEPOSITION & TRIAL

(800) 528 - 3335
NAEGELIUSA.COM

Nationwide
COURT REPORTING
LEGAL VIDEOGRAPHY
REMOTE DEPOSITIONS
TRIAL PRESENTATION
LEGAL TRANSCRIPTION
COPYING AND SCANNING
LANGUAGE INTERPRETERS


Powerful
LITIGATION SUPPORT

NAEGELI
DEPOSITION & TRIAL | (800) 528-3335
NAEGELIUSA.COM

DOUGLAS SOUTHARD
86073

June 26, 2025

2 to 5

---

Page 2

```
 1                    APPEARANCES:
 2
 3  FOR THE PLAINTIFF:
 4  JOHN H. DOLLARHIDE, ESQUIRE
 5  Butler Snow, LLP
 6  1320 Adams Street, Suite 1400
 7  Nashville, Tennessee  37208
 8  (651) 651-6700
 9  john.dollarhide@butlersnow.com
10
11  FOR THE DEFENDANTS:
12  THOMAS G. PASTERNAK, ESQUIRE
13  Taft Stettinius & Hollister, LLP
14  111 East Wacker Drive, Suite 2600
15  Chicago, Illinois  60601
16  (312) 527-4000
17  tpasternak@taftlaw.com
18
19  ALSO PRESENT:
20  TIM BOYD
21  WADE ETHERTON
22  JESSE MAUPIN
23  BARRY HARRELL
24
25
```

---

Page 3

EXAMINATION INDEX

| | | PAGE |
|---|---|---|
| EXAMINATION BY MR. PASTERNAK | | 5 |
| EXAMINATION BY MR. DOLLARHIDE | | 85 |
| FURTHER EXAMINATION BY MR. PASTERNAK | | 90 |

---

Page 4

EXHIBIT INDEX

| EXHIBIT | | | PAGE |
|---|---|---|---|
| 1 | Notice of deposition | | 6 |
| 2 | Expert disclosure | | 28 |
| 3 | Rebuttal report | | 69 |
| 4 | Valuation Analysis | | 74 |
| 5 | Valuation Analysis | | 74 |

---

Page 5

```
 1              DEPOSITION OF
 2            DOUGLAS K. SOUTHARD
 3                TAKEN ON
 4             JUNE 26, 2025
 5               8:55 A.M.
 6
 7          (Whereupon, the foregoing deposition began
 8  at 8:55 a.m.)
 9          THE VIDEOGRAPHER:  We are on the record.
10  The time is 8:55 a.m. The date is 6/26/25. This is
11  the deposition of Douglas Southard. The case caption
12  is Consolidated Industries versus Maupin. Will
13  counsel introduce yourselves and state whom you
14  represent, please.
15          MR. PASTERNAK:  Thomas Pasternak from the
16  Taft Law firm for the defendants.
17          MR. DOLLARHIDE:  John Dollarhide of Butler
18  Snow representing the plaintiff.
19          THE VIDEOGRAPHER:  The court reporter will
20  now swear in the witness. Whereupon,
21          DOUGLAS SOUTHARD, having been first duly
22  sworn, was examined and deposed as follows:
23  EXAMINATION
24  BY MR. PASTERNAK:
25      Q.  Good morning, sir.
```

---

NAEGELI
DEPOSITION & TRIAL

**(800) 528-3335**
NAEGELIUSA.COM

Page 6

1     A.    Yes, good morning.
2     Q.    State your name, please.
3     A.    Douglas K. Southard, S-o-u-t-h-a-r-d.
4           MR. PASTERNAK:  And I'm going to mark as
5  Exhibit 1 a document titled notice of deposition.
6           (Exhibit 1 was marked.)
7  BY MR. PASTERNAK:
8     Q.    Can you take a look at that.
9     A.    Yes, sir.
10    Q.    Have you seen that before?
11    A.    Yes, sir.
12    Q.    And you understand you are being deposed
13 as part of this lawsuit today?
14    A.    Yes, sir.
15    Q.    Have you been deposed before?
16    A.    Yes, sir.
17    Q.    How many times?
18    A.    In excess of a hundred times.
19    Q.    So you're familiar with the procedures?
20    A.    Yes, sir.
21    Q.    Have you testified in court?
22    A.    Yes, sir.
23    Q.    How many times?
24    A.    Probably 30 times, plus or minus a time.
25    Q.    Do you understand you will be testifying

Page 7

1  under oath in a court of law?
2     A.    Yes, sir.
3     Q.    Do you understand you have sworn to tell
4  the truth?
5     A.    Yes, sir.
6     Q.    Is there anything that will prevent you
7  from testifying truthfully and accurately today?
8     A.    No, sir.
9     Q.    Are you under any medications that would
10 prevent you from testifying truthfully and
11 accurately today?
12    A.    No.
13    Q.    It's important that we don't talk over
14 each other, so let me ask my question, and then you
15 can answer. It will be --
16    A.    That will be -- excuse me.
17    Q.    That will be easier for the court
18 reporter.
19    A.    That will be a challenge for both of us,
20 I'm sure.
21    Q.    Yeah, we will probably get into that. Your
22 responses must be audible, yes, or no, or an answer,
23 not just a nod or an uh-huh.
24    A.    Correct.
25    Q.    Do you understand that? Okay. If you don't

Page 8

1  understand a question I ask, will you let me know,
2  and I will rephrase?
3     A.    Yes, sir.
4     Q.    If you don't tell me that you don't
5  understand, I will assume you do understand; is that
6  fair?
7     A.    Okay.
8     Q.    All right. We'll take a break every hour
9  or so, but if you need a break, please let me know.
10    A.    Yes.
11    Q.    Where do you live?
12    A.    My current legal residence is 212
13 Flintrock Knob Lane in Landrum, South Carolina.
14    Q.    And who is your current employer?
15    A.    Southard Finance -- well, I am a partner
16 in the firm, so I am not really employed.
17    Q.    You're not really employed?
18    A.    Well, I'm -- I don't receive a paycheck. I
19 receive a partnership distribution.
20    Q.    I see. Can you describe your education
21 starting in high school.
22    A.    Okay. I graduated from East High School
23 in. I graduated from what was then Southwestern
24 Memphis -- it is now Rhodes College -- in 1975,
25 received my degree with honors and distinction. I

Page 9

1  received my M.B.A. from Indiana University in 1976.
2  And I received my doctorate of business
3  administration from Indiana University in 1981.
4     Q.    Doctorate of business administration, what
5  is that?
6     A.    Back in the day -- you know, obviously,
7  this was a while back. A lot of the business schools
8  in the country maintained status separate from the
9  college of liberal arts and sciences. And so they --
10 they issued a Ph.D. equivalent and called it a
11 doctorate of business administration. Among the
12 schools doing that were Harvard University. There
13 were a large number that issued that degree, I
14 suppose. I was given the option to elect to change
15 my degree, but I chose not to.
16    Q.    What would you have changed it to?
17    A.    To a Ph.D. The college -- the college of
18 arts and science would have issued the degree, but I
19 saw no reason to do that. I mean, it's clear what it
20 is.
21    Q.    After your -- could you go through your
22 employment history starting with your first job
23 after college?
24    A.    Okay. I mean, well, my first job after
25 college would have been -- in the summer after

DOUGLAS SOUTHARD                    June 26, 2025                    10 to 13
86073

Page 10

1  college, I got married, and I worked for a temporary
2  service until my wife and I moved to Bloomington,
3  Indiana for me to attend graduate school. At IU, I
4  was a graduate assistant, and then a lecturer, and
5  then a visiting lecturer in finance. A full-time
6  position the last two years I was there.
7           And then in -- then I took a position as
8  an assistant professor of finance at Virginia
9  Polytechnic Institute and State University, better
10 known as Virginia Tech. I was there from -- for the
11 academic years 1981 through 1983, at which time I
12 took a job at my alma mater in Memphis. There were
13 personal family reasons that I needed to -- that my
14 wife and I needed to return to Memphis, so I took a
15 job there and was on the faculty as an assistant
16 professor until 1986 -- end of the '86 academic
17 year.
18          And since that time taught courses and
19 filled in. I actually went back for a full year when
20 somebody was on sabbatical and taught. But my -- I
21 would say my formal academic career ended when I --
22 in 1986, '87. So that's my academic career. And then
23 I have a professional career. And I assume that you
24 want me to go through my professional career?
25      Q.    Yes, please.

Page 11

1       A.   So when I moved back to Memphis, I just --
2  I was -- part of my personal reason was to start a
3  consulting practice. And so first couple of years I
4  was back, I worked independently by myself doing
5  various economic analyses, lost earnings, personal
6  injury, you know, economic analysis-type situations.
7           At the end of '82 and in the beginning of
8  '83, I joined a firm called Mercer Capital
9  Management, which is based in Memphis, as a -- I
10 guess best said as a contract employee because I
11 wasn't paid a salary. I was paid based upon revenues
12 generated. And I was there until I formed Southard
13 Financial in 1987.
14      Q.    What did you do at Mercer Capital?
15      A.    Same thing I do now. I mean, it's a
16 business valuation and economic consulting firm that
17 dabbles in investment banking. But that's still what
18 -- that's what Southard Financial does also, so no
19 -- no real change in what services I was providing.
20 It's just that I was providing as -- as Southard
21 Financial and not as Mercer Capital.
22      Q.    And you formed Southern [sic] Financial in
23 what year?
24      A.    1987. And it operated as a sole
25 proprietorship until, I believe, 2012, at which time

Page 12

1  we -- we formed the company as a limited liability
2  company.
3           And I admitted, as part of the formation,
4  three other people into membership in the firm
5  without economic consideration.
6       Q.    What does that mean, without economic
7  consideration?
8       A.    That they didn't buy in. We just reformed
9  it.
10      Q.    And what do you do at Southern [sic]
11 Financial?
12      A.    Well, it's Southard Financial. It's not
13 Southern.
14      Q.    Oh, I'm sorry. Southard.
15      A.    It is my last name.
16      Q.    Yeah.
17      A.    We do business valuation predominately. We
18 do some economic analyses for -- but all -- all
19 financial in orientation, and we do investment
20 banking, private company investment banking.
21      Q.    And what is your role?
22      A.    Well, I mean, originally I was Southard
23 Financial. It started in the living room of my
24 house.  I was its founding partner. Over the last,
25 gosh, 15 years, I've probably slowly reduced the

Page 13

1  level of my involvement. I would say I probably
2  spend 800 to a thousand hours a year, maybe,
3  working.
4       Q.    How old are you, Mr. Southard?
5       A.    I'm 72.
6       Q.    Are you planning on retiring soon?
7       A.    I love -- I love what I'm doing, so I'm
8  not sure. But, you know, it's kind of time. It's one
9  of those dilemmas when you found a company, it's
10 very -- extremely difficult to walk away and leave
11 something that, you know, you put your heart and
12 soul into. But I mean, I recognize that it's time
13 for me to step away entirely.
14      Q.    Have you ever worked for Butler and Snow
15 before?
16      A.    I am sure we've done -- I mean, I've been
17 in business since 1983. It would hard for me to
18 imagine -- I can't recall any particular cases, but
19 I am sure we have.
20      Q.    Do you recall ever working for Mr.
21 Dollarhide before?
22      A.    No.
23      Q.    Mr. Johnson?
24      A.    I don't believe so.
25      Q.    Have you ever worked for Weather King

DOUGLAS SOUTHARD                    June 26, 2025                           14 to 17
86073

Page 14

1  before?
2      A.   No.
3      Q.   Have you ever been convicted or accused of
4  a crime?
5      A.   No.
6      Q.   Have you ever been in the military?
7      A.   No.
8      Q.   Have you ever filed for bankruptcy?
9      A.   No.
10     Q.   Let's talk about how you were retained.
11  How did it come about that you started working on
12  this case?
13     A.   Well, we were contacted by -- I believe,
14  initially, by Mr. Johnson, in the fall of 2022. And
15  we had an initial conversation. And I don't know
16  whether Mr. Dollarhide was on the call or not. But
17  it was certainly myself and one of my partners. And
18  we had initial conversation about the case, and at
19  which point, shortly thereafter, I think it was
20  either October or November, we issued an engagement
21  letter and were engaged.
22     Q.   What did they tell you about the case in
23  this initial call?
24     A.   Essentially what is in the complaint.
25     Q.   Did they send you any documents?

Page 15

1      A.   Other than the complaint, no.
2      Q.   Just the complaint.
3      A.   Again, it was three years ago. That's my
4  recollection that I had no other -- I don't recall
5  that we had any financial data or any other
6  information, other than the complaint.
7      Q.   And you had a written agreement and
8  engagement letter?
9      A.   Sure.
10     Q.   What did they ask you to do?
11     A.   They asked us to do an economic damage,
12  lost profit analysis of what -- of the -- of what
13  occurred, what I call the event of what occurred
14  with the departure of certain individuals from the
15  company on or about June 1st.
16     Q.   Did they tell you to use any particular
17  method?
18     A.   We discussed methodologies in the first
19  meeting. We talked about a lost profit approach,
20  which is what we ended up doing. We talked about a
21  detriment to value approach, a pre-event, post-event
22  valuation analysis. The decision -- after counsel,
23  you know, contemplated those options and we
24  discussed again, and we determined that the most
25  appropriate methodology and the most accepted

Page 16

1  methodology would have been some sort of lost profit
2  model, discounted cash flow, lost profit model.
3      Q.   What is a lost profit approach?
4      A.   You attempt to estimate the profits to
5  which the party suffering damages lost as a result
6  of the actions.
7      Q.   Did you say you did a lost profit approach
8  in your report?
9      A.   Yes. Well, I don't know if I did or not,
10  but it's clear that it is.
11     Q.   It's clear from what?
12     A.   I mean, the approach is to project the
13  future profits of the company had it continued to --
14  how much clearer can it be?
15     Q.   What is the event you're talking about?
16     A.   The events leading up to the termination
17  of the employment of the defendants on or about June
18  1st, which would have been that occurring all at
19  once simultaneously and the other things that they
20  did or allege to have done leading up to that time.
21     Q.   How do you know about these events -- or
22  about this event?
23     A.   Only -- only relying upon representations
24  from my client and from the management team of the
25  company. And if you don't mind, can -- I would like

Page 17

1  to just define management team. It's a term I'll
2  probably use frequently.
3      Q.   Please do.
4      A.   I had discussions with the Weather King
5  folks that were limited essentially -- mostly to
6  Jill Coker, and to David Sullivan, and to a limited
7  extent, Mr. Boyd. So I refer to that as, you know,
8  my source of information from management.
9      Q.   And what did they tell you about the
10  event?
11     A.   I mean, I think that's way too broad of a
12  question to ask.
13     Q.   That's fine. What is your understanding of
14  the event?
15     A.   My understanding of the event is that the
16  defendants left the employment of the company on or
17  about June 1st. And that prior to that, they had
18  done actions that damaged the reputation and the
19  feasibility of the company on a going-forward basis.
20     Q.   What actions were those -- was that?
21     A.   Talking to customers. Talking to supplier
22  manufacturers. Alleging that Weather King was no
23  longer going to be able to provide product to the
24  dealers. That -- in essence, that when they left,
25  there would not be a Weather King.

DOUGLAS SOUTHARD                    June 26, 2025                    18 to 21
86073

Page 18

1    Q.  Are you being paid for your work -- or how
2 are you being paid for your work?
3    A.  We pay -- we bill hourly on a -- what I
4 would call a conservative basis.
5    Q.  And what does that mean, a conservative
6 basis?
7    A.  Well, if I have a ten-minute phone call
8 with Mr. Boyd, I don't -- we don't record that as a
9 quarter of an hour and charge $125 for it. I mean,
10 we -- I charge it for work actually done. Almost all
11 of the work we do in the firm is -- is fixed-fee
12 related. We quote a fee, and then we do valuations,
13 and investment banking, and the services we provide
14 for a fixed-dollar amount.
15    Q.  But this case is not a fixed fee. You are
16 charging --
17    A.  Correct. Well, you can't in a litigation
18 matter. It's extremely difficult to say we can take
19 this case all of the way to court for X dollars. We
20 did give an indication of what we thought it would
21 cost to get to various stages.
22    Q.  When you say we, is there more than one
23 person working on this matter for Southard?
24    A.  I -- I've done essentially all the work,
25 but I can't say that my partners have not reviewed

Page 19

1 work product.
2    Q.  What partners have reviewed work product?
3    A.  Well, certainly Dave Harris has. Probably
4 Matthew Jakes.
5    Q.  What was that last name?
6    A.  Matthew Jakes.
7    Q.  Jakes.
8    A.  J-a-k-e-s.
9    Q.  And what is the hourly rate you're
10 charging?
11    A.  My standard billing rate is $500 an hour.
12    Q.  Are there different rates for different
13 phases of the case? Like at trial, will you charge a
14 different rate?
15    A.  Well, we charge a daily fee for trial.
16    Q.  And what is that daily fee?
17    A.  You've got it in my Rule 26. I don't have
18 it in front of me.
19    Q.  Do you know how much you've charged so
20 far?
21    A.  We have billed and collected roughly
22 $49,000, and we have incurred, since the last
23 billing, probably an additional 18, $20,000,
24 including what I estimate to be today's full-time.
25    Q.  What did you do to incur that additional

Page 20

1 $18,000?
2    A.  Well, I reviewed the depositions of Mr.
3 Napper -- is that his correct -- is that the correct
4 pronunciation?
5    Q.  Yes, that's right.
6    A.  Thank you. I reviewed the depositions of
7 Brian Barrymore, Scott Barrymore, Tim Boyd, and Jill
8 Coker. I prepared a supplemental rebuttal report.
9 And I prepared for this deposition.
10    Q.  How did you prepare?
11    A.  We just reviewed my report.
12    Q.  Who is the we?
13    A.  What?
14    Q.  You said we just reviewed my report.
15    A.  You know, I speak of -- I speak of it as a
16 firm. So I reviewed the report. We didn't review it.
17 I did.
18    Q.  How long did you spend preparing?
19    A.  Probably six -- five, six hours.
20    Q.  Did you meet with anyone?
21    A.  Yes.
22    Q.  Who did you meet with?
23    A.  Had a video conference with Mr. Dollarhide
24 and Mr. Johnson Tuesday that lasted for about two
25 hours.

