# EXHIBIT 3

## In the Matter of:

## CONSOLIDATED INDUSTRIES, LLC

vs.

## JESSE A. MAUPIN, et al.

## BRIAN NAPPER

*June 10, 2025*



www.LexitasLegal.com
Ph.(615) 595-0073

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F. California Firm Registration #179

Page 3

```
 1                F E D E R A L   S T I P U L A T I O N S
 2
 3      IT IS HEREBY STIPULATED AND AGREED by and
 4   between the attorneys for the respective
 5   parties herein, that the sealing, filing and
 6   certification of the within deposition be
 7   waived;
 8      IT IS FURTHER STIPULATED AND AGREED that all
 9   objections, except as to form, are reserved to
10   the time of trial;
11      IT IS FURTHER STIPULATED AND AGREED that the
12   transcript of this deposition may be signed
13   before any Notary Public, with the same force
14   and effect as if signed before a clerk or
15   Judge of the Court;
16      IT IS FURTHER STIPULATED AND AGREED that all
17   rights provided to all parties by the F.R.C.P.
18   cannot be deemed waived, and the appropriate
19   sections of the F.R.C.P. shall be controlling
20   with respect thereto.
21
22                       ooOoo
23
24
25
```

Page 17

1    B. NAPPER
2    owning stock or shares in the company as being
3    an owner.
4        Q.   As do I.  Again, my question to
5    you after that was; being a member in an LLC
6    or being a partner in a partnership would also
7    qualify as an owner, so does that change any
8    of your previous answers?
9        A.   It does not.
10       Q.   Okay.
11            What about Ocean Tomo?
12       A.   Ocean Tomo, I was a shareholder
13   in Ocean Tomo.
14       Q.   You were?
15       A.   I was.
16       Q.   You're no longer?
17       A.   Since JS Held acquired us, I have
18   shares in JS Held.
19       Q.   So do you work for Ocean Tomo or
20   JS Held?
21       A.   JS Held.
22       Q.   What is your title at JS Held?
23       A.   Senior managing director.
24       Q.   What duties do you perform for
25   JS Held?

Page 18

1    B. NAPPER
2        A.   Same type of work I've described,
3    which is valuation work, outside of disputes,
4    and disputes work and advisory work.
5        Q.   Do you have any experience in
6    operating a business?
7        A.   I'm hesitating, Mr. Dollarhide,
8    because, again, I have run and been a leader
9    in very small consulting firms where I was one
10   of the leaders that would -- you could define
11   that as running the consulting group along
12   with two or three other people.
13       Q.   Do you have any experience in
14   operating a business that sold consumer goods?
15       A.   No.
16       Q.   You don't have any experience in
17   selling portable buildings?
18       A.   No.
19       Q.   Have you ever been in the
20   military?
21       A.   My father was, but, no, I was
22   not.
23       Q.   Have you ever been a party to a
24   lawsuit, have you ever been a plaintiff in a
25   lawsuit or named as a defendant in a lawsuit?

Page 19

1    B. NAPPER
2        A.   No.
3        Q.   Have you ever filed for
4    bankruptcy?
5        A.   No.
6        Q.   Has any business that you've been
7    an owner of filed for bankruptcy?
8        A.   No.
9        Q.   Have you been convicted of any
10   crime?
11       A.   No.
12       Q.   What did you do to prepare for
13   your deposition today?
14       A.   I reviewed my materials, my
15   reports, if you will, in this matter and
16   reviewed some of the underlying documents.
17   And then I reviewed a couple of days ago
18   deposition transcripts that have taken place
19   after my report was filed in this matter, I
20   think the date of the report was May 7, 2025,
21   so I think Ms. Coker, I briefly reviewed her
22   transcripts.  And there was another person
23   whom I can't remember whom I reviewed their
24   transcript.
25       Q.   What was the subject of the