Page 21

1    Q.  What did you talk about?
2    A.  What to expect.
3    Q.  What did they tell you to expect?
4    A.  What I already knew. I didn't glean a lot
5 of real insight from the meeting. I mean, I -- I
6 knew what to expect, so -- but we went over it.
7    Q.  Tell me what you went over.
8    MR. DOLLARHIDE:  So Tom, I am going to
9 make an objection. Doug, to the extent that there is
10 any specific communications, you're not -- you're
11 protected by the attorney/client privilege from
12 divulging specific communications, and so don't -- I
13 am instructing you not to answer to any specific
14 communications.
15    THE WITNESS:  Okay.
16 BY MR. PASTERNAK:
17    Q.  Tell me generally what you went over.
18    MR. DOLLARHIDE:  Objection, asked and
19 answered. You can answer.
20    THE WITNESS:  We went over my analysis and
21 went over some points in the deposition of Mr.
22 Napper.
23 BY MR. PASTERNAK:
24    Q.  What points?
25    MR. DOLLARHIDE:  Same objection. I'm

DOUGLAS SOUTHARD
86073

June 26, 2025

22 to 25

Page 22

1  instructing you not to answer that.
2  BY MR. PASTERNAK:
3      Q.   Did you review any documents while
4  preparing?
5      A.   I reviewed my report.
6      Q.   Right.
7      A.   I looked briefly again at Mr. Napper's
8  report and briefly at his deposition again.
9      Q.   Did you review your second report?
10     A.   Actually, I don't think I -- I don't
11  believe I did in the last week or so.
12     Q.   Have any of your opinions ever been
13  excluded by a court?
14     A.   Not to my knowledge.
15     Q.   Have any of your opinions been struck by a
16  court?
17     A.   Not to my knowledge.
18     Q.   And you know what a Daubert motion is?
19     A.   Yes, I do.
20     Q.   What is a Daubert motion?
21     A.   It's a motion to disqualify an expert for
22  a litany reasons.
23     Q.   Have any of your reports ever had Daubert
24  motions filed against them?
25     A.   Motions filed against them? First of all,

Page 23

1  I haven't been involved in a court matter since the
2  late s, personally, so that's almost when the
3  Daubert starts to really become more prevalent. I am
4  not aware of any. I know none have been successful.
5  I don't know if they've been filed. I think that's
6  the safest answer.
7      Q.   So you just said you have been not
8  involved in a court matter since the late 1990s.
9  Does that mean you -- what do you mean, you haven't
10  testified in court?
11     A.   I haven't given a deposition or testified
12  since I -- let's say 2000, just to make it safe.
13     Q.   Why haven't you done any of that since
14  then?
15     A.   Didn't want to.
16     Q.   Have you done any other reports involving
17  the misappropriation of trade secrets?
18     A.   I didn't do a -- I don't think I did a
19  report this time that was a misappropriation of
20  trade secrets.
21     Q.   You didn't do a report this time in --
22     A.   I did a report of the lost profits that
23  resulted from the actions taken by the defendants.
24     Q.   Have you ever done a report involving the
25  misappropriation of trade secrets?

Page 24

1      A.   I need -- you know, I am not a lawyer. You
2  are going to have to tell me what misappropriation
3  of trade secrets means.
4      Q.   You don't know what that means?
5      A.   No.
6      Q.   Have you ever done a report involving the
7  breach of a duty of loyalty?
8      A.   I mean, if you are talking about the
9  wrongful actions that an employee took to damage an
10  employer, yes.
11     Q.   How many reports have you done on that?
12     A.   Probably two or three. Not a lot.
13     Q.   Have you ever done a report involving a
14  civil conspiracy?
15     A.   Specifically this report is related to
16  this civil conspiracy, or was this report used in a
17  civil conspiracy matter?
18     Q.   No, I am asking you in the past, have you
19  ever done a report relating to civil conspiracy?
20     A.   Not where we identified the purpose to be
21  civil conspiracy.
22     Q.   Have you ever done a report involving
23  defamation?
24     A.   I don't believe so.
25     Q.   How about a report involving conversion?

Page 25

1      A.   Conversion of what?
2      Q.   Property.
3      A.   Define.
4      Q.   Well, do you know what property is?
5      A.   I know what property is. What kind of
6  conversion of property?
7      Q.   Well, the -- one of the allegations in
8  this case is that defendants have converted some of
9  Weather King's property, so I am asking if you have
10  ever done a report relating to that issue before?
11     A.   Well, I think the answer is -- I think
12  I've answered that question. We have done lost
13  profit analyses when there was an event that caused
14  damage to one party or -- to one party. And it could
15  have been a result of -- literally, this list of
16  things you just asked me could have been a result of
17  any or all of those.
18     Q.   You've done a report in the past relating
19  to the same sort of circumstances?
20     A.   The exact same circumstances? Well, no,
21  because you couldn't recreate this exactly.
22     Q.   Similar circumstances?
23     A.   I mean, we've had -- we've done analyses
24  where there was an alleged taking of a -- taking a
25  business -- of an operating business through actions

DOUGLAS SOUTHARD                    June 26, 2025                    26 to 29
86073

Page 26

1  taken by folks, yes.
2      Q.    Do you remember the name of that case?
3      A.    No, I don't. It didn't go to trial.
4      Q.    But you did an expert report?
5      A.    We did an analyses probably for the --
6  probably for the lawyers and possibly for both the
7  plaintiff and the defendants.
8      Q.    You did an analysis for both sides?
9      A.    First of all, litigation -- if I -- I
10 looked at my files. Litigation over the last ten
11 years, our firm does roughly $2 million a year in
12 revenues. So that's $20 million over the last ten
13 years. Litigation revenues totaled $140,000. So I
14 mean, we are not a litigation firm, and we don't
15 pursue that type of work.
16          I also looked at my records, and over that
17 same period of time, there are probably 15 or 20
18 events or assignments, I guess, that we've
19 undertaken where we were retained by both sides to
20 offer an opinion to resolve the matter.
21     Q.    You're not a litigation firm?
22     A.    Absolutely not.
23     Q.    And you haven't testified in the last ten
24 years?
25     A.    I haven't testified in the last ten years

Page 27

1  as an expert.
2      Q.    And you don't know what misappropriation
3  of trade secrets is?
4      A.    Well, I assume it's stealing trade
5  secrets. I mean, that would be my assumption.
6      Q.    You testified earlier you don't even know
7  what it means, correct?
8      A.    I asked for you to define it for me, yes,
9  I believe. But I don't know the legal definition of
10 misappropriation of trade secrets.
11     Q.    Do you know the legal definition of a
12 breach of duty of loyalty?
13     A.    The legal definition, no.
14     Q.    Have you ever filed a report or done a
15 report relating to a tort called aiding and
16 abetting?
17     A.    Specifically for that, no.
18     Q.    Do you have any experience in the portable
19 sheds business?
20     A.    No.
21     Q.    Hold on. I am going to get your report
22 out. And when I say your report, I am getting the
23 first report you did. I know you've done two.
24          MR. PASTERNAK:  We can mark as Exhibit 2 a
25 document titled Plaintiff's Rule 26(2) expert --

Page 28

1  (a)(2) expert disclosure.
2          (Exhibit 2 was marked.)
3  BY MR. PASTERNAK:
4      Q.    Take a look at that.
5      A.    Thank you.
6      Q.    Have you seen that document before?
7      A.    Yes.
8      Q.    Is this one of the reports you prepared
9  for this case?
10     A.    Yes.
11     Q.    And you understand that we're here to
12 discuss the opinions in that report?
13     A.    Yes.
14     Q.    Tell me how this was prepared.
15     A.    I mean, I'm not sure how to answer that
16 question. How was it prepared?
17     Q.    How did you prepare it?
18     A.    We can go through the -- do you want to go
19 through the entire process of preparing the report?
20     Q.    Yes, please.
21     A.    Okay. Well, we were engaged in 2022.
22 Essentially started the process of collecting
23 information, historical financial data, and the
24 like.  The time frame got delayed a number of times,
25 postponement of expert date -- due dates for

Page 29

1  reports.  And so we continued the process of
2  gathering information.
3          But for a large portion of the time, until
4  this report was prepared and filed, which is -- May
5  31st is the date on the report. Probably most of the
6  time up until the fall of '24, really the file was
7  pretty dead.  There wasn't a lot of action or
8  activity on our part because we don't want to do the
9  analysis twice and charge the client twice for it.
10          So we want to do it as close as we can to
11 the date that it has to be done. So we work up
12 against the deadline, so there was no reason for us
13 to have prepared a lost profit analysis in August of
14 2023 because the report would be irrelevant, and it
15 would cost a fair amount of money to do, and it
16 wouldn't have any value to the client.
17          So probably in the late -- in the fall of
18 '24, we kept pushing to get additional information
19 and updated financial data from the client. We did a
20 lot of the exhibits to the reports, had data by
21 year, so we just kept adding years and information
22 as it became available.
23          I traveled to Paris, I believe, in October
24 of '24 -- it may have been November, I can't
25 remember -- to have a face-to-face meeting with

Page 30

1  management that lasted most of the day. It was a
2  different management meeting than we normally would
3  have because normally we would be visiting an
4  operating entity, and obviously there's -- A, the
5  operations were not in Paris, and B, the operations
6  of the western division of Weather King no longer
7  existed. So it was a little bit different than a
8  typical management get-together.
9         We went back. Didn't really do a lot until
10 near -- really until after the end of the year when
11 the year-end financials became available. So
12 probably started working significantly on the
13 project in February up and through to the end of
14 March, when the report was filed.
15        Physically, I don't have a secretary. I
16 don't dictate to the computer and let it generate a
17 report. So the report that you're seeing is
18 essentially my personal effort to get into the
19 computer, type it in, so to speak.
20    Q.   So you typed it all in, yourself?
21    A.   Not all of it. I mean, a lot of it -- you
22 can tell, a lot of it is -- there's some boilerplate
23 in there just like any professional uses. I mean,
24 you have text and language that's used over -- you
25 know, used repeatedly, so I didn't type it in. But

Page 31

1  yeah, I wrote the report, physically. I did not
2  write it out on notes. I didn't dictate it to
3  someone to type. I didn't have an analyst in our
4  firm write it. So yeah, I wrote it.
5     Q.   Did you send drafts to counsel?
6     A.   I sent drafts first internally within the
7  firm. That's why I said Dave Harris and Matthew
8  Jakes, I'm sure -- we -- our process internally is
9  -- you know, we do a lot of opinion work for
10 transactions. And our process internally is to have
11 the eyes of at least three partners see everything
12 that goes out the door.
13        So that's why I said I am pretty sure that
14 Matthew and Mark -- excuse me, Matthew and Dave both
15 reviewed the document at various times or at least
16 once in the process. Yes, a draft -- a draft was
17 sent to counsel, and a draft was sent to management.
18    Q.   Did they make changes?
19    A.   Editorial, not substantive.
20    Q.   Not substantive?
21    A.   Not substantive.
22    Q.   Do you remember any of the changes they
23 made?
24    A.   Oh, yeah, they put commas in, corrected
25 grammatical mistakes. Analytically, did they - I

Page 32

1  will tell you, they made no change to the conclusion
2  of the report.
3     Q.   Do you have any opinion on the liability
4  of the defendants?
5     A.   No.
6     Q.   So you just assume liability?
7     A.   Correct.
8     Q.   Did you do any investigation on their
9  liability?
10    A.   That's not my job or my expertise.
11    Q.   How did your -- does your expertise inform
12 your conclusion?
13    A.   Well, my expertise is in financial
14 analyses, which involves financial projections and
15 the like. So I mean, the expertise is in
16 understanding how to prepare financial projections,
17 reduce those to current value, present value
18 analysis, and the like.
19    Q.   Can you show me where in the report I
20 would know that it is a lost profit analysis?
21    A.   I think the whole report speaks for
22 itself.
23    Q.   Well, show me --
24    A.   Just --
25    Q.   Let me finish the question. Show me, upon

Page 33

1  reading this, how I would know you did a lost
2  profits analysis?
3     A.   Because to me, I can't -- don't know
4  whether you would know or not. I can't answer that.
5  Because A, it's a discounted cash flow model, which
6  is how lost profits is measured because it's a
7  future projection of the performance of the entity.
8  So a discount rate is developed, and then there is a
9  projection all of the way through 2032 of -- of the
10 profits of the entity as we project it would be
11 going forward. Definition, lost profits.
12    Q.   Why did you use 2032?
13    A.   There's two issues. One, I mean, ten
14 years is more than a reasonable period of time to go
15 out. The company and the folks at Weather King had a
16 lot of experience in the portable building business.
17 And the company had a longevity that speaks for
18 itself at the time and speaks for itself today,
19 particularly in the Florida operations still going
20 on.
21        So management had long-term -- had shown a
22 long-term capability of running the business, so
23 running it out does seem more than reasonable. You
24 can argue that a lost profit operations analysis in
25 a -- in a situation where the entity is put out of

Page 34

1 business should be done indefinitely.
2           There is no -- there is very little reason
3 to do an indefinite analysis. Present value after
4 ten years is pennies on the dollar at a fifteen
5 percent discount rate. I mean, you're looking at,
6 you know, another $5 million of lost profits is
7 $100,000. I mean, it's just -- it's becoming an
8 irrelevant calculation because of the time value of
9 money. So we ended the analysis at that point.
10    Q.   And you said you did a discounted cash
11 flow method, correct?
12    A.   Sure.
13    Q.   And your testimony is that's the same as a
14 lost profits method?
15    A.   If you are discounting your cash flow from
16 the lost profits or the lost cash flow, yeah.
17    Q.   But you didn't say lost profits anywhere
18 in your report, correct?
19    A.   I didn't think it was necessary. I think
20 an informed reader would clearly understand that
21 this was a projection of the future performance of
22 the company and a discounting of the performance
23 back to a due -- a certain date.
24    Q.   Is the discounted cash flow method common
25 in your field?

Page 35

1    A.   Absolutely.
2    Q.   Is it reputable?
3    A.   Yes.
4    Q.   Have you been asked to do any other work
5 in this case?
6    A.   Define other work.
7    Q.   Do you have any other projects ongoing?
8    A.   No.
9    Q.   Have you used this discounted cash flow
10 model or method before?
11    A.   We probably use it and/or consider it in a
12 couple hundred assignments a year.
13    Q.   But these aren't litigation assignments?
14    A.   They're values of companies, so yeah,
15 which are discounted cash flow analysis.
16    Q.   Did you make any assumptions in this
17 methodology?
18    A.   Oh, yeah.
19    Q.   What were the assumptions you made?
20    A.   Well, we assumed -- we -- let me -- I'll
21 go through the process that we did in developing our
22 cash flow model if that's an acceptable answer to
23 your question.
24    Q.   That's perfect. Yes.
25    A.   We gathered the historical financial

Page 36

1 information, as I -- as I told you earlier. And in
2 the -- at the -- in the -- in late summer of '24,
3 when we looked like we were going to have a date
4 that we were actually going to have to produce the
5 report, the discovery -- not -- expert witness
6 disclosure date became that it was going to -- it
7 was going to stick in the first part of '25, I
8 started working with David Sullivan to make some
9 projections for the western division of Weather
10 King.
11           And so I prepared a model that looked much
12 like the exhibit to the report, which would be,
13 what? I guess it's Exhibit 15, I think, is the --
14 yeah. Exhibit is the -- is the discounted cash flow.
15 I prepared an exhibit that looked of this form. It
16 didn't look like this because it had a lot more
17 information on it initially.
18           And we started out, and I requested that
19 management in this case, really David and Jill, give
20 me an historical analysis of sales of -- sales by --
21 by plant location, and a capacity statement about
22 how many buildings could be produced roughly from
23 those plants, and average price information for
24 buildings sold, some of which is in the report in
25 summary form.

Page 37

1           And so I started out looking at, do I
2 project revenues by -- you know, by plant location.
3 And we went down that road a little bit. And so I
4 got -- and we had a unique situation in that the
5 Kingman, Arizona plant had just come online. So when
6 David and I -- when David filled out my units, he
7 said, well, yeah, that plant is going to be up and
8 running at full speed in 18 months.  And so we had a
9 ramp -- a very fast ramp-up in revenues minus growth
10 at the lower locations at a fairly rapid ramp-up at
11 Kingman.
12           So -- and so I was getting -- you know, we
13 were getting numbers of revenues in the western
14 division were going to be in the high 20s in '23 and
15 near 30 in '24. And I said, you know, I'm not -- I
16 told him, I said, I'm not buying that. I said, I
17 don't think that's a reasonable, you know,
18 assumption to make that we're going to grow --
19 increase our revenues by 50 percent over a two-and-
20 a-half-year period.
21           So I went -- so then I said, let's take a
22 much more conservative approach to the analysis.
23 Let's just assume that -- that people leaving or
24 whatever occurs that, you know, that happens in
25 companies, that we're just going to kind of track

DOUGLAS SOUTHARD                      June 26, 2025                        38 to 41
86073

Page 38

1  along at a normal rate. And any revenue impact or
2  revenue losses could be offset by Kingman. And so we
3  continued to see just kind of slow historical growth
4  that the company had in the past.
5          And from there, the analysis is really
6  fairly simple. They have pretty much a history of
7  what their cost per building is, as a percent of the
8  selling price. And we did an analysis to make sure
9  that it -- that was a reasonable number. I think it
10  was 45 percent. Sales commissions of 10 percent.
11  Delivery cost ran somewhere between 9 and 11
12  percent.
13          I mean -- so I mean, their cost structure
14  was indicative of good management. You know, their
15  cost structure was extremely stable, you know, on an
16  historical basis. So we then imposed a cost
17  structure and an overhead structure onto the revenue
18  stream to come up with the projected lost profits.
19      Q.   Does this model you talked about still
20  exist?
21      A.   The original one, no, because it's been --
22  we would just revise what we were working on. So
23  what it is, is now Exhibit 15.
24      Q.   So the model evolved into Exhibit 15?
25      A.   Yes. Now, is there an earlier version? I

Page 39

1  -- there probably is. I'm sure there is somewhere.
2      Q.   Where would that model be?
3      A.   It would be in some e-mail exchange
4  between David and myself, which means it would have
5  to be recovered. I mean, I -- it's not -- it's no
6  longer something that -- I would have to get my IT
7  to go back and find every e-mail from -- to and from
8  David Sullivan.
9          MR. DOLLARHIDE:  Tom, just to be clear,
10  are you talking about the original model or the
11  spreadsheet that's Exhibit 15?
12          MR. PASTERNAK:  The original model.
13          MR. DOLLARHIDE:  Fair enough. I think --
14          THE WITNESS:  Yeah, it's 15, it says.
15          MR. DOLLARHIDE:  Is that what you
16  understood?
17          THE WITNESS:  Yeah, that's what I
18  understood, .
19          MR. PASTERNAK:  I am going to request that
20  that be produced, Counsel.
21          MR. DOLLARHIDE:  We'll look into that, but
22  that's probably a draft and probably not
23  discoverable.
24  BY MR. PASTERNAK:
25      Q.   Are the -- you filed two extra reports.

Page 40

1  Are those your full and final opinions in this case?
2      A.   That's all I've been asked to opine about
3  as of this moment.
4      Q.   Do you have any other opinions, other than
5  the opinions expressed in those three reports?
6      A.   I mean, I have lots of opinions, but I
7  don't think they're real -- that are specifically
8  relevant to this case. I am not aware of any other
9  opinions in this case that I am going to be asked to
10  give, other than the economic damage, slash, lost
11  profits and the supplemental analysis that was
12  presented in my report.  And I guess potentially I
13  might be asked to make comments about Mr. Napper,
14  but I have not prepared a document at this point to
15  do so.
16      Q.   What opinions do you have about -- today
17  about Mr. Napper's report?
18      A.   I mean, I have a couple of pretty global
19  opinions that I would say. Globally, I am not sure
20  how head start measures damages to Weather King
21  because it's the advantage they receive. It's not
22  the losses that Weather King suffered. So I don't
23  connect those, two personally.
24          I found it interesting that his 2022
25  number in his analysis, in his head start analysis,

Page 41

1  is -- indicates that there was a huge negative
2  advantage that the defendants gain by getting their
3  head start. His analysis shows a million-and-a-half-
4  dollar net negative impact of them getting a head
5  start. I found that intriguing.
6          There is no underlying work product in his
7  case, so I mean, it's just -- it's just like five
8  lines. So I mean, I -- you know, I don't know how
9  he got there.  I found that very interesting. I
10  found it interesting that he analyzed the financial
11  statements of -- is it ABCO? Is that the correct
12  legal name, American Barn?
13      Q.   American Barn LLC.
14      A.   Can we call it ABCO? That's what everybody
15  does.
16      Q.   You can call it ABCO.
17      A.   He made no adjustments to the performance
18  of ABCO for any expenses, and I find that
19  fascinating from an economic analysis standpoint
20  that you wouldn't make any adjustments to a reported
21  financial analysis. Every analyst does. So I found
22  that interesting. And I think in his deposition he
23  was asked about legal fees. I mean, legal fees are
24  not ongoing, and they're certainly specific to this
25  case.