Page 20

1    B. NAPPER
2    latter?
3        A.   I don't remember.
4        Q.   Do you remember if it was a
5    witness for the plaintiff or a witness for the
6    defendants?
7        A.   I think it was a witness for the
8    plaintiff.
9        Q.   Was it Tim Boyd?
10       A.   That sounds right, thank you.
11       Q.   Anyone else?
12       A.   I reviewed the deposition of
13   Scott Barrymore, I believe his deposition was
14   on the same day as my report was issued, but I
15   hadn't seen the transcript.
16       Q.   Did you speak with or meet with
17   anybody to prepare for your deposition today?
18       A.   Yes, I met with Mr. Pasternak.
19       Q.   Only Mr. Pasternak?
20       A.   I believe so.
21       Q.   When did y'all meet?
22       A.   Yesterday.
23       Q.   How long?
24       A.   An hour.
25       Q.   Anyone else present?

Page 21

1  B. NAPPER
2  A. No.
3  Q. What did you discuss?
4  A. We generally discussed one issue,
5  which was the information that was forthcoming
6  on the same day of the depositions
7  Mr. Pasternak reminded me that he was taking
8  the depositions of Scott Barrymore, I believe,
9  and Tim Boyd, if I'm not mistaken, if I have
10 those names right.
11 Q. Berryman.
12 A. Berryman, I'm sorry, the same day
13 that I was issuing my report, so he reminded
14 me of that, that I didn't have the
15 transcripts, and we just talked about the fact
16 that we had talked after that deposition, and
17 he'd given me sort of a download, if you will.
18 Q. A download of what?
19 A. Of what the testimony was that
20 same day.
21 Q. This was in the meeting
22 yesterday?
23 A. No, we'd had a phone call on the
24 afternoon of May 7, 2025.
25 Q. Did you meet with Mr. Pasternak

Page 22

1  B. NAPPER
2  between May 7th and yesterday?
3  A. I did not.
4  Q. What did you speak about
5  yesterday?
6  A. Again, we talked about the fact
7  that those deposition transcripts were not
8  available, those being the ones done on May 7,
9  2025, and so we briefly talked about that, and
10 I think he mentioned that Mr. Southard may
11 have attempted to do additional analyses, and
12 I didn't look at those.
13 Q. Okay.
14    Why didn't you look at those?
15 A. Well, I didn't know if it was
16 appropriate for him to supplement, so I didn't
17 review those -- I don't think it was a report,
18 I think it was some sort of schedule that
19 Mr. Southard had performed.
20 Q. Did you review that?
21 A. No.
22 Q. But you're aware of it?
23 A. I'm aware of it, yes.
24 Q. Did you became aware of it
25 through Mr. Pasternak?

Page 23

1  B. NAPPER
2  A. Yes.
3  Q. Did you ask to see the report?
4  A. I did not.
5     MR. PASTERNAK: Objection, there
6  is no report.
7  Q. Did you ask to see the schedules?
8  A. I did not ask to see them, no.
9  Q. Previously you said one of your
10 answers was referencing not proper for him to
11 supplement, is that something that you came up
12 with?
13 A. No, it's not -- I'm not a legal
14 expert; however, I have a lot of experience in
15 the space. And so -- but in any event, I just
16 didn't feel it was appropriate for me to be
17 looking at something that was not part of the
18 back and forth, the dates of the supplemental
19 and rebuttal type of reports, the schedule
20 from the case.
21 Q. So, walk me through how it came
22 to be that you became aware of this report or
23 the schedules, this additional analysis, but
24 it sounds like you made the decision not to
25 review it?

Page 24

1  B. NAPPER
2  A. No, I think it was more of a
3  joint decision. I asked -- well, I didn't
4  know whether there was leave to amend, if you
5  will, for lack of a better term for
6  Mr. Southard, I didn't see that in the
7  trial -- the case transcripts -- I'm sorry,
8  the case schedule. Because that's what we
9  looked at, I have a lot of cases and I track
10 when things are due. And I had not seen that,
11 and so the decision was made for me not to
12 review those, because one; didn't seem to be
13 consistent with the case schedule. And two;
14 it was literally the, you know, a day or two
15 before my deposition, and I didn't have time
16 to review the schedules.
17 Q. You talked with Mr. Pasternak for
18 an hour?
19 A. Yes.
20 Q. And you talked for an hour about
21 him reminding you of the fact that there were
22 transcripts that were not available on the
23 date of your report?
24 A. Yes, and a conversation we'd had
25 after those depositions, yes.