DOUGLAS SOUTHARD
86073
June 26, 2025
42 to 45

Page 42

1    And you are, in essence, asking the
2  defendant to pay -- or, excuse me, the plaintiff to
3  pay for the defendant's legal fees if you take them
4  out of the damage calculation. So even if the
5  defendant gets his number, you say, but you have to
6  pay my fees. I found that to be an interesting
7  approach.
8    And finally, I found it interesting that
9  he entered his analysis on a date specific. I
10 believe it was April 22nd of this year. And made no
11 indication -- I mean, his analysis would infer that
12 there is an ongoing head start advantage that is
13 going to continue in the future. And he's like --
14 said, well, I am not going to consider that because
15 I haven't seen the data yet.
16   Well, the -- I would think the Court would
17 have to consider -- I think he would have to provide
18 an opinion about the future damages that Weather
19 King would receive or would incur as a result of the
20 head start. And he just says, okay, it ended on
21 April 22nd. There's no -- you know, his analysis,
22 there's no more advantage. It's just over. Now,
23 granted, he doesn't have financials to make a
24 precise calculation, but he is an expert. He has got
25 to be able to project what that future is going to

Page 43

1  be.
2    Q.   What is your understanding of the head
3  start theory?
4    A.   Head start theory is that you receive an
5  advantage in earnings by being able to start early.
6    Q.   And do you think that ABCO got a head
7  start by misappropriating trade secrets?
8    A.   I don't -- I think ABCO got a head -- he
9  did.  I mean, he said they did.
10   Q.   What do you think?
11   A.   They got a head start, yeah. They -- they
12 -- yeah, they clearly got a head start.
13   Q.   Let's look at your report a little.
14   A.   Sure.
15   Q.   Go to Page 1. And you say that you
16 considered various sources of information. One of
17 those is other pertinent information. What is that?
18   A.   I mean, we have -- we have 80 or 90 files
19 of data of information we received. I didn't list
20 every document that we looked at. Other pertinent --
21 we consider these to be the key things that we
22 evaluate, but there's lots of additional information
23 that's been developed and provided.
24   Q.   What is that other additional information?
25   A.   Well...

Page 44

1    Q.   You said 80 or 90 files?
2    A.   Yeah. Yeah, a lot of information that we
3  received.
4    Q.   And what is contained in it?
5    A.   Sales information. Sales information by
6  location. We have production capabilities by
7  location.  We have internally prepared allocated
8  financials for the western operations. Can I look at
9  my computer? I can tell you what they are. I mean, I
10 can't -- off the top of my head, I can't recall what
11 everything is in my folder.
12   Q.   On Page 2, you say -- first full
13 paragraph, you say, the result, the company ceased
14 operations in the western division resulting in a
15 loss of ongoing revenues and operating profits. Do
16 you see that?
17   A.   Yes.
18   Q.   Did the company do anything to mitigate
19 its damages?
20   A.   In what respect?
21   Q.   Well, did it do anything to try to prevent
22 the damage that you're saying they suffered?
23   A.   Again, in what respect?
24   Q.   In what respect did they do anything?
25   A.   Well, I mean, my understanding is they

Page 45

1  sent someone out there to try to salvage the
2  operation. I can't remember the individual's name. I
3  mean, it's -- it's kind of a total blindside that
4  happened on there.  So there was no -- I mean, in a
5  normal employee leaving an operation, you don't have
6  a mass exodus on a particular date.
7    And you don't have -- you know, you have,
8  I think, what would be normal, some sort of notice
9  period.  So I mean, you have time to respond, and
10 send people out, and talk to your customers and your
11 suppliers, and get somebody out there and let them
12 meet all of the dealers. And I mean, you have
13 ability to -- well, that was not the case here.
14   They didn't have an ability to -- you
15 know, to -- in my opinion -- well, the facts that
16 have been presented to me indicate that they did not
17 have an ability to do that so that ceased
18 operations.
19   Q.   Let me ask it this way: Do you have an
20 opinion on whether Weather King mitigated its
21 damages?
22   A.   Yeah, I think they sold their assets out
23 there at what would have been a liquidation for more
24 than liquidation value.
25   Q.   They sold their assets for more than a

Page 46

1 liquidation value. What is a liquidation value?
2      A.   Well, a liquidation would be a fire sale
3 value. And they were able to find someone else that
4 was interested in buying those assets. And they
5 negotiated a price that was 65 percent of retail for
6 the inventory, which is 20 percent above their cost,
7 so it was over in the gain. So yeah, I mean, I think
8 they -- had they not done the transactions, I would
9 think that the value of their inventories would have
10 deteriorated fairly rapidly over time.
11      So I think they mitigated their damage to
12 the extent they -- to the extent they thought they
13 could. And, you know, I have no reason to believe
14 that they wouldn't have done what was in their
15 personal best economic interest. I mean, a
16 fundamental principle of economics and a fundamental
17 principal of capitalism is that people act in their
18 own economic best interest. So they did what they
19 thought was in their own economic best interest.
20      Q.   Is it your testimony that they negotiated
21 the sale price?
22      A.   I don't know how the sales -- I mean, my
23 understanding -- I have read Brian's deposition, as
24 I indicated earlier. And he said that his dad called
25 and said that they were liquidating -- I think he

Page 47

1 used the word liquidating in his deposition. They
2 were liquidating the western division operations.
3 And I understand that Weather King presented to them
4 a price, and he accepted the price.
5      Q.   Was that a negotiation?
6      A.   Define -- I mean, they entered into -- he
7 asked -- I don't know whether he asked because I
8 wasn't there. He -- he offered a price, and then he
9 accepted it. I mean, that's like saying I go into a
10 car lot, and I'm going to buy a new Mercedes or a
11 new Toyota, and I offer $20,000, and the dealer
12 accepts it, even though the list price was 22. I
13 mean, is that a negotiation? I would say no.
14      But, you know, they entered into a
15 transaction. And the parties to the transaction,
16 other than Mr. Berryman and his son, have no reason
17 to do something that is not in their economic best
18 interest. I mean, none.
19      Q.   Do you believe that that was an arm's
20 length transaction?
21      A.   I believe it was the best transaction that
22 they could have entered into at the time.
23      Q.   Did they try to find other buyers?
24      A.   I don't know. Well, they did because they
25 sold a portion of the inventory to, what, Cumberland

Page 48

1 Industries LLC. So they did -- I assume that they
2 talked to Cumberland about other things. I don't
3 know. They were -- they were liquidating their
4 assets. They were liquidating inventories. They
5 weren't selling a going concern. There was no going
6 concern by July, when this -- July, August, when
7 this transaction occurred. There is no longer a
8 going concern.
9      They don't have manufacturers. They don't
10 have a dealer now or -- I mean, they've got a bunch
11 -- they had a bunch of sheds, and some inventory,
12 and some equipment. I mean, you know, so now they're
13 -- I mean, ask any banker, what collateral value is
14 inventory typically? Forty, fifty -- forty, fifty
15 percent on the dollar at best. So I mean, they got
16 cost plus twenty percent.
17      Q.   How do you know that?
18      A.   Because that's what -- because they sold
19 it for 65 percent of the selling price and the
20 manufacturing costs are roughly 45, 50 percent. So
21 they sold it at a profit. I mean, Mr. Napper says in
22 the report he doesn't understand how they made a
23 profit in the last half of the year. They had no --
24 they had no expenses in the last part of the year,
25 and they sold their inventories and assets for more

Page 49

1 than it was on the books for. I mean, it's clear.
2 Exactly what they said.
3      Q.   You say the purchase price for the
4 building was pegged at 65 percent of selling price.
5 What does that mean?
6      A.   Well, they -- well, when you sell
7 something for -- let's use easy numbers, $100. So
8 the selling price that they sold to Old Hickory
9 would be $65, and their cost to manufacture was $45,
10 okay? That's what it means.
11      Q.   Go to Page 7 of your report.
12      A.   Yes, sir.
13      Q.   Is the last paragraph on that page an
14 accurate statement?
15      A.   To my knowledge, yes.
16      Q.   At the back of your expert report,
17 Appendix B, you attached something you called
18 qualifications of appraiser. Do you see that?
19      A.   Yeah.
20      Q.   Is this an accurate CV?
21      A.   Let me see where that is.
22      Q.   It's all the way at the back.
23      A.   Okay.
24      Q.   The last three or four pages.
25      A.   Which one, the overview of Southard

DOUGLAS SOUTHARD
86073
June 26, 2025
50 to 53

Page 50

1  Financial, or my bio sketch, or what?
2      Q.    Both.
3      A.    Maybe under the related experience, that
4  probably is a little -- on mine, it's probably a
5  little dated. I'm -- actually, I'm chairman and CEO
6  of both Plymkraft Inc. and Columbian Rope Company.
7      Q.    Say that again.
8      A.    I'm actually chairman of the board and CEO
9  of both of those entities.
10     Q.    Which entities?
11     A.    Columbian Rope Company and Plymkraft Inc.
12  And Columbian Rope Company is now domiciled not in
13  Auburn, New York, but Newport News, Virginia. So
14  that's a -- needs to be corrected.
15     Q.    Under related experience, you say expert
16  witness, business valuation, local, state, and
17  federal courts?
18     A.    Uh-huh.
19     Q.    When is the last time you've testified as
20  an expert witness?
21     A.    I told you, it had to have been in the
22  late '90s.
23     Q.    When's the last time you were engaged as
24  an expert witness?
25     A.    This case.

Page 51

1      Q.    Before that?
2      A.    Oh, before that? Me, personally, or the
3  firm?
4      Q.    You, personally.
5      A.    It's probably been since before -- before
6  I moved to the Carolina mountains. So it has to be
7  back in the early 2000s. I mean, I already indicated
8  that over the last ten years, out of $20 million in
9  revenue it was only $140,000 were litigation
10  related. So it's -- you know, it's -- so obviously,
11  not much. If you add the divorce part to that, you
12  know, that's probably another four or five hundred
13  thousand dollars. I mean, we're not -- we're not --
14  that's not what we do.
15     Q.    What do you mean add the divorce part?
16     A.    Well, I mean, divorces are litigation by
17  definition, but -- so we do valuations and economic
18  consulting in divorce matters. And that's
19  litigation.  But as I said earlier, about half of
20  the time in those situations we've been retained by
21  the plaintiff and the defendant to come up with a
22  value to settle the divorce, and so...
23     Q.    On the table of contents, which is about
24  the fifth page, you say, approach discounted cash
25  flow method. Do you see that, Page 12?

Page 52

1      A.    Yeah.
2      Q.    It doesn't say lost profits, does it?
3      A.    No, it doesn't. It says what it says.
4      Q.    What causes of actions did you consider in
5  coming to your report?
6      A.    Any and all.
7      Q.    Where does it say that in your report?
8      A.    It doesn't. I was asked -- I was asked to
9  assume -- assume the facts as presented in the -- in
10  the complaint and to project economic damages,
11  slash, lost profits resulting from those actions. I
12  didn't -- I made no attempt to assign any specific
13  dollar amount to any -- any individual cause of
14  action.
15     Q.    Why not?
16     A.    I wasn't asked to.
17     Q.    So just so I am clear, you didn't consider
18  any specific causes of action coming to your report,
19  correct?
20          MR. DOLLARHIDE:  Object to the form. You
21  can answer.
22          THE WITNESS:  I considered any and all. I
23  think that's the answer.
24  BY MR. PASTERNAK:
25     Q.    Do you see anywhere in your report mention

Page 53

1  of any specific cause of action?
2      A.    I don't believe so.
3      Q.    And you did it the way you did it because
4  you were instructed to do it that way by counsel?
5      A.    No, sir.
6      Q.    Why did you do it the way you did it?
7      A.    I did it -- I did it the way I did it
8  because I thought it was the appropriate methodology
9  to measure lost profits. Counsel had no input on our
10  model at all.  This is my opinion.
11     Q.    But why, in your opinion, did you not
12  consider the causes of action that were alleged in
13  the complaint?
14     A.    I considered the causes -- I didn't
15  consider them individually. I considered the -- I
16  considered that the actions that the defendants took
17  resulted in the cessation of business of Weather
18  King in the western division, period.
19     Q.    And you don't know what those actions
20  were, correct?
21     A.    I --
22          MR. DOLLARHIDE:  Object to the form.
23          THE WITNESS:  I do know some of them. They
24  allegedly -- I only know what it says in the
25  complaint with respect to what it is -- what they

DOUGLAS SOUTHARD                    June 26, 2025                                    54 to 57
86073

Page 54

1  were alleged to have done. I may have -- I haven't
2  read any of the -- I can't -- I've only -- I have
3  read no defendant's deposition, so I haven't heard
4  their statement, as to causes of action.
5           All right. So we've been at this an hour.
6           MR. PASTERNAK:  You need a break?
7           THE WITNESS:  I think we ought to all take
8  a break.
9           MR. PASTERNAK:  All right. Sounds good.
10          THE VIDEOGRAPHER:  We are off the record.
11 The current time is 10:00 a.m.
12          (Recess observed.)
13          THE VIDEOGRAPHER:  We are now on the
14 record. The time is 10:14 a.m.
15 BY MR. PASTERNAK:
16     Q.   Going back to what we were just talking
17 about before the break, so you have no opinion -- so
18 I'm clear, you have no opinion on any specific
19 damages for any specific cause of action, correct?
20     A.   My damages are, in essence, for any and
21 all, any that the Court would find applicable and
22 all that the Court might find applicable.
23     Q.   You understand that there are one, two,
24 three, four, five, six, seven, eight separate causes
25 of action here, correct?

Page 55

1      A.   No, I really don't, but I'll -- I'll trust
2  you.
3      Q.   I'll represent to you that there are eight
4  separate causes of action. Do you have any opinion
5  on how any specific defendant has damaged Weather
6  King by any specific cause of action?
7      A.   We have done no analysis and have not been
8  requested to do any analysis about damages to either
9  one or any group that the defendants might have
10 caused individually or collectively.
11     Q.   So if I were to ask you what were -- what
12 are Weather King's damages due to Jesse Maupin's
13 misappropriation of trade secrets, would you have an
14 opinion?
15     A.   Specifically to him, no. I would say my
16 opinion would be, as I said, that the collective
17 action -- all of the actions resulted in the
18 cessation of operations and the loss of profits.
19     Q.   Other than the discounted cash flow
20 method, which you selected, did you consider --
21 before filing your second report, did you consider
22 any other possible accepted valuation approaches?
23     A.   Or accepted damage measurement approaches,
24 yes.
25     Q.   Accepted what?

Page 56

1      A.   Accepted damage measurement approaches,
2  yes, we did.
3      Q.   What other ones did you consider?
4      A.   We considered the change in value approach
5  that we put in our supplemental report. I think I
6  indicated that very early on that when we had our
7  initial meeting, phone conference, with Mr. Johnson
8  and Mr. Dollarhide, we discussed various ways to
9  measure the damage.
10          And that was a method that was discussed
11 at that time. And that subsequent to that
12 conversation, it was determined that the single most
13 appropriate and most accepted methodology for
14 measuring the damages suffered by cessation of
15 operations is the loss of profits.
16     Q.   So the only other method you considered
17 before filing your original report was something you
18 are calling the change-in-value approach?
19     A.   Sure. Well, I mean, we're talking about
20 damages, so did we consider -- and I know where you
21 are going. Did we consider an asset-based approach?
22 No, because the asset-based approach is -- unless
23 you make adjustments for all of the tangible values
24 that the company has, which requires a determination
25 of the estimated present value of the future cash

Page 57

1  flows, then the asset approach only measures the
2  value of the physical assets.
3           The DCF model is then used when we do an
4  intangible asset value to determine the value of
5  cash flows so that you can attribute the difference
6  between the asset value, the value of the assets
7  owned by the company, and its economic value, market
8  value, whatever you want to call it. And then one
9  assigns that difference.
10          Make twelve million in assets are worth
11 four. You have eight million dollars. That eight
12 million dollars is attributable to lots of
13 intangible things in many businesses. Workforce
14 employees, trademarks, trade secrets, dealer net --
15 you know, supplier network, customer network. You
16 know, a litany. And then, ultimately, after you've
17 tried to identify where it's applied, it goes into
18 good will.
19     Q.   In your report, did you ever discuss that
20 you had considered other -- considered and rejected
21 other approaches?
22     A.   I don't believe I did mention it
23 specifically, no.
24     Q.   Would you agree that there's missing from
25 your report any explanation of why you chose 2032?

DOUGLAS SOUTHARD                    June 26, 2025                                      58 to 61
86073

Page 58

1          MR. DOLLARHIDE: Object to the form.
2          THE WITNESS: I believe I answered that
3  question. We think that in a present-value analysis,
4  that going out ten years is sufficient to measure
5  the damages sustained. And the damages after that
6  date on a present value standpoint become relatively
7  insignificant.
8  BY MR. PASTERNAK:
9       Q.   But that's not in your report, right?
10      A.   Does that statement -- is what I just said
11  written in there? No, it's not. That's the reason
12  that we did.
13      Q.   Would you agree that by extending your
14  analysis through 2032, this -- it assumes that each
15  defendant would have continued his employment with
16  Weather King through 2032?
17      A.   No, no, it assumes that Weather King would
18  have continued to operate at or near the levels that
19  are in our discounted cash flow analysis.
20      Q.   How would it have continued to operate if
21  it lost all of these people?
22      A.   Well, first of all, it lost them under the
23  circumstances that -- that this lawsuit is about,
24  and the events that occurred prior to them leaving,
25  and then -- and as we already referred to. If --

Page 59

1  Weather King's management has a long-term history of
2  surviving changes in personnel, changes in the
3  market, changes in who they're competing against,
4  you know, at -- with you know, running a business.
5  They've been in the shed business for a long time.
6          One person or two people coming in and
7  saying, I am leaving, having done nothing else,
8  giving reasonable notice, then I am confident that
9  the Weather King management team would have
10  responded to the departure of one, or two, or three
11  key employees, yeah.
12      Q.   So you assume that they replace the people
13  who had left?
14      A.   I assume they would had responded
15  appropriately to continue the business.
16      Q.   Would they have hired sub -- or
17  contractors to replace the people who have left?
18      A.   I didn't run the business. I'm not -- you
19  know, it's not -- I assume, is what I said, they
20  would have hired a team or would have promoted
21  within. They would have made decisions to continue
22  to operate the business if the employee -- if the
23  cessation of the employment had been done in a
24  normal course of business and manner. And if there
25  hadn't been prior damages or comments, yeah. The

Page 60

1  analysis assumes that.
2          I did say, if you recall, earlier, that
3  management thought at that time that the Kingman,
4  Arizona branch, that facility was coming online, and
5  that they candidly thought they were getting ready
6  to go through a significant growth period in '23 and
7  '24. In our analysis, we said, no. Let's just assume
8  we continued more or less at the same level. So I
9  think it's very conservative, that assumption.
10      Q.   Why did you not deduct from your analysis
11  Weather King's actual pretax income for the western
12  operation over the last seven months of 2022 of
13  about .8 million?
14      A.   Who says I didn't? It's deducted. We took
15  the proceeds from the sale of all of the assets off.
16  The proceeds of the sale of all of those assets are
17  what resulted in the gain.
18      Q.   So you're saying you did deduct it?
19      A.   Yeah, we deducted the -- we have two
20  numbers, where we deducted the value of all of the
21  assets that were sold, and then we have a second one
22  where we deducted the value of just the profits that
23  were under the second half of the year. You wouldn't
24  deduct the profits and the value of all of the
25  assets sold or generated, the assets and the profit

Page 61

1  in the second half of the year with the sale of all
2  of the assets. So the answer is we did. I found that
3  to be a confusing comment by Mr. Napper.
4       Q.   I wanted to -- something I just thought of
5  in your report on Page 2. It's Exhibit 2.
6       A.   I've got it. Yeah, I have it. Thank you.
7       Q.   You say your conclusion of economic
8  damages is $11,300,000 to $14,875,000. Do you see
9  that?
10      A.   Uh-huh.
11          MR. DOLLARHIDE: Object to the form.
12  BY MR. PASTERNAK:
13      Q.   Which number are you going to present to
14  the jury?
15      A.   I am going to present both. I'm going to
16  present this report. It reaches those two
17  conclusions.
18      Q.   And you -- in your supplemental report,
19  you have other numbers, correct?
20      A.   Correct.
21      Q.   So you are going to present all of those
22  numbers to the jury?
23      A.   I don't know whether my supplemental
24  report is going to be presented to the jury or not.
25  I'm not planning what the lawyers are going to

DOUGLAS SOUTHARD
86073

June 26, 2025

62 to 65

Page 62

1 present to the jury. If they present that report,
2 then I will present that number to the jury, yeah.
3     Q.   And you will ask the jury to pick one of
4 the various numbers?
5     A.   I think the jury -- juries always pick a
6 number. So I mean, that's, by definition, what --
7 that's their job is to determine what the damages
8 are. I would be shocked if they picked any specific
9 number that any expert gave. At least that's been my
10 experience.
11          And so yeah, I mean, I think they will
12 take a look at the facts and circumstances, the
13 reports and information given by the plaintiff's and
14 defendants' experts, and determine what they --
15 what, in their opinion, are the economic damages.
16     Q.   Don't you think they're going to be
17 confused by being presented with several different
18 numbers from you?
19     A.   I think --
20          MR. DOLLARHIDE:  Object to the form.
21          THE WITNESS:  I think I can explain it to
22 them.
23 BY MR. PASTERNAK:
24     Q.   Have you reviewed the deposition testimony
25 of Mr. Maupin?