(615)595-0073
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.
California Firm Registration #179
21..24

Page 25

1              B. NAPPER
2      Q.   And in that hour, talking about
3  him reminding you that the transcripts weren't
4  available on May 7th, you didn't have time to
5  review schedules?
6      A.   I don't understand that question,
7  Mr. Dollarhide.
8      Q.   Do you know how many pages the
9  schedules were?
10     A.   No.
11     Q.   How would you know whether you
12 had time to review them or not?
13     A.   I take a lot of time to do any
14 kind of review of information, I don't just do
15 it on the fly, so I was certainly not
16 comfortable looking at schedules that have
17 been produced, in my words, late in this -- if
18 any opportunity to provide those schedules.
19     Q.   Do you not think that would be
20 helpful to the jury -- I mean, what I'm
21 getting at is, isn't -- do you understand what
22 the subject of Mr. Southard's supplemental
23 schedule was?
24     A.   No, not really.
25     Q.   You said additional analysis, do

Page 26

1              B. NAPPER
2  you know anything more than that?
3      A.   No.
4      Q.   Are you aware that it was
5  valuations using the three primary
6  methodologies of valuation of Weather King?
7      A.   That would be completely
8  inconsistent with the original analysis that
9  he performed.
10     Q.   One of the subjects of your
11 opinion in this case, or at least your report,
12 is that Mr. Southard did not conduct this
13 analysis, that was one of your criticisms of
14 him, was it not?
15     A.   It was one of my observations
16 that he only used one approach for valuation,
17 correct.
18     Q.   So his supplement, the schedule
19 conducts those valuations that you observed
20 that he did not do, so what I'm asking you now
21 is, if was noteworthy enough for you to put it
22 in your report that he did not do those
23 things, you didn't find it important enough to
24 review when he actually did it?
25     A.   When he actually did the

Page 27

1              B. NAPPER
2  supplemental analysis?
3      Q.   Right.
4      A.   I don't know when he did those,
5  but it was, again, my understanding that was
6  not consistent with the case schedule to have
7  an opportunity to do a rebuttal to -- and even
8  a supplement, if you want to call it that, to
9  his report.
10     Q.   So would you agree with me that
11 the case schedule is very important?
12     A.   I don't know what you mean by
13 important, it's more that it --
14     Q.   Well, would you agree with me
15 that the case schedule, we have to adhere to
16 it?
17     A.   We should adhere to it, yes.
18     Q.   Is there any reason why we would
19 go around the case schedule or disregard the
20 case schedule?
21     A.   I don't know what folks'
22 motivations are for disregarding the case
23 schedule.
24     Q.   You didn't want to disregard the
25 case schedule to look at Mr. Southard's

Page 28

1              B. NAPPER
2  supplement, did you?
3      A.   I've explained, Mr. Dollarhide,
4  that that was one of the reasons, the second
5  reason is, it came in quite late and I have
6  other cases to work on as well, and I don't
7  have any of the underlying documentation if
8  indeed he used -- Mr. Southard used three
9  different approaches, instead of the primary
10 one or the only one he used in his previous,
11 there must be documents, underlying documents,
12 that he should be producing as well, so I can
13 actually look at it and understand it.  And I
14 didn't have access to any of that information.
15     Q.   Okay.
16         Did you make any notes from your
17 conversations with Mr. Pasternak?
18     A.   No.
19     Q.   Do you have any notes from your
20 analysis at all?
21     A.   No.
22         MR. DOLLARHIDE:  Let's mark this
23 as Exhibit 2 (handing).
24         (Expert report was marked as
25 Plaintiff's Exhibit 2, for