Page 63

1     A.   No.
2     Q.   I am representing to you that he testified
3 that he believed Weather King was having discussions
4 with Old Hickory regarding a potential sale prior to
5 June of 2022?
6     A.   They may have had discussions.
7     Q.   Would that -- if that was true, would that
8 impact your opinion?
9     A.   No.
10     Q.   Why not?
11     A.   That's a separate transaction. This damage
12 has resulted -- didn't result from them having
13 discussions. It resulted from the event -- what I
14 defined as the event. We weren't -- I'm not aware of
15 any, you know, oh -- you know, having discussions
16 with Scott or Brian. It would not affect our
17 analysis in any way, prior discussions.
18          I've -- I've never been involved with a
19 business owner that doesn't think about the
20 prospects of possibly selling his business. And
21 that's why we're here. And that's why people are in
22 business. They're trying to create economic wealth.
23     Q.   And you said you reviewed the testimony of
24 Brian Berryman, correct?
25     A.   Yes.

Page 64

1     Q.   And he testified that he bought his
2 company for roughly a four times multiple of profit?
3     A.   An ongoing -- I assume an operating
4 business, yeah.
5     Q.   Does that impact your opinion as to
6 whether or not Weather King sold its operations for
7 a fair market value?
8     A.   Time-out. They didn't sell an operation.
9 They sold -- they no longer had an operating
10 business.  You can't compare a transaction value for
11 an ongoing -- ongoing operating business to somebody
12 that is out of business that's liquidating their
13 assets. That's like black and white. Those -- our --
14 you have to -- you know, they're going to buy the
15 assets. They're not buying an operation.
16     Q.   Had you read Brian Berryman's testimony
17 before filing your initial report?
18     A.   No, I had not. I had been told. I had had
19 discussions. I hadn't read his deposition. I am not
20 sure it had been taken prior to my report. I don't
21 remember the date. But we had discussions when I was
22 in Paris about the -- that transaction, yeah.
23     Q.   What were those discussions?
24     A.   That they sold the business -- just like
25 it says on the bottom of Page 2. They sold the

Page 65

1 assets for -- the materials and the buildings, and
2 they paid the price of 65 percent of the selling
3 price. And that that was what they -- that's what
4 they could do. They had no other vehicle to get rid
5 of those assets.
6     Q.   Did Weather King shop around the assets to
7 any other potential buyers, other than Old Hickory?
8     A.   Well, they sold part of the assets to
9 Cumberland Industries LLC, so -- but no, I do not
10 know if they shopped the assets to any other
11 potential buyer.  Any potential buyer to maximize
12 value would have had to have been in the portable
13 shed business; otherwise, you have a bunch of raw
14 materials that had been converted into an asset that
15 the buyer doesn't want. So you have to be in that
16 business to want to buy those assets.
17     Q.   Are you aware that there was no sales
18 contract or agreement in place for the Weather King
19 West -- Weather King to Old Hickory transaction?
20     A.   Correct.
21          MR. DOLLARHIDE:  Object to the form.
22          THE WITNESS:  Yes, I am aware.
23 BY MR. PASTERNAK:
24     Q.   How does that impact your opinion on
25 whether that was a fair market value sale?

Page 66

1      A.   Nobody -- I didn't say fair market value.
2 You did.
3      Q.   Does it affect your opinion on whether it
4 was a fair market value sale?
5      A.   I -- I believe that it represented that
6 the parties on the selling side had every -- every
7 motivation to sell the assets for the maximum value
8 that they could receive for them, in light of the
9 circumstances that they were in.
10     Q.   Even though there was no sales contract?
11     A.   Yeah, I mean, they're buying -- you know,
12 you could go to a Home Depot and buy a bunch of
13 lumber and stuff and that would -- to build
14 something with. You don't need a sales contract.
15 They're buying an existing -- well, they're buying
16 inventories. They're not -- you know, they're not
17 buying the business. I mean, they don't need all of
18 the reps and warranties that are in -- you know,
19 that are in a traditional asset, slash, business
20 sales transaction.
21          They need to get -- they need to sell
22 these assets, transfer the title. That's it. You
23 know, they're not going to warrant anything. And the
24 buyer is not going to warrant anything. They don't
25 need to.  They're selling a very limited number of

Page 67

1 -- a limited asset group.
2      Q.   In your experience, is it common to not
3 have a contract in such a transaction?
4      A.   I haven't done a lot of pure liquidation
5 sales. We do going concern sales.
6      Q.   In a going concern sale is there typically
7 a sales contract?
8      A.   Absolutely.
9      Q.   Is it your understanding that Old Hickory
10 has been successful since acquiring the former
11 Weather King assets?
12     A.   I have not seen any financial results for
13 Old Hickory.
14     Q.   What is an arm's length transaction?
15     A.   Well...
16     Q.   In your opinion?
17     A.   In my opinion, okay. Arm's length. I mean,
18 if you look at the old court definition of a fair
19 market value, it's a willing buyer and a willing
20 seller, fully informed, not being forced to or under
21 any compulsion to enter into a transaction. Each
22 party operating in their own economic best interest.
23 That's probably the best definition of arm's length
24 transaction.
25     Q.   Did you analyze what the fair market value

Page 68

1 would have been of the Weather King assets that were
2 sold?
3      A.   As I've already stated, and I will state
4 again, they didn't sell an ongoing business. They
5 sold assets. And they sold them for more than cost
6 that resulted -- more than carrying value. Resulted
7 in a million six, million eight gain that the
8 parties on the seller's side of that transaction had
9 every reason to enter into a transaction that
10 maximized their personal economic best interest.
11 That's -- that's all I can infer.
12          Did I go out there or did anybody -- none
13 of us can now -- go out and do a fair market
14 analysis?  Hell -- I mean, excuse me, no, you can't.
15     Q.   Did you ever review penal statements of
16 Weather King after 2022?
17     A.   Of Weather King?
18     Q.   Yes.
19     A.   Yeah, they're in our -- they're in the
20 report.
21     Q.   After 2022?
22     A.   Yeah. All of the way through 2024. It was
23 in our report.
24     Q.   Do you understand that Weather King's
25 western operation earned about $6 million in the

Page 69

1 last seven months of 2022?
2      A.   Earned?
3      Q.   Uh-huh, after the event.
4      A.   Earned $6 million? I mean, they made a
5 revenue of $6 million.
6      Q.   That's what I mean, revenues.
7      A.   Oh, okay. That's -- almost all of that is
8 the sale of the assets.
9      Q.   That's the sale of the assets?
10     A.   Virtually all of it is, yes. They had some
11 other -- I assume they had some other, you know,
12 one-off transactions of buildings and so forth as
13 they went through the process, but that's not --
14 they didn't earn that. They sold their assets.
15          MR. PASTERNAK:  Three.
16          (Exhibit 3 was marked.)
17 BY MR. PASTERNAK:
18     Q.   Mr. Southard, I'm handing you what has
19 been marked as Exhibit 3, a document titled rebuttal
20 report.
21     A.   Uh-huh.
22     Q.   Have you seen this before?
23     A.   Yes, sir.
24     Q.   Does the scheduling order allow for a
25 rebuttal report?

DOUGLAS SOUTHARD
86073

June 26, 2025

70 to 73

Page 70

1    A.   I have no idea.
2         Q.   If it doesn't allow for one, would that
3    impact your ability to put one in?
4    A.   I don't know.
5         MR. PASTERNAK:   And just like you said in
6    your deposition, we are going to move to strike
7    this, so by asking questions about it, I am not
8    admitting it's admissible.
9         MR. DOLLARHIDE:   Understood.
10   BY MR. PASTERNAK:
11        Q.   Who suggested you prepare a rebuttal
12   report?
13   A.   I did. When I read Mr. Napper's deposition
14   and he criticized that -- early in the deposition,
15   criticized our lack of consideration of -- I think
16   he even said specifically a valuation approach, but
17   I am not real sure. But it was my suggestion.
18        Q.   And you only did this report after Mr.
19   Napper suggested you did not consider alternate
20   approaches, correct?
21   A.   We discussed, in our very first phone
22   call, doing this type of analysis. We discussed the
23   impact of what it would look like. We did not
24   prepare the analysis -- a specific analysis. I mean,
25   I've been in this business for 40-something years

Page 71

1    now. And, you know, we've got a business that was
2    generating a cash flow of X before the event, and Y
3    after the event.
4         Fundamentally, the change in the value is
5    going to be the change in the cash flow times six,
6    five or six. That's -- that's the answer.
7    Particularly for a business of this size category.
8    So I mean, we had talked repeatedly that doing this
9    type of analysis would have resulted in a damages in
10   the 15-, 20-million-dollar range.
11        Q.   Could you have done this report when you
12   filed your initial report?
13   A.   I just told you that in my head, I had.
14        Q.   But you didn't do it. Why not?
15   A.   Because we determined in discussions with
16   counsel, our client, that the most appropriate
17   approach for measuring the losses in this case was a
18   lost profit model.
19        Q.   But there was no new developments or new
20   evidence that came out that caused you to file this
21   report --
22   A.   Only Mr. Napper saying I didn't consider
23   it when -- when I know, in fact, that I had
24   considered it.  I had discussed with counsel, and I
25   discussed with representatives of Weather King. But

Page 72

1    I --
2         Q.   But it wasn't in your initial report, and
3    you could have done it in your initial report,
4    correct?
5    A.   Absolutely.
6         Q.   And why didn't you?
7    A.   Because -- I just answered that question.
8    Because we determined in discussions with counsel
9    that the most appropriate approach and the most
10   widely accepted method for measuring economic
11   damages in a lost profit analysis is a discounted
12   cash flow lost profit analysis.
13        Q.   Who prepared the supplement or the
14   rebuttal report?
15   A.   That's what I did.
16        Q.   The same way you prepared your initial
17   report?
18   A.   Absolutely.
19        Q.   You typed it in, yourself?
20   A.   Absolutely.
21        Q.   Can you summarize your conclusions from
22   your rebuttal report?
23   A.   Well, I mean, can I look at it?
24        Q.   Sure.
25   A.   I mean, our conclusion is on the last

Page 73

1    page, Page 7. We provide -- I mean, the analysis is
2    really very straightforward. We did an evaluation of
3    the company as of December 31, '21, okay, before any
4    -- supposedly any alleged activities were going on
5    that led up to the event. So we valued the company
6    at the end of , between 41 and 43 million dollars,
7    depending on which approach you want to look at or
8    the -- or the average of the two. It doesn't really
9    matter.
10        And then we value the company as it
11   existed at the end of 2022, after the dust is
12   settled from the transaction, okay? And we valued it
13   between 16 and 18 million dollars. You subtract
14   those two numbers, and you get a change in value of
15   22 to 25 million. And then you subtract out the net
16   proceeds that they received from the sale of the
17   assets. Very simple -- very straight -- very simple,
18   straightforward type of analysis.
19        Q.   Does this report cover any specific
20   causes of action?
21   A.   No.
22        Q.   Does it cover any specific defendants?
23   A.   No.
24        MR. PASTERNAK:   I'm going to mark your two
25   exhibits to the report. Exhibit 4.

Page 74

1          (Exhibit 4 was marked.)
2          MR. PASTERNAK:  I'm handing you what has
3   been marked as Exhibit 4. It's titled Exhibit V2.
4          THE WITNESS:  Okay.
5          (Exhibit 5 was marked.)
6          MR. PASTERNAK:  And I'm going to hand you
7   what is marked as Exhibit 5. Exhibit V -- titled
8   Exhibit V1.
9   BY MR. PASTERNAK:
10         Q.  Can you tell me what those two exhibits
11   are?
12         A.  They're the two exhibits that value the
13   company as of December '21 and December '22.
14         Q.  So Exhibit 5 is a V1. That's a value as of
15   -- December 20 --
16         A.  Right, I think -- I think -- well, yeah,
17   it says, under the asset, as of December 31, 2021.
18   That's probably -- so that's as of that date.
19         Q.  And Exhibit 4 is value as of December
20   31st, 2022, correct?
21         A.  Correct.
22         Q.  And you say in your rebuttal expert report
23   that the conclusions of this report are presented in
24   Exhibits V1 and V2. Do you see that at the bottom of
25   Page 1?

Page 75

1         A.  Sure.
2         Q.  Where are the conclusions of your report
3   in these exhibits?
4         A.  On the last page.
5         Q.  Go to Exhibit 4 and show where the
6   conclusion is. There's a lot of numbers on that
7   page.
8         A.  Well, it says, combined value, and
9   underneath that it says, conclusion of value on the
10   very last page.  Conclusion of value, right there.
11         Q.  So the conclusion of value as of that date
12   was 17,480,000.
13         A.  Based upon weighing those two -- the two
14   methods that we used to average, 50/50, correct.
15         Q.  And the conclusion of value as of December
16   is $41,930,000?
17         A.  Correct.
18         Q.  On Page 2, you say --
19         A.  On the rebuttal report?
20         Q.  Of the rebuttal report, sorry.
21         A.  Yeah, no problem.
22         Q.  It says, this rebuttal report is prepared
23   to rebut suggestions in the Napper report that the
24   Southard report did not consider other accepted
25   valuation approaches. Do you see that, first

Page 76

1   sentence in the middle paragraph?
2         A.  Oh, yeah.
3         Q.  Did the Southard report consider other
4   accepted valuation approaches?
5          MR. DOLLARHIDE:  Object to the form.
6          THE WITNESS:  I think we've discussed this
7   a number of times, but I'll answer again. You're
8   talking about the --
9   BY MR. PASTERNAK:
10         Q.  The report.
11         A.  The report. It was determined that the
12   most appropriate measure of the damages suffered was
13   a discounted cash flow model measuring lost profits.
14   And that was what was presented in the -- in the
15   report.
16         Q.  And you say that, in the same paragraph,
17   that the rebuttal report buttresses its conclusion
18   in the Southard report. Do you see that?
19         A.  Yeah.
20         Q.  What does that mean?
21         A.  Supports them.
22         Q.  Well, the numbers are very different,
23   aren't they?
24         A.  Yes. They're higher under the destruction
25   of -- they're much -- yeah, they're higher under the

Page 77

1   destruction of value.
2         Q.  So how does that buttress the initial
3   report?
4         A.  I think it shows how conservative and
5   reasonable we are in developing a discounted cash
6   flow model.
7         Q.  Going to Page 3, you list three
8   approaches, the asset-based approach, the income --
9   based approach, and the market approach. Do you see
10   that?
11         A.  Yes, I do.
12         Q.  Did you use all three of these approaches
13   in this report?
14         A.  We presented them all, and we considered
15   two, which would be the normal course of action on a
16   going concern business is that the asset approach
17   would not be considered. And I can -- you can point
18   to an immeasurable number of public companies that
19   have negative net worth that are worth millions and
20   trillions of dollars, in some cases. You know, I mean,
21   companies from a transaction -- from a financial
22   control basis are based upon cash flow and that --
23   you know, not the assets that they own.
24         Q.  So you only considered the income approach
25   and the market approach, correct?

Page 78

1    A.   Again, you are putting words in my mouth.
2  I considered it and rejected it, the asset approach.
3        Q.   And for what reason?
4    A.   Just what I just said. It doesn't measure
5  the value of a business in a going-concern basis.
6  And I think any business generating significant cash
7  flow is going to be valued on the basis of its cash
8  flow.  That's what shareholders want.
9        Q.   Describe the income approach.
10   A.   You measure -- in this case we measured a
11  static estimate of the current earning capacity of
12  Weather King's western division, as of the two
13  dates.  And then you develop an income cash flow
14  multiple and you multiply the two together to come
15  up with a value.  It's kind of a traditional -- what
16  I refer to as, you know, kind of a traditional stock
17  analyst approach to the value, you know, when an
18  analyst were covering X, Y, Z company values that
19  they typically are talking about what they believe
20  to be the underlying earning capacity of the company
21  at the date of the value.
22        It's a multiple to apply to that to
23  reflect, in essence, really the present value of the
24  future cash flows. The multiple is measuring -- it's
25  a simple way to measure present value. I mean,

Page 79

1  that's what a P/E ratio is. If you know
2  theoretically what a P/E ratio is, it's a present-
3  value model under specific growth assumptions. So
4  the income approach is measuring, you know, an
5  anticipated cash flow going forward.
6        Q.   And going to Page 7, on the bottom where
7  you have your indication of damages and conclusion,
8  which row is the income approach?
9    A.   The income approach only?
10       Q.   Yes.
11   A.   What do you mean?
12       Q.   Well, you have three rows titled
13  indication of value, EBITDA value only, and income
14  approach value only. Is it the third row?
15   A.   Income approach only is the income
16  approach only row.
17       Q.   And which row is the market approach?
18   A.   The economic value only.
19       Q.   So the third row is the income approach --
20   A.   Only.
21       Q.   -- only. The second row is the market
22  approach. What is the first row?
23   A.   An average of the two. It's what's -- it's
24  what's on the last page of each of the exhibits at
25  the top, the two approaches.

Page 80

1        Q.   So just so I'm understanding it, the
2  average of -- if you go to the chart at the bottom
3  of Page 7, the average of $18,570,000 and
4  $16,396,000 is $17,480,000?
5    A.   All of the numbers are rounded, yeah.
6        Q.   So that's --
7    A.   It's a rounded number, correct.
8        Q.   And you have three net damages numbers in
9  the last column on the chart on the bottom of Page
10  7.
11   A.   Uh-huh.
12       Q.   Which one of those numbers are you going
13  to present to the jury?
14   A.   I am going to present the entire analysis.
15  If we are allowed to present this report, it will be
16  presented as this right here.
17       Q.   How come there's no citations in this
18  report, no citations to any authority?
19   A.   I was asked to give my expert opinion, not
20  somebody else's.
21       Q.   On Page 3, last full paragraph, you say
22  that in any event, it's clear the book value of the
23  company understates the value of the company as a
24  going concern.  Why is that?
25        MR. DOLLARHIDE:  Object to the form.

Page 81

1        THE WITNESS:  I just -- I think I've
2  answered that question. The going concern value is
3  going to be measured by the cash flow, not by the
4  assets owned. I mean, take Google. Take any -- take
5  any company that has essentially a nominal or
6  negative net assets.  They're worth lots and lots of
7  money because they generate lots and lots of cash
8  flow.
9        And the default, people buy companies. You
10  don't by a company to enjoy its assets, generally.
11  You buy the company because your expectation is
12  they're going to pay you a lot of money down the
13  road, cash flow. And if you do a private equity -- I
14  mean, if you did a sale of the company, I mean, the
15  private equity firm is not going to buy the assets.
16  They're going to buy a cash flow stream.
17        So the asset approach in a -- in an
18  operating entity is frequently, if not almost
19  always, disregarded in the valuation of a company on
20  a financial control basis. If you value on a -- you
21  would consider it in -- the asset approach maybe in
22  a real estate holding company where you could mark
23  all of the assets -- all of the real estate held to
24  their fair market value.
25        And yeah, I mean, the asset approach is

Page 82

1  relevant. But all you've really done when you've
2  marked the assets up to their fair market value in a
3  real estate holding company is capitalize the cash
4  flow of the underlying assets, so you're basically
5  doing the same thing.
6  BY MR. PASTERNAK:
7      **Q.   On Page 4 in the middle paragraph, you**
8  **say, the analysis below assumes that the required**
9  **cash levels to support operations was one million.**
10 **Do you see that?**
11     A.   Right.
12     **Q.   Where did you get that number from?**
13     A.   It was my -- our opinion as to what level
14 of cash they needed to maintain their operations at.
15     **Q.   Was it based on any documentation or any**
16 **input from the client?**
17     A.   I -- I don't recall if I discussed it with
18 management or not. But a typical -- typical in a
19 control transaction when you sell a business, you
20 sell the ongoing assets and retain the cash. So --
21 or you deliver some level -- you deliver some --
22 when you sell a business, you -- the seller delivers
23 to the buyer the operating assets and some required
24 level of working capital to operate the business.
25         All this is saying is that we believe the

Page 83

1  deliverable amount of cash plus the inventories that
2  a buyer would have demanded would have been roughly
3  $1 million.
4      **Q.   Can you describe or tell me what you mean**
5  **by capitalization rate, capitalization factor on**
6  **Page 6?**
7      A.   Okay. Well, the cap rate is a percentage
8  -- a capital-issued rate is a percent required rate
9  of return that an investor has. And a capitalization
10 factor is one divided by that required rate.
11     **Q.   And where did you come up with 3.5**
12 **percent?**
13     A.   The growth. It's the same growth rate that
14 we used in our -- basically, in our DCF model.
15         MR. PASTERNAK:  Let's take a break. I am
16 going to finish before lunch.
17         MR. DOLLARHIDE:  Okay.
18         THE WITNESS:  Okay.
19         MR. DOLLARHIDE:  Off the record.
20         THE VIDEOGRAPHER:  We are currently off
21 the record. The time is 10:52 a.m.
22         (Recess observed.)
23         THE VIDEOGRAPHER:  We are now on the
24 record.  The current time is 11:01 a.m.
25 BY MR. PASTERNAK:

Page 84

1      **Q.   I just wanted to get clarity on the timing**
2  **of your last court testimony. When was that?**
3      A.   Well, I don't know exactly, as I said. I
4  believe it was -- as an expert witness, it had to be
5  in the late '90s. It may have been as recently as
6  early s. But it's been a long, long time.
7      **Q.   And the last time you prepared an expert**
8  **report?**
9      A.   It would have been mine, obviously. It
10 would have been -- well, I don't -- I may have
11 prepared a report that didn't go to trial or
12 deposition. I don't know that I can answer that
13 question.
14     **Q.   Was it late 1990s or early 2000s?**
15     A.   Probably that I prepared -- that I
16 prepared a report explicitly for a litigation
17 matter, yeah, probably 2000 is probably a good
18 number, good date.
19     **Q.   And do you know how Butler Snow got your**
20 **name?**
21     A.   We're pretty well know for what we do.
22     **Q.   Is there some connection?**
23     A.   No.
24         MR. PASTERNAK:  No further questions.
25         MR. DOLLARHIDE:  I have a couple of

Page 85

1  questions.
2  EXAMINATION
3  BY MR. DOLLARHIDE:
4      **Q.   Mr. Southard, earlier when Mr. Pasternak**
5  **was asking you about the opinions you have about Mr.**
6  **Napper's report, you're very -- obviously, you are**
7  **very professional and you're being very civil. And**
8  **you said things like there were things that were**
9  **interesting and fascinating about what he did. And I**
10 **understand if -- were you being professional in your**
11 **characterization of your interpretation of things he**
12 **said in his report?**
13     A.   Well, I wasn't trying to be in any way
14 detrimental toward him. If it came across that way,
15 that was purely -- interesting to me meant I didn't
16 understand why he did a certain thing that he did.
17 It wasn't a criticism, specifically.
18     **Q.   When we get to the jury, we're going to**
19 **need be hyperaccurate with our terminology, even if**
20 **it is detrimental. Do you understand what I am**
21 **saying?**
22     A.   Yes, sir.
23     **Q.   Understanding that, that we don't want**
24 **your opinions to be in one light today and in a**
25 **different light at the trial in front of the jury,**

DOUGLAS SOUTHARD                    June 26, 2025                            86 to 89
86073

Page 86

1  how would you characterize your opinions about Mr.
2  Napper's report?  Would you say that those things
3  are interesting, or would you say something else?
4      A.   Well, I would have to look back at exactly
5  what I said. You know, interesting meant that I
6  thought it was a unique approach or a unique
7  statement about -- about what he did or said.
8      Q.   So one of the -- specifically one of the
9  points that you made was that him including the very
10 large negative -- well, the loss in the first half
11 of as the head start advantage?
12     A.   Well, I guess when I said interesting --
13 I did say interesting about that particular comment
14 because it is counterintuitive that a head start
15 would result in $1.6 million loss. So to me that's
16 an interesting conclusion to present in a report.
17 And there is no documentation in the report for me
18 to see how he got that number. There are like four
19 or five lines in his total presentation of the
20 damage analysis.
21         So that's, to me, an interesting result
22 about a methodology that says there is an advantage
23 to a head start to come -- to start out of the shoot
24 and say there's a million and a half dollar negative
25 advantage to a head start. I found that to be, as I

Page 87

1  said, an interesting conclusion. I don't understand
2  it.
3      Q.   Is it interesting in a good way or
4  interesting in a bad way, if that makes sense?
5      A.   It's inexplicable, I guess, is a better
6  word.
7      Q.   Another point you made was that he made no
8  adjustments for ABCO's expenses. You said that that
9  was either -- you either said interesting or
10 fascinating?
11     A.   I probably did. Well, almost every
12 analyst, when we do financial statements and doing
13 an economic analysis, value analysis, discounted
14 cash flow, head start, which is some sort of cash
15 flow analysis, would look at the cash flows that are
16 generated and likely find things that should be
17 adjusted for.
18         So not finding them -- not finding any,
19 which is a theme, because he didn't make any
20 adjustments, I found that -- I guess I used the word
21 fascinating, as I recall, at that time. It's, again,
22 hard for me to understand how you wouldn't find
23 anything to adjust for. I mean, it's just, again,
24 inexplicable is probably -- I don't understand. So I
25 said it was -- I said fascinating or interesting

Page 88

1  that he reached the conclusion.
2      Q.   Would you say that that's an issue with
3  his opinion?
4      A.   Oh, absolutely.
5      Q.   And then the other point that you made
6  about Mr. Napper's opinion was that he ended his
7  damages calculation on an arbitrary date, based on
8  the information that was provided to him, without
9  explaining that those damages would continue in
10 perpetuity. You also said -- I believe that you used
11 the word interesting.
12     A.   Probably.
13     Q.   And so I had the same question about that,
14 your opinion about Mr. Napper's termination of the
15 damages calculation?
16     A.   Well, and I'll -- I -- interesting that he
17 would present it that way because it's clearly a
18 mistake in his analysis. That's the best way I can
19 summarize it. Because the damages -- I assume that
20 if he did the damages at the -- now, today, there
21 would be a couple more month's worth of records, and
22 his number would change.
23         And he doesn't indicate, that I can
24 recall, in his report anywhere that this was a
25 partial estimate of the head start. He doesn't say

Page 89

1  -- he just says, this is it. This is what the head
2  start damages are. Well, no, they're the head start
3  damages as of April 22nd, .
4      Q.   Switching gears a little bit. You also
5  said at one point that you only know -- I think Mr.
6  Pasternak asked you why didn't you consider any
7  causes of action or specific causes of action in
8  your report. And then you said something along the
9  lines of that you only know what it says in the
10 complaint. I -- is it correct that you have read --
11 it is correct that you have read deposition
12 testimony, right?
13     A.   I've read those five depositions, I think
14 that I indicated that I've read.
15     Q.   So to the extent that there are facts that
16 are in those depositions, would your opinions in
17 this case also be informed by those, not only what
18 is in the complaint?
19     A.   Well, I certainly know that from reading
20 particularly Mr. Napper's report, because there was
21 a tremendous amount of time -- or in his report and
22 in his deposition about cause of action discussion.
23 So I knew that there were different causes of
24 actions alleged. So I didn't read his report until
25 after my report had been prepared.

DOUGLAS SOUTHARD                    June 26, 2025                          90 to 93
86073

Page 90

1    So I can't say that as of the date of the
2 preparation of my report that I knew what his report
3 was going to say. He prepared his -- I think in
4 response to mine. I don't know when he was retained
5 or when he did his work. So the other deposition --
6 the only deposition that I read prior to issuing the
7 main report, I am not sure I read any. I don't think
8 -- I don't think y'all provided me with anybody's
9 deposition until after Mr. Napper's report was
10 filed.
11    MR. DOLLARHIDE:  That's all of the
12 questions.  Thank you.
13 FURTHER EXAMINATION
14 BY MR. PASTERNAK:
15    **Q.    Did you put any of these criticisms of Mr.**
16 **Napper in your rebuttal report?**
17    A.    No.
18    **Q.    Why not?**
19    A.    Wasn't asked to.
20    **Q.    So your rebuttal report was only based on**
21 **what you were asked to do?**
22    A.    It was based upon what it says in the
23 report, a response to his comment that we considered
24 no other methodology.
25    **Q.    But you just said you weren't asked to.**

Page 91

1 **That implies that you were asked to prepare the**
2 **rebuttal report, and you said it was your idea?**
3    A.    I am going to correct myself. I -- it was
4 after I read his deposition, I indicated to counsel
5 that I thought is, is something that we should --
6 that statement is, A, not true because we did
7 consider it.  Didn't put it in the report, but it
8 was considered. And that we should respond to it. I
9 was not asked to prepare any document in response to
10 either Mr. Napper's test -- report or deposition.
11    **Q.    But your rebuttal report was prepared in**
12 **response to his report, correct?**
13    A.    Just that one part.
14    MR. PASTERNAK:  No further questions.
15    THE WITNESS:  Thank you.
16    MR. PASTERNAK:  Thank you, sir.
17    THE VIDEOGRAPHER:  This is the end of the
18 deposition of Douglas Southard. The court reporter
19 will now take the orders for the transcript, and
20 then I will take orders for the video.
21    MR. PASTERNAK:  Can I get a rough?
22    THE COURT REPORTER:  How soon?
23    MR. PASTERNAK:  How soon can you do it?
24    THE COURT REPORTER:  Well, I have court
25 this afternoon, so --

Page 92

1    MR. PASTERNAK:  I don't need it like
2 tomorrow.
3    THE COURT REPORTER:  Oh, yeah, yeah.
4    MR. PASTERNAK:  And then, yeah, order a
5 condensed report and a regular.
6    THE COURT REPORTER:  Okay. And I have
7 written -- well, I am doing this for a national
8 firm, so I don't know how they do it, but I will let
9 them know.
10    MR. PASTERNAK:  Okay.
11    THE COURT REPORTER:  Do you have a
12 paralegal that you would like to have copied, too?
13    MR. PASTERNAK:  Yeah.
14    THE COURT REPORTER:  And they may have
15 that information, but I would like to get it in case
16 I have any questions.
17    MR. PASTERNAK:  It's Alicia, A-l-i-c-i-a,
18 Dockett. Her last name is Dockett, D-o-c-k-e-t-t.
19 And it would be adockett@taftlaw.com.
20    THE COURT REPORTER:  Alicia Dockett @?
21    MR. PASTERNAK:  No, her e-mail is adockett
22 --
23    THE COURT REPORTER:  Oh, you just gave me
24 her name. Okay. Got it.
25    MR. PASTERNAK:  @taftlaw.com.

Page 93

1    THE COURT REPORTER:  T-a-f-t?
2    MR. PASTERNAK:  Uh-huh.
3    THE COURT REPORTER:  Taft Law.
4    MR. PASTERNAK:  Yeah.
5    THE COURT REPORTER:  All right.
6    THE VIDEOGRAPHER:  This is Thomas. Mr.
7 John is getting the video of today's deposition
8 included with a transcript. Would you like to order
9 a copy of today's --
10    MR. PASTERNAK:  Yes, please.
11    THE VIDEOGRAPHER:  And the time is now
12 11:12 a.m. We are off the record.
13    (FURTHER DEPONENT SAITH NOT.)

Page 94
```
 1                   CERTIFICATE
 2
 3       I, the undersigned Amaliko Carroll, am a
 4  videographer on behalf of NAEGELI Deposition &
 5  Trial. I do hereby certify that I have accurately
 6  made the video recording of the deposition of
 7  Douglas Southard, in the above captioned matter on
 8  the 26th day of June, 2025, taken at the location of
 9  1320 Adams St, Ste 1400, Nashville, TN 37208.
10
11       No alterations, additions, or deletions were
12  made thereto.
13
14       I further certify that I am not related to any
15  of these parties in the matter and I have no
16  financial interest in the outcome of this matter.
17
18
19
20
21
22               Amaliko Carroll
23
24
25
```

Page 95
```
 1                   CERTIFICATE
 2
 3       I, CAROLE K. BRIGGS, Licensed Court Reporter
 4  within and for the State of Tennessee, do hereby
 5  certify that the above deposition was reported by me
 6  and that the foregoing pages of the transcript is a
 7  true and accurate record to the best of my
 8  knowledge, skills, and ability.
 9
10       I further certify that I am not a relative,
11  counsel or attorney of either party nor employed by
12  any of the parties in this case or otherwise
13  interested in the event of this action.
14       IN WITNESS WHEREOF, I have hereunto affixed my
15  official hand on this 6th day of July 2025.
16
17
18  Carole K. Briggs
19
20
21  CAROLE K. BRIGGS
22  Shorthand Reporter
23  Tennessee License No. 345
24
25
```

Page 96
```
 1              CORRECTION SHEET
 2  Deposition of: Douglas Southard   Date: 06/26/25
 3  Regarding: Consolidated Ind et al vs Maupin et al
 4  Reporter: Briggs
 5  _____
 6  Please make all corrections, changes or
 7  clarifications to your testimony on this sheet,
 8  showing page and line number.  If there are no
 9  changes, write "none" across the page.  Sign this
10  sheet and the line provided.
11  Page  Line  Reason for Change
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24          Signature: _____
25                    Douglas Southard
```

Page 97
```
 1               DECLARATION
 2  Deposition of: Douglas Southard   Date: 06/26/2025
 3  Regarding: CONSOLIDATED INDUSTRIES Vs. JESSE A. MAUPIN
 4  Reporter:  Carole Briggs
 5  _____
 6
 7  I declare under penalty of perjury the following to be
 8  true:
 9
10  I have read my deposition and the same is true and
11  accurate save and except for any corrections as made
12  by me on the Correction Sheet herein.
13
14  Signed at _____, _____
15  on the _____ day of _____, 20____.
16
17
18
19
20
21
22
23
24          Signature: _____
25                    Douglas Southard
```

## Exhibits

**EX001 NOD** 6:5,6

**EX002 EXPERT DIS
CLOSURE** 27:24
28:2 61:5

**EX003 REBUTTAL R
EPORT** 69:16,19

**EX004 VALUATION
ANALYSIS** 73:25
74:1,3,19 75:5

**EX005 VALUATION
ANALYSIS** 74:5,7,
14

## $

**$1** 83:3

**$1.6** 86:15

**$100** 49:7

**$100,000** 34:7

**$11,300,000** 61:8

**$125** 18:9

**$14,875,000** 61:8

**$140,000** 26:13 51:9

**$16,396,000** 80:4

**$17,480,000** 80:4

**$18,000** 20:1

**$18,570,000** 80:3

**$2** 26:11

**$20** 26:12 51:8

**$20,000** 19:23 47:11

**$41,930,000** 75:16

**$45** 49:9

**$49,000** 19:22

**$5** 34:6

**$500** 19:11

**$6** 68:25 69:4,5

**$65** 49:9

## (

**(a)(2)** 28:1

## 1

**1** 6:5,6 43:15 74:25

**10** 38:10

**10:00** 54:11

**10:14** 54:14

**10:52** 83:21

**11** 38:11

**11:01** 83:24

**11:12** 93:12

**12** 51:25

**15** 12:25 26:17
36:13 38:23,24
39:11,14

**15-** 71:10

**16** 73:13

**17,480,000** 75:12

**18** 19:23 37:8 73:13

**1975** 8:24

**1976** 9:1

**1981** 9:3 10:11

**1983** 10:11 13:17

**1986** 10:16,22

**1987** 11:13,24

**1990s** 23:8 84:14

**1st** 15:15 16:18
17:17

## 2

**2** 27:24 28:2 44:12
61:5 64:25 75:18

**20** 26:17 46:6 74:15

**20-million-dollar**
71:10

**2000** 23:12 84:17

**2000s** 51:7 84:14

**2012** 11:25

**2021** 74:17

**2022** 14:14 28:21
40:24 60:12 63:5
68:16,21 69:1 73:11
74:20

**2023** 29:14

**2024** 68:22

**2025** 5:4

**2032** 33:9,12 57:25
58:14,16

**20s** 37:14

**21** 73:3 74:13

**212** 8:12

**22** 47:12 73:15
74:13

**22nd** 42:10,21 89:3

**23** 37:14 60:6

**24** 29:6,18,24 36:2
37:15 60:7

**25** 36:7 73:15

**26** 5:4 19:17

**26(2)** 27:25

## 3

**3** 69:16,19 77:7
80:21

**3.5** 83:11

**30** 6:24 37:15

**31** 73:3 74:17

**31st** 29:5 74:20

## 4

**4** 73:25 74:1,3,19
75:5 82:7

**40-something** 70:25

**41** 73:6

**43** 73:6

**45** 38:10 48:20

## 5

**5** 74:5,7,14

**50** 37:19 48:20

**50/50** 75:14

## 6

**6** 83:6

**6/26/25** 5:10

**65** 46:5 48:19 49:4
65:2

**7**

**7** 49:11 73:1 79:6 80:3,10

**72** 13:5

**8**

**8** 60:13

**80** 43:18 44:1

**800** 13:2

**82** 11:7

**83** 11:8

**86** 10:16

**87** 10:22

**8:55** 5:5,8,10

**9**

**9** 38:11

**90** 43:18 44:1

**90s** 50:22 84:5

**@**

**@taftlaw.com** 92:25

**A**

**a-half-year** 37:20

**A-L-I-C-I-A** 92:17

**a.m.** 5:5,8,10 54:11, 14 83:21,24 93:12

**ABCO** 41:11,14,16, 18 43:6,8

**ABCO's** 87:8

**abetting** 27:16

**ability** 45:13,14,17 70:3

**absolutely** 26:22 35:1 67:8 72:5,18, 20 88:4

**academic** 10:11,16, 21,22

**acceptable** 35:22

**accepted** 15:25 47:4,9 55:22,23,25 56:1,13 72:10 75:24 76:4

**accepts** 47:12

**accurate** 49:14,20

**accurately** 7:7,11

**accused** 14:3

**acquiring** 67:10

**act** 46:17

**action** 29:7 52:14,18 53:1,12 54:4,19,25 55:4,6,17 73:20 77:15 89:7,22

**actions** 16:6 17:18, 20 23:23 24:9 25:25 52:4,11 53:16,19 55:17 89:24

**activities** 73:4

**activity** 29:8

**actual** 60:11

**add** 51:11,15

**adding** 29:21

**additional** 19:23,25 29:18 43:22,24

**adjust** 87:23

**adjusted** 87:17

**adjustments** 41:17, 20 56:23 87:8,20

**administration** 9:3, 4,11

**admissible** 70:8

**admitted** 12:3

**admitting** 70:8

**adockett** 92:21

**adockett@taftlaw. com.** 92:19

**advantage** 40:21 41:2 42:12,22 43:5 86:11,22,25

**affect** 63:16 66:3

**afternoon** 91:25

**agree** 57:24 58:13

**agreement** 15:7 65:18

**aiding** 27:15

**Alicia** 92:17,20

**allegations** 25:7

**allege** 16:20

**alleged** 25:24 53:12 54:1 73:4 89:24

**allegedly** 53:24

**Alleging** 17:22

**allocated** 44:7

**allowed** 80:15

**alma** 10:12

**alternate** 70:19

**American** 41:12,13

**amount** 18:14 29:15 52:13 83:1 89:21

**analyses** 11:5 12:18 25:13,23 26:5 32:14

**analysis** 15:12,22 21:20 26:8 29:9,13 32:18,20 33:2,24 34:3,9 35:15 36:20 37:22 38:5,8 40:11, 25 41:3,19,21 42:9, 11,21 55:7,8 58:3, 14,19 60:1,7,10 63:17 68:14 70:22, 24 71:9 72:11,12 73:1,18 80:14 82:8 86:20 87:13,15 88:18

**analysis-type** 11:6

**analyst** 31:3 41:21 78:17,18 87:12

**Analytically** 31:25

**analyze** 67:25

**analyzed** 41:10

**and/or** 35:11

**anticipated** 79:5

**anybody's** 90:8

**Appendix** 49:17

**applicable** 54:21,22

**applied** 57:17

**apply** 78:22

**appraiser** 49:18

**approach** 15:19,21 16:3,7,12 37:22 42:7 51:24 56:4,18, 21,22 57:1 70:16 71:17 72:9 73:7 77:8,9,16,24,25

78:2,9,17 79:4,8,9,
14,15,16,17,19,22
81:17,21,25 86:6

**approaches** 55:22,
23 56:1 57:21 70:20
75:25 76:4 77:8,12
79:25

**appropriately** 59:15

**April** 42:10,21 89:3

**arbitrary** 88:7

**argue** 33:24

**Arizona** 37:5 60:4

**arm's** 47:19 67:14,
17,23

**arts** 9:9,18

**asset** 57:1,4,6 65:14
66:19 67:1 74:17
77:16 78:2 81:17,
21,25

**asset-based** 56:21,
22 77:8

**assets** 45:22,25
46:4 48:4,25 57:2,6,
10 60:15,16,21,25
61:2 64:13,15 65:1,
5,6,8,10,16 66:7,22
67:11 68:1,5 69:8,9,
14 73:17 77:23
81:4,6,10,15,23
82:2,4,20,23

**assign** 52:12

**assignments** 26:18
35:12,13

**assigns** 57:9

**assistant** 10:4,8,15

**assume** 8:5 10:23
27:4 32:6 37:23

**48:1 52:9 59:12,14,**
19 60:7 64:3 69:11
88:19

**assumed** 35:20

**assumes** 58:14,17
60:1 82:8

**assumption** 27:5
37:18 60:9

**assumptions** 35:16,
19 79:3

**attached** 49:17

**attempt** 16:4 52:12

**attend** 10:3

**attorney/client**
21:11

**attributable** 57:12

**attribute** 57:5

**Auburn** 50:13

**audible** 7:22

**August** 29:13 48:6

**authority** 80:18

**average** 36:23 73:8
75:14 79:23 80:2,3

**aware** 23:4 40:8
63:14 65:17,22

**B**

**back** 9:6,7 10:19
11:1,4 30:9 34:23
39:7 49:16,22 51:7
54:16 86:4

**bad** 87:4

**banker** 48:13

**banking** 11:17 12:20
18:13

**bankruptcy** 14:8

**Barn** 41:12,13

**Barrymore** 20:7

**based** 11:9,11 75:13
77:9,22 82:15 88:7
90:20,22

**basically** 82:4 83:14

**basis** 17:19 18:4,6
38:16 77:22 78:5,7
81:20

**began** 5:7

**beginning** 11:7

**believed** 63:3

**Berryman** 47:16
63:24

**Berryman's** 64:16

**bill** 18:3

**billed** 19:21

**billing** 19:11,23

**bio** 50:1

**bit** 30:7 37:3 89:4

**black** 64:13

**blindside** 45:3

**Bloomington** 10:2

**board** 50:8

**boilerplate** 30:22

**book** 80:22

**books** 49:1

**bottom** 64:25 74:24
79:6 80:2,9

**bought** 64:1

**Boyd** 17:7 18:8 20:7

**branch** 60:4

**breach** 24:7 27:12

**break** 8:8,9 54:6,8,
17 83:15

**Brian** 20:7 63:16,24
64:16

**Brian's** 46:23

**briefly** 22:7,8

**broad** 17:11

**build** 66:13

**building** 33:16 38:7
49:4

**buildings** 36:22,24
65:1 69:12

**bunch** 48:10,11
65:13 66:12

**business** 9:2,4,7,11
11:16 12:17 13:17
25:25 27:19 33:16,
22 34:1 50:16 53:17
59:4,5,15,18,22,24
63:19,20,22 64:4,
10,11,12,24 65:13,
16 66:17,19 68:4
70:25 71:1,7 77:16
78:5,6 82:19,22,24

**businesses** 57:13

**Butler** 5:17 13:14
84:19

**buttress** 77:2

**buttresses** 76:17

**buy** 12:8 47:10
64:14 65:16 66:12
81:9,11,15,16

**buyer** 65:11,15
66:24 67:19 82:23
83:2

**buyers** 47:23 65:7

**buying** 37:16 46:4
64:15 66:11,15,17

## C

**calculation** 34:8
42:4,24 88:7,15

**call** 14:16,23 15:13
18:4,7 41:14,16
57:8 70:22

**called** 9:10 11:8
27:15 46:24 49:17

**calling** 56:18

**candidly** 60:5

**cap** 83:7

**capabilities** 44:6

**capability** 33:22

**capacity** 36:21
78:11,20

**capital** 11:8,14,21
82:24

**capital-issued** 83:8

**capitalism** 46:17

**capitalization** 83:5,9

**capitalize** 82:3

**caption** 5:11

**car** 47:10

**career** 10:21,22,23,
24

**Carolina** 8:13 51:6

**carrying** 68:6

**case** 5:11 14:12,18,
22 18:15,19 19:13
25:8 26:2 28:9 35:5

36:19 40:1,8,9 41:7,
25 45:13 50:25
71:17 78:10 89:17
92:15

**cases** 13:18 77:20

**cash** 16:2 33:5
34:10,15,16,24
35:9,15,22 36:14
51:24 55:19 56:25
57:5 58:19 71:2,5
72:12 76:13 77:5,22
78:6,7,13,24 79:5
81:3,7,13,16 82:3,9,
14,20 83:1 87:14,15

**category** 71:7

**caused** 25:13 55:10
71:20

**ceased** 44:13 45:17

**CEO** 50:5,8

**cessation** 53:17
55:18 56:14 59:23

**chairman** 50:5,8

**challenge** 7:19

**change** 9:14 11:19
32:1 56:4 71:4,5
73:14 88:22

**change-in-value**
56:18

**changed** 9:16

**characterization**
85:11

**characterize** 86:1

**charge** 18:9,10
19:13,15 29:9

**charged** 19:19

**charging** 18:16
19:10

**chart** 80:2,9

**chose** 9:15 57:25

**circumstances**
25:19,20,22 58:23
62:12 66:9

**citations** 80:17,18

**civil** 24:14,16,17,19,
21 85:7

**clarity** 84:1

**clear** 9:19 16:10,11
39:9 49:1 52:17
54:18 80:22

**clearer** 16:14

**client** 16:24 29:9,16,
19 71:16 82:16

**close** 29:10

**Coker** 17:6 20:8

**collateral** 48:13

**collected** 19:21

**collecting** 28:22

**collective** 55:16

**collectively** 55:10

**college** 8:24 9:9,17,
23,25 10:1

**Columbian** 50:6,11,
12

**column** 80:9

**combined** 75:8

**commas** 31:24

**comment** 61:3
86:13 90:23

**comments** 40:13
59:25

**commissions** 38:10

**common** 34:24 67:2

**communications**
21:10,12,14

**companies** 35:14
37:25 77:18,21 81:9

**company** 12:1,2,20
13:9 15:15 16:13,25
17:16,19 33:15,17
34:22 38:4 44:13,18
50:6,11,12 56:24
57:7 64:2 73:3,5,10
74:13 78:18,20
80:23 81:5,10,11,
14,19,22 82:3

**compare** 64:10

**competing** 59:3

**complaint** 14:24
15:1,2,6 52:10
53:13,25 89:10,18

**compulsion** 67:21

**computer** 30:16,19
44:9

**concern** 48:5,6,8
67:5,6 77:16 80:24
81:2

**conclusion** 32:1,12
61:7 72:25 75:6,9,
10,11,15 76:17 79:7
86:16 87:1 88:1

**conclusions** 61:17
72:21 74:23 75:2

**condensed** 92:5

**conference** 20:23
56:7

**confident** 59:8

**confused** 62:17

**confusing** 61:3

NAEGELI
DEPOSITION & TRIAL
(800) 528-3335
NAEGELIUSA.COM

connect 40:23

connection 84:22

conservative 18:4,5
37:22 60:9 77:4

consideration 12:5,
7 70:15

considered 43:16
52:22 53:14,15,16
56:4,16 57:20 71:24
77:14,17,24 78:2
90:23 91:8

Consolidated 5:12

conspiracy 24:14,
16,17,19,21

consulting 11:3,16
51:18

contacted 14:13

contained 44:4

contemplated 15:23

contents 51:23

continue 42:13
59:15,21 88:9

continued 16:13
29:1 38:3 58:15,18,
20 60:8

contract 11:10
65:18 66:10,14
67:3,7

contractors 59:17

control 77:22 81:20
82:19

conversation 14:15,
18 56:12

conversion 24:25
25:1,6

converted 25:8

65:14

convicted 14:3

copied 92:12

copy 93:9

correct 7:24 18:17
20:3 27:7 32:7
34:11,18 41:11
52:19 53:20 54:19,
25 61:19,20 63:24
65:20 70:20 72:4
74:20,21 75:14,17
77:25 80:7 89:10,11
91:3,12

corrected 31:24
50:14

cost 18:21 29:15
38:7,11,13,15,16
46:6 48:16 49:9
68:5

costs 48:20

counsel 5:13 15:22
31:5,17 39:20 53:4,
9 71:16,24 72:8
91:4

counterintuitive
86:14

country 9:8

couple 11:3 35:12
40:18 84:25 88:21

courses 10:18

court 5:19 6:21 7:1,
17 18:19 22:13,16
23:1,8,10 42:16
54:21,22 67:18 84:2
91:18,22,24 92:3,6,
11,14,20,23 93:1,3,
5

courts 50:17

cover 73:19,22

covering 78:18

create 63:22

crime 14:4

criticism 85:17

criticisms 90:15

criticized 70:14,15

Cumberland 47:25
48:2 65:9

current 8:12,14
32:17 54:11 78:11
83:24

customer 57:15

customers 17:21
45:10

CV 49:20

D

D-O-C-K-E-T-T
92:18

dabbles 11:17

dad 46:24

daily 19:15,16

damage 15:11 24:9
25:14 40:10 42:4
44:22 46:11 55:23
56:1,9 63:11 86:20

damaged 17:18 55:5

damages 16:5 40:20
42:18 44:19 45:21
52:10 54:19,20
55:8,12 56:14,20
58:5 59:25 61:8
62:7,15 71:9 72:11
76:12 79:7 80:8
88:7,9,15,19,20

89:2,3

data 15:5 28:23
29:19,20 42:15
43:19

date 5:10 28:25
29:5,11 34:23 36:3,
6 42:9 45:6 58:6
64:21 74:18 75:11
78:21 84:18 88:7
90:1

dated 50:5

dates 28:25 78:13

Daubert 22:18,20,23
23:3

Dave 19:3 31:7,14

David 17:6 36:8,19
37:6 39:4,8

day 9:6 30:1

DCF 57:3 83:14

dead 29:7

deadline 29:12

dealer 47:11 48:10
57:14

dealers 17:24 45:12

December 73:3
74:13,15,17,19
75:15

decision 15:22

decisions 59:21

deduct 60:10,18,24

deducted 60:14,19,
20,22

defamation 24:23

default 81:9

defendant 42:2,5

DOUGLAS SOUTHARD
86073

June 26, 2025

103
Index: defendant's..earning

51:21 55:5 58:15

**defendant's** 42:3
54:3

**defendants** 5:16
16:17 17:16 23:23
25:8 26:7 32:4 41:2
53:16 55:9 73:22

**defendants'** 62:14

**define** 17:1 25:3
27:8 35:6 47:6

**defined** 63:14

**definition** 27:9,11,
13 33:11 51:17 62:6
67:18,23

**degree** 8:25 9:13,15,
18

**delayed** 28:24

**deliver** 82:21

**deliverable** 83:1

**delivers** 82:22

**Delivery** 38:11

**demanded** 83:2

**departure** 15:14
59:10

**depending** 73:7

**DEPONENT** 93:13

**deposed** 5:22 6:12,
15

**deposition** 5:1,7,11
6:5 20:9 21:21 22:8
23:11 41:22 46:23
47:1 54:3 62:24
64:19 70:6,13,14
84:12 89:11,22
90:5,6,9 91:4,10,18
93:7

**depositions** 20:2,6
89:13,16

**Depot** 66:12

**describe** 8:20 78:9
83:4

**destruction** 76:24
77:1

**deteriorated** 46:10

**determination** 56:24

**determine** 57:4
62:7,14

**determined** 15:24
56:12 71:15 72:8
76:11

**detriment** 15:21

**detrimental** 85:14,
20

**develop** 78:13

**developed** 33:8
43:23

**developing** 35:21
77:5

**developments**
71:19

**dictate** 30:16 31:2

**difference** 57:5,9

**difficult** 13:10 18:18

**dilemmas** 13:9

**disclosure** 28:1
36:6

**discount** 33:8 34:5

**discounted** 16:2
33:5 34:10,24 35:9,
15 36:14 51:24
55:19 58:19 72:11
76:13 77:5 87:13

**discounting** 34:15,
22

**discoverable** 39:23

**discovery** 36:5

**discuss** 28:12 57:19

**discussed** 15:18,24
56:8,10 70:21,22
71:24,25 76:6 82:17

**discussion** 89:22

**discussions** 17:4
63:3,6,13,15,17
64:19,21,23 71:15
72:8

**disqualify** 22:21

**disregarded** 81:19

**distinction** 8:25

**distribution** 8:19

**divided** 83:10

**division** 30:6 36:9
37:14 44:14 47:2
53:18 78:12

**divorce** 51:11,15,18,
22

**divorces** 51:16

**divulging** 21:12

**Dockett** 92:18,20

**doctorate** 9:2,4,11

**document** 6:5 27:25
28:6 31:15 40:14
43:20 69:19 91:9

**documentation**
82:15 86:17

**documents** 14:25
22:3

**dollar** 34:4 41:4

48:15 52:13 86:24

**Dollarhide** 5:17
13:21 14:16 20:23
21:8,18,25 39:9,13,
15,21 52:20 53:22
56:8 58:1 61:11
62:20 65:21 70:9
76:5 80:25 83:17,19
84:25 85:3 90:11

**dollars** 18:19 51:13
57:11,12 73:6,13
77:20

**domiciled** 50:12

**door** 31:12

**Doug** 21:9

**Douglas** 5:2,11,21
6:3 91:18

**draft** 31:16,17 39:22

**drafts** 31:5,6

**due** 28:25 34:23
55:12

**duly** 5:21

**dust** 73:11

**duty** 24:7 27:12

**E**

**e-mail** 39:3,7 92:21

**earlier** 27:6 36:1
38:25 46:24 51:19
60:2 85:4

**early** 43:5 51:7 56:6
70:14 84:6,14

**earn** 69:14

**earned** 68:25 69:2,4

**earning** 78:11,20

**earnings** 11:5 43:5

**easier** 7:17

**East** 8:22

**easy** 49:7

**EBITDA** 79:13

**economic** 11:5,6,16
12:5,6,18 15:11
40:10 41:19 46:15,
18,19 47:17 51:17
52:10 57:7 61:7
62:15 63:22 67:22
68:10 72:10 79:18
87:13

**economics** 46:16

**Editorial** 31:19

**education** 8:20

**effort** 30:18

**elect** 9:14

**else's** 80:20

**employed** 8:16,17

**employee** 11:10
24:9 45:5 59:22

**employees** 57:14
59:11

**employer** 8:14
24:10

**employment** 9:22
16:17 17:16 58:15
59:23

**end** 10:16 11:7
30:10,13 73:6,11
91:17

**ended** 10:21 15:20
34:9 42:20 88:6

**engaged** 14:21
28:21 50:23

**engagement** 14:20
15:8

**enjoy** 81:10

**enter** 67:21 68:9

**entered** 42:9 47:6,
14,22

**entire** 28:19 80:14

**entities** 50:9,10

**entity** 30:4 33:7,10,
25 81:18

**equipment** 48:12

**equity** 81:13,15

**equivalent** 9:10

**essence** 17:24 42:1
54:20 78:23

**essentially** 14:24
17:5 18:24 28:22
30:18 81:5

**estate** 81:22,23 82:3

**estimate** 16:4 19:24
78:11 88:25

**estimated** 56:25

**evaluate** 43:22

**evaluation** 73:2

**event** 15:13 16:15,
22 17:10,14,15
25:13 63:13,14 69:3
71:2,3 73:5 80:22

**events** 16:16,21
26:18 58:24

**evidence** 71:20

**evolved** 38:24

**exact** 25:20

**EXAMINATION** 5:23
85:2 90:13

**examined** 5:22

**excess** 6:18

**exchange** 39:3

**excluded** 22:13

**excuse** 7:16 31:14
42:2 68:14

**exhibit** 6:5,6 27:24
28:2 36:12,13,14,15
38:23,24 39:11 61:5
69:16,19 73:25
74:1,3,5,7,8,14,19
75:5

**exhibits** 29:20 73:25
74:10,12,24 75:3
79:24

**exist** 38:20

**existed** 30:7 73:11

**existing** 66:15

**exodus** 45:6

**expect** 21:2,3,6

**expectation** 81:11

**expenses** 41:18
48:24 87:8

**experience** 27:18
33:16 50:3,15 62:10
67:2

**expert** 22:21 26:4
27:1,25 28:1,25
36:5 42:24 49:16
50:15,20,24 62:9
74:22 80:19 84:4,7

**expertise** 32:10,11,
13,15

**experts** 62:14

**explain** 62:21

**explaining** 88:9

**explanation** 57:25

**explicitly** 84:16

**expressed** 40:5

**extending** 58:13

**extent** 17:7 21:9
46:12 89:15

**extra** 39:25

**extremely** 13:10
18:18 38:15

**eyes** 31:11

_____

**F**

**face-to-face** 29:25

**facility** 60:4

**fact** 71:23

**factor** 83:5,10

**facts** 45:15 52:9
62:12 89:15

**faculty** 10:15

**fair** 8:6 29:15 39:13
64:7 65:25 66:1,4
67:18,25 68:13
81:24 82:2

**fairly** 37:10 38:6
46:10

**fall** 14:14 29:6,17

**familiar** 6:19

**family** 10:13

**fascinating** 41:19
85:9 87:10,21,25

**fast** 37:9

**feasibility** 17:19

**February** 30:13

**federal** 50:17

**fee** 18:12,15 19:15, 16

**fees** 41:23 42:3,6

**field** 34:25

**fifteen** 34:4

**fifty** 48:14

**file** 29:6 71:20

**filed** 14:8 22:24,25 23:5 27:14 29:4 30:14 39:25 71:12 90:10

**files** 26:10 43:18 44:1

**filing** 55:21 56:17 64:17

**filled** 10:19 37:6

**final** 40:1

**finally** 42:8

**finance** 8:15 10:5,8

**financial** 11:13,18, 21,22 12:11,12,19, 23 15:5 28:23 29:19 32:13,14,16 35:25 41:10,21 50:1 67:12 77:21 81:20 87:12

**financials** 30:11 42:23 44:8

**find** 39:7 41:18 46:3 47:23 54:21,22 87:16,22

**finding** 87:18

**fine** 17:13

**finish** 32:25 83:16

**fire** 46:2

**firm** 5:16 8:16 11:8, 16 12:4 18:11 20:16 26:11,14,21 31:4,7 51:3 81:15 92:8

**fixed** 18:15

**fixed-dollar** 18:14

**fixed-fee** 18:11

**Flintrock** 8:13

**Florida** 33:19

**flow** 16:2 33:5 34:11,15,16,24 35:9,15,22 36:14 51:25 55:19 58:19 71:2,5 72:12 76:13 77:6,22 78:7,8,13 79:5 81:3,8,13,16 82:4 87:14,15

**flows** 57:1,5 78:24 87:15

**folder** 44:11

**folks** 17:5 26:1 33:15

**forced** 67:20

**foregoing** 5:7

**form** 36:15,25 52:20 53:22 58:1 61:11 62:20 65:21 76:5 80:25

**formal** 10:21

**formation** 12:3

**formed** 11:12,22 12:1

**forty** 48:14

**forward** 33:11 79:5

**found** 13:9 40:24 41:5,9,10,21 42:6,8

61:2 86:25 87:20

**founding** 12:24

**frame** 28:24

**frequently** 17:2 81:18

**front** 19:18 85:25

**full** 10:19 37:8 40:1 44:12 80:21

**full-time** 10:5 19:24

**fully** 67:20

**fundamental** 46:16

**Fundamentally** 71:4

**future** 16:13 33:7 34:21 42:13,18,25 56:25 78:24

---

## G

**gain** 41:2 46:7 60:17 68:7

**gathered** 35:25

**gathering** 29:2

**gave** 62:9 92:23

**gears** 89:4

**generally** 21:17 81:10

**generate** 30:16 81:7

**generated** 11:12 60:25 87:16

**generating** 71:2 78:6

**get-together** 30:8

**give** 18:20 36:19 40:10 80:19

**giving** 59:8

**glean** 21:4

**global** 40:18

**Globally** 40:19

**going-concern** 78:5

**going-forward** 17:19

**good** 5:25 6:1 38:14 54:9 57:18 84:17,18 87:3

**Google** 81:4

**gosh** 12:25

**graduate** 10:3,4

**graduated** 8:22,23

**grammatical** 31:25

**granted** 42:23

**group** 55:9 67:1

**grow** 37:18

**growth** 37:9 38:3 60:6 79:3 83:13

**guess** 11:10 26:18 36:13 40:12 86:12 87:5,20

---

## H

**half** 48:23 51:19 60:23 61:1 86:10,24

**hand** 74:6

**handing** 69:18 74:2

**happened** 45:4

**hard** 13:17 87:22

**Harris** 19:3 31:7

**Harvard** 9:12

**head** 40:20,25 41:3,
4 42:12,20 43:2,4,6,
8,11,12 44:10 71:13
86:11,14,23,25
87:14 88:25 89:1,2

**heard** 54:3

**heart** 13:11

**held** 81:23

**Hell** 68:14

**Hickory** 49:8 63:4
65:7,19 67:9,13

**high** 8:21,22 37:14

**higher** 76:24,25

**hired** 59:16,20

**historical** 28:23
35:25 36:20 38:3,16

**history** 9:22 38:6
59:1

**Hold** 27:21

**holding** 81:22 82:3

**Home** 66:12

**honors** 8:25

**hour** 8:8 18:9 19:11
54:5

**hourly** 18:3 19:9

**hours** 13:2 20:19,25

**house** 12:24

**huge** 41:1

**hundred** 6:18 35:12
51:12

**hyperaccurate**
85:19

**I**

**idea** 70:1 91:2

**identified** 24:20

**identify** 57:17

**imagine** 13:18

**immeasurable**
77:18

**impact** 38:1 41:4
63:8 64:5 65:24
70:3,23

**implies** 91:1

**important** 7:13

**imposed** 38:16

**included** 93:8

**including** 19:24
86:9

**income** 60:11 77:8,
24 78:9,13 79:4,8,9,
13,15,19

**increase** 37:19

**incur** 19:25 42:19

**incurred** 19:22

**indefinite** 34:3

**indefinitely** 34:1

**independently** 11:4

**Indiana** 9:1,3 10:3

**indication** 18:20
42:11 79:7,13

**indicative** 38:14

**individual** 52:13

**individual's** 45:2

**individually** 53:15

55:10

**individuals** 15:14

**Industries** 5:12 48:1
65:9

**inexplicable** 87:5,24

**infer** 42:11 68:11

**inform** 32:11

**information** 15:6
17:8 28:23 29:2,18,
21 36:1,17,23
43:16,17,19,22,24
44:2,5 62:13 88:8
92:15

**informed** 34:20
67:20 89:17

**initial** 14:15,18,23
56:7 64:17 71:12
72:2,3,16 77:2

**initially** 14:14 36:17

**injury** 11:6

**input** 53:9 82:16

**insight** 21:5

**insignificant** 58:7

**Institute** 10:9

**instructed** 53:4

**instructing** 21:13
22:1

**intangible** 57:4,13

**interest** 46:15,18,19
47:18 67:22 68:10

**interested** 46:4

**interesting** 40:24
41:9,10,22 42:6,8
85:9,15 86:3,5,12,
13,16,21 87:1,3,4,9,
25 88:11,16

**internally** 31:6,8,10
44:7

**interpretation** 85:11

**intriguing** 41:5

**introduce** 5:13

**inventories** 46:9
48:4,25 66:16 83:1

**inventory** 46:6
47:25 48:11,14

**investigation** 32:8

**investment** 11:17
12:19,20 18:13

**investor** 83:9

**involved** 23:1,8
63:18

**involvement** 13:1

**involves** 32:14

**involving** 23:16,24
24:6,13,22,25

**irrelevant** 29:14
34:8

**issue** 25:10 88:2

**issued** 9:10,13,18
14:20

**issuing** 90:6

**IU** 10:3

**J**

**J-A-K-E-S** 19:8

**Jakes** 19:4,6,7 31:8

**Jesse** 55:12

**Jill** 17:6 20:7 36:19

**job** 9:22,24 10:12,15
32:10 62:7

DOUGLAS SOUTHARD
86073

June 26, 2025

**John** 5:17 93:7

**Johnson** 13:23 14:14 20:24 56:7

**joined** 11:8

**July** 48:6

**June** 5:4 15:15 16:17 17:17 63:5

**juries** 62:5

**jury** 61:14,22,24 62:1,2,3,5 80:13 85:18,25

### K

**key** 43:21 59:11

**kind** 13:8 25:5 37:25 38:3 45:3 78:15,16

**King** 13:25 17:4,22, 25 30:6 33:15 36:10 40:20,22 42:19 45:20 47:3 53:18 55:6 58:16,17 59:9 63:3 64:6 65:6,18, 19 67:11 68:1,16,17 71:25

**King's** 25:9 55:12 59:1 60:11 68:24 78:12

**Kingman** 37:5,11 38:2 60:3

**knew** 21:4,6 89:23 90:2

**Knob** 8:13

**knowledge** 22:14,17 49:15

### L

**lack** 70:15

**Landrum** 8:13

**Lane** 8:13

**language** 30:24

**large** 9:13 29:3 86:10

**lasted** 20:24 30:1

**late** 23:2,8 29:17 36:2 50:22 84:5,14

**law** 5:16 7:1 93:3

**lawsuit** 6:13 58:23

**lawyer** 24:1

**lawyers** 26:6 61:25

**leading** 16:16,20

**leave** 13:10

**leaving** 37:23 45:5 58:24 59:7

**lecturer** 10:4,5

**led** 73:5

**left** 17:16,24 59:13, 17

**legal** 8:12 27:9,11, 13 41:12,23 42:3

**length** 47:20 67:14, 17,23

**letter** 14:21 15:8

**level** 13:1 60:8 82:13,21,24

**levels** 58:18 82:9

**liability** 12:1 32:3,6, 9

**liberal** 9:9

**light** 66:8 85:24,25

**limited** 12:1 17:5,6 66:25 67:1

**lines** 41:8 86:19 89:9

**liquidating** 46:25 47:1,2 48:3,4 64:12

**liquidation** 45:23,24 46:1,2 67:4

**list** 25:15 43:19 47:12 77:7

**litany** 22:22 57:16

**literally** 25:15

**litigation** 18:17 26:9,10,13,14,21 35:13 51:9,16,19 84:16

**live** 8:11

**living** 12:23

**LLC** 41:13 48:1 65:9

**local** 50:16

**location** 36:21 37:2 44:6,7

**locations** 37:10

**long** 20:18 59:5 84:6

**long-term** 33:21,22 59:1

**longer** 17:23 30:6 39:6 48:7 64:9

**longevity** 33:17

**looked** 22:7 26:10, 16 36:3,11,15 43:20

**loss** 44:15 55:18 56:15 86:10,15

**losses** 38:2 40:22 71:17

**lost** 11:5 15:12,19 16:1,2,3,5,7 23:22 25:12 29:13 32:20 33:1,6,11,24 34:6, 14,16,17 38:18 40:10 52:2,11 53:9 58:21,22 71:18 72:11,12 76:13

**lot** 9:7 21:4 24:12 29:7,20 30:9,21,22 31:9 33:16 36:16 44:2 47:10 67:4 75:6 81:12

**lots** 40:6 43:22 57:12 81:6,7

**love** 13:7

**lower** 37:10

**loyalty** 24:7 27:12

**lumber** 66:13

**lunch** 83:16

### M

**M.B.A.** 9:1

**made** 31:23 32:1 35:19 41:17 42:10 48:22 52:12 59:21 69:4 86:9 87:7 88:5

**main** 90:7

**maintain** 82:14

**maintained** 9:8

**make** 21:9 23:12 31:18 35:16 36:8 37:18 38:8 40:13 41:20 42:23 56:23 57:10 87:19

**makes** 87:4

**management** 11:9 16:24 17:1,8 30:1,2, 8 31:17 33:21 36:19 38:14 59:1,9 60:3 82:18

**manner** 59:24

**manufacture** 49:9

**manufacturers** 17:22 48:9

**manufacturing** 48:20

**March** 30:14

**mark** 6:4 27:24 31:14 73:24 81:22

**marked** 6:6 28:2 69:16,19 74:1,3,5,7 82:2

**market** 57:7 59:3 64:7 65:25 66:1,4 67:19,25 68:13 77:9,25 79:17,21 81:24 82:2

**married** 10:1

**mass** 45:6

**mater** 10:12

**materials** 65:1,14

**matter** 18:18,23 23:1,8 24:17 26:20 73:9 84:17

**matters** 51:18

**Matthew** 19:4,6 31:7,14

**Maupin** 5:12 62:25

**Maupin's** 55:12

**maximize** 65:11

**maximized** 68:10

**maximum** 66:7

**means** 24:3,4 27:7 39:4 49:10

**meant** 85:15 86:5

**measure** 53:9 56:9 58:4 76:12 78:4,10, 25

**measured** 33:6 78:10 81:3

**measurement** 55:23 56:1

**measures** 40:20 57:1

**measuring** 56:14 71:17 72:10 76:13 78:24 79:4

**medications** 7:9

**meet** 20:20,22

**meet all** 45:12

**meeting** 15:19 21:5 29:25 30:2 56:7

**membership** 12:4

**Memphis** 8:24 10:12,14 11:1,9

**mention** 52:25 57:22

**Mercedes** 47:10

**Mercer** 11:8,14,21

**method** 15:17 34:11,14,24 35:10 51:25 55:20 56:10, 16 72:10

**methodologies** 15:18

**methodology** 15:25 16:1 35:17 53:8 56:13 86:22 90:24

**methods** 75:14

**middle** 76:1 82:7

**military** 14:6

**million** 26:11,12 34:6 51:8 57:10,11, 12 60:13 68:7,25 69:4,5 73:6,13,15 82:9 83:3 86:15,24

**million-and-a-half-** 41:3

**millions** 77:19

**mind** 16:25

**mine** 50:4 84:9 90:4

**minus** 6:24 37:9

**misappropriating** 43:7

**misappropriation** 23:17,19,25 24:2 27:2,10 55:13

**missing** 57:24

**mistake** 88:18

**mistakes** 31:25

**mitigate** 44:18

**mitigated** 45:20 46:11

**model** 16:2 33:5 35:10,22 36:11 38:19,24 39:2,10,12 53:10 57:3 71:18 76:13 77:6 79:3 83:14

**moment** 40:3

**money** 29:15 34:9

**month's** 88:21

**months** 37:8 60:12 69:1

**morning** 5:25 6:1

**motion** 22:18,20,21

**motions** 22:24,25

**motivation** 66:7

**mountains** 51:6

**mouth** 78:1

**move** 70:6

**moved** 10:2 11:1 51:6

**multiple** 64:2 78:14, 22,24

**multiply** 78:14

---

## N

**Napper** 20:3 21:22 40:13 48:21 61:3 70:19 71:22 75:23 90:16

**Napper's** 22:7 40:17 70:13 85:6 86:2 88:6,14 89:20 90:9 91:10

**national** 92:7

**needed** 10:13,14 82:14

**negative** 41:1,4 77:19 81:6 86:10,24

**negotiated** 46:5,20

**negotiation** 47:5,13

**net** 41:4 57:14 73:15 77:19 80:8 81:6

DOUGLAS SOUTHARD
86073

June 26, 2025

**network** 57:15

**Newport** 50:13

**News** 50:13

**nod** 7:23

**nominal** 81:5

**normal** 38:1 45:5,8 59:24 77:15

**notes** 31:2

**notice** 6:5 45:8 59:8

**November** 14:20 29:24

**number** 9:13 28:24 38:9 40:25 42:5 61:13 62:2,6,9 66:25 76:7 77:18 80:7 82:12 84:18 86:18 88:22

**numbers** 37:13 49:7 60:20 61:19,22 62:4,18 73:14 75:6 76:22 80:5,8,12

**O**

**oath** 7:1

**Object** 52:20 53:22 58:1 61:11 62:20 65:21 76:5 80:25

**objection** 21:9,18, 25

**observed** 54:12 83:22

**occurred** 15:13 48:7 58:24

**occurring** 16:18

**occurs** 37:24

**October** 14:20 29:23

**offer** 26:20 47:11

**offered** 47:8

**offset** 38:2

**one-off** 69:12

**ongoing** 35:7 41:24 42:12 44:15 64:3,11 68:4 82:20

**online** 37:5 60:4

**operate** 58:18,20 59:22 82:24

**operated** 11:24

**operating** 25:25 30:4 44:15 64:3,9, 11 67:22 81:18 82:23

**operation** 45:2,5 60:12 64:8,15 68:25

**operations** 30:5 33:19,24 44:8,14 45:18 47:2 55:18 56:15 64:6 82:9,14

**opine** 40:2

**opinion** 26:20 31:9 32:3 42:18 45:15,20 53:10,11 54:17,18 55:4,14,16 62:15 63:8 64:5 65:24 66:3 67:16,17 80:19 82:13 88:3,6,14

**opinions** 22:12,15 28:12 40:1,4,5,6,9, 16,19 85:5,24 86:1 89:16

**option** 9:14

**options** 15:23

**order** 69:24 92:4 93:8

**orders** 91:19,20

**orientation** 12:19

**original** 38:21 39:10,12 56:17

**originally** 12:22

**overhead** 38:17

**overview** 49:25

**owned** 57:7 81:4

**owner** 63:19

**P**

**P/e** 79:1,2

**pages** 49:24

**paid** 11:11 18:1,2 65:2

**paragraph** 44:13 49:13 76:1,16 80:21 82:7

**paralegal** 92:12

**Paris** 29:23 30:5 64:22

**part** 6:13 11:2 12:3 29:8 36:7 48:24 51:11,15 65:8 91:13

**partial** 88:25

**parties** 47:15 66:6 68:8

**partner** 8:15 12:24

**partners** 14:17 18:25 19:2 31:11

**partnership** 8:19

**party** 16:5 25:14

67:22

**past** 24:18 25:18 38:4

**Pasternak** 5:15,24 6:4,7 21:16,23 22:2 27:24 28:3 39:12, 19,24 52:24 54:6,9, 15 58:8 61:12 62:23 65:23 69:15,17 70:5,10 73:24 74:2, 6,9 76:9 82:6 83:15, 25 84:24 85:4 89:6 90:14 91:14,16,21, 23 92:1,4,10,13,17, 21,25 93:2,4,10

**pay** 18:3 42:2,3,6 81:12

**paycheck** 8:18

**pegged** 49:4

**penal** 68:15

**pennies** 34:4

**people** 12:4 37:23 45:10 46:17 58:21 59:6,12,17 63:21 81:9

**percent** 34:5 37:19 38:7,10,12 46:5,6 48:15,16,19,20 49:4 65:2 83:8,12

**percentage** 83:7

**perfect** 35:24

**performance** 33:7 34:21,22 41:17

**period** 26:17 33:14 37:20 45:9 53:18 60:6

**perpetuity** 88:10

**person** 18:23 59:6

**personal** 10:13 11:2,5 30:18 46:15 68:10

**personally** 23:2 40:23 51:2,4

**personnel** 59:2

**pertinent** 43:17,20

**Ph.d.** 9:10,17

**phases** 19:13

**phone** 18:7 56:7 70:21

**physical** 57:2

**physically** 30:15 31:1

**pick** 62:3,5

**picked** 62:8

**place** 65:18

**plaintiff** 5:18 26:7 42:2 51:21

**plaintiff's** 27:25 62:13

**planning** 13:6 61:25

**plant** 36:21 37:2,5,7

**plants** 36:23

**Plymkraft** 50:6,11

**point** 14:19 34:9 40:14 77:17 87:7 88:5 89:5

**points** 21:21,24 86:9

**Polytechnic** 10:9

**portable** 27:18 33:16 65:12

**portion** 29:3 47:25

**position** 10:6,7

**possibly** 26:6 63:20

**post-event** 15:21

**postponement** 28:25

**potential** 63:4 65:7, 11

**potentially** 40:12

**practice** 11:3

**pre-event** 15:21

**precise** 42:24

**predominately** 12:17

**preparation** 90:2

**prepare** 20:10 28:17 32:16 70:11,24 91:1,9

**prepared** 20:8,9 28:8,14,16 29:4,13 36:11,15 40:14 44:7 72:13,16 75:22 84:7,11,15,16 89:25 90:3 91:11

**preparing** 20:18 22:4 28:19

**present** 32:17 34:3 56:25 58:6 61:13, 15,16,21 62:1,2 78:23,25 80:13,14, 15 86:16 88:17

**present-** 79:2

**present-value** 58:3

**presentation** 86:19

**presented** 40:12 45:16 47:3 52:9 61:24 62:17 74:23

76:14 77:14 80:16

**pretax** 60:11

**pretty** 29:7 31:13 38:6 40:18 84:21

**prevalent** 23:3

**prevent** 7:6,10 44:21

**price** 36:23 38:8 46:5,21 47:4,8,12 48:19 49:3,4,8 65:2, 3

**principal** 46:17

**principle** 46:16

**prior** 17:17 58:24 59:25 63:4,17 64:20 90:6

**private** 12:20 81:13, 15

**privilege** 21:11

**problem** 75:21

**procedures** 6:19

**proceeds** 60:15,16 73:16

**process** 28:19,22 29:1 31:8,10,16 35:21 69:13

**produce** 36:4

**produced** 36:22 39:20

**product** 17:23 19:1, 2 41:6

**production** 44:6

**professional** 10:23, 24 30:23 85:7,10

**professor** 10:8,16

**profit** 15:12,19 16:1, 2,3,7 25:13 29:13 32:20 33:24 48:21, 23 60:25 64:2 71:18 72:11,12

**profits** 16:4,13 23:22 33:2,6,10,11 34:6,14,16,17 38:18 40:11 44:15 52:2,11 53:9 55:18 56:15 60:22,24 76:13

**project** 16:12 30:13 33:10 37:2 42:25 52:10

**projected** 38:18

**projection** 33:7,9 34:21

**projections** 32:14, 16 36:9

**projects** 35:7

**promoted** 59:20

**pronunciation** 20:4

**property** 25:2,4,5,6, 9

**proprietorship** 11:25

**prospects** 63:20

**protected** 21:11

**provide** 17:23 18:13 42:17 73:1

**provided** 43:23 88:8 90:8

**providing** 11:19,20

**public** 77:18

**purchase** 49:3

**pure** 67:4

**purely** 85:15

**purpose** 24:20

**pursue** 26:15

**pushing** 29:18

**put** 13:11 31:24 33:25 56:5 70:3 90:15 91:7

**putting** 78:1

---

## Q

**qualifications** 49:18

**quarter** 18:9

**question** 7:14 8:1 17:12 25:12 28:16 32:25 35:23 58:3 72:7 81:2 84:13 88:13

**questions** 70:7 84:24 85:1 90:12 91:14 92:16

**quote** 18:12

---

## R

**ramp** 37:9

**ramp-up** 37:9,10

**ran** 38:11

**range** 71:10

**rapid** 37:10

**rapidly** 46:10

**rate** 19:9,11,14 33:8 34:5 38:1 83:5,7,8, 10,13

**rates** 19:12

**ratio** 79:1,2

---

**raw** 65:13

**reached** 88:1

**reaches** 61:16

**read** 46:23 54:2,3 64:16,19 70:13 89:10,11,13,14,24 90:6,7 91:4

**reader** 34:20

**reading** 33:1 89:19

**ready** 60:5

**real** 11:19 21:5 40:7 70:17 81:22,23 82:3

**reason** 9:19 11:2 29:12 34:2 46:13 47:16 58:11 68:9 78:3

**reasonable** 33:14, 23 37:17 38:9 59:8 77:5

**reasons** 10:13 22:22 33:13

**rebut** 75:23

**rebuttal** 20:8 69:19, 25 70:11 72:14,22 74:22 75:19,20,22 76:17 90:16,20 91:2,11

**recall** 13:18,20 15:4 44:10 60:2 82:17 87:21 88:24

**receive** 8:18,19 40:21 42:19 43:4 66:8

**received** 8:25 9:1,2 43:19 44:3 73:16

**recently** 84:5

---

**recess** 54:12 83:22

**recognize** 13:12

**recollection** 15:4

**record** 5:9 18:8 54:10,14 83:19,21, 24 93:12

**records** 26:16 88:21

**recovered** 39:5

**recreate** 25:21

**reduce** 32:17

**reduced** 12:25

**refer** 17:7 78:16

**referred** 58:25

**reflect** 78:23

**reformed** 12:8

**regular** 92:5

**rejected** 57:20 78:2

**related** 18:12 24:15 50:3,15 51:10

**relating** 24:19 25:10,18 27:15

**relevant** 40:8 82:1

**relying** 16:23

**remember** 26:2 29:25 31:22 45:2 64:21

**repeatedly** 30:25 71:8

**rephrase** 8:2

**replace** 59:12,17

**report** 16:8 20:8,11, 14,16 22:5,8,9 23:19,21,22,24 24:6,13,15,16,19,

---

22,25 25:10,18 26:4 27:14,15,21,22,23 28:12,19 29:4,5,14 30:14,17 31:1 32:2, 19,21 34:18 36:5, 12,24 40:12,17 43:13 48:22 49:11, 16 52:5,7,18,25 55:21 56:5,17 57:19,25 58:9 61:5, 16,18,24 62:1 64:17,20 68:20,23 69:20,25 70:12,18 71:11,12,21 72:2,3, 14,17,22 73:19,25 74:22,23 75:2,19, 20,22,23,24 76:3, 10,11,15,17,18 77:3,13 80:15,18 84:8,11,16 85:6,12 86:2,16,17 88:24 89:8,20,21,24,25 90:2,7,9,16,20,23 91:2,7,10,11,12 92:5

**reported** 41:20

**reporter** 5:19 7:18 91:18,22,24 92:3,6, 11,14,20,23 93:1,3, 5

**reports** 22:23 23:16 24:11 28:8 29:1,20 39:25 40:5 62:13

**represent** 5:14 55:3

**representations** 16:23

**representatives** 71:25

**represented** 66:5

**representing** 5:18 63:2

reps 66:18

reputable 35:2

reputation 17:18

request 39:19

requested 36:18
55:8

required 82:8,23
83:8,10

requires 56:24

residence 8:12

resolve 26:20

respect 44:20,23,24
53:25

respond 45:9 91:8

responded 59:10,14

response 90:4,23
91:9,12

responses 7:22

result 16:5 25:15,16
42:19 44:13 63:12
86:15,21

resulted 23:23
53:17 55:17 60:17
63:12,13 68:6 71:9

resulting 44:14
52:11

results 67:12

retail 46:5

retain 82:20

retained 14:10
26:19 51:20 90:4

retiring 13:6

return 10:14 83:9

revenue 38:1,2,17

51:9 69:5

revenues 11:11
26:12,13 37:2,9,13,
19 44:15 69:6

review 20:16 22:3,9
68:15

reviewed 18:25 19:2
20:2,6,11,14,16
22:5 31:15 62:24
63:23

revise 38:22

Rhodes 8:24

rid 65:4

road 37:3 81:13

role 12:21

room 12:23

Rope 50:6,11,12

rough 91:21

roughly 19:21 26:11
36:22 48:20 64:2
83:2

rounded 80:5,7

row 79:8,14,16,17,
19,21,22

rows 79:12

Rule 19:17 27:25

run 59:18

running 33:22,23
37:8 59:4

S

S-O-U-T-H-A-R-D
6:3

sabbatical 10:20

safe 23:12

safest 23:6

SAITH 93:13

salary 11:11

sale 46:2,21 60:15,
16 61:1 63:4 65:25
66:4 67:6 69:8,9
73:16 81:14

sales 36:20 38:10
44:5 46:22 65:17
66:10,14,20 67:5,7

salvage 45:1

scheduling 69:24

school 8:21,22 10:3

schools 9:7,12

science 9:18

sciences 9:9

Scott 20:7 63:16

secretary 30:15

secrets 23:17,20,25
24:3 27:3,5,10 43:7
55:13 57:14

selected 55:20

sell 49:6 64:8 66:7,
21 68:4 82:19,20,22

seller 67:20 82:22

seller's 68:8

selling 38:8 48:5,19
49:4,8 63:20 65:2
66:6,25

send 14:25 31:5
45:10

sense 87:4

sentence 76:1

separate 9:8 54:24
55:4 63:11

service 10:2

services 11:19
18:13

settle 51:22

settled 73:12

shareholders 78:8

shed 59:5 65:13

sheds 27:19 48:11

shocked 62:8

shoot 86:23

shop 65:6

shopped 65:10

shortly 14:19

show 32:19,23,25
75:5

shown 33:21

shows 41:3 77:4

sic 11:22 12:10

side 66:6 68:8

sides 26:8,19

significant 60:6
78:6

significantly 30:12

Similar 25:22

simple 38:6 73:17
78:25

simultaneously
16:19

single 56:12

sir 5:25 6:9,11,14,
16,20,22 7:2,5,8 8:3
49:12 53:5 69:23

DOUGLAS SOUTHARD
86073

June 26, 2025

113
Index: situation..team

85:22 91:16

**situation** 33:25 37:4

**situations** 11:6 51:20

**size** 71:7

**sketch** 50:1

**slash** 40:10 52:11 66:19

**slow** 38:3

**slowly** 12:25

**Snow** 5:18 13:14 84:19

**sold** 36:24 45:22,25 47:25 48:18,21,25 49:8 60:21,25 64:6, 9,24,25 65:8 68:2,5 69:14

**sole** 11:24

**son** 47:16

**sort** 16:1 25:19 45:8 87:14

**soul** 13:12

**Sounds** 54:9

**source** 17:8

**sources** 43:16

**South** 8:13

**Southard** 5:2,11,21 6:3 8:15 11:12,18, 20 12:12,14,22 13:4 18:23 49:25 69:18 75:24 76:3,18 85:4 91:18

**Southern** 11:22 12:10,13

**Southwestern** 8:23

**speak** 20:15 30:19

**speaks** 32:21 33:17, 18

**specific** 21:10,12,13 41:24 42:9 52:12,18 53:1 54:18,19 55:5, 6 62:8 70:24 73:19, 22 79:3 89:7

**specifically** 24:15 27:17 40:7 55:15 57:23 70:16 85:17 86:8

**speed** 37:8

**spend** 13:2 20:18

**spreadsheet** 39:11

**stable** 38:15

**stages** 18:21

**standard** 19:11

**standpoint** 41:19 58:6

**start** 11:2 40:20,25 41:3,5 42:12,20 43:3,4,5,7,11,12 86:11,14,23,25 87:14 88:25 89:2

**started** 12:23 14:11 28:22 30:12 36:8,18 37:1

**starting** 8:21 9:22

**starts** 23:3

**state** 5:13 6:2 10:9 50:16 68:3

**stated** 68:3

**statement** 36:21 49:14 54:4 58:10 86:7 91:6

**statements** 41:11 68:15 87:12

**static** 78:11

**status** 9:8

**stealing** 27:4

**step** 13:13

**stick** 36:7

**stock** 78:16

**straight** 73:17

**straightforward** 73:2,18

**stream** 38:18 81:16

**strike** 70:6

**struck** 22:15

**structure** 38:13,15, 17

**stuff** 66:13

**subsequent** 56:11

**substantive** 31:19, 20,21

**subtract** 73:13,15

**successful** 23:4 67:10

**suffered** 40:22 44:22 56:14 76:12

**suffering** 16:5

**sufficient** 58:4

**suggested** 70:11,19

**suggestion** 70:17

**suggestions** 75:23

**Sullivan** 17:6 36:8 39:8

**summarize** 72:21 88:19

**summary** 36:25

**summer** 9:25 36:2

**supplement** 72:13

**supplemental** 20:8 40:11 56:5 61:18,23

**supplier** 17:21 57:15

**suppliers** 45:11

**support** 82:9

**Supports** 76:21

**suppose** 9:14

**supposedly** 73:4

**surviving** 59:2

**sustained** 58:5

**swear** 5:20

**Switching** 89:4

**sworn** 5:22 7:3

**T**

**T-A-F-T** 93:1

**table** 51:23

**Taft** 5:16 93:3

**taking** 25:24

**talk** 7:13 14:10 21:1 45:10

**talked** 15:19,20 38:19 48:2 71:8

**talking** 16:15 17:21 24:8 39:10 54:16 56:19 76:8 78:19

**tangible** 56:23

**taught** 10:18,20

**team** 16:24 17:1

59:9,20

**Tech** 10:10

**temporary** 10:1

**ten** 26:10,12,23,25
33:13 34:4 51:8
58:4

**ten-minute** 18:7

**term** 17:1

**termination** 16:16
88:14

**terminology** 85:19

**test** 91:10

**testified** 6:21 23:10,
11 26:23,25 27:6
50:19 63:2 64:1

**testifying** 6:25 7:7,
10

**testimony** 34:13
46:20 62:24 63:23
64:16 84:2 89:12

**text** 30:24

**theme** 87:19

**theoretically** 79:2

**theory** 43:3,4

**thing** 11:15 82:5
85:16

**things** 16:19 25:16
43:21 48:2 57:13
85:8,11 86:2 87:16

**Thomas** 5:15 93:6

**thought** 18:20
46:12,19 53:8 60:3,
5 61:4 86:6 91:5

**thousand** 13:2
51:13

**Tim** 20:7

**time** 5:10 6:24
10:11,18 11:25
13:8,12 16:20
23:19,21 26:17
28:24 29:3,6 33:14,
18 34:8 45:9 46:10
47:22 50:19,23
51:20 54:11,14
56:11 59:5 60:3
83:21,24 84:6,7
87:21 89:21 93:11

**Time-out** 64:8

**times** 6:17,18,23,24
28:24 31:15 64:2
71:5 76:7

**timing** 84:1

**title** 66:22

**titled** 6:5 27:25
69:19 74:3,7 79:12

**today** 6:13 7:7,11
33:18 40:16 85:24
88:20

**today's** 19:24 93:7,9

**told** 36:1 37:16
50:21 64:18 71:13

**Tom** 21:8 39:9

**tomorrow** 92:2

**top** 44:10 79:25

**tort** 27:15

**total** 45:3 86:19

**totaled** 26:13

**Toyota** 47:11

**track** 37:25

**trade** 23:17,20,25
24:3 27:3,4,10 43:7

55:13 57:14

**trademarks** 57:14

**traditional** 66:19
78:15,16

**transaction** 47:15,
20,21 48:7 63:11
64:10,22 65:19
66:20 67:3,14,21,24
68:8,9 73:12 77:21
82:19

**transactions** 31:10
46:8 69:12

**transcript** 91:19
93:8

**transfer** 66:22

**traveled** 29:23

**tremendous** 89:21

**trial** 19:13,15 26:3
84:11 85:25

**trillions** 77:20

**true** 63:7 91:6

**trust** 55:1

**truth** 7:4

**truthfully** 7:7,10

**Tuesday** 20:24

**twelve** 57:10

**twenty** 48:16

**two-and-** 37:19

**type** 26:15 30:19,25
31:3 70:22 71:9
73:18

**typed** 30:20 72:19

**typical** 30:8 82:18

**typically** 48:14 67:6
78:19

---

## U

**uh-huh** 7:23 50:18
61:10 69:3,21 80:11
93:2

**ultimately** 57:16

**underlying** 41:6
78:20 82:4

**underneath** 75:9

**understand** 6:12,25
7:3,25 8:1,5 28:11
34:20 47:3 48:22
54:23 68:24 85:10,
16,20 87:1,22,24

**understanding**
17:13,15 32:16 43:2
44:25 46:23 67:9
80:1 85:23

**understates** 80:23

**understood** 39:16,
18 70:9

**undertaken** 26:19

**unique** 37:4 86:6

**units** 37:6

**University** 9:1,3,12
10:9

**updated** 29:19

---

## V

**V1** 74:8,14,24

**V2** 74:3,24

**valuation** 11:16
12:17 15:22 50:16
55:22 70:16 75:25
76:4 81:19

**valuations** 18:12
51:17

**valued** 73:5,12 78:7

**values** 35:14 56:23
78:18

**vehicle** 65:4

**version** 38:25

**versus** 5:12

**video** 20:23 91:20
93:7

**Virginia** 10:8,10
50:13

**Virtually** 69:10

**visiting** 10:5 30:3

---

**W**

**walk** 13:10

**wanted** 61:4 84:1

**warrant** 66:23,24

**warranties** 66:18

**ways** 56:8

**wealth** 63:22

**Weather** 13:25 17:4,
22,25 25:9 30:6
33:15 36:9 40:20,22
42:18 45:20 47:3
53:17 55:5,12
58:16,17 59:1,9
60:11 63:3 64:6
65:6,18,19 67:11
68:1,16,17,24 71:25
78:12

**week** 22:11

**weighing** 75:13

**West** 65:19

**western** 30:6 36:9
37:13 44:8,14 47:2
53:18 60:11 68:25
78:12

**When's** 50:23

**white** 64:13

**widely** 72:10

**wife** 10:2,14

**word** 47:1 87:6,20
88:11

**words** 78:1

**work** 18:1,2,10,11,
24 19:1,2 26:15
29:11 31:9 35:4,6
41:6 90:5

**worked** 10:1 11:4
13:14,25

**Workforce** 57:13

**working** 13:3,20
14:11 18:23 30:12
36:8 38:22 82:24

**worth** 57:10 77:19
81:6 88:21

**write** 31:2,4

**written** 15:7 58:11
92:7

**wrongful** 24:9

**wrote** 31:1,4

---

**Y**

**y'all** 90:8

**year** 10:17,19 11:23
13:2 26:11 29:21
30:10 35:12 42:10
48:23,24 60:23 61:1

**year-end** 30:11

**years** 10:6,11 11:3
12:25 15:3 26:11,
13,24,25 29:21
33:14 34:4 51:8
58:4 70:25

**York** 50:13