(615)595-0073
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.
California Firm Registration #179
25..28

Page 225

1          B. NAPPER
2     Q.    All right, turning to Page 30,
3  Paragraph 76, you say there are different
4  methods to calculate damages for trade secret
5  misappropriation, you understand that DTSA
6  provides damages for actual loss, unjust
7  enrichment or reasonable royalty, that's from
8  the Federal Defend Trade Secrets Act; is that
9  right?
10    A.    Correct.
11    Q.    And, do you have any opinion
12 about the Tennessee Uniform Trade Secrets Act
13 and what remedies it provides?
14    A.    Not that I recall.
15    Q.    You choose not to offer the jury
16 any lost profit calculation, you're only
17 making observations about Mr. Southard's
18 report and then offering these two theories
19 that we are going to get to, why did you not
20 offer your own lost profits damages analysis?
21    A.    Well, first and foremost, the
22 term lost profits, doesn't appear anywhere in
23 Mr. Southard's report.
24    Q.    I'm not asking you about
25 Mr. Southard's report, I'm saying why didn't

Page 226

1          B. NAPPER
2  you offer your own lost profits analysis?
3     A.    I didn't think that was -- based
4  upon on the information I understand in this
5  case, the trade secrets at issue and the
6  breach of duty of loyalty, that lost profits
7  would be an appropriate approach.
8     Q.    Why is that?
9     A.    I think because there's
10 competition, I think from a high level
11 standpoint there's nothing preventing folks
12 from leaving a company and contacting former
13 customers. What I understand is that there's
14 allegations in this case of trade secrets
15 being misappropriated, which maybe helps make
16 sales, and the breach of duty of loyalty where
17 that happened too early, if you will, it
18 happened while the departing employees were
19 still at Weather King, so that's a different
20 concept of what the question you're asking.
21 So there's nothing wrong with competing for
22 customers in a marketplace.
23    Q.    Is it your testimony that there
24 was nothing wrong with what the defendants
25 did?

Page 227

1          B. NAPPER
2     A.    No, that's why I was trying to
3  differentiate, but you got distracted, I
4  understand that. So what I'm saying is that
5  that is because of the facts and circumstances
6  of the allegations in this case, I felt it
7  better to use trade secrets, misappropriation
8  damages, as I discussed in my report, and
9  breach of duty of loyalty and to try to
10 quantify the damages associated with each one
11 of those.
12    Q.    Why didn't you do that with
13 respect to tortious interference with business
14 relations?
15    A.    I wasn't asked to look at that.
16    Q.    What about civil conspiracy?
17    A.    Same, I was not asked to opine on
18 that.
19    Q.    Aiding and abetting?
20    A.    Not asked to opine on that.
21    Q.    Conversion?
22    A.    Not asked to opine on that.
23    Q.    Any other causes of action?
24    A.    No, but I will suggest,
25 Mr. Southard doesn't even list out any cause

Page 228

1          B. NAPPER
2  of action. None, zero. And he's Plaintiff's
3  damages expert, so I was kind of working in a
4  little bit of a vacuum.
5     Q.    Do you understand that lost
6  profits is a measure of damages available
7  under the Defend Trade Secrets Act?
8     A.    Actual lost, I think is how it's
9  described. I don't know about the
10 availability of lost profits under the DTSA,
11 I'm trying to recall if I've done that. But
12 could be because I don't think that -- yeah,
13 okay.
14    Q.    You don't think you've done that?
15    A.    I can't recall one way or the
16 other. I don't even know if Mr. Southard has
17 done that. But I'm giving more clarity; are
18 you suggesting to me that Mr. Southard did a
19 lost profit calculation? It doesn't say that.
20 And he did as a result of trade
21 misappropriation? Is that your -- are you
22 asking me to assume that he did that?
23    Q.    I think it's clear that you
24 assumed that he did not do that.
25    A.    I don't know what he did